**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| ERIC GREATHOUSE, ERNESTO COVARRUBIAS, TIFFANY SUMRALL, BARBARA MYLES, CORI PERICHO, JOHN PINKNEY, JOSHUA SMITH and ALICIA MENA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CAPITAL PLUS FINANCIAL, LLC, CROSSROADS IMPACT CORP., ERIC A. DONNELLY and ROBERT H. ALPERT,<br><br>Defendants. | Case No. 4:22-cv-686<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiffs Eric Greathouse, Ernesto Covarrubias, Tiffany Sumrall, Barbara Myles, Cori Pericho, John Pinkney, Joshua Smith, and Alicia Mena (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, file this Class Action Complaint for damages, an accounting, and equitable relief against Capital Plus Financial, LLC ("CPF"), CPF's corporate parent, Crossroads Impact Corp. (formerly known as Crossroads Systems, Inc.) ("Crossroads"), CPF's and Crossroads's former dual CEO and dual Director Eric A. Donnelly ("Donnelly"), and Crossroads Board Chairman Robert H. Alpert ("Alpert") (collectively, the "Defendants"). Plaintiffs' claims arise from CPF's failure to fund U.S. Small Business Administration (the "SBA")-approved Paycheck Protection Program ("PPP" or the "Program") loans that CPF was contractually obligated to fund. In support, Plaintiffs allege the following based upon information and belief except as to the allegations pertaining to themselves which are based on personal knowledge. Plaintiffs' information and belief is based on the applicable facts of which

Plaintiffs are aware and the ongoing investigation of their counsel which included, among other things, a review of applicable documents, information from other litigation against Defendants, publicly available information concerning the PPP and PPP loans, filings with the U.S. Securities and Exchange Commission (the "SEC"), and media and other reports including information available on the Internet.

## Summary of the Claims

1.      Following the worldwide outbreak of COVID-19, Congress passed the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") to, among other things, provide some relief to America's small businesses and sole proprietors through the creation of the PPP.

2.      Administered by the SBA, the PPP was established to provide hundreds of billions of dollars of potentially forgivable loans to small businesses and sole proprietors in a quick and efficient manner using a standard form note and accompanying loan agreement documents that Plaintiffs and other PPP borrowers entered into with CPF.

3.       To ensure that small businesses and sole proprietors received PPP loan proceeds quickly, the applicable provisions of the PPP required lenders to fund PPP loans within ten days of SBA approval.

4.      Lenders that participated in the Program were entitled to fees payable by the SBA for each PPP loan the lenders processed.

5.      Defendant CPF was one of the SBA's authorized PPP lenders.

6.      Before the PPP, CPF was a small lender in the Texas area with approximately $36.6 million in total revenue in fiscal year 2020.

7.      At all times relevant in 2021, defendant CPF was wholly owned and operated by defendant Crossroads, and remains presently Crossroads's wholly owned subsidiary.  Crossroads is a publicly-traded for-profit holding company.  CPF is, and at all times relevant in 2021 was, controlled and dominated by Crossroads; shared certain of the same senior executives, including defendant Donnelly who, until August 30, 2021, served simultaneously as both CPF's and Crossroads's dual CEO and was and continues to be Crossroads's CEO and a Director of both CPF and Crossroads, as well as Farzana Giga ("Giga"), who also at all times relevant in 2021 and continuing through today served simultaneously as CPF's and Crossroads's dual CFO and a Director of both CPF and Crossroads and executed the standard form PPP loan notes entered into by CPF and the Plaintiffs and other putative members of the proposed class; had a website that referenced and promoted Crossroads and provided links to Crossroads's website; was referred to in Crossroads's SEC filings and other public statements as one and the same company; and was operated by Crossroads as if they were one and the same company.

8.      In 2021, after the SBA substantially increased the fees lenders would receive for PPP loans made in 2021, Crossroads caused CPF to exploit that increased fee opportunity by dramatically ramping up CPF's participation in PPP lending.  Defendants were hugely successful in that respect.

9.      In particular, CPF reportedly processed 472,036 PPP loans totaling over $7.5 billion through May 31, 2021 -- the second most PPP loans by any other lender in 2021, and more than the total number of PPP loans made in 2021 by Bank of America, PNC Bank, TD Bank and Wells Fargo *combined*.  *See* Paycheck Protection Program (PPP) Report: Approvals through 05/31/2021 (sba.gov) (last visited July 25, 2022).

10.     Although only CPF and not Crossroads was the qualified and approved SBA supervised PPP lender, Crossroads was the alter ego of CPF and, at the direction of defendants Donnelly and Alpert, caused CPF to upstream all or the vast bulk of its PPP lending fees directly to Crossroads.

11.     Accordingly, in its SEC filings, *Crossroads* reported that "the Company" received $970.5 million in total revenue of which $930 million was PPP loan fees in 2021 compared to just $27.5 million in total revenue the prior year. As stated in *Crossroads's* quarterly report filed with the SEC for the period ending July 31, 2021:

> "Total revenue from operations for the nine months ended July 31, 2021, was $970.5 million compared to $27.5 million for the same period of 2020. The increase in revenue was the result of *the Company* participating in the Payment Protection Program (PPP) administered by the Small Business Administration ('SBA'). *The Company* earned fees from the program totaling approximately $930.0 million."

*See* http://www.crossroads.com/wp-content/uploads/2021/09/CRSS_Q3-2021-OTC-Disclosure-Statement.pdf (last visited Dec. 23, 2021) (emphasis added).

12.     In flagrant disregard of its contractual loan agreement obligations to Plaintiffs and the other eligible class member borrowers, however, CPF failed to actually fund those borrowers' SBA-approved PPP loans.

13.     Plaintiffs and numerous other business owners across the country each timely applied for PPP loans with CPF, had their loans approved by the SBA and assigned PPP loan numbers, and yet never received their PPP loan funds.

14.     For its role in dominating and controlling CPF and in directing the conduct and exploiting CPF's status as an SBA-approved and supervised PPP lender, Crossroads not only received hundreds of millions of dollars in PPP loan fees -- including loan fees on the backs of the PPP loans of Plaintiffs and other putative borrower members of the proposed class across the

country that CPF failed to fund. It also, less than two months from when the PPP lending window closed on May 31, 2021, announced that as a result of its "windfall associated with the PPP loan program" it was "now overcapitalized" and would pay out a special dividend of $40 per share to shareholders of record as of July 19, 2021 totaling over $238 million, $157 million of which was rushed out and paid on or about July 26, 2021 to the handful of senior executives and directors of defendant Crossroads who collectively then owned approximately 66% of Crossroads's equity, of which defendants Donnelly and Alpert collectively received nearly $150 million, consisting specifically of $90,227,080 to Donnelly and $59,691,400 to Alpert.

15.     Additionally, according to Crossroads's Annual Report for the fiscal year ending October 31, 2021, Donnelly and Giga received base salaries of $350,000 and $300,000, respectively, and bonuses of $8,899,474 *each* for fiscal year 2021 total compensation.  *See* https://crossroads.com/wp-content/uploads/2022/01/FY-2021-Annual-Disclosure-Statement_CRSS.pdf (last visited July 26, 2022).

16.     In sum, while touting CPF's professed status as a certified B-Corp purporting to "promote economic vitality and community development" and "'hav[ing] seen firsthand the impact that the pandemic has had on minority-owned businesses in low-to-moderate income tracts'" as Crossroads stated in its January 11, 2021 news release (*see* Capital Plus Financial Partners with Blueacorn to Expedite PPP Loan Relief to Small Businesses (prnewswire.com), Defendants shamelessly enriched themselves off the backs of PPP loans to which Plaintiffs and other class member borrowers were contractually entitled but CPF failed to fund.

**Parties**

17.     Plaintiff Eric Greathouse ("Greathouse"), a natural person residing in Russellville, Arkansas, is a sole proprietor of an insurance inspection business.

18.     Plaintiff Ernesto Covarrubias ("Covarrubias"), a natural person residing in Santee, California, is a sole proprietor of an auto repair business.

19.     Plaintiff Tiffany Sumrall ("Sumrall"), a natural person residing in El Paso, Texas, is a sole proprietor of a landscape architectural business.

20.     Plaintiff Barbara Myles ("Myles"), a natural person residing in Raeford, North Carolina, is a sole proprietor of a business involving independent artists, writers and performers.

21.     Plaintiff Cori Pericho ("Pericho"), a natural person residing in Kamuela, Hawaii, is a sole proprietor of a messenger and delivery service business.

22.     Plaintiff John Pinkney ("Pinkney"), a natural person residing in Beaumont, Texas, is a sole proprietor of a cable communications business.

23.     Plaintiff Joshua Smith ("Smith"), a natural person residing in Sacramento, California, is an independent contractor involved in delivery service and human resource consulting.

24.     Plaintiff Alicia Mena ("Mena"), a natural person residing in Casa Grande, Arizona, operates a home housecleaning business.

25.     Defendant CPF is a limited liability company organized under the laws of the state of Texas with its principal place of business at 2247 Central Drive, Bedford, Texas 76021. According to Texas state records, defendant CPF's registered agent is defendant Donnelly, and Donnelly and Giga also at all times relevant in 2021 served as CPF's Directors and Managers.

26.     Defendant Crossroads is a publicly traded corporation organized under the laws of Delaware with its principal place of business at 4514 Cole Avenue, Suite 1600, Dallas, Texas 75205.

27.     Defendant Donnelly has served as a Director and as CEO of defendant Crossroads since December 2017.  As noted previously, Donnelly also simultaneously served as CEO of defendant CPF from 2014 until August 30, 2021, after Crossroads had declared and paid out in July 2021 the special dividend based on PPP loan fees CPF obtained and upstreamed to Crossroads pursuant to which Donnelly personally received over $90 million, in addition to the over $9 million in other total cash compensation he received in 2021 as CEO of Crossroads and any other compensation he may have received for 2021 from CPF.

28.     Defendant Alpert has served as Chairman of Crossroads's Board of Directors since October 2017.  Alpert is also the Co-Chairman and Co-CEO of P10, Inc. (formerly P10 Holdings, Inc.) ("P10"), a publicly traded investment firm that, itself or through its affiliates, including Enhanced Capital Group, provides investment advisory services to Crossroads.  P10 is headquartered at the same corporate headquarters as Crossroads.  *See* https://www.p10alts.com/ (last visited July 24, 2022).  Defendant Alpert's Co-CEO at P10 is C. Clark Webb ("Webb"), who also serves as a director of both P10 and, at all times applicable, Crossroads.  According to Crossroads's annual report for the fiscal year ending October 31, 2021, Crossroads reportedly has financed $7.5 million in loans for P10 or its affiliates, and CPF reportedly leases office space from an entity called 210 Capital whose principals are Alpert and Webb.

### Jurisdiction & Venue

29.     This Court has subject matter jurisdiction under the Class Action Fairness Act because at least one member of the proposed class is a citizen of a different state than defendants CPF and Crossroads; there are more than 100 members of the proposed class; and the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.  *See* 28 U.S.C. § 1332(d)(2)(A).

30.     This Court also has personal jurisdiction over each Defendant.

31.     The Court has personal jurisdiction over defendant CPF because CPF is organized under Texas law, its principal place of business is in the Fort Worth Division of the Northern District of Texas, and it undertook substantial and continuous business from this District concerning the claims at issue.

32.     The Court has personal jurisdiction over defendant Crossroads because Crossroads's principal place of business is in this District, and it undertook substantial and continuous business from this District concerning the claims at issue.

33.     Plaintiff Greathouse originally filed this litigation against defendants CPF and Crossroads on December 29, 2021 in the U.S. District Court for the Eastern District of Arkansas, where plaintiff Greathouse resides and was approved by the SBA for his PPP loan.  *See Greathouse v. Capital Plus Financial LLC*, Case No. 4:21-cv-01243-BRW (E.D. Ark.). Defendants CPF and Crossroads moved to dismiss under Fed. R. Civ. P. 12(b)(2), among other grounds, arguing that the Court there lacked personal jurisdiction.  Defendants CPF and Crossroads contended in their motion that personal jurisdiction in this District is proper.  *Id*. ECF 25 at 28-29 ("Apart from Plaintiff's own choice to file this case in Arkansas, there is no reason to believe that maintaining suit in Arkansas (subject to Defendants' 12(b)(1) and 12(b)(6) challenges set forth in this motion) would be more convenient or effective than doing so in, for example, Texas, where at least personal jurisdiction over Defendants could easily be established.").  By Order on July 19, 2022, the Court granted defendants CPF and Crossroads's motion to dismiss for lack of personal jurisdiction "without prejudice."  *See Greathouse v. Capital Plus Financial LLC,* Case No. 4:21-cv-01243-BRW (ECF 53) (E.D. Ark. June 28, 2022).

As a result, defendants CPF and Crossroads are also estopped from disputing that this Court has personal jurisdiction over Plaintiffs' claims against them.

34.     The Court has personal jurisdiction over defendant Donnelly because Donnelly at all times relevant had substantial and continuous contacts with Texas concerning the claims at issue by virtue of his simultaneous and dual roles as CEO and Director of Crossroads and CPF and CPF's Manager.  This Court also has personal jurisdiction over Donnelly because Donnelly purposefully conducted substantial activities in Texas on behalf of Crossroads and CPF relating to the claims at issue; the causes of action herein arise from and relate to those activities in and contacts with Texas; and the exercise of personal jurisdiction by this Court over Donnelly does not offend traditional notions of fair play and substantial justice.

35.     The Court has personal jurisdiction over defendant Alpert because Alpert at all times relevant had substantial and continuous contacts with Texas concerning the claims at issue by virtue of his role as Chairman of Crossroads's Board of Directors and as Co-CEO of P10 and the advisory services P10 directly or indirectly provided to Crossroads under Alpert's control and direction.  This Court also has personal jurisdiction over Alpert because Alpert purposefully conducted substantial activities in Texas on behalf of Crossroads and CPF relating to the claims at issue; the causes of action herein arise from and relate to those activities in and contacts with Texas; and the exercise of personal jurisdiction by this Court over Alpert does not offend traditional notions of fair play and substantial justice.

36.     Venue is proper in this judicial District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District. Defendant CPF's principal place of business is in the city of Bedford, Tarrant County, Texas, which is in the Fort Worth Division of the Northern District of Texas.

<u>**Additional Factual Allegations**</u>

**Background Concerning the**
<u>**COVID-19 Pandemic and the PPP**</u>

37.     On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a "pandemic." Two days later, on March 13, 2020, the United States declared a national emergency due to the COVID-19 pandemic.

38.     In response, on March 27, 2020, the United States Congress passed the largest economic stimulus package in the nation's history -- the CARES Act. The CARES Act amounted to over $2 trillion in aid, equivalent to roughly $6,000 per American, or 45% of all federal government spending for 2019.

39.     The CARES Act was enacted to provide immediate assistance to individuals, families, and businesses affected by the COVID-19 emergency.

40.     One facet of the CARES Act's approach to economic relief was the PPP. Recognizing the huge strain that the COVID-19 pandemic would likely impose on American small businesses, the PPP initially allocated $349 billion for loans to small businesses, sole proprietors, and nonprofit organizations, among others. These loans were intended to pay up to eight weeks of payroll costs (including benefits) and could also be used to pay interest on mortgages, rent, and utilities.

41.     PPP loans are guaranteed by the SBA, and the PPP provides for loan forgiveness if the borrower demonstrates that the funds were used in compliance with PPP regulations.

42.     The PPP has received several legislative renewals, modifications, and extensions. On April 24, 2020, the President signed the Paycheck Protection Program and Health Care Enhancement Act, which provided additional funding and authority for the PPP. On June 5, 2020, the Paycheck Protection Program Flexibility Act of 2020 was enacted, extending the

deferral period for PPP loans, among other provisions. On July 4, 2020, the PPP was further amended to guarantee PPP loans to August 8, 2020. On December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Economic Aid Act") was enacted, which further extended the PPP and allowed for the SBA to authorize second-draw PPP loans through March 31, 2021, available to borrowers who already used their previous PPP loan proceeds for permitted expenditures. On March 11, 2021, the American Rescue Plan Act was signed into law, adding an additional $7.25 billion for PPP loans, bringing total appropriations for the program to $813.7 billion. Finally, on March 30, 2021, the PPP Extension Act was enacted, which extended the PPP application deadline to May 31, 2021, and gave the SBA until June 30, 2021 to process loan applications.

43.     PPP loans are generally available to businesses in operation as of February 15, 2020 that had paid employees, as well as self-employed individuals. Businesses receiving PPP loans cannot have more than 500 employees and cannot be in bankruptcy. Further, applicants are required to certify that the "current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Currently, at least 60% of the proceeds must be used for payroll costs. The entire amount of any PPP loan is subject to forgiveness so long as the proceeds are used for eligible expenses.

44.     Under the Economic Aid Act, a PPP borrower is entitled to a second draw under narrower conditions than its first draw. For example, a second draw borrower must have 300 or fewer employees, must demonstrate that it sustained a certain percentage reduction in its gross receipts compared to 2019, and must have used its entire first draw proceeds prior to disbursement of its second draw proceeds. Second draw loans -- like first draw loans -- are also subject to forgiveness.

45.     Given the anticipated volume of PPP loan applications, Congress provided for PPP loan processing and funding through private lenders, with the SBA paying these lenders a fee for each processed PPP loan.

46.     For their participation, the PPP originally provided that lenders would receive fees at a rate of five percent for loans $350,000.00 or less, three percent for loans between $350,000.00 and $2,000,000.00, and one percent for loans over $2,000,000.00. *See* SBA Procedural Notice, Control No. 5000-20091 (Feb. 8, 2021), available at

https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20091%20-%202nd%20Updated%20PPP%20Processing%20Fee%20and%201502%20Reporting-508.pdf

(last visited Sept. 17, 2021).

47.     To address institutional lenders' neglecting of PPP loan applications from many small businesses -- especially minority, underserved, veteran, and women-owned businesses -- in favor of larger PPP loans, the Economic Aid Act added that lenders processing loans of up to $50,000.00 would receive an increased fee of fifty percent or $2,500.00, whichever is less, per PPP loan beginning December 27, 2020.

48.     As a result,  PPP lenders received a flat fee of $2,500 for virtually every PPP loan less than $50,000.00.

49.     On February 8, 2021, the SBA issued a new notice setting forth the procedure for how lenders would be paid PPP loan fees by the SBA. *Id*.

50.     To apply for a PPP loan, a prospective borrower would have to submit a standardized Borrower Application Form issued by the SBA (SBA Form 2483 for first time borrowers and SBA Form 2483-SD for second draw borrowers), together with relevant payroll

documentation, to a lender. Once the lender reviewed and approved the loan application, the lender would submit the application to the SBA for approval.

51.     Following SBA approval of an application, the SBA would issue a ten-digit loan identification number (known as a "GP [General Program] number") for the borrower's loan.

52.     Provided that the borrower had executed the loan documents, the lender was *required* to disburse the PPP funds within ten days of SBA approval and assignment of the loan number.  In particular, the SBA rule regarding PPP loan funding states, in relevant part, as follows:  "The lender *must* make a one-time, full disbursement of the PPP loan within 10 calendar days of loan approval; for the purposes of this rule, a loan is considered approved when the loan is assigned a loan number by SBA."  86 Fed. Reg. 3692, 3710 (emphasis added).

53.     If the PPP borrower did not sign and submit all of the required documents to the lender, then the PPP lender was required to report the loan and corresponding loan number as cancelled no later than twenty days from the SBA approval and assignment of the loan number. *Id*.

54.     Lenders' compliance with the above PPP funding requirement was of paramount importance to applicants and borrowers for reasons beyond their need to get the PPP loan proceeds in a timely manner.

55.     Once the SBA approved a PPP loan and assigned it a loan number, the applicant could not apply for a PPP loan with any other lender because the applicant could not make all of the required certifications on another PPP loan application. Thus, once approved, the borrower was essentially "stuck" with the lender to whom it applied for the PPP loan, meaning that the borrower had to rely exclusively on the good faith of the lender to actually fund the loan.

56.     For both first draw and second draw PPP loans, a PPP loan applicant had to certify that they had not and would not receive another first draw or second draw loan, respectively.

57.     Since the lender's obligation to fund a PPP loan ran from the date the SBA approved and assigned a loan number, an applicant could not certify to another lender that they would not receive the first loan even if the first lender had failed to timely fund the loan.

58.     Once a PPP loan was purportedly funded, the lender had ten days to submit an SBA Form 1502 to report to the SBA that the loan proceeds had been disbursed. After the lender submitted a Form 1502, the SBA would initiate payment of the processing fee to the lender.

59.     By submitting a Form 1502, the lender represented to the SBA that the PPP loan had been fully funded. Further, a lender was required to update the SBA with monthly Form 1502 reports detailing each PPP loan's status.

60.     The PPP was designed to make eligible PPP loans completely forgivable.  To be eligible to obtain forgiveness, however, PPP borrowers had to certify that the PPP proceeds were used only for qualified expenses consistent with the PPP.  Ironically, Crossroads itself obtained a PPP loan in the amount of $376,800.  As Crossroads stated in its own discussion of PPP loan forgiveness in its quarterly report for the period ending July 31, 2021:  "The principal amount of the PPP loan is subject to forgiveness under the Paycheck Protection Program upon the Company's request to the extent that the PPP Loan proceeds are used to pay expenses permitted by the Paycheck Protection Program, including payroll costs, covered rent, and mortgage obligations, and covered utility payments incurred by the Company.  The Company has applied for forgiveness of the PPP Loan for these covered expenses."  *See* https://crossroads.com/wp-

content/uploads/2021/12/CRSS_Q3-2021-OTC-Disclosure-Statement.pdf (at p. 22) (last visited July 26, 2022).

61.     Unlike Crossroads, however, Plaintiffs and other putative members of the class could not obtain forgiveness on their PPP loans because they could not represent that they had properly used PPP loan proceeds that they in fact never received from CPF.  Furthermore, and in addition to being unable to have their loans forgiven, Plaintiffs and other putative class members are and remain nevertheless bound under the PPP loan notes they and CPF entered into to pay back to CPF, *with interest*, PPP loan proceeds they never received.

**Background Concerning Defendants**

62.     CPF is a certified community development financial institution ("CDFI").

63.     CDFIs were established as part of the Riegle Community Development and Regulatory Improvement Act of 1994. *See* What Are CDFIs, available at https://www.cdfifund.gov/sites/cdfi/files/documents/cdfi_infographic_v08a.pdf (last visited Sept. 17, 2021).  There are reportedly 1,000 CDFIs operating nationwide. *Id.*

64.     CPF was acquired by the for-profit, publicly-traded company Crossroads in 2017 (OTCQX: CRSS ).

65.     Crossroads states in media releases and on its website that it is a holding company that focuses on investing in businesses that promote economic vitality and community development. *See, e.g.*, https://crossroads.com/ (last visited July 25, 2022).

66.     Since many sole proprietors' PPP loans were in amounts less than $10,000.00, PPP lenders were generating processing fees of only several hundred dollars for making those loans in 2020.

67.     Pursuant to the new 2021 increased fee schedule, however, lenders like CPF could count on collecting a $2,500.00 flat fee for virtually every PPP loan less than $50,000.00.

68.     Taking into consideration the incredible demand for PPP loans less than $50,000.00 by sole proprietors, independent contractors, self-employed individuals and other underserved small businesses together with the more lucrative fee schedule, CPF and its corporate parent Crossroads, at the direction of defendants Donnelly and Alpert, saw an opportunity to generate enormous amounts of lender fees by booking a high volume of PPP loans under $50,000.00.

69.     CPF and/or Crossroads reportedly contracted with loan service providers in 2021 such as Blueacorn PPP, LLC (and/or its affiliates and predecessors) ("Blueacorn") who helped identify borrowers to whom CPF could make PPP loans and assist in the PPP paperwork process.

70.     CPF also obtained referrals of PPP borrowers from what Donnelly referred to in his letter to shareholders that accompanied Crossroads's shareholder report for the fiscal quarter ended July 31, 2021 as "our community bank referral partners[.]"

71.     In general, only SBA section 7(a)-approved lenders were approved to make PPP loans, together with any additional lenders determined by the Administrator of the SBA and the Secretary of the U.S. Treasury to also be qualified to make such loans. *See* 86 Fed. Reg. 3692 (Jan. 14, 2021), available at https://www.federalregister.gov/documents/2021/01/14/2021-00451/business-loan-program-temporary-changes-paycheck-protection-program-as-amended-by-economic-aid-act (last visited July 27, 2022).

72.     Plaintiffs and other similarly situated class member borrowers contracted with CPF as the SBA-approved lender obligated to make the PPP loans.

73.     By virtue as their positions and status within CPF and Crossroads, defendants Donnelly and Alpert had the power and authority to exercise substantial control over, and did in fact exercise substantial control over, the business affairs of defendants CPF and Crossroads at all times relevant, including concerning the PPP lending at issue.  Defendants Donnelly and Alpert helped lead in establishing corporate policy regarding CPF's and Crossroads's PPP lending activities; had and continue to have access to material nonpublic information regarding those PPP lending activities; and caused CPF and Crossroads to engage in the breaches of legal duty to Plaintiffs and the other similarly situated SBA-approved but unfunded putative members of the class.

**Defendants' Exploit PPP Lending**

74.     Before becoming a PPP lender, CPF was a small, regional lender whose total revenue from operations for the fiscal year ending October 31, 2020 was $36.6 million.

75.     At the direction and under the control of defendants Donnelly, Alpert and its corporate parent Crossroads, CPF exploited the increased fees to be paid by the SBA on smaller PPP loans in 2021 by reportedly agreeing to fund 472,036 PPP loans totaling over $7.5 billion in loan proceeds -- again, the second highest number of loans by any lender in 2021, and more loans than Bank of America, PNC Bank, TD Bank and Wells Fargo combined.  *See* SBA, Paycheck Protection Program (PPP) Report, Approvals through 5/31/2021, p. 7, available at https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf (last visited July 25, 2022).

76.     As a result, Crossroads (not CPF) publicly reported that it "earned fees from the [PPP] totaling approximately $930 million" according to its quarterly report filed with the SEC

for the period ending July 31, 2021.  *See* Microsoft Word - Q2-2022 OTC Disclosure Statement v5.docx (crossroads.com) (last visited July 25, 2022).

77.     On June 14, 2021, Crossroads released its consolidated financial results for the fiscal quarter ending April 30, 2021. Crossroads disclosed that its "[g]ross origination fees associated with PPP loans totaled $464.1 million for the quarter," and that Crossroads "[e]xpects to accrue a total of $1.1 billion in deferred gross origination fees from the [PPP]."  It also disclosed that, as of April 30, 2021, Crossroads "held a cash balance of $213.1 million compared to $2.6 million as of October 31, 2020."

78.     Crossroads also stated in its June 14, 2021 financial report as follows (emphasis added):

> "In the last several months, Capital Plus has transformed from a regional single-family mortgage-based lending institution into ***one of the country's largest providers of small business loans***," said Eric A. Donnelly, Chief Executive Officer of Crossroads Systems. When the SBA announced its reopening of the program in January, we immediately identified strong synergies between the program's focus on small businesses and Capital Plus's core mission as a CDFI. Together with our loan service providers, we established early incumbency as the go-to institution for small business owners, independent contractors, and sole proprietors. Financially, our success in the program has put us into the ***best position we have ever been in, netting us more than $150 million in operating income for the quarter***. ***At a record cash position***, we are well-capitalized to support the future growth initiatives that will drive our double bottom line. We will provide a more detailed review of the quarter and these growth initiatives in the near future upon the completion of PPP." (emphasis added).

79.     In a July 8, 2021 letter to Crossroads' shareholders, Donnelly again touted "our" success in PPP lending, stating as follows:

> "Within just five months, we have approved 472,036 loans at an average amount of $16,062. In total, this amounts to …. As a result of our early dominance in PPP lending, Capital Plus was ranked the fourth largest PPP lender by net dollar amount and the second largest by the number of loans approved."

80.     According to a July 2021 investor presentation, corporate insiders of Crossroads then owned approximately 66% of Crossroads' equity, including specifically as follows:  Alpert, 1,492,285 shares, or 25% of Crossroad's total outstanding shares; Donnelly, 2,255,677 shares, or 37.8% of Crossroad's total outstanding shares; and Giga and Crossroads Board members James Perez Foster, Claire Gogel, Ray Kembel and Webb collectively, 194,440 shares, or 3.3% of Crossroad's total outstanding shares.  *See* Providing Affordable Housing and Financing for Families (wpengine.com) at p. 20 (last visited July 27, 2022).

81.     Thus, in sum, the corporate insiders and directors of Crossroads owned 3,942,402 shares, or approximately 66%, of Crossroads's 6,171,984 total outstanding shares as of July 2021, with defendants Alpert and Donnelly together owning approximately 62.8%. *Id.*

82.     On July 8, 2021 -- following its receipt of hundreds of millions of dollars in PPP loan fees, including for Plaintiffs and numerous other class member PPP loans CPF failed to actually fund -- Crossroads announced in a letter to shareholders signed jointly by defendants Alpert and Donnelly that, based on its "windfall associated with the PPP loan program" it was "now overcapitalized" and would pay out a special dividend of $40 per share to its shareholders on July 26, 2021.  *See* Microsoft Word - CRSS FQ2 2021 Shareholder Letter NO Enhanced - Final Draftdts.docx (crossroads.com) (at pp. 3-4).

83.     On July 15, 2021, Crossroads issued a news release stating the special dividend of $40 per share will be payable on July 26, 2021 to stockholders of record at the close of business on July 19, 2021, and that the total amount of the dividend would be approximately $238.9 million based on the number of Crossroads shares outstanding. *See* https://crossroads.mediaroom.com/2021-07-15-Crossroads-Systems-Provides-Additional-Information-on-Special-Dividend?pagetemplate=widgetpopup&printable.

84.     As a result, and based on the respective equity interests in Crossroads, Alpert received $59,691,400 in cash from the special dividend; Donnelly received $90,227,080; and Alpert, Donnelly, Giga and other corporate insiders and directors collectively received $157,696,080 of the approximately $238.9 million in total special dividend cash proceeds.

85.     According to Crossroads's quarterly report for the period ending July 31, 2021, "[t]otal revenue from operations for the nine months ended July 31, 2021, was $970.5 million compared to $27.5 million for the same period of 2020"; "[t]he increase in revenue was the result of *the Company* participating in the Payment [sic] Protection Program (PPP) administered by the" SBA (emphasis added); "[n]et operating income before taxes and non-controlling interest for the nine months ended July 31, 2021, was $320.2 million compared to $3.5 million for the same period of 2020"); "[n]et earnings per share from operations before taxes and after non-controlling interest for the nine months ended July 31, 2021, was $53.54 compared to $0.51 for the nine months ended July 31, 2020"; and "[t]he increase in the earnings per share was primarily due to *the Company's* participation in the PPP lending program" (emphasis added).

86.     Crossroads's quarterly report for the period ending July 31, 2021 also stated that "[t]he Company earned fees from the program totaling approximately $465.6 million for the quarter"; that "[t]he Company funded approximately **$6.1 billion** in PPP loans generating an annual interest rate of 1%" (emphasis added); that "[t]he Company funded approximately **400,000** loans during the period" (emphasis added); and that "[n]o such fees were earned during the quarter ended July 31, 2020."

87.     Although that July 31, 2021 quarterly report stated that "the Company" funded approximately 400,000 PPP loans for approximately $6.1 billion, SBA data indicates that CPF obtained over **$7.5 billion** from the federal government in total PPP loan advances to fund

**472,036** PPP loans.  *See* SBA, Paycheck Protection Program (PPP) Report, Approvals through 5/31/2021, p. 7, available at https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf (last visited July 25, 2022).

88.     In a letter to shareholders that accompanied Crossroads's shareholder report for the three months ended April 30, 2021, defendants Alpert and Donnelly corroborated the SBA's publicly available data of 472,036 PPP loans for over $7.5 billion specifically as follows:

> "Within just five months, we have approved 472,036 loans at an average amount of $16,062.  In total, this amounts to $7.6 billion in funding, more than 80% of which went directly to companies and independent contractors of color. As a result of our early dominance in PPP lending, Capital Plus was ranked the fourth largest PPP lender by net dollar amount and the second largest by the number of loans approved."[1]

89.     On December 14, 2021, Crossroads issued a news release reporting its fiscal year 2021 financial results. In that news release, Crossroads stated that its total fiscal year "revenues increased 2,446% to $932.7 million, up from $36.6 million in the comparative 2020 period"; that "[r]emoving PPP impact from the year's operations, total revenues were $34.9 million compared to $36.6 million in 2020"; that "[o]perating income increased 4,127% to $243.4 million, up from $5.8 million in 2020"; that "[t]he substantial increase in operating income was primarily due to origination fees associated with the Company's participation in the PPP loan program"; and that "[c]ash EPS (operating income less income to non-controlling interests) was $36.19, which was a 4,820% increase compared to $0.74 during the same period in 2020." *See*

---

[1]     Although previously posted on its website, Crossroads has now apparently deleted that shareholder letter from its website.  *See* http://crossroads.mediaroom.com/2021-07-08-Crossroads-Systems-Releases-Fiscal-Second-Quarter-2021-Shareholder-Letter.  Instead, Crossroads's website presently contains only the 2021 Q1 shareholder letter signed by defendants Alpert and Donnelly jointly, and the 2021 Q3 and 2021 Q4 and fiscal year end shareholder letters signed by defendant Donnelly alone. *See* https://crossroads.com/for-investors/ (visited July 26, 2022).  *See also* Microsoft Word - CRSS FQ2 2021 Shareholder Letter NO Enhanced - Final Draftdts.docx (crossroads.com) (last visited December 29, 2021).

https://www.prnewswire.com/news-releases/crossroads-systems-reports-fiscal-fourth-quarter-and-fiscal-year-2021-financial-results-301443835.html (last visited December 29, 2021).

90.     Crossroad's management referred to itself and CPF as if they were one also specifically in public communications to shareholders concerning the PPP, among other things. For example, the joint letter to shareholders of Alpert and Donnelly that accompanied Crossroads's report to shareholders for the three months ended April 30, 2021 stated that "the Company" had engaged in the PPP lending; that "[w]e were well equipped to lead the charge for the program's second draw as a result of *our* CDFI status" (emphasis added); that "[l]ast quarter we highlighted *our* intention to participate in the second federal PPP program" (emphasis added); that "*we* were able to issue and approve loan applications at an unprecedently rapid pace" (emphasis added); and, as noted, that "*we* have approved **472,036** loans" and that "this amounts to **$7.6 billion** in funding ..." (emphasis added).  *See* Microsoft Word - CRSS FQ2 2021 Shareholder Letter NO Enhanced - Final Draftdts.docx (crossroads.com) (last visited December 29, 2021).

91.     Defendants' exploitation of PPP lending for themselves and other insiders to the detriment of Plaintiffs and other SBA-approved but unfunded class members also enriched other Crossroads officials.  For example, whereas defendants Donnelly and Alpert owned 37.8% and 25%, respectively, of Crossroads's equity as of the July 2021 payment to them of over $149 million via the special dividend as alleged above, Donnelly and Alpert had reduced their equity stakes in Crossroads by the end of Crossroads's fiscal year on October 31, 2021 to, respectively, 12% and 9.1%, with Giga's equity position increased from less (and perhaps substantially less) than 3.3% as of July 2021, to 10.4% as of October 31, 2021.

92.    Adding insult to injury for the Plaintiffs and numerous other unfunded putative members of the class, Defendants also apparently now view their PPP lending as "nearly complete" -- meaning that CPF does not intend to even belatedly fund their loans, although the present whereabouts, or even potential disposition, of the PPPLF and other advances CPF obtained to fund the PPP loans of Plaintiffs and other class members remains presently unknown to Plaintiffs (and defendants CPF and Crossroads resisted producing, and in fact did not produce, any discovery when this litigation was pending in the Eastern District of Arkansas, including regarding the status of the unfunded PPP loan proceeds CPF obtained from the Federal Reserve). According to Donnelly's letter to shareholders accompanying Crossroads's report to shareholders for the fourth quarter and fiscal year ending October 31, 2021:

> "Today, our work within the PPP is nearly complete. We're continuing to work closely with the SBA to address the remaining loan forgiveness applications as efficiently as we can, not only to let us move forward, but also to let our loan recipients close this chapter in their lives as well. As of the end of the fourth quarter, we have completed about 62% or approximately 230,000 loan forgiveness applications, and we anticipate processing the remaining requests over the next few quarters. The process has been quite painless for the borrowers, and we are most appreciative of the SBA's direct forgiveness portal and incredible customer service team."

93.    In sum, at the direction and control of defendants Donnelly and Alpert, Crossroads participated directly and indirectly in the PPP loan processing through its common management and control and 100% ownership of CPF; exploited CPF's status as an SBA-approved CDFI PPP lender to enrich itself and defendants Donnelly and Alpert and other Crossroads corporate insiders to obtain fees on PPP loans CPF never funded, including the PPP loans of Plaintiffs and the other putative members of the proposed class; obtained millions of dollars in PPP lender processing fees including on the backs of the unfunded loans of Plaintiffs and the other putative members of the proposed class; and, in turn, improperly enriched itself and

its senior leadership from a federally-backed program Congress actually designed to assist the very members of the class here whose businesses were adversely impacted by the COVID-19 pandemic.

**CPF's Direct Participation in the**
**PPP Liquidity Facility**

94.     To facilitate lending under the SBA's PPP, the Federal Reserve supplied liquidity to CPF and other participating financial institutions through term financing to be secured by the PPP loans. *See* Board of Governors of the Federal Reserve System, Paycheck Protection Program Liquidity Facility (PPPLF), available at

https://www.federalreserve.gov/monetarypolicy/ppplf.htm (last visited Sept. 17, 2021).

95.     In particular, the Paycheck Protection Program Liquidity Facility ("PPPLF") was authorized under § 13(3) of the Federal Reserve Act "to facilitate lending by eligible borrowers [*i.e.*, PPP lenders] to small businesses under the [PPP]. … Under the Facility, the Federal Reserve Banks ('Reserve Banks') will lend to eligible borrowers [*i.e.*, PPP lenders] on a non-recourse basis, taking PPP Loans as collateral."  *See* Paycheck Protection Program Liquidity Facility Term Sheet, available at

https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20210625a1.pdf (last visited Sept. 17, 2021).

96.     Further, "[a]ll lenders that are eligible to originate PPP Loans are eligible to borrow under the Facility." *Id.*

97.     For CPF and other qualified CDFI PPP lenders, the lending Federal Reserve Bank was the Federal Reserve Bank of Cleveland. *Id.*

98.     Only SBA-guaranteed PPP loans are eligible to serve as collateral for PPPLF advances, and the principal amount advanced under the PPPLF was to be equal to the principal amount of the PPP loan pledged to secure the extension of credit. *Id.*

99.     By borrowing from the PPPLF, CPF received PPP loan advances exclusively for the purpose of funding SBA-approved PPP loans, and CPF pledged those loans, in turn, as collateral to secure those PPPLF loan proceeds.  The PPP provided that the funding for the PPP loans would only be advanced by the Federal Reserve after the SBA had approved the PPP loan and the PPP note and accompanying loan documents were signed.  To pledge a PPP loan as collateral and request a PPPLF loan advance, CPF had to complete and submit a Paycheck Protection Program Liquidity Facility PPP Pledge and Advance Request form (the "Advance Request Form").  *See*

https://www.frbdiscountwindow.org/generalpages/ppplf_historical_documentation. The Advance Request Form required CPF to provide information about each loan, and the PPP rules were incorporated into and a binding part of each PPP loan agreement.  *See* 15 U.S.C. § 9008(g) (requiring PPP lenders to make loans "under the criteria, terms, and conditions" set by the SBA and other applicable rules).

100.     CPF also repeatedly although falsely made numerous representations confirming its agreement to fund the loans of Plaintiffs and other SBA-approved but unfunded PPP borrowers.  For example, CPF obtained PPP loan processing fees by falsely representing to the SBA that CPF had funded Plaintiffs' and the other SBA-approved PPP loans CPF committed to fund but failed to fund.

101.     CPF received billions of dollars of advances through the PPPLF as specified more fully below, in addition to other PPP advances.

102.     In fact, although the PPP application period ended on May 31, 2021 and the life cycle of a PPP loan application should only take a few business days, CPF continued to receive substantial advances through the PPPLF between June 30, 2021 and July 30, 2021, after the deadline for processing loan applications.

103.     For example, between July 1, 2021 and July 30, 2021, CPF received at least three PPPLF cash advances each exceeding $30,000,000.00, and also received a total of $134,119,585.79 in PPP loan advances for the month of July 2021 alone.

104.     In particular, according to a report by the Federal Reserve to the U.S. Congress dated December 13, 2021 "PPPLF Transaction-specific Disclosures (XLSX)," CPF received the following specific cash advances from the PPPLF among other PPP funding:

| **Date of Advance** | **Amount** |
|---|---|
| 2021-02-02 | $2,178,040.41 |
| 2021-02-02 | $627,622.00 |
| 2021-02-11 | $5,708,115.06 |
| 2021-02-11 | $273,968.00 |
| 2021-02-11 | $2,710,413.00 |
| 2021-02-11 | $273,579.59 |
| 2021-02-11 | $2,129,648.45 |
| 2021-02-11 | $3,693,488.60 |
| 2021-02-11 | $5,512,672.14 |
| 2021-02-25 | $1,191,862.00 |
| 2021-02-25 | $1,906,418.00 |
| 2021-02-25 | $34,357.00 |
| 2021-02-25 | $1,291,742.00 |
| 2021-02-25 | $2,976,057.35 |
| 2021-02-25 | $541,239.00 |
| 2021-02-25 | $372,863.50 |
| 2021-02-25 | $57,626.00 |
| 2021-03-01 | $354,159.11 |
| 2021-03-01 | $5,647,969.98 |
| 2021-03-02 | $325,669.00 |
| 2021-03-02 | $4,378,004.32 |
| 2021-03-02 | $1,460,686.27 |
| 2021-03-02 | $182,176.50 |

| **Date of Advance** | **Amount** |
|---|---|
| 2021-03-02 | $215,785.00 |
| 2021-03-02 | $10,184,988.00 |
| 2021-03-02 | $586,175.75 |
| 2021-03-03 | $452,683.05 |
| 2021-03-03 | $2,161,402.00 |
| 2021-03-04 | $5,273,526.10 |
| 2021-03-09 | $5,825,425.32 |
| 2021-03-09 | $5,502,974.02 |
| 2021-03-09 | $791,045.97 |
| 2021-03-09 | $7,966,408.33 |
| 2021-03-10 | $4,144,182.85 |
| 2021-03-11 | $3,279,707.66 |
| 2021-03-15 | $22,298,842.23 |
| 2021-03-16 | $764,647.00 |
| 2021-03-16 | $17,845,001.09 |
| 2021-03-16 | $902,196.50 |
| 2021-03-16 | $1,794,125.60 |
| 2021-03-17 | $19,604,711.14 |
| 2021-03-18 | $14,608,755.33 |
| 2021-03-18 | $1,091,038.95 |
| 2021-03-19 | $12,415,131.15 |
| 2021-03-22 | $82,131,881.16 |
| 2021-03-23 | $54,386,988.50 |
| 2021-03-23 | $ 16,861,162.00 |
| 2021-03-23 | $27,003,647.85 |
| 2021-03-24 | $98,770,508.82 |
| 2021-03-25 | $10,147,992.90 |
| 2021-03-29 | $479,593.40 |
| 2021-03-29 | $6,760,457.63 |
| 2021-03-29 | $11,671,507.38 |
| 2021-03-29 | $11,310,627.52 |
| 2021-03-29 | $8,987,367.00 |
| 2021-03-29 | $8,840,001.43 |
| 2021-03-29 | $8,036,480.35 |
| 2021-03-29 | $7,579,378.00 |
| 2021-03-29 | $7,687,847.70 |
| 2021-03-29 | $5,476,010.00 |
| 2021-03-29 | $3,022,105.50 |
| 2021-03-29 | $2,097,367.75 |
| 2021-03-29 | $7,343,229.25 |
| 2021-03-29 | $5,352,732.72 |

| Date of Advance | Amount |
|---|---|
| 2021-03-29 | $3,907,229.00 |
| 2021-03-29 | $3,074,780.48 |
| 2021-03-29 | $2,324,503.09 |
| 2021-03-29 | $947,087.00 |
| 2021-03-29 | $2,505,979.50 |
| 2021-03-29 | $1,170,854.10 |
| 2021-03-29 | $4,357,560.50 |
| 2021-03-30 | $79,562,983.00 |
| 2021-03-30 | $102,496,216.00 |
| 2021-03-30 | $72,574,056.00 |
| 2021-03-30 | $84,507,665.00 |
| 2021-03-31 | $75,764,259.00 |
| 2021-04-01 | $9,549,671.89 |
| 2021-04-01 | $39,612,141.00 |
| 2021-04-02 | $243,075,429.00 |
| 2021-04-06 | $257,472,124.33 |
| 2021-04-06 | $132,444,399.00 |
| 2021-04-07 | $10,927,697.00 |
| 2021-04-07 | $62,021,483.00 |
| 2021-04-08 | $85,339,435.12 |
| 2021-04-08 | $259,374,000.00 |
| 2021-04-16 | $126,501,443.00 |
| 2021-04-16 | $181,211,831.00 |
| 2021-04-16 | $162,256,760.73 |
| 2021-04-16 | $16,005,416.00 |
| 2021-04-16 | $176,063,638.00 |
| 2021-04-20 | $15,295,725.00 |
| 2021-04-21 | $12,171,969.60 |
| 2021-04-21 | $5,953,438.16 |
| 2021-04-21 | $38,643,341.00 |
| 2021-04-21 | $96,987,237.00 |
| 2021-04-21 | $48,105,810.00 |
| 2021-04-23 | $58,507,134.00 |
| 2021-04-23 | $368,780,681.00 |
| 2021-04-23 | $327,135,009.82 |
| 2021-04-23 | $70,865,658.00 |
| 2021-04-26 | $114,086,044.00 |
| 2021-04-30 | $5,717,971.00 |
| 2021-05-03 | $1,765,216.00 |
| 2021-05-03 | $2,944,483.47 |
| 2021-05-03 | $2,096,650.00 |

| Date of Advance | Amount |
|---|---|
| 2021-05-04 | $2,293,625.00 |
| 2021-05-04 | $34,802,766.00 |
| 2021-05-06 | $2,125,832.00 |
| 2021-05-06 | $1,070,106.00 |
| 2021-05-06 | $616,115.00 |
| 2021-05-06 | $835,290.00 |
| 2021-05-07 | $365,435.00 |
| 2021-05-12 | $263,080,394.00 |
| 2021-05-12 | $33,579,305.00 |
| 2021-05-12 | $16,088,836.00 |
| 2021-05-12 | $5,443,630.00 |
| 2021-05-12 | $890,741.00 |
| 2021-05-12 | $1,413,197.00 |
| 2021-05-17 | $1,851,188.00 |
| 2021-05-17 | $1,577,688.00 |
| 2021-05-17 | $1,581,021.00 |
| 2021-05-17 | $8,630,450.25 |
| 2021-05-18 | $1,101,950.00 |
| 2021-05-18 | $577,710.00 |
| 2021-05-18 | $535,369,687.12 |
| 2021-05-20 | $33,419,154.94 |
| 2021-05-20 | $46,027,570.00 |
| 2021-05-24 | $11,859,766.00 |
| 2021-05-25 | $9,886,972.00 |
| 2021-05-25 | $2,365,516.00 |
| 2021-05-25 | $600,024.00 |
| 2021-05-25 | $1,831,023.00 |
| 2021-05-28 | $1,902,346.00 |
| 2021-05-28 | $5,249,415.00 |
| 2021-05-28 | $1,677,600.00 |
| 2021-06-02 | $2,478,525.99 |
| 2021-06-02 | $395,067.00 |
| 2021-06-02 | $574,919.00 |
| 2021-06-04 | $2,086,894.92 |
| 2021-06-04 | $834,823.00 |
| 2021-06-04 | $1,120,999.32 |
| 2021-06-04 | $80,299,469.78 |
| 2021-06-04 | $147,886,129.00 |
| 2021-06-10 | $1,805,560.00 |
| 2021-06-10 | $700,921.00 |
| 2021-06-10 | $1,143,936.00 |

| Date of Advance | Amount |
|---|---|
| 2021-06-10 | $12,226,237.00 |
| 2021-06-10 | $968,115.00 |
| 2021-06-16 | $1,729,026.00 |
| 2021-06-16 | $933,469.00 |
| 2021-06-16 | $46,130,527.00 |
| 2021-06-17 | $484,266.07 |
| 2021-06-17 | $542,102.00 |
| 2021-06-17 | $807,337.00 |
| 2021-06-18 | $49,044,789.00 |
| 2021-06-22 | $16,783,373.00 |
| 2021-06-23 | $515,136,782.00 |
| 2021-06-23 | $312,406,138.00 |
| 2021-06-24 | $8,087,276.00 |
| 2021-06-24 | $15,750,200.00 |
| 2021-06-24 | $23,444,948.00 |
| 2021-06-25 | $1,627,318.00 |
| 2021-06-25 | $1,400,035.00 |
| 2021-06-25 | $2,004,933.00 |
| 2021-06-25 | $1,331,199.00 |
| 2021-06-25 | $1,303,819.32 |
| 2021-06-25 | $149,773.00 |
| 2021-06-29 | $2,496,951.63 |
| 2021-06-29 | $538,849.00 |
| 2021-06-29 | $41,636.00 |
| 2021-06-29 | $126,344.00 |
| 2021-06-29 | $1,119,986.00 |
| 2021-06-29 | $179,504.00 |
| 2021-06-29 | $244,511.00 |
| 2021-06-29 | $26,324.00 |
| 2021-06-29 | $127,795.00 |
| 2021-06-29 | $144,425.00 |
| 2021-06-29 | $39,294.00 |
| 2021-06-29 | $114,014.00 |
| 2021-06-29 | $5,000.00 |
| 2021-06-29 | $1,140,000.00 |
| 2021-06-29 | $7,642,798.00 |
| 2021-06-29 | $101,233,693.33 |
| 2021-06-30 | $194,761.00 |
| 2021-07-01 | $35,891,616.00 |
| 2021-07-01 | $217,926.00 |
| 2021-07-01 | $436,360.00 |

| Date of Advance | Amount |
|---|---|
| 2021-07-06 | $38,610,016.00 |
| 2021-07-06 | $1,025,508.00 |
| 2021-07-06 | $62,496.00 |
| 2021-07-07 | $7,098,589.00 |
| 2021-07-13 | $1,219,924.00 |
| 2021-07-13 | $452,164.00 |
| 2021-07-14 | $385,525.00 |
| 2021-07-14 | $41,193,415.00 |
| 2021-07-29 | $239,725.00 |
| 2021-07-30 | $72,735.00 |
| 2021-07-30 | $6,304,677.00 |
| 2021-07-30 | $858,609.79 |
| 2021-07-30 | $32,930.00 |
| 2021-07-30 | $17,370.00 |
| *Total* | **$6,458,857,759.43** |

*See* Board of Governors of the Federal Reserve System, Paycheck Protection Program Liquidity Facility (PPPLF), available at https://www.federalreserve.gov/monetarypolicy/ppplf.htm (last visited Dec. 23, 2021).

105.    While CPF reportedly received over $6.4 billion in the specific PPPLF advances as noted above and $7.6 billion total per SBA data and Crossroads's SEC filings, CPF failed to actually fund PPP loans approved by the SBA for Plaintiffs and numerous other SBA-approved borrower members of the proposed class.  CPF failed to fund class member approved loans, moreover, despite having actually received the unfunded PPP loan proceeds via advances from the PPPLF secured by the PPP loans, including the PPP loans it failed to fund.

106.    Emails from Donnelly and other CPF officials reflect that Defendants knew of CPF's failure to fund SBA-approved PPP loans. For example, one such unfunded borrower wrote an email to Christopher Dalton ("Dalton") of the SBA on June 24, 2021 and stated as follows:

> "Hi Christopher, This is Minority women own small business for 14 years Covid 19 destroyed my business . SBA approved ppp loan . I email to Ms .Faranza giga capital plus , I got respond from Greg Jacobson i give him my information still no respond . 'I NEED HELP.' My lender is Capital Plus My loan no is . First draw ppp loan . Amount of loan is not big but for me is really helpful to restart my business . Thank you,"

Dalton forwarded that email to Donnelly and CPF employee Greg Jacobson on June 25, 2021.

107.    Further, CPF also had the opportunity and benefited from any interest or other income it obtained on the unfunded PPP principal proceeds it received from the PPPLF and otherwise from the Federal Reserve, while nevertheless failing to fund the SBA-approved PPP loans of Plaintiffs and the other SBA-approved putative borrower members of the proposed class.

108.    In moving to dismiss in this case in Arkansas defendants CPF and Crossroads glibly and callously cited other unrelated PPP litigation that has nothing to do with SBA-approved but unfunded PPP borrowers and asserted that "Plaintiff's misleading claim in this case, that CPF 'failed to fund' a loan it agreed to make, suggests that litigants seeking to exploit the PPP for private gain are simply running out of ideas."  *See Greathouse v. Capital Plus Financial, LLC*, Case No. 4:21-cv-01243-BRW (E.D. Ark.) ECF 25 at 11.  In truth, Plaintiffs -- who are small business owners involved, respectively, in insurance inspection, auto repair, landscaping, support for artists and writers, delivery services, cable services, and housekeeping -- are among the very intended beneficiaries that Congress designed the PPP to assist and CPF was contractually obligated but failed to fund.

**CPF's Failure to Fund
<u>Plaintiff Greathouse's PPP Loan</u>**

109.    When the pandemic began, Plaintiff Greathouse was, and continues to be, in the business of providing insurance inspection services in the Russellville, Arkansas area.

110.    Due to the pandemic, Plaintiff was not able to provide these services with the same frequency and, as a result, lost significant income.

111.    On or about April 8, 2021, Greathouse applied for a PPP loan with CPF. Greathouse submitted all requested documentation and information.

112.    On or about April 9, 2021, the SBA approved Greathouse's PPP loan application and assigned it a loan number (SBA Loan Number 9988328700).

113.    Greathouse was approved for a PPP loan in the amount of $15,665.00.

114.    On April 18, 2021, Greathouse received the standard form PPP promissory note (the "Note") and accompanying documents for him to sign.

115.    The Note identified the SBA loan number and amount, Defendant CPF as the lender and Plaintiff Greathouse as the borrower; set forth payment terms, potential events of default, CPF's rights in the event of default, and other terms and conditions; and provided the terms for Plaintiff Greathouse to repay the loan to CPF if it was not forgiven.

116.    The Note also included a standard form Additional and Correction Documents Agreement (Errors and Omissions Agreement) between CPF and Plaintiff Greathouse; a Business Purpose Statement; a Notice - No Oral Agreements bearing the signature CPF Chief Financial Officer Giga and Plaintiff Greathouse; a Written Consent of Governing Body form for Greathouse to represent that he is authorized to receive the loan and on which CPF may rely; an IRS W-9 Request for Taxpayer Identification Number and Certification; and an Information and Bank Account Certification and Authorization form identifying the bank or other account to which CPF was obligated to send the funds (collectively, the "Loan Documents").

117.    On April 18, 2021, Greathouse signed and returned the Loan Documents in order to obtain the $15,665.00 PPP loan.

118.    Also on April 18, 2021, Greathouse was advised by email that his loan was approved and is being funded.

119.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Greathouse never received the proceeds of his SBA-approved PPP loan.

120.    For example, Greathouse contacted and consulted with his local SBA office about CPF's failure to fund his PPP loan, and sent emails and made numerous telephone calls to CPF and Blueacorn to try to follow-up and get funded, all to no avail.

121.    On July 19, 2021, and following his complaints to the local SBA office and telephone calls again seeking funding, Greathouse was advised on July 19, 2021 that his PPP loan was being funded within an estimated three to six days.

122.    Although the SBA's records reported that Greathouse's PPP loan had actually been funded, Greathouse never received any PPP loan proceeds.

123.    The SBA's record of the alleged disbursement of Greathouse's loan proceeds was based on data CPF provided to the SBA.

124.    CPF's failure to fund Greathouse's SBA-approved PPP loan deprived Greathouse of funds that would have directly assisted in the operation of his business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund**
**Plaintiff Covarrubias's PPP Loan**

125.    When the pandemic began, plaintiff Covarrubias was, and continues to be, in the business of providing auto repair services in the Santee, California area.

126.    Due to the pandemic, plaintiff Covarrubias's business lost significant income.

127.     In or about May 2021, Covarrubias applied for a PPP loan with CPF. Covarrubias submitted all requested documentation and information.

128.     In May 2021, the SBA approved Covarrubias's PPP loan application and assigned it a loan number (SBA Loan Number 4713608906).

129.     Covarrubias was approved for a PPP loan in the amount of $8,332.00.

130.     On May 21, 2021, Covarrubias received the same standard form PPP promissory Note and accompanying standard form Loan Documents for him to sign that plaintiff Greathouse also received and signed.

131.     On May 21, 2021, Covarrubias signed and returned the Loan Documents in order to obtain the $8,332.00 PPP loan.

132.     Also on May 21, 2021, Covarrubias was advised by email that his loan was approved and is being funded.

133.     Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Covarrubias never received the proceeds of his SBA-approved PPP loan. Covarrubias attempted to contact CPF directly to get his loan funded, but was unable to reach anyone live with whom to speak. As he stated in a December 8, 2021 email to an SBA representative, there was a "lack of customer service and being able to get ahold of a live person being nonexistent made things worse."

134.     Covarrubias also contacted the SBA directly about CPF's failure to fund his PPP loan, and sent emails and made numerous telephone calls to CPF and SBA to try to follow-up and get funded, all to no avail.

135.     For example, Covarrubias sent an email to a SBA representative on November 29, 2021 stating "If the loan had been canceled and return why was I able to get approved for my

loan to be forgiven. Someone kept that money knowing that if I didn't get my loan forgiven I would be on the hook for paying it back. I would've been out of time to apply for the loan to be forgiven [] I would've been responsible for paying loan back if the loan was still in limbo." The SBA representative replied to him that same day by email stating "I understand this has happened to a lot of individuals, but therefore the SBA is program -- the bank utilize [sic] just like a mortgage done by Fanny/Freddie. Yes, it is backed by a Government program, but it is managed and held with a bank or lending institution. We don't approve, deny, or withdraw any requests, because they are not our loans."

136.    Similarly, in a September 29, 2021 email Covarrubias sent to the Blueacorn portal after Blueacorn refused to assist in getting CPF to fund his loan, Covarrubias sought further information regarding the whereabouts of the PPP loan proceeds he was approved by the SBA to receive, and which SBA records falsely showed were disbursed to him and as to which he was be obligated to repay plus interest:

> "First and foremost those documents I originally sent in where prove enough for the SBA to approve my loan and give me a loan number. Second had my loan been denied I wouldn't of received an email reminding me about the loan forgiveness. Why haven't I received an email from you or my lender telling me to get my loan forgiven. I know why because than you would be committing a fraud. What your trying to do is wait everyone out until the very last minute who has $8332 just laying around to pay the loan back when it could all just go away with the loan forgiveness, oh but wait what happens to the $8332 dollars of mine that the SBA approved who gets that money. Well that money who knows where it went it just disappeared it vanished along with thousands of other people's PPP loans that BLUE ACORN AND CAPITAL PLUS FINANCIAL HAVE STOLEN LIED ABOUT BEING DISBURSED. I NEVER RECEIVED NOT ONE PHONE CALL FROM EITHER BLUE ACORN OR CAPITAL PLUS FINANCIAL." (emphasis in original)

137.    Covarrubias still persisted in his efforts to actually get his SBA-approved loan funded.

138.    Although the SBA's records reported that Covarrubias's PPP loan had actually been funded, Covarrubias never received any PPP loan proceeds.

139.    The SBA's record of the alleged disbursement of Covarrubias's loan proceeds was based on data CPF provided to the SBA.

140.    CPF's failure to fund Covarrubias's SBA-approved PPP loan deprived Covarrubias of funds that would have directly assisted in the operation of his business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund**
**Plaintiff Sumrall's PPP Loan**

141.    When the pandemic began, plaintiff Sumrall was, and continues to be, in the business of providing landscape architectural services in the El Paso, Texas area.

142.    Due to the pandemic, plaintiff Sumrall was not able to provide these services with the same frequency and, as a result, lost significant income.

143.    On or about May 18, 2021, Sumrall applied for a PPP loan with CPF. Sumrall submitted all requested documentation and information.

144.    In May 2021, the SBA approved Sumrall's PPP loan application and assigned it a loan number (SBA Loan Number 5126489010).

145.    Sumrall was approved for a PPP loan in the amount of $4,095.00.

146.    Also in May 2021, Sumrall received the same standard form Note and accompanying Loan Documents for her to sign that plaintiff Greathouse received, and Sumrall signed and returned the Loan Documents in order to obtain the $4,095.00 PPP loan.

147.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Sumrall never received the proceeds of her SBA-approved PPP loan.

148.     For example, Sumrall contacted Blueacorn for any information it had about CPF's obligation to fund her loan and, by email on May 29, 2021, was told that "[i]f your application is SBA approved, you can be rest assured that your funds are secure and they will be transferred to your account." Sumrall replied as follows:

> "I understand you may be very busy but I have lost 2 people to COVID my business home and family a on the brink. There has been no light in sight. I have passed every identity verification process. I never once stated anything about fraud. Please explain why I was approved and signed your promissory note and have no money and now this. Please explain."

149.     Although the SBA's records reported that Sumrall's PPP loan had actually been funded, Sumrall never received any PPP loan proceeds.

150.     The SBA's record of the alleged disbursement of Sumrall's loan proceeds was based on data CPF provided to the SBA.

151.     CPF's failure to fund Sumrall's SBA-approved PPP loan deprived Sumrall of funds that would have directly assisted in the operation of her business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund**
**Plaintiff Myles's PPP Loan**

152.     When the pandemic began, plaintiff Myles was, and continues to be, in the business of providing services to independent artists, writers and performers in the Raeford, North Carolina area.

153.     Due to the pandemic, plaintiff Myles's business was damaged and, as a result, lost significant income.

154.     In or about May 2021, Myles applied for a PPP loan with CPF.

155.     Also in May 2021, the SBA approved Myles's PPP loan application and assigned it a loan number (SBA Loan Number 5742309006).

156.     Myles was approved for a PPP loan in the amount of $11,497.00.

157.     In May 2021, Myles received and properly signed and returned the same standard form Note and accompanying Loan Documents that plaintiff Greathouse received.

158.     Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Myles never received the proceeds of her SBA-approved PPP loan.

159.     For example, in an email on August 11, 2021, Myles summarized her experience as follows:

> "I also can show text messages beginning in 10/2019 until this year. I began proceedings for this singing competition in October 2019, communicated with the Director at Cole Auditorium in February 2020. I have the messages. Also, if you requested all of the information that you stated I did not present to you, I would like to know when, how, and a completed copy of what you were requesting. I was never to start the business because of the pandemic so there wasn't any taxes to file, no revenue, nothing. And finally, if you needed all of the documentation that you claim I did not submit, why was I ever approved and sent a check to my bank account?
>
> I will expect answers, I will not allow you all to treat me this way, and I will fight for my right to have the check that was sent to me, returned. My account had not been negative for a long time, but because I was informed that I had been approved, I went in debt to open a business bank account, pay over $2000 for a website, and many meetings.
>
> I want the funds I was approved for returned to me or we will be in the news. And don't say I am threatening you because I am not.... this is a promise. You will not give and then take back, and think you're going to get away with it."

160.     Although the SBA's records reported that Myles's PPP loan had actually been funded, Myles never received any PPP loan proceeds.

161.     The SBA's record of the alleged disbursement of Myles's loan proceeds was based on data CPF provided to the SBA.

162.    CPF's failure to fund Myles's SBA-approved PPP loan deprived Myles of funds that would have directly assisted in the operation of her business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund**
**Plaintiff Pericho's PPP Loan**

163.    When the pandemic began, plaintiff Pericho was, and continues to be, in the business of providing delivery services, including of exotic tropical fruit to the market and for export, in the Kamuela, Hawaii area.

164.    Due to the pandemic, Pericho was not able to provide these services with the same frequency and, as a result, lost significant income.

165.    In or about March 2021, Pericho applied for a PPP loan with CPF.  Pericho submitted all requested documentation and information.

166.    On or about April 1, 2021, the SBA approved Pericho's PPP loan application and assigned it a loan number (SBA Loan Number 4624888700).

167.    Pericho was approved for a PPP loan in the amount of $20,832.00.

168.    On April 7, 2021, Pericho received the standard form PPP promissory note and accompanying Loan Documents for her to sign.

169.    Also on or about April 7, 2021, Pericho signed and returned the Loan Documents in order to obtain the $20,832.00 PPP loan.

170.    Subsequently in April 2021, Pericho was advised by email that her loan was approved and is being funded.

171.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Pericho never received the proceeds of her SBA-approved PPP loan.

40

172.     Although the SBA's records reported that Pericho's PPP loan had actually been funded, Pericho never received any PPP loan proceeds.

173.     The SBA's record of the alleged disbursement of Pericho's loan proceeds was based on data CPF provided to the SBA.

174.     CPF's failure to fund Pericho's SBA-approved PPP loan deprived Pericho of funds that would have directly assisted in the operation of her business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund**
**Plaintiff Pinkney's PPP Loan**

175.     When the pandemic began, plaintiff Pinkney was, and continues to be, in the business of providing cable communication services in the Beaumont, Texas area.

176.     Due to the pandemic, Pinkney was not able to provide these services with the same frequency and, as a result, lost significant income.

177.     In April 2021, Pinkney applied for a PPP loan with CPF.  Pinkney submitted all requested documentation and information.

178.     Also in April 2021, the SBA approved Pinkney's PPP loan application and assigned it a loan number (SBA Loan Number 5588248703).

179.     Subsequently in April 2021, Pinkney was approved for a PPP loan in the amount of $20,832.00.

180.     On April 8, 2021, Pinkney received the standard form PPP promissory note (the "Note") and accompanying Loan Documents for him to sign.

181.     On or about April 8, 2021, Pinkney signed and returned the Loan Documents in order to obtain the $20,832.00 PPP loan.

41

182.    Subsequently in April 2021, Pinkney was advised by email that his loan was approved and is being funded.

183.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Pinkney never received the proceeds of his SBA-approved PPP loan.

184.    Although the SBA's records reported that Pinkney's PPP loan had actually been funded, Pinkney never received any PPP loan proceeds.

185.    The SBA's record of the alleged disbursement of Pinkney's loan proceeds was based on data CPF provided to the SBA.

186.    CPF's failure to fund Pinkney's SBA-approved PPP loan deprived Pinkney of funds that would have directly assisted in the operation of his business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund**
**Plaintiff Smith's PPP Loan**

187.    When the pandemic began, plaintiff Smith was, and continues to be, in the business of providing services as a driver for Uber and Lyft, and also doing human resource consulting in the Sacramento, California area.

188.    Due to the pandemic, Smith was not able to provide these services with the same frequency and, as a result, lost significant income.

189.    In or about April 2021, Smith applied for a PPP loan with CPF.  Smith submitted all requested documentation and information.

190.    Also in April 2021, the SBA approved Smith's PPP loan application and assigned it a loan number (SBA Loan Number 8472138707).

191.    Subsequently in April 2021, Smith was approved for a PPP loan in the amount of $19,582.00.

192.    On or about April 17, 2021, Smith received the standard form PPP promissory note and accompanying Loan Documents for him to sign.

193.    Also on or about April 17, 2021, Smith signed and returned the Loan Documents in order to obtain the $19,582.00 PPP loan.

194.    Subsequently in April 2021, Smith was advised by email that his loan was approved and is being funded.

195.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Smith never received the proceeds of his SBA-approved PPP loan.

196.    Although the SBA's records reported that Smith's PPP loan had actually been funded, Smith never received any PPP loan proceeds.

197.    The SBA's record of the alleged disbursement of Smith's loan proceeds was based on data CPF provided to the SBA.

198.    CPF's failure to fund Smith's SBA-approved PPP loan deprived Smith of funds that would have directly assisted in the operation of his business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund**
**Plaintiff Mena's PPP Loan**

199.    When the pandemic began, plaintiff Mena was, and continues to be, in the business of providing house cleaning services in the Casa Grande, Arizona area.

200.    Due to the pandemic, Mena was not able to provide these services with the same frequency and, as a result, lost significant income.

43

201.    On or about April 5, 2021, Mena applied for a PPP loan with CPF.  Mena submitted all requested documentation and information.

202.    On or about April 10, 2021, the SBA approved Mena's PPP loan application and assigned it a loan number (SBA Loan Number 8311138706).

203.    Mena was approved for a PPP loan in the amount of $3,750.00.

204.    On or about April 9, 2021, Mena received the standard form PPP promissory note and accompanying Loan Documents for her to sign.

205.    Also on or about April 9, 2021, Mena signed and returned the Loan Documents in order to obtain the $3,750.00 PPP loan.

206.    Subsequently in April 2021, Mena was advised by email that her loan was approved and is being funded.  Mena received multiple emails stating that her PPP loan was approved for funding and actually being funded.  For example, an email on April 9, 2021 said "Congratulations – Your Loan is Being Funded by the SBA!"

207.    Mena took additional steps to actually obtain funding of her PPP loan including by contacting the SBA.  Among other things, Mena was told in emails on April 27, 2021 and again on April 29, 2021 that her PPP loan "application status is approved by the SBA and in the process of being funded.  This can take up to 10 business days from the date you signed your loan agreement while the money is being transferred."

208.    Mena persisted in her efforts to obtain funding and was actually advised by the SBA that CPF was aware of "a large number of loans" that were SBA-approved but unfunded[.]" In particular, by email on May 7, 2021, Kim Voss, Lender Relations Specialist, West Texas District Office of the SBA, replied to Mena and stated as follows: "Good morning, Farzana Giga is your lender and she can be contacted at fgiga@capitalplusfin.com and her phone number is

214-558 …. Just this week they have added additional employees to focus on this issue as they have had a large number of loans and are trying to get these funded as soon as possible."

209.     Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Mena never received the proceeds of her SBA-approved PPP loan.

210.     Although the SBA's records reported that Mena's PPP loan had actually been funded, Mena never received any PPP loan proceeds.

211.     The SBA's record of the alleged disbursement of Mena's loan proceeds was based on data CPF provided to the SBA.

212.     In fact, by email on September 21, 2021, the SBA sent Mena an email stating that she was eligible to apply for forgiveness on her PPP loan.  Like all Plaintiffs and other putative members of the class, however, Mena, could not properly apply for forgiveness because she never received the PPP loan proceeds and thus could not certify she used those proceeds consistent with the PPP.

213.     CPF's failure to fund Mena's SBA-approved PPP loan deprived Mena of funds that would have directly assisted in the operation of her business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund Other
SBA-Approved Class Member
Borrower PPP Loans**

214.     While defendants Crossroads and CPF also contended in their motion to dismiss plaintiff Greathouse's original complaint that "CPF is committed to its borrowers' satisfaction" and that "the vast majority of CPF's borrowers have reported no issues receiving their loans" (*see Greathouse v. Capital Plus Financial, LLC,* Case No. 4:21-cv-1243-BRW (E.D. Ark.); ECF

25 at ECF 9), the truth is that, in addition to Plaintiffs' experiences, numerous other PPP

borrowers across the United States have complained publicly about CPF's failure to fund their

PPP loans, examples of which include the following:

a.  "Capital Plus Financial has kept hundreds of people's PPP loans that were already
approved by the SBA." (Consumer Financial Protection Bureau Complaint
Database, Complaint No. 4409176, May 26, 2021,
https://www.consumerfinance.gov/data-research/consumer-complaints/, last
accessed Dec. 23, 2021);

b.  "I hope capital plus financial is shut down after this, and that's on god. They
deserve to lose all of their financial accreditations and business licenses. I have
never in my life been in a situation like this with a financial institution that cuts
off all methods of contact/communication for months at a time with zero
explanation." (Consumer complaint, June 2020,
https://www.reddit.com/r/Blueacorn/comments/nci8lm/just_got_off_the_phone_w
ith_an_sba_rep_in_tx/, last accessed Dec. 23, 2021);

c.  "[T] they don't have a ETA on when my funds will be sent to my account. They
do not have a phone to contact them, the lender Capital Plus Financial doesn't
have a way for me to contact. I have emailed the CEO of capital plus financial
every single day which is the lender and I have not heard anything from them at
all." (Consumer Financial Protection Bureau Complaint Database, Complaint No.
4348481, May 4, 2021, https://www.consumerfinance.gov/data-
research/consumer-complaints/, last accessed Dec. 23, 2021);

d.  "I signed on April 8th and it says that my friends have been transferred or
deposited and I have not seen a dime has anybody reported this to the SBA?"
(June 2021 Consumer Complaint,
https://www.reddit.com/r/PPPLoans/comments/ms0pzr/anybody_been_funded_by
_capital_plus_financial/gz92tah/?utm_source=reddit&utm_medium=web2x&cont
ext=3, last accessed Dec. 23, 2021);

e.  "If they broke they really need to just say that and send me to another lender or
something because at this point they owe me." (Consumer complaint, May 2021,
Facebook Group PPP Funding Group,
https://www.facebook.com/groups/442306946857529/posts/456065148815042,
last accessed Dec. 23, 2021);

f.  "They are making up the rules as they go, holding money that doesn't belong to
them. This is not what SBA intended." (Consumer complaint June 2021,
change.org, https://www.change.org/p/ppp-fraud-by-blueacorn-and-capital-plus-
financial-failure-to-deliver-sba-

[funds?utm_source=share_petition&utm_medium=custom_url&recruited_by_id=9
da43a80-c0d6-012f-2f2f-4040496dcccb](funds?utm_source=share_petition&utm_medium=custom_url&recruited_by_id=9da43a80-c0d6-012f-2f2f-4040496dcccb), last accessed Dec. 23, 2021); and

g.   "Other delay tactics are mistakes on bank account information you didn't make, an inability to correct mistakes you did make and an inability to reach anyone at both companies. They are holding funds and not delivering money to borrowers. SBA tells you to resolve with a lender you can't reach directly and never returns calls." (Change.org Petition: *Report PPP fraud by Blueacorn and Capital Plus Financial Failure to Deliver SBA Funds*, 147 supporters, last accessed Dec. 23, 2021).

h.   Cody Crane
"Please need assistance."

> Rodricus Hammonds
> "You get your assistance?"

Rodricus Hammonds
"I need help with understanding why my ppp funds hasn't been deposited into my account I signed my loan contract on the 18th of this month I received a email from my lender Capital Plus Financial stating that it would be disbursed into my account in 10 business days and its been over that period I have emailed and called and got no kind of response so can you please tell me what's going on"

> Malik fuller
> "You have no heard anything back have you??? Just think about it for a second. You have the CFO on this particular platform and she still will not help you or me???"
>
> Rodricus Hammonds
> "Malik fuller The Giga person is a he? And how could the sba agree with this lender it's a true lende4r the sba told me this that they is one of their lenders"
>
> Malik fuller
> "No it's a female"

Malik fuller
"This company is a scam!!! Many people like myself have been contacting this company with no assistance available."

> Rodricus Hammonds
> "So this company is a Scam"

Rodricus Hammonds
"Why is it so difficult to get answers from Capital Plus Financial or Blueacorn about our ppp loan funds being deposited"

Rodricus Hammonds
"Farzana Giga
        Capital Plus Financial has not funded my ppp loan yet I've signed all my loan contract documents on the 18th of April what's going on"

Mel Bonner
"Farzana Giga you are my loan officer for my Ppp loan. I was approved on April 8th 2021 signed my papers on the 19th of April. I have not received my deposit. I've got messages from blue acorn stating that my funds was sent to the federal reserve to be deposited but I called and the federal reserve said it is a lie. I keep getting messages says 7-10 business days and still nothing.  What is going on. I've also contacted the sba, the ftc and the attorney general in your state. If I don't hear anything back by the end of today then I will be taking legal action. Not to mention my address was publicly published and I did receive any money. So disappointed. Your company could at least address your customers that you have completely ignored."

Tavon Hughes
"I'm in the same boat, this is crazy"

*See* https://www.linkedin.com/in/farzana-giga-090064a/recent-activity/shares/.

215.    Indeed, defendants CPF and Crossroads have reportedly received so many complaints about CPF's failure to fund SBA-approved PPP loans that they actually had to add a warning to CPF's website about communications to CPF regarding PPP lending which stated as follows:

NOTICE CONCERNING THREATENING OR HARASSING
COMMUNICATIONS

The partnership of Capital Plus Financial and Blue Acorn has successfully served hundreds of thousands of individuals and small businesses through the funding of Paycheck Protection Program (PPP) loans.

Feedback from customers is always appreciated. Customer service remains our top priority.

However, we will not tolerate any threatening or harassing actions or communications from customers in any form.

48

Any communication from an applicant we deem threatening, harassing or intimidating will result in the immediate withdrawal of the loan.

Additionally, we will pursue all available criminal and civil legal avenues to defend and protect our companies and our associates. Our team includes former federal agents and prosecutors. We are working closely with federal, state, and local law enforcement to identify and prosecute those who would make threats against our companies or our associates. We will pursue these options to the fullest extent of the law.

*See* https://capitalplusfin.com/home/ (visited Dec. 26, 2021).

216.    CPF failed to fund the SBA-approved PPP loans of Plaintiffs and other Class member borrowers despite the fact that CPF itself participated in the Program directly also as a beneficiary, having received the PPP loan on April 13, 2020 of reportedly $376,800 as noted above.  *See*, *e.g.*, Capital Plus Financial LLC in Bedford, TX - SBA PPP Loan Data (Paycheck Protection Program) (federalpay.org) (accessed on Dec. 28, 2021).

<u>**Class Action Allegations**</u>

217.    Plaintiffs bring this action individually and on behalf of the following national class (the "Class"):

> **National Class:** All persons and entities in the United States who, in 2021, applied for PPP loans with defendant CPF as the lender for whom the SBA provided an SBA loan number, and who executed and submitted their Loan Documents but did not receive the PPP loan proceeds.

218.    Plaintiffs Covarrubias and Smith bring this action individually and also on behalf of the following California Subclass:

> **California Subclass:** All persons and entities in California who, in 2021, applied for PPP loans with defendant CPF as the lender for whom the SBA provided an SBA loan number, and who executed and submitted their Loan Documents but did not receive the PPP loan proceeds.

219.     Plaintiff Myles brings this action individually and also on behalf of the following North Carolina Subclass:

> **<u>North Carolina Subclass</u>:** All persons and entities in North Carolina who, in 2021, applied for PPP loans with defendant CPF as the lender for whom the SBA provided an SBA loan number, and who executed and submitted their Loan Documents but did not receive the PPP loan proceeds.

220.     Excluded from the Class and Subclasses are Defendants, any entities in which Defendants have a controlling interest, Defendants' agents and employees, any Judge to whom this action is assigned, and any member of such Judge's staff and immediate family.

221.     There is a well-defined community of interest among members of the Class and Subclasses, and the disposition of their claims in a single action will benefit the parties and the Court.

222.     The proposed Class and Subclasses meet each applicable requirement of Fed. R. Civ. P. 23.

223.     *Numerosity*: While the exact number of members of the Class and Subclasses are unknown at this time and can be determined by appropriate discovery, the Class and each Subclass includes numerous members such that joinder of all members is impracticable within the meaning of Rule 23(a)(1).

224.     *Ascertainability*: Names and addresses of members of the Class and Subclasses are available from Defendant CPF's records and potentially other sources including publicly available databases. Notice can be provided to the members of the Class and Subclasses through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in class action litigation.

225.     *Typicality:* Plaintiffs' claims are based on the same facts and legal theories as those of the other members of the Class and Subclasses which Plaintiffs seek to represent.

Plaintiffs and the members of the Class and Subclasses all similarly applied for PPP loans, had their loans approved by the SBA, but did not receive their PPP loan proceeds from CPF despite the parties' loan contracts.

226. *Adequacy*: Plaintiffs will fairly and adequately represent the interests of the members of the Class and respective Subclasses. Plaintiffs are adequate representatives of the Class and respective Subclasses as their interests align with the interests of the members of the Class and respective Subclasses, and Plaintiffs are represented by counsel skilled and experienced in class actions, including financial consumer and other class action litigation.

227. *Superiority:* A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action because the expense and burden of individual litigation makes it economically unfeasible for members of the Class and Subclasses to seek to redress their claims other than through a class action; if separate actions were brought by individual members of the Class and Subclasses, the resulting duplicity of lawsuits could lead to differing and inconsistent adjudications; and, absent a class action, Defendants are unlikely to be held accountable for CPF's failure to actually fund all applicable SBA-approved PPP loans.

228. *Predominance and Commonality*: Common questions of law and fact exist and predominate over any questions which affect individual members of the Class and Subclasses. Common questions of fact and law include, but are not limited to:

      a.     whether defendant CPF failed to fund SBA-approved PPP loans to Plaintiffs and other members of the Class and Subclasses in breach of its obligations to actually fund such loans;

      b.     whether CPF and Crossroads obtained fees for PPP loans that CPF did not make;

      c.     whether CPF's corporate parent, Crossroads, controlled CPF and was unjustly enriched by obtaining fees for PPP loans;

      d.     whether CPF's failure to fund SBA-approved PPP loans violated the Loan Documents it entered into with Plaintiffs and other members of the Class and Subclasses;

      e.     whether defendants Donnelly and Alpert were unjustly enriched by CPF's PPP lending and CPF's failure to fund the SBA-approved PPP loans of Plaintiffs and the other members of the class; and

      f.     whether defendant CPF's failure to fund SBA-approved PPP loans and Crossroads's receipt of PPP loan fees damaged Plaintiffs and the members of the Class and Subclasses.

229.    Plaintiffs reserve the right to amend the definition of the Class and Subclasses if discovery or further investigation reveals that the definition of the Class or Subclasses should be amended.

**COUNT ONE**
**Breach of Contract**
**(Against CPF)**

230.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

231.    This Count is alleged by all Plaintiffs against only defendant CPF.

232.    The standard form promissory Note and accompanying Loan Documents that CPF and the members of the proposed Class entered into are binding, enforceable agreements. Among other provisions, the Note identifies the specific PPP loan, loan number and amount of the loan; specifies that the parties to the Note are, respectively, the Class member borrower and the "Lender" CPF; provides that, "[t]his loan is made pursuant to the PPP"; requires the borrower to pay back the principal of the loan plus interest if the PPP loan is not forgiven; contains other PPP loan repayment terms and events of default and the lender's rights in the event of the borrower's default; and contains general provisions, including specifically that "[a]ll individuals and entities signing this Note are jointly and severally liable[.]"

233.    In addition, the Additional and Correction Documents Agreement (Errors and Omissions Agreement) that accompanies the promissory Note between the Plaintiff class member borrowers and CPF provides additional terms and states, at the outset, explicitly as follows:

> "In consideration of Capital Plus Financial, LLC, located at 2247 Central Drive, Bedford, Texas 76021 (hereinafter called 'Lender') making the above loan, each of the undersigned, jointly and severally, do hereby agree as follows …."

234.    The Loan Document contracts entered into by CPF and the putative members of the alleged borrower Class also include a "Notice - No Oral Agreements" document that governs the "Loan by Lender, Capital Plus Financial, LLC to Borrower"; identifies each Class member borrower; and is executed by both CPF via its CFO Giga, and each putative Class member borrower.

235.    A complete copy of the Loan Document plaintiff Greathouse agreed to is attached to this Complaint as Exhibit A (with only plaintiff Greathouse's Social Security and bank account numbers redacted).

236.    Through its agreement to make PPP loans via the Loan Documents and as the counterparty to the Loan Documents and by virtue of the PPP and other applicable regulations that were a part of and incorporated into the Loan Documents, CPF entered into binding agreements with Plaintiffs and the members of the proposed Class to fund their respective PPP loans.

237.    Further, CPF had an implied duty to act in good faith and in accordance with fair dealing to take all steps necessary to fund Plaintiffs' and the Class members' PPP loans pursuant to the Loan Documents.

238.     In addition, CPF and its corporate parent Crossroads also acted consistent with, reaped the benefits of and made numerous representations confirming CPF's agreement to fund Plaintiffs' loans. For example, defendant Crossroads reported that "the Company" made $930 million in PPP loan fees by representing to the SBA that it had funded Plaintiffs' and other PPP loans. Defendant CPF also obtained billions of dollars from the PPPFL by pledging Plaintiffs' and other borrowers' loans as collateral. Defendant CPF could not properly secure PPPLF advances on loans it would not fund. Defendant CPF also consistently reported to the SBA that it had funded class members' loans.

239.     Defendant CPF breached its obligations to fund Plaintiffs' and the Class members' PPP loans under the Loan Documents by failing to fund their loans.

240.     Moreover, all PPP loan applications require applicants to certify that they have not, and will not, receive other PPP loans.

241.     As a result, once Plaintiffs and the other members of the Class applied for PPP loans and their loan applications were approved by the SBA and assigned PPP loan numbers pursuant to the Loan Documents, Plaintiffs and the Class members were no longer able to apply for PPP loans with other PPP lenders as they would not be able to certify that they would not receive another PPP loan.

242.     Plaintiffs and the Class members were therefore effectively bound to, and had to rely exclusively on, CPF to actually abide by their Loan Document commitments to provide them with the PPP loan funds that the SBA had already approved.

243.     As a result, CPF harmed Plaintiffs and the members of the Class in an amount to be determined at trial, but not less than the amount of the wrongfully withheld PPP loan proceeds plus all other applicable damages to the full extent permissible by law.

**COUNT TWO**
**Breach of Contract**
**(Against Crossroads)**

244.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

245.    This Count is alleged by all Plaintiffs against only defendant Crossroads.

246.    As more fully described above, Crossroads exercised control over CPF, operated with CPF as a single enterprise, held out in its SEC filings and other public statements that it was one and the same companies, controlled and participated in CPF's PPP loan processing practices, and exploited CPF's status as an SBA-approved CDFI lender to enrich itself, defendants Donnelly and Alpert and other corporate insiders through improperly obtained funds.

247.    Crossroads also exercised its control over CPF to cause CPF to "upstream" to Crossroads hundreds of millions of dollars in PPP-related loan processing fees and PPPLF loan advances, notwithstanding that CPF had not funded Plaintiffs' and Class members' loans on account of which CPF received those funds.

248.    Accordingly, Crossroads also breached the Loan Agreement contracts Plaintiffs entered into with CPF because Crossroads controlled the conduct of, and is thus also liable for, CPF's breaches of those contracts which is also imputed to Crossroads.

249.    As a result of the foregoing, Crossroads is liable to Plaintiffs and the putative members of the Class as CPF's alter ego, for the amount of the wrongfully withheld PPP loan proceeds plus all other applicable damages to the full extent permissible by law.

250.    Also as a result of the foregoing, the corporate veil of CPF should be pierced, and Crossroads is liable to Plaintiff and the putative members of the Class for the amount of the

wrongfully withheld PPP loan proceeds plus all other applicable damages to the full extent permissible by law.

## COUNT THREE
### Unjust Enrichment
### (Against Defendants Crossroads and CPF)

251.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein *except* all previous paragraphs that allege the existence of a contract between Plaintiffs and defendants CPF and Crossroads, including without limitation ¶¶ 12, 72, 216, 228(a) & (d), 230-50.  Defendants Crossroads and CPF have argued that there is no contractual obligation for CPF to fund Plaintiffs' PPP loans, and some courts have held that "a party may not incorporate by reference allegations of the existence of a contract between the parties in the unjust enrichment count."  *Gociman v. Loyola University of Chicago*, No. 21-1304, 2022 WL 2913751, at *8 (7th Cir. July 25, 2022).  Accordingly, for purposes of this Count only, Plaintiffs do not incorporate by reference their contract claims.

252.    This Count is alleged by all Plaintiffs against only defendants CPF and Crossroads.  Plaintiffs allege this Count only in the alternative, to the extent that Plaintiffs' breach of contract claims fail to adequately compensate Plaintiffs and Class members for CPF's and Crossroads's violations as alleged herein.

253.    Plaintiffs and Class members conferred a monetary benefit on defendants CPF and Crossroads.  Specifically, CPF used Plaintiffs' participation in the PPP and Plaintiffs' efforts to have CPF process and fund their PPP loans to obtain hundreds of millions of dollars in PPP loan processing fees, including from the PPP loans of Plaintiffs and other putative members of the proposed Class that never received their PPP loan proceeds.  Plaintiffs and Class members should have received those PPP loan proceeds but never did.

254.    Defendant Crossroads controlled and dominated defendant CPF and caused CPF to upstream to Crossroads the PPP loan processing fees CPF obtained even though CPF and not Crossroads was the SBA-approved PPP lender, including without limitation on the unfunded loans of the Plaintiffs and Class members.

255.    Defendants Crossroads and CPF understood the benefits they directly and indirectly received as a result of the Plaintiffs' and Class members' SBA-approved PPP loans and they accepted and retained those benefits. Defendants CPF and Crossroads profited from Plaintiffs' and Class members' PPP loans and used the funds resulting therefrom for the respective personal gain of themselves and certain of their senior executives including without limitation defendants Donnelly and Alpert as alleged more fully above.

256.    Under the principles of equity and good conscience, defendants CPF and Crossroads should not be permitted to retain any of the funds they received as a result of Plaintiffs' and Class members' unfunded loans, without having caused CPF to disburse those or other funds to fund the loans to which Plaintiffs and Class members were entitled.

257.    CPF did not fund those loans, and therefore did not provide full compensation for the benefit Plaintiffs and Class members provided.

258.    As a direct and proximate result of defendant CPF's and Crossroads's conduct, Plaintiffs and Class members have suffered and will suffer injury.

259.    Defendants CPF and Crossroads should not be permitted to unjustly enrich themselves at the expense of Plaintiffs and Class members, but in equity and good conscience should be required to make restitution for all funds acquired as a result of defendants' improper conduct.

260.     Defendants Crossroads and CPF should be compelled to provide an accounting of, and disgorge into a common fund or constructive trust for the benefit of Plaintiffs and Class members, all proceeds that they unjustly received as a result of Plaintiffs' and Class members' PPP loans.

## COUNT FOUR
**Unjust Enrichment**
**(Against Defendants Donnelly and Alpert)**

261.     Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

262.     This Count is alleged by all Plaintiffs against only defendants Donnelly and Alpert.

263.     Plaintiffs and Class members conferred a monetary benefit on defendants Donnelly and Alpert.  Specifically, via the special dividend declared by defendant Crossroads from the "windfall" it received from CPF's PPP lending, defendants Donnelly and Alpert received, respectively, $90,227,080 and $59,691,400 in cash, including for PPP loans of Plaintiffs and other putative members of the Class. Defendant Donnelly also received over $9 million in separate compensation from Crossroads in 2021; and defendants Donnelly and Alpert also received compensation for their roles as members of Crossroads's Board of Directors, in addition to any other compensation they may have received from CPF.

264.     Defendants Donnelly and Alpert appreciated and knew of the benefits they received as a result of these PPP lending activities and approved, accepted and retained those benefits.

265.     Defendants Donnelly and Alpert controlled both Crossroads and CPF.

266.     Defendants Donnelly and Alpert also controlled and directed Crossroads's and CPF's PPP lending activities.

267.     Defendants Donnelly and Alpert were unjustly enriched by receiving in July 2021 via Crossroads's special dividend millions of dollars in cash that came directly to CPF and was upstreamed to Crossroads from CPF's PPP loan processing fees, including for Plaintiffs' and other Class members' PPP loans that CPF failed to fund but which had to be pledged for CPF to receive the PPPLF advances and used by CPF to represent the loans were funded in order to obtain the loan processing fees, all as also alleged more fully above.

268.     Defendants Donnelly and Alpert profited from Plaintiffs' and Class members' PPP loan transactions and used the funds resulting therefrom for their personal gain, although Plaintiffs and Class members were injured because their loans were never funded.

269.     Under principles of equity and good conscience, defendants Donnelly and Alpert should not be permitted to retain the funds they received as a result of Plaintiffs' and Class members' unfunded loans.

270.     As a direct and proximate result of Plaintiffs' and the Class's PPP loan activities, defendants Donnelly and Alpert unjustly and personally profited, while Plaintiffs and the putative members of the Class were injured by being deprived of their PPP loan funding, all as alleged more fully above.

271.     Defendants Donnelly and Alpert should not be permitted to unjustly enrich themselves at the expense of Plaintiffs and Class members, but in equity and good conscience should be required to make restitution for all proceeds or funds they personally acquired or obtained as a result of the PPP loans of Plaintiffs and other SBA-approved but unfunded PPP borrowers of CPF.

272.     As a direct and proximate result of defendants Donnelly's and Alpert's conduct, Plaintiffs and the Class have suffered and continue to suffer injury.

59

273.    Defendants should be compelled to provide an accounting of all funds they personally acquired or obtained as a result of the PPP loans of Plaintiffs and other SBA-approved but unfunded PPP borrowers of CPF.

274.    Defendants should also be compelled to disgorge into a common or constructive trust, for the benefit of Plaintiffs and Class members, all proceeds or funds they personally acquired or obtained as a result of the PPP loans of Plaintiffs and other SBA-approved but unfunded Class member PPP borrowers of CPF.

**COUNT FIVE**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(Against All Defendants )**

275.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

276.    The California Unfair Competition Law ("UCL") defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

277.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

278.    Plaintiffs Covarrubias and Smith bring this claim individually and on behalf of the California Subclass against all Defendants.

279.    Plaintiffs Covarrubias and Smith have standing to bring this claim because they are, and at all times relevant were, residents of California and subject to the protection of the UCL.

280.    CPF's failure to fund SBA-approved PPP loans breached the Loan Documents and accompanying legal duties it owed plaintiffs Covarrubias and Smith and the other members of the California Subclass.

281.    As a result of its failure to fund the SBA-approved PPP loans, CPF obtained fees and other compensation to which it was not entitled, including fees on loans it never funded and loan proceeds rightfully belonging to plaintiffs Covarrubias and Smith and members of the California Subclass, and wrongfully deprived plaintiffs Covarrubias and Smith and the members of the California Subclass of PPP loan proceeds.

282.    When the PPP loans of plaintiffs Covarrubias and Smith and the California Subclass were approved by the SBA, these SBA-approved borrowers had a vested interest in the PPP loan proceeds which CPF wrongfully withheld.

283.    CPF's failures to fund these PPP loans thereby constitute a violation under the "unlawful" prong of the UCL.

284.    Similarly, CPF's failure to fund SBA-approved loans also constitutes "unfair" acts and practices under the UCL because CPF's acts and practices as alleged offend public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to plaintiffs Covarrubias and Smith and the members of the California Subclass.

285.    CPF's breaches of contract -- including not disbursing SBA-approved loan funds and "locking" these borrowers into CPF -- constitute an unfair practice because those breaches are immoral, unethical, oppressive, unscrupulous, or substantially injurious.

286.    Once the loan applications of plaintiffs Covarrubias and Smith and other similarly situated members of the California Subclass were approved by the SBA, these subclass member

borrowers had to rely exclusively on CPF to actually fund their PPP loans and were thereby precluded from seeking PPP loans from other lenders, also as alleged above.

287.    CPF's failure to fund PPP loans of plaintiffs Covarrubias and Smith and the other members of the California Subclass constitute unlawful and unfair business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200.

288.    As a result of CPF's violations of the UCL, plaintiffs Covarrubias and Smith and the members of the California Subclass are, in the alternative and to the extent that their breach of contract claim fails to adequately award their damages for CPF's violations as alleged herein, entitled to equitable relief, including specifically injunctive relief directing CPF to fund their SBA-approved loans in full with applicable interest from the date the loans should have been funded, or restitution for the amount of the wrongfully withheld PPP loan proceeds plus interest.

289.    Defendant Crossroads is liable to plaintiffs Covarrubias and Smith and the members of the California Subclass by virtue of its control of CPF and it being CPF's alter ego and by virtue of its direct participation in PPP lending and both its and CPF's violations and CPF's failure to fund the SBA-approved PPP loans at issue, all as also alleged more fully above.

290.    Defendants Donnelly and Alpert are liable to plaintiffs Covarrubias and Smith and the members of the California Subclass because they controlled and directed Crossroads's and CPF's PPP lending activities and directly participated in in CPF's and Crossroads's violations and failure to fund the SBA-approved PPP loans at issue and personally profited therefore, all as also alleged more fully above.

<u>COUNT SIX</u>
**North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. Ann. §§ 75-1.1, et seq.**
**(Against All Defendants)**

291.     Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

292.     Plaintiff Myles brings this claim individually and on behalf of the North Carolina Subclass against all Defendants.

293.     Plaintiff Myles has standing to bring this claim because she is, and at all times relevant was, a resident of North Carolina subject to the protection of the North Carolina Unfair and Deceptive Acts and Practices Act (the "NCUDTPA").

294.     The NCUDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."

295.     Defendant CPF advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by the NCUDPTA. *See* N.C. Gen. Stat. Ann. § 75-1.1(b).

296.     Defendant CPF engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, including:

a.     Representing to plaintiff Myles and members of the North Carolina Subclass their willingness to disburse SBA-approved loans by delivering to plaintiff Myles and members of the North Carolina Subclass copies of the Note for their signatures, and accepting the signed Notes; and

b.     Omitting, suppressing, and concealing the reasons why loans to plaintiff Myles and members of the North Carolina Subclass had not been disbursed.

297.     Defendant CPF's conduct constitutes "deceptive acts" in violation of the NCUDTPA.

298.     Defendant CPF's conduct constitutes "unfair acts" in violation of the NCUDTPA.

299.    Defendant CPF's representations and omissions and acts and omissions were material because they were likely to deceive reasonable consumers about their ability to secure SBA-approved loans from defendant CPF, and to preclude plaintiff Myles and other members of the North Carolina Subclass from seeking PPP loans from other lenders.

300.    Defendant CPF intended to mislead plaintiff Myles and members of the North Carolina Subclass and induce them to rely on their misrepresentations and omissions.

301.    Had CPF which was controlled and dominated at all material times by defendant Crossroads disclosed its intention to withhold the loan proceeds due to plaintiff Myles and members of the North Carolina Subclass, plaintiff Myles and the members of the North Carolina Subclass would not have done business with CPF.

302.    Plaintiff Myles and members of the North Carolina Subclass acted reasonably in relying on CPF's misrepresentations and omissions and acts and omissions in failing to fund their PPP loans, the truth of which they could not have discovered before they were contractually bound to CPF, and thereby exclusively reliant upon CPF's good faith in actually funding their SBA-approved PPP loans.

303.    Defendant CPF acted intentionally, knowingly, and maliciously to violate the NDUDTPA, and recklessly disregarded plaintiff Myles' and North Carolina Subclass members' rights.

304.    Plaintiff Myles and members of the North Carolina Subclass have suffered ascertainable losses of money or property, and monetary and non-monetary damages as a direct and proximate result of CPF's misrepresentations and their concealment of and failure to disclose material information.

305.    Defendant Crossroads is liable to plaintiff Myles and the members of the North

Carolina Subclass by virtue of its control of CPF and it being CPF's alter ego and by virtue of its

direct participation in PPP lending and both its and CPF's violations and CPF's failure to fund

the SBA-approved PPP loans at issue, all as also alleged more fully above.

306.    Defendants Donnelly and Alpert are liable to plaintiff Myles and the members of

the North Carolina Subclass because they controlled and directed Crossroads's and CPF's PPP

lending activities and directly participated in in CPF's and Crossroads's violations and failure to

fund the SBA-approved PPP loans at issue and personally profited therefore, all as also alleged

more fully above.

307.    Plaintiff Myles and members of the North Carolina Subclass seek all monetary

and non-monetary relief allowed by law against each Defendant under the NCUDTPA, including

actual damages, treble damages, restitution, and attorneys' fees and costs.

## Prayer for Relief

Plaintiffs, individually and on behalf of the proposed Class and Subclasses as applicable,

respectfully request the following relief:

A.    an order certifying the Class and Subclasses under Rule 23 of the Federal Rules of

Civil Procedure; naming Plaintiffs as representative of the proposed national Class; naming

plaintiffs Covarrubias and Smith as representatives of the proposed California Subclass; naming

plaintiff Myles as the representative of the proposed North Carolina Subclass; and naming

Plaintiffs' attorneys as counsel for the Class and California and North Carolina Subclasses;

B.    judgment in favor of Plaintiffs and the Class and Subclasses on all applicable

counts asserted herein;

C.      an award of compensatory, consequential and other damages to Plaintiffs and members of the Class and Subclasses in amounts to be determined at trial to the maximum extent permissible by law, plus prejudgment interest;

D.      an accounting of all PPPLF advances CPF obtained for PPP lending and any other federally-guaranteed proceeds CPF obtained for PPP lending, including the whereabouts of any such proceeds they were not disbursed to SBA-approved borrowers, whether any such proceeds were paid by CPF to Crossroads and/or any other person or entity, the amounts of such payments, the identities of the recipients, and the date such proceeds were paid;

E.      an accounting of all PPP lender processing fees CPF and/or Crossroads obtained, including for PPP loans CPF ultimately funded and for PPP loans CPF did not fund;

F.      an accounting of all PPP lender processing fees defendants Donnelly and Alpert obtained on the PPP loans of Plaintiffs and any other SBA-approved but unfunded Class member borrower;

G.      an order of all other forms of monetary relief to the maximum extent permissible by law, including payment to Plaintiffs and the Class and Subclasses of all PPP loan proceeds owed and due to Plaintiffs and the members of the Class and Subclasses with interest, as well as disgorgement of all loan processing fees obtained by Defendants that are attributable to the unfunded but SBA-approved loans of Plaintiffs and other Class members to the maximum extent permissible by law;

H.      an award of punitive damages based on Defendants' intentional, wanton and malicious conduct, or their reckless disregard of Plaintiffs' and the Class members' rights, in amounts to be determined at trial to the maximum extent permissible by law;

66

I.      an order awarding Plaintiffs and the Class and California and North Carolina Subclasses their reasonable attorneys' fees and expenses and costs of this lawsuit, including but not limited to expert fees and costs, to the maximum extent permissible by law; and

J.      such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: August 9, 2022                     Respectfully submitted,

**KENDALL LAW GROUP, PLLC**

By: */s/ Joe Kendall*
        Joe Kendall
        Texas Bar No. 11260700
        3811 Turtle Creek Blvd., Suite 1450
        Dallas, TX  75219
        T:  (214) 744-3000
        F:  (214) 744-3015
        jkendall@kendalllawgroup.com

**BAILEY & GLASSER LLP**
Lawrence J. Lederer (to seek *pro hac vice* admission)
Bart D. Cohen (to seek *pro hac vice* admission)
1622 Locust Street
Philadelphia, PA  19103
T:  (202) 463-2101
F:  (202) 463-2103
llederer@baileyglasser.com
bcohen@baileyglasser.com

**BAILEY & GLASSER LLP**
Michael L. Murphy (to seek *pro hac vice* admission)
209 Capital Street
Charleston, WV  25301
T:  (304) 345-6555
F:  (304) 342-1110
mmurphy@baileyglasser.com

**NOLAN HELLER KAUFFMAN LLP**
Justin A. Heller (to seek *pro hac vice* admission)
Matthew M. Zapala (to seek *pro hac vice* admission)
80 State Street, 11th Floor
Albany, NY 12207
T:  (518) 449-3300
F:  (518) 432-3123
jheller@nhkllp.com
mzapala@nhkllp.com

and

**FRIDAY, ELDREDGE & CLARK, LLP**
Katherine C. Campbell (to seek *pro hac vice* admission)
Marshall S. Ney (to seek *pro hac vice* admission)
3350 S Pinnacle Hills Pkwy, Suite 301
Rogers, AR  72758
T:  (479) 695-6049
F:  (501) 244-5389
kcampbell@fridayfirm.com
mney@fridayfirm.com

*Attorneys for Plaintiffs and the*
*Proposed Class and Subclasses*