**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

**FILED**

**January 12, 2023**
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

---

Eric Greathouse, Ernesto Covarrubias,
Tiffany Sumrall, Barbara Myles, Cori
Pericho, John Pinkney, Joshua Smith and
Alicia Mena, individually and on behalf of
all others similarly situated,

        Plaintiffs,

v.

Capital Plus Financial, LLC, Crossroads
Impact Corp., Eric A. Donnelly and Robert
H. Alpert,

        Defendants.

---

Case No. 4:22-cv-686-P

**APPENDIX IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

**Table of Contents**

| Tab | Description | Page |
|-----|-------------|------|
| 1 | Standard Form Loan Documents | App'x 0001 - 0014 |
| 2 | Expert Report of Jason D. Koontz | App'x 0015 - 0039 |
| 3 | Expert Report of William M. Manger, Jr. | App'x 0040 - 0049 |
| 4 | Expert Report of Steve P. Feinstein, Ph.D., CFA | App'x 0050 - 0076 |
| 5 | Expert Report of William Briggs | App'x 0077 - 0086 |
| 6 | Plaintiffs' Proposed Trial Plan | App'x 0087 - 0097 |
| 7 | Declaration of Lawrence J. Lederer | App'x 0098 - 0101 |
| 8 | Declarations of Plaintiffs | App'x 0102 - 0125 |
| 9 | Resume of Kendall Law Group, PLLC | App'x 0126 - 0138 |
| 10 | Resume of Bailey & Glasser, LLP | App'x 0139 - 0154 |
| 11 | Resume of Nolan Heller Kauffman LLP | App'x 0155 - 0164 |
| 12 | Resume of Friday, Eldredge & Clark, LLP | App'x 0165 - 0173 |
| 13 | Charts Identifying Elements of Contract Claims for the National Class | App'x 0174 - 0211 |
| 14 | Chart Identifying Elements of Unjust Enrichment Claims for the National Class | App'x 0212 - 0226 |

Respectfully submitted this 11th day of January 2023.

**Kendall Law Group, PLLC**

By: */s/ Joe Kendall*
    Joe Kendall
    Texas Bar No. 11260700
    3811 Turtle Creek Blvd., Suite 1450
    Dallas, TX  75219
    T:  (214) 744-3000
    F:  (214) 744-3015
    jkendall@kendalllawgroup.com

**Bailey & Glasser LLP**
Lawrence J. Lederer (*pro hac vice*)
Bart D. Cohen (*pro hac vice*)
1622 Locust Street
Philadelphia, PA  19103
T:  (215) 274-9420
F:  (202) 463-2103
llederer@baileyglasser.com
bcohen@baileyglasser.com

**Bailey & Glasser LLP**
Michael L. Murphy (*pro hac vice*)
1055 Thomas Jefferson St., NW, Suite 540
Washington, DC 20007
T:  (202) 463-2101
F:  (202) 463-2103
mmurphy@baileyglasser.com

**Nolan Heller Kauffman LLP**
Justin A. Heller (*pro hac vice*)
Matthew M. Zapala (*pro hac vice*)
80 State Street, 11th Floor
Albany, NY 12207
T:  (518) 449-3300
F:  (518) 432-3123
jheller@nhkllp.com
mzapala@nhkllp.com

and

**Friday, Eldredge & Clark, LLP**
Katherine C. Campbell (*pro hac vice*)
3350 S. Pinnacle Hills Pkwy, Suite 301
Rogers, AR  72758
T:  (479) 695-6049
F:  (501) 244-5389
kcampbell@fridayfirm.com

*Attorneys for Plaintiffs and the*
*Proposed Class and Subclasses*

## Certificate of Service

I hereby certify that a copy of the foregoing document was served on all counsel of record on January 11, 2023 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

*/s/ Joe Kendall*
Joe Kendall

# TAB 1

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F



U.S. Small Business Administration

# NOTE

| SBA Loan # | 9988328700 |
|---|---|
| SBA Loan Name | Paycheck Protection Program |
| Date | 4/18/2021 |
| Loan Amount | $ 15665 |
| Interest Rate | 1.00% |
| Borrower | Eric Greathouse |
| Operating Company | Eric Greathouse |
| Lender | Capital Plus Financial |

1.   PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of

$ 15665 _____ Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2.   DEFINITIONS:

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020), as amended by the Economic Aid Act, Pub. L. No. 116-269 (Dec. 27, 2020).

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower.

"PPP" means the Paycheck Protection Program under the CARES Act, including the rules, regulations and guidance of the SBA with respect thereto.

"SBA" means the Small Business Administration, an Agency of the United States of America.

SBA Form 147 (Hanmi Bank 01.22.2021)

App'x. 0002

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

3.   PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

This Loan is made pursuant to the PPP. Borrower agrees that it will comply with all SBA guidance under the CARES Act and the PPP as it applies to this Loan, regardless when enacted or supplemented.

**Initial Deferment Period:** In accordance with the terms of the PPP, no payments are due on this Loan for ten (10) months from the date of first disbursement of this Loan. Interest will continue to accrue during the deferment period.

**Loan Forgiveness:** Loan payments will be deferred if the Borrower applies for forgiveness of this Loan until such time as Lender receives payoff of the Loan from the SBA. Borrower may apply to Lender for forgiveness under the PPP of the amount due on this Loan in an amount equal to the sum of the following allowable costs, as defined in more detail by the SBA, incurred by Borrower during the "Covered Period", which shall be between 8- and 24-weeks, beginning on the date of first disbursement of this Loan:

    a.   Payroll Costs

    b.   Any payment of interest on a covered mortgage obligation (which shall not include any prepayment of, or payment of, principal on a covered mortgage obligation)

    c.   Any payment on a covered rent obligation

    d.   Any covered utility payment

    e.   Any covered operating expenditures

    f.   Any covered uninsured property damage expenditures

    g.   Any covered supplier costs

    h.   Any covered worker protection expenditures

Subject to the eligible forgiveness amount determined by the SBA, any remaining principal and deferred interest will be amortized over the remaining term of this Note in equal monthly payments of principal and interest beginning on the eleventh (11th) month from the date of the end of the Covered Period. Lender shall provide the calculation of the monthly amortization amount to Borrower not later than ten (10) business days prior to the date on which the first payment is due.

If the Borrower seeks forgiveness under the PPP, it shall submit an application with supporting documentation in accordance with the PPP. If the Loan is not fully forgiven, Borrower will remain liable for the full and punctual payment and satisfaction of the remaining outstanding principal balance of the Loan plus accrued but unpaid interest.

**Maturity:** This Note will mature five (5) years from date of first disbursement of this Loan.

**Repayment Terms:** The interest rate on this Note is one percent (1.00%) per year, calculated on a non-adjustable, non-compounding basis. The interest rate is fixed and will not be changed during the life of the Loan.

Borrower must pay principal and interest payments every month, beginning the eleventh (11th) month from the date of end of the Covered Period. Payments must be made on the first calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

All remaining principal and accrued interest is due and payable in five (5) years from first disbursement of this Loan.

**Loan Repayment:** Notwithstanding any provision in this Note to the contrary, Borrower may prepay this Note at any time without penalty.

**Non-Recourse:** Lender and SBA shall have no recourse against any individual shareholder, member or partner of Borrower for non-payment of the Loan, except to the extent that such shareholder, member or partner uses the Loan proceeds for an unauthorized purpose.

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

4.    DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.    Fails to do anything required by this Note and other Loan Documents;

B.    Defaults on any other loan with Lender;

C.    Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

D.    Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

E.    Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

F.    Fails to pay any taxes when due;

G.    Becomes the subject of a proceeding under any bankruptcy or insolvency law;

H.    Has a receiver or liquidator appointed for any part of their business or property;

I.    Makes an assignment for the benefit of creditors;

J.    Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower 's ability to pay this Note;

K.    Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender 's prior written consent; or

L.    Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5.    LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.    Require immediate payment of all amounts owing under this Note;
B.    Collect all amounts owing from the Borrower; or
C.    File suit and obtain judgment.

6.    LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.    Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document. If Among other things, the expenses may include reasonable attorney's fees and costs. Lender incurs any such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

B.    Transfer or sell this Note;
C.    Release anyone obligated to pay this Note; and
D.    Take any action necessary to collect amounts owing on this Note.

7.    WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

App'x. 0004

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

8. SUCCESSORS AND ASSIGNS:

   Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

   A. All individuals and entities signing this Note are jointly and severally liable;

   B. Borrower waives all suretyship defenses;

   C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to comply with SBA requirements pursuant to the CARES Act and the PPP;

   D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them;

   E. Borrower may not use an oral statement of Lender or SBA that contradict or alter the written terms of this Note.

   F. If any part of this Note is unenforceable, all other parts remain in effect;

   G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee.

10. ASSIGNMENT: AGREEMENT TO MAKE CHANGES TO THIS NOTE.

   This Note is assignable by Lender in whole or in part without the consent of Borrower (including, without limitation, any assignment to SBA or any third-party at SBA's direction) and is assignable by Borrower with the written consent of Lender. Borrower acknowledges that in order to disburse the loan proceeds to Borrower at the earliest possible time, Lender has prepared this Note based on its current understanding of the PPP. Borrower agrees that, if Lender deems it necessary or appropriate to amend this Note in any respect in order for this Note to comply with the PPP or for the SBA to guarantee all or any portion of the amounts outstanding under this Note, Borrower will sign and deliver to Lender any amendment to this Note or a new note in replacement of this Note, with the terms of any amendment or new Note retroactive to the date of this Note. Borrower will also execute any additional documentation the Lender or SBA requests that Lender or SBA believes is consistent with the purposes of the PPP.

SBA Form 147 (Hanmi Bank 01.22.2021)

**App'x. 0005**

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

11.  STATE-SPECIFIC PROVISIONS:

Unless otherwise prohibited by law, the following additional provisions will apply:

Release of Lender. In consideration of the agreement of the Lender to provide this Note, and other good and valuable consideration, which consideration is agreed by Borrower to be good and sufficient, Borrower RELEASES, ACQUITS AND FOREVER DISCHARGES the Lender, its directors, officers, shareholders, agents, contractors, employees, affiliates, attorneys, successors and assigns from any and all claims, demands, liens, damages, actions or suits, of whatsoever nature or character, whether statutory (including without limitation usury and deceptive trade practices claims), in contract or in tort, known or unknown, which have accrued or may accrue to Borrower or any creditor or affiliate of Borrower on account of any injuries, damages or losses or otherwise arising out of or in any way connected to (i) any extension of credit by the Lender to Borrower on or prior to the date hereof, or (ii) any matter or thing done, omitted or suffered to be done by the Lender, its directors, officers, shareholders, agents, employees, affiliates, attorneys, predecessors or assignors on or prior to the date hereof.

Notwithstanding anything else contained herein, this Note is not secured and there are no guarantors.

App'x. 0006

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

12.  BORROWER 'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

BORROWER: Eric Greathouse

By _____
—711447A2B1B3404...

By _____

By _____

By _____

App'x. 0007

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

## ADDITIONAL AND CORRECTION DOCUMENTS AGREEMENT
### (ERRORS AND OMISSIONS AGREEMENT)

RE:    Loan by Lender, Capital Plus Financial, LLC to Eric Greathouse_____, a(n)

Independent Contractor_____, in the amount of $ 15665_____.

In consideration of Capital Plus Financial, LLC, located at 2247 Central Drive, Bedford, Texas 76021, (hereinafter called "Lender") making the above loan, each of the undersigned, jointly and severally, do hereby agree as follows:

1.    In the event the promissory note or any other document or other writing evidencing, securing or pertaining to the above loan is misplaced or lost or incorrectly reflects the true and correct terms, conditions or provisions of the loan in the opinion of Lender, each of the undersigned shall execute, acknowledge, initial and deliver to Lender all documents and other writings that Lender requests which Lender deems necessary to replace or correct any misplaced, lost or incorrect document or other writing; and

2.    In the event Lender deems it necessary that any additional documents or other writings be executed by any of the undersigned in connection with or pertaining to the above loan which have not been requested to be executed by the undersigned on or before the date hereof (or which were requested but not executed for any reason whatsoever), each of the undersigned shall execute, acknowledge, initial and deliver to Lender all such additional documents or other writings that Lender may reasonably request in connection with such loan; and

3.    Each of the undersigned further agrees to execute, acknowledge, initial and deliver to Lender all such documents and writings and pay such additional sums requested by Lender within ten (10) days after Lender requests same.  Any request by Lender shall be deemed given and received on the earlier of (i) the date such request is actually received by one of the undersigned or (ii) three (3) days after such request is mailed, postage prepaid and addressed to any of the undersigned at the last known address of the undersigned in accordance with the records of Lender, whichever date occurs first; and

4.    If any of the undersigned refuses or fails within such ten (10) day period to (i) execute, acknowledge, initial and deliver any such document or other writing requested by Lender, or (ii) pay any such fees, expenses, costs or interest, each of the undersigned, jointly and severally, agree to pay to Lender all losses, damages and expenses paid or incurred by Lender in any manner emanating therefrom or connected therewith, including (but not limited to) reasonable attorney's fees, and each of the undersigned further agree that any such failure or refusal shall constitute a default and an Event of Default under the note and all other writings evidencing, securing or pertaining to said loan; and

5.    Each of the undersigned hereby acknowledges that Lender is relying upon this agreement in making the above loan and that Lender would not make such loan unless each of the undersigned execute and deliver this agreement; and each of the undersigned further agree that this agreement (i) shall inure to the benefit of Lender and each subsequent holder of the note evidencing such loan, and (ii) shall be binding upon each of the undersigned and upon each of the heirs, personal representatives, successors and assigns of each of the undersigned.

EXECUTED 4/18/2021

### BORROWER:

Eric Greathouse_____.

A(n)                Independent Contractor

By: _____

Name: Eric Greathouse

Title: Owner_____

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

**BUSINESS PURPOSE STATEMENT**
**(SBA Paycheck Protection Program)**

I, Eric Greathouse                  , Owner       of   Eric Greathouse                         ,

a(n) _____ Independent Contractor _____, state as follows:

      1.    To induce Capital Plus Financial, LLC, 2247 Central Drive, Bedford, Texas 76021, to

extend credit to Eric Greathouse _____, a(n) _____ Independent Contractor ,

I represent that the proceeds of the loan in the amount of $ 15665 _____ will  be  used

only for the following purpose(s):

      Business related purposes as authorized by the U.S. Small Business Administration Paycheck
Protection Program and as specified in the loan application.

      2.    I understand that the above-stated purpose is for business or commercial purposes only

and that you are relying upon these representations in not making Truth-in-Lending disclosures pursuant

to 15 U.S.C. Section 1601, in connection with this loan.

      EXECUTED  4/18/2021

DocuSigned by:

_____

(Authorized Person)

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

## NOTICE - NO ORAL AGREEMENTS

RE:   Loan by Lender, Capital Plus Financial, LLC to Borrower, <u>Eric Greathouse</u>             ,

a(n)              <u>Independent Contractor</u>      , in the amount of $ <u>15665</u>            .

## THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE

## PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR

## SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

## THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

"Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods, or another thing of value or to otherwise extend credit or make a financial accommodation.

EXECUTED  4/18/2021

LENDER:

CAPITAL PLUS FINANCIAL, LLC

By: _____

Name:  Farzana Giga

Title:   CFO

BORROWER:

Eric Greathouse

A(n)              Independent Contractor

By: _____
—711447A2B1B3404...

Name:  Eric Greathouse

Title:   Owner

**App'x. 0010**

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

## WRITTEN CONSENT OF GOVERNING BODY
### (SBA PPP loan)

Pursuant to applicable law, the undersigned, being the appropriate governing body pursuant to the governing documents for the borrowing entity designated on the signature page hereof ("Company"), hereby consent to the adoption of and do hereby adopt the following resolutions and acknowledge that Capital Plus Financial, LLC ("Lender") is relying on the effectiveness hereof in making a loan to Company under the Paycheck Protection Program Second Draw Loans of the Small Business Administration ("SBA") as authorized under Section 311 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act ("Economic Aid Act"):

**RESOLVED,** that the undersigned hereby authorizes the Authorized Person named below as the appropriate person pursuant to the governing documents of the Company ("Authorized Person"), for and on behalf and in the name of the Company, to take such action necessary for the Company to borrow money and to obtain credit from the Lender, with its principal office located in Dallas, Texas, in the amount stated in the promissory note executed by Company and payable to Lender (the "Loan") and dated on or about the date hereof, hereinafter called the "Loan", including any renewals, extensions, consolidations or rearrangements of such indebtedness, upon such terms and at such rates as he or she deems reasonable;

**BE IT FURTHER RESOLVED,** that the undersigned hereby authorizes the Authorized Person, for and on behalf and in the name of the Company to prepare, execute and deliver any and all applications, certifications, promissory notes, loan agreements and any and all other documents and to perform any and all acts which may be necessary or proper to effect the borrowing and to execute and deliver any and all instruments and perform any and all acts required by the Lender and/or the SBA in connection with any matters herein contained, including any renewals, extensions, consolidations or rearrangements of such indebtedness, upon such terms and at such rates as the Authorized Person, in his or her sole discretion, deems reasonable;

**BE IT FURTHER RESOLVED,** that all the acts and deeds done or to be done by the Authorized Person, in connection with the execution and delivery of any promissory note, loan agreements, and any and all other documents, and any and all acts which may be necessary or proper to effect the borrowing, are hereby authorized, adopted, ratified, confirmed and approved as the acts and deeds of Company;

**BE IT FURTHER RESOLVED,** that the Authorized Person be and is hereby authorized and directed to take such other action and deliver such additional instruments in the name of and on behalf of Company, or otherwise to do all such further acts and things that the Authorized Person shall deem necessary or proper in order to effectively perform all of the obligations and agreements expressed to be kept and performed by Company, pursuant to the provisions of any promissory notes, loan agreements and any and all other documents and to perform any and all acts which may be necessary or proper to effect the borrowing described above;

**BE IT FURTHER RESOLVED,** that any government agency, including but not limited to, the SBA, may also rely on this Written Consent when identifying any Authorized Person for purposes of any loan guaranty, loan forgiveness, or other government program related to the Loan; and

**BE IT FURTHER RESOLVED,** that any and all acts authorized pursuant to this Written Consent and performed prior to the execution of this Written Consent are hereby ratified and approved. This Written Consent shall be continuing and shall remain in full force and effect until written notice of its revocation shall have been delivered to the Lender and receipt acknowledged by the Lender in writing.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK - SIGNATURES ON FOLLOWING PAGE]**

App'x. 0011

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

**IN WITNESS WHEREOF,** the undersigned have executed this consent effective as of  4/18/2021

AUTHORIZED PERSON:

Eric Greathouse

A(n)                              Independent Contractor

By: _____

Name: ___Eric Greathouse_____

Title: ___Owner_____

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

| Form **W-9** (Rev. October 2018) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** ▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | Give Form to the requester. Do not send to the IRS. |
|---|---|---|

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Eric Greathouse

**2** Business name/disregarded entity name, if different from above

Eric Greathouse

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

[X] Individual/sole proprietor or single-member LLC  [ ] C Corporation  [ ] S Corporation  [ ] Partnership  [ ] Trust/estate

[ ] Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

[ ] Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

2103 W 5th St

**6** City, state, and ZIP code

Russellville          AR          72801

Requester's name and address (optional)

**7** List account number(s) here (optional)

---

**Part I**    **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

or

Employer identification number

---

**Part II**    **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**    Signature of U.S. person ▶    *[signature: DocuSigned by: Eric Greathouse   71447A2B1B3404]*    Date ▶ 4/18/2021

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

App'x. 0013

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

## Information and Bank Account Certification and Authorization:

I acknowledge that the lender has to its best ability confirmed the ownership and active status of the depository account at the Financial Institution listed as required in the documents submitted to the SBA for PPP loan approval. I understand, acknowledge, and agree that the Lender or its' partners can share any financial information that I have provided with along with the SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, or any of its affiliates or partners for the purpose of compliance, accuracy, and verification of good standing to comply with all SBA Loan Program Requirements and or any and all SBA reviews.

I, Eric Greathouse_____ certify in good faith to the below information to be the rightful and correct owner of the account and am responsible for the accuracy and information provided below and authorize the lender and or its affiliates or partners to deposit the loan proceeds on the company's behalf. I further certify that the account information provided below is true and accurate in all material respects.

BANK NAME:    Evolve Bank & Trust

ACCOUNT NAME:    Eric Greathouse

ACCOUNT NUMBER:    ▇▇▇▇▇▇▇▇

ROUTING NUMBER:    084106768

TAB 2

# Expert Report by Jason D Koontz

# December 15, 2022

## Eric Greathouse, Ernesto Covarrubias, Tiffany Sumrall, Barbara Myles, Cori Pericho, John Pinkney, Joshua Smith and Alicia Mena, Plaintiffs,

## v.

## Capital Plus Financial, LLC, Crossroads Impact Corp., Eric A Donnelly, and Robert H. Alpert, Defendants.

## United States District Court

## Northern District of Texas–Fort Worth Division

## Civil Action No.: 4:22-cv-686

App'x. 0016

## Contents

Section 1: Assignment ............................................................................................................ 3

Section 2: Qualifications ......................................................................................................... 3

Section 3: Scope of this Assignment .................................................................................... 3

Section 4: Background Facts ................................................................................................... 4

Section 5: Opinion 1 ................................................................................................................ 5

Section 6: Opinion 2 ................................................................................................................ 9

Section 7: Conclusion .............................................................................................................. 9

Appendix 1 .............................................................................................................................. 11

Appendix 2 .............................................................................................................................. 15

Appendix 3 .............................................................................................................................. 16

Appendix 4 .............................................................................................................................. 19

App'x. 0017

# Section 1: Assignment

Bailey & Glasser LLP, the "Client," (as counsel for Eric Greathouse and other Plaintiffs), in the above action retained me to provide expert testimony in this matter based on my knowledge of and experience in, among other things, commercial lending. My opinions are the subject of this expert report, the scope of which is described further below in Section 3.

# Section 2: Qualifications

I have over twenty years of lending experience, including, but not limited to, loan origination, underwriting, closing, servicing, debt collection, and foreclosure when necessary. I fulfilled the role of Senior Vice President with Summit Community Bank and had a secured loan approval limit of $750,000. While at Summit Community Bank, I also served on the Bank's loan committee.

Over my lending career, I have originated, underwritten, and closed thousands of commercial and consumer loans. I managed servicing issues within my loan portfolio regarding loan closing proceeds, loan payments, hazard insurance, real estate taxes, flood insurance, requests for information, loan modifications, and force-placed insurance. If a borrower defaulted, I was also responsible for working with them to cure the default.

I currently provide consulting services to community banks that need assistance or support in their lending and collection areas.

I have earned the Credit Risk Certification (CRC) designation. This CRC designation is the only recognized professional designation for credit and lending professionals.[1] The CRC designation demonstrates that the holder possesses the knowledge and skills necessary to master many credit risk situations. To maintain the CRC designation, I must complete at least fifteen hours of continuing education annually. Refer to my CV attached to this report for additional information.

# Section 3: Scope of this Assignment

As I understand it, the Plaintiffs allege that Capital Plus Financial, LLC (hereinafter referred to as CPF)[2] failed to fund the plaintiffs' and the other eligible class member borrowers' SBA-approved loans.[3]

In this matter, the Client asked me to review the SBA Paycheck Protection Plan Promissory Note (hereinafter referred to as the Note) that is attached to the Class Action Complaint to determine if

---

[1] https://www.rmahq.org/credentialing/crc/?gmssopc=1
[2] In addition to Capital Plus Financial, LLC, the other defendants are Crossroads Impact Corp., Eric A Donnelly, and Robert H. Alpert (hereinafter collectively referred to as the defendants)
[3] Class Action Complaint. United States District Court. Northern District of Texas-Fort Worth Division. Case No. 4:22-cv-686. Page 4. Paragraph 12.

1  the language in the Note is consistent with industry standards for loans that are required to be
2  funded consistent with the delivery of the executed note.
3
4  I was also asked if it would be acceptable for a lender to furnish inaccurate information to
5  government agencies.
6
7  My fee schedule is $475 per hour plus expenses. My fee for testimony at either deposition or trial
8  is $475 per hour plus any reimbursable costs. My fee is not contingent on the outcome of this
9  matter or the nature of my opinions. In performing my assignment, I have relied upon or considered
10  both the information and documents listed in Appendix 2, as well as information referenced in the
11  footnotes of this report.
12
13  # Section 4: Background Facts
14
15  - On March 27, 2020, the CARES Act was signed into law.[4] According to the U.S.
16    Department of the Treasury, the CARES Act implemented a variety of programs to address
17    issues related to the onset of the COVID-19 pandemic. One program implemented was the
18    Paycheck Protection Program (hereinafter referred to as PPP). This program provided
19    small businesses with funds to pay up to eight weeks of payroll costs including benefits.
20    Funds could also pay interest on mortgages, rent, and utilities.[5]
21
22  - One requirement of the PPP is that the lender must disburse the loan no later than 10
23    calendar days from the loan approval.[6]
24
25  - On April 9, 2021, Eric Greathouse was approved for a $15,665.00 loan. CPF was identified
26    as the lender.[7]
27
28  - On April 18, 2021, Eric Greathouse executed loan documents for a PPP loan from CPF for
29    $15,665.00. The documents were returned on the same date.[8] Repayment terms included a
30    deferment period (no payment however interest continues to accrue) for the first ten months
31    after the loan closing. Principal and interest payments were to begin on the eleventh month
32    and continue monthly with the loan maturing in five years from the first disbursement of
33    the loan. The interest rate was 1.00%.[9]

---

[4] https://home.treasury.gov/policy-issues/coronavirus/about-the-cares-
act#:~:text=The%20Coronavirus%20Aid%2C%20Relief%2C%20and,%2C%20small%20businesses%2C%20and%20in
dustries.
[5] https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheck-protection-
program
[6] https://home.treasury.gov/system/files/136/FAQ-PPP-for-Borrowers-and-Lender-Questions-1-70-V11.pdf
[7] https://www.federalpay.org/paycheck-protection-program/eric-greathouse-russellville-ar
[8] Class Action Complaint. United States District Court. Northern District of Texas-Fort Worth Division. Case No.
4:22-cv-686. Page 33. Paragraph 117.
[9] Id at Exhibit A. SBA Note. April 18, 2021.

App'x. 0019

- To date, CPF has not funded Eric Greathouse's PPP loan.[10]

# Section 5: Opinion 1

**Unless otherwise stated in the loan documents or for regulatory compliance, standard lending practice calls for funds to be provided to a borrower upon execution and return of the promissory note and subject to any applicable rules and conditions.**

To understand the opinion, it is important to break down the loan funding process.

**First, what is a loan?**
The Cambridge Dictionary definition of a loan:[11]

*"an amount of money that is borrowed, often from a bank, and has to be paid back, usually together with an extra amount of money that you have to pay as a charge for borrowing."*

To put it simply, a lender provides funds (money), and the borrower agrees to repay it. In the past, a loan was made relying upon an oral agreement. However, over time and for different reasons, this process has been improved with written contracts. The primary document used to memorialize a loan is the promissory note.

**What is a promissory note?**
A promissory note is the borrower's written promise to pay a certain amount of money to another party (the lender). A typical note includes the following terms and conditions:[12]

- A promise to pay
- The names of the lender and the borrower
- The amount of money being borrowed
- Repayment terms and conditions
- The interest rate
- Default provisions
- Signature of the borrower (the lender may also sign the note, but it is not required.)

---

[10] Id. at Page 34. Paragraph 119-122.
[11] https://dictionary.cambridge.org/us/dictionary/english/loan
[12] https://www.bankrate.com/glossary/n/note/

App'x. 0020

1   Other than stating that the lender will provide a loan with certain terms and conditions, the note
2   does not require any additional actions by the lender. The borrower responds to the lender's offer
3   by signing the note for the protection of the lender.
4
5   The Consumer Financial Protection Bureau offers this regarding the purpose of the note:[13]
6

> The Note is the legal document you sign to agree to repay your mortgage.
> The Note will provide you with details regarding your loan, including the
> amount you owe, the interest rate of the mortgage loan, the dates when
> the payments are to be made, the length of time for repayment, and the
> place where the payments are to be sent. The Note also explains the
> consequences of failing to make your monthly mortgage payments. Read
> this document carefully. If something is different from what you agreed
> upon, contact your lender right away.

7
8
9   There are two primary types of notes. The first type is a closed-end credit. American Banker
10  defines a closed-end credit as:[14]
11

> Closed-end credit
>
> Credit extensions in which the borrower receives the entire proceeds of the loan at or shortly
> after the loan is closed. In closed-end credit facilities, the amount borrowed cannot increase after
> it has been disbursed and partially repaid. Closed-end credit may require regular repayment of
> principal (see installment note and term note) or may only require the repayment of principal at
> maturity. See bullet loan, single-payment loan, and time note.

12
13
14  When using a closed-end credit note, the funds are usually distributed at the time of the closing or
15  once a previously agreed upon condition has been met.[15] [16]
16
17  Some examples of the standard language found in a closed-end credit are:[17]
18

---

[13] CFPB. Know Before you Owe: Closing Time – Promissory Note. https://files.consumerfinance.gov/f/201410-promissory_note_explainer.pdf

[14] Americanbanker.com/glossary/c.html

[15] Two examples of why loan proceeds might be delayed when using a closed-end note include waiting until security documents are recorded or a right of rescission period has ended.

[16] In the case of the Greathouse loan, consistent with industry standards, he was advised on the date he signed and returned the loan documents that the loan was being funded. Class Action Complaint. United States District Court. Northern District of Texas-Fort Worth Division. Case No. 4:22-cv-686. Paragraph 117 on page 33 and Paragraph 118 on page 34.

[17] FHA HUD Promissory Note Sample. https://www.hud.gov/sites/documents/13-19MLATCH1.PDF

> **2. BORROWER'S PROMISE TO PAY**
>
> In return for a loan received from Lender, Borrower promises to pay the principal sum of
> _____ Dollars (U.S. $_____), to the order of the Lender.

1
2
3 And in a PPP note which also shows the standard language found in a closed-end credit[18]
4

> In consideration of the Loan received by Borrower from Bank, Borrower agrees as follows:
> 1. DEPOSIT ACCOUNT/USE OF LOAN PROCEEDS: Borrower is required to maintain a deposit account with Bank of America, N.A. (the "Deposit Account") until the Loan is either forgiven in full or the Loan is fully paid by Borrower. Borrower acknowledges and agrees that the proceeds of the Loan shall be deposited by Bank into the Deposit Account. The Loan proceeds are to not be used by Borrower for any illegal purpose and Borrower represents to the Bank that it will derive material benefit, directly and indirectly, from the making of the Loan.

5
6
7 The Greathouse note is a closed end note. The above examples are similar to language found in
8 the SBA form PPP note signed by Eric Greathouse:[19]
9

> In return for the Loan, Borrower promises to pay to the order of Lender the amount of
> $ 15665 _____ Dollars,
> interest on the unpaid principal balance, and all other amounts required by this Note.

10
11
12 The second type of note is an open-end credit. American Banker defines an open-end credit as:[20]
13

> Open-end credit
> Types of credit extensions that permit borrowers to add to the amount borrowed, usually in irregular amounts, at various times subsequent to the granting of the credit. Examples include credit card loans, personal lines of credit, and home equity lines of credit.

14
15
16 By contrast, open-ended credit notes allow the lender to advance the funds at various times. Often,
17 the outstanding principal balance can be paid and drawn again by the borrower. This is typical in
18 a line of credit arrangement. If a note is to have disbursements at times other than the closing, the
19 standard industry practice is to include language in the note and other loan documents spelling out
20 the terms and conditions of the advances. One example of multiple advance language is:[21]
21

---

[18] Sample Bank of America PPP Promissory Note
[19] Class Action Complaint. United States District Court. Northern District of Texas-Fort Worth Division. Case No. 4:22-cv-686. Exhibit A. SBA Note. April 18, 2021.
[20] Americanbanker.com/glossary/o.html
[21] This was an example taken form a draft Promissory Note. The specific language can vary but the important points are that the documents states that the loan is revolving and provides the conditions for future advances.

> **REVOLVING LINE OF CREDIT; ADVANCES.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office as set forth in Section 7.12 of the Loan Agreement. The

Regardless of either a closed-end or open-end credit, the note is the primary document in a loan transaction that memorializes the terms and details of the loan represented by the lender. A lender may also include a loan agreement and other provisions, but a lender cannot properly document a loan without a note.

The note is the link between the lender (who provides the funds) and the borrower (who promises to repay the funds). In his article titled, "Lender Liability: Changing or Enforcing The Ground Rules?" Jonathan K. Van Patten stated the following,[22]

*"The debtor-creditor relations is grounded on the agreement of the parties…"*

And,

*"The terms and conditions of the agreement establish and circumscribe the rights and obligations of the parties. At the center of the relationship is the exchange of money or credit for the promise to pay."*

**The Lender's Obligation to Fund.**

A lender's agreement to make a loan is not always memorialized through a written loan commitment letter. In many instances, the Lender's commitment to lend is implicit in its having advised the borrower that the loan application has been approved without noting any conditions to funding and having provided the borrower with a promissory note to sign and return. Under prevailing lending industry norms and practices, in such circumstances, the lender confirms its agreement to make the loan by providing the borrower with a promissory note, and the borrower accepts the lender's offer to make the loan by signing and returning the promissory note.

The key takeaway from that quote is the "exchange of money for the promise to pay." Put another way, the lender provides a loan (money), and the borrower has the expectation of receiving the money and in signing promises to pay it back. Without money being provided, a borrower would have no reason to sign a promise to pay.

---

[22] Jonathan K. Van Patten. Lender Liability: Changing or Enforcing The Ground Rules. South Dakota Law Review. Volume 33. Page 387.

App'x. 0023

# Section 6: Opinion 2

**It is irregular and inconsistent with standard lending practice to limit debtors' borrowing opportunities by providing misleading information to government agencies and credit reporting agencies (also known as credit bureaus).**

Lenders rely on other lenders, debt collectors, loan servicers and others (also referred to as furnishers) to furnish accurate data when reporting loan activity on a borrower. When considering financing opportunities for a borrower, a lender will rely upon another lender's furnished information regardless of any dispute a borrower might have with the accuracy of the reported data. A furnisher that has not provided accurate information regarding a borrower can harm the borrower by limiting their ability to get financing from other sources. Some examples of improper furnishing can include:

- **Improper credit reporting negatively affecting a loan applicant's ability to get financing on favorable terms, or the applicant may be declined.** Two examples are improperly reporting that a borrower is past due when they are current or overstating the loan balance/repayment terms.

- **Not furnishing accurate loan payoff information on a Department of Veterans Affairs (VA) backed mortgage loan.** This can reduce or delay the VA entitlement that a borrower can use on a future loan if the current entitlement has not been restored.

- **A lender underwriting a PPP loan application and the SBA reporting that it has approved the loan applicant, but the loan was not funded.** This would stop a loan applicant from applying for a PPP loan with another approved PPP lender.[23] [24] This would harm the applicant's business by denying them access to low cost funds that could help them meet their obligations, such as payroll. This could also negatively affect their business and personal credit ratings.

# Section 7: Conclusion

Based upon my knowledge, skill, experience, training, and education regarding commercial loans and their closing, as well as my review of the documents provided to me:

- A promissory note is the lender's offer of a loan and is accepted when the borrower signs the note.

---

[23] Paycheck Protection Program Borrower Application Form. A borrower must certify on a PPP loan application that they have not and will not receive another loan under the Paycheck Protection Program.
[24] Class Action Complaint. United States District Court. Northern District of Texas-Fort Worth Division. Case No. 4:22-cv-686. Page 54. Paragraph 241.

App'x. 0024

- The SBA Promissory Note offered by CPF and signed by Eric Greathouse was a closed-end credit.
- Lending industry standards dictate, and borrowers expect the funding of a loan (money is provided to the borrower) at the time the promissory note is signed, and the loan documents are delivered unless a valid reason (see earlier examples found in this report) is shared with the borrower regarding why there is a delay in funding.
- It is irregular and inconsistent with standard lending practice to limit debtors' borrowing opportunities by providing misleading information to government agencies and credit reporting agencies which can cause harm to the borrower.

The documents identified in this report are reasonably relied upon by experts in this field in forming this type of opinion. My opinions expressed above are based upon my consideration of reliable principles and methods and the application thereof to the facts and information reviewed. If asked at trial or provided supplemental materials or information, I reserve the right to amend or supplement my opinions and reasoning. I hold all of these opinions to a reasonable degree of professional certainty.

Respectfully submitted,

J.D. Koontz
3818 MacCorkle Ave, SE
Charleston, WV 25304

App'x. 0025

# Appendix 1

I have been deposed in the following matters during the previous four years.

• Bella Grace Properties, LLC, and Faith Investment Properties, LLC, Plaintiffs v. The First State Bank, Defendant. Circuit Court of Cabell County. Civil Action No. 15-C-470. October 2017.

• The First State Bank, Plaintiff v. Traditional American Investments, Inc. and Timothy Donahue, Defendants. Circuit Court of Cabell County. Civil Action No. 15-C-657. October 2018.

• Whitaker Bank, Inc. v. Majeed Nami; Eagle Capital Management, LLC; Appalachian Royalty Trust, LLC; Fortress Properties, LLC; Morgan Stanley Capital Group, LLC; Nally & Hamilton Enterprises, Inc.; United States of America, Internal Revenue Service; Commonwealth of Kentucky, Revenue cabinet; Vinland Energy Eastern, LLC; Commonwealth of Kentucky, Division of Unemployment Insurance; Bell County, Kentucky; and Laurel County, Kentucky. Commonwealth of Kentucky, 27th Judicial Circuit, Laurel Circuit Court. Civil Action No. 17- CI-183. December 2018.

• Whitaker Bank, Inc. v. KJ & BR, LLC; James P. Devers, A/K/A Jim Devers and his wife, Kimberly Devers; Liberty Automotive, LLC; Robert L. Langley; Mortgage Electronic Registration Systems, Inc.; Roundpoint Mortgage Company; Knox County, Kentucky; and Laurel County, Kentucky. Commonwealth of Kentucky, 27th Judicial Circuit, Laurel Circuit Court. Civil Action No. 17-CI-00307. Division II. February 2019.

• Shawn E. Fauber and Rosa Yvonne Fauber, Plaintiffs, v. Nationstar Mortgage, LLC, Jeffrey S. Moore, and ISGN Fulfillment Services, Inc., Defendants. Circuit Court of Kanawha County. Civil Action No. 15-C-1650. September 2019.

• Davantic, LLC, Plaintiff, v. Michael P. Thompson, RealCorp, LLC, Val Young, MPT Realty, LLC, and TOP Properties, LLC, Defendants. Circuit Court of Kanawha County. Civil Action No. 16C-304. September 2019.

• Radiosurgery Solutions, LLC, a California limited liability company; Channel Blue, Inc., a California corporation, Plaintiffs, v. Select Healthcare Solutions Fund II, LLC, a California limited liability company; Select Healthcare Solutions, LLC, a California limited liability company; Select Technology Partners, LLC, a California limited liability company; Matthew Cutler, an individual, Defendants. Superior Court of the State of California for the County of Los Angeles. Case No. BC632727. January 2020.

• Coalfield Lumber Co., Inc., A Kentucky Corporation, and Bryan K. Jude, Plaintiffs, v. Madelina M. "Tint" Stacy, Sheri Bragg, B&T Speedway, LLC, a West Virginia Limited Liability Company, Tint's Steak & Grill, A West Virginia Limited Liability Company, and Bank of Mingo, a West Virginia Corporation, Defendants. United States District Court for the Southern District of West Virginia – Charleston Division. Case No.: 2:19-CV-00681. November 2020.

• Alyssa Mayer, Christopher Cahill, Charles and Kathleen Carey, Patricia Carey, Charles F. Carey and Kathleen A. Carey Revocable Living Trust, Anne Cuddy, Marianne Dubois, Frank Joseph Heyen III, Gary Hines, Scott Intagliata, Roman Katchaluba, Patrick Keyes, Manoj Kintali, Kristine Kucera, Mike and Cynthia Mahoney, John and Deborah Mallory, Alex Mallory, Twinkaljim Properties, LLC, Kirk and Fran Meany, Mitchell Messner, John Pusateri, Renee Roosa, Van and Marci Spears, Chelsea Swaggerty, Sam and Kate Sweeten, Jonathan Torres, Theresa Torres, and Chris Whiteman, Plaintiffs, v. Citizens Bank & Trust Company, Defendant. Circuit Court of Jackson County, Missouri at Kansas City. Case No. 19160CV30034 Division 14. May 2021.

• Stephanie Suttle, Plaintiff, v. Stephen Calk and the Federal Savings Bank, Defendants. United States District Court for the Northern District of Illinois – Eastern Division, Chicago, Illinois. Case No. 19-cv-4541. June 2021.

• Peta-Gaye P. Connors, Plaintiff, v. Dutch Miller of Charleston, Inc. and Tommy Henson, Defendants. Circuit Court of Kanawha County, West Virginia. Case No. 18-C-521. June 2021.

• Patrick P. Galford and Tessa L. Galford, Plaintiffs, v. Alcova Mortgage, LLC, Nationstar Mortgage LLC, d/b/a Mr. Cooper, and Shumate Appraisals, LLC, Defendants. Circuit Court of Mercer County, West Virginia. Case No.: 19-C-37. August 2021.

• Cash Link USA, LLC d/b/a Cash Link USA, Plaintiff, v. Christopher Flathers, Defendant. Circuit Court of Jackson County, Missouri at Independence Associate Division. Case No. 1916-CV33003. October 2021.

• Blackjewel, LLC., et al., Plaintiffs v. United Bank, Defendant, United States Bankruptcy Court for the Southern District of West Virginia. Chapter 11. Case No 19-30289. Adv. Proceeding No. 3:20-ap-03007. October 2021.

• Sergio Larios, Plaintiff, v. Specialized Loan Servicing LLC and WF Victoria Grantor Trust 2016-3, and Does 1-25, Defendants. Superior Court of the State of California – County of Los Angeles. Case No. 18SSTCP02482. January 2022.

• The Barbara Bek Payne Family Trust Dated November 3, 2008. Superior Court for the State of California, County of Los Angeles – Central District. Case No.: 16STPB01383. May 2022. May 2022. The client is Leigh E. Payne, Successor-In-Interest to Robert Erie Payne. June 2022.

•Mary Beth Wallace, a/k/a Mary P. Wallace, Plaintiff, v. Davis Trust Company; Allegheny Insurance Services, Inc.; James W. Wallace; Hugh Hitchcock; and Hoy Ferguson, Defendants. Circuit Court of Randolph County West Virginia, Civil Action No.: 20C-119. October 2022.

## Trials

I have testified in the following cases during the last four years.

• The Wall Guy, Inc., Jeffrey Frye, and The Wall Guy, Inc., d/b/a JR Contractors. Plaintiffs / Counterclaim Defendants v. The First State Bank, Defendant / Counterclaim Plaintiff. Circuit Court of Cabell County, West Virginia. Civil Action No. 16-C-027. August 2018

• Lisa King, Plaintiff, v. The Poca Valley Bank, Inc., Defendant. Circuit Court of Roane County, West Virginia. Civil Action 16-C-42E. August 2018.

• The First State Bank, Plaintiff v. Zane L. Metz, Jr., Zane L. Metz, III, Hollie L. Metz, and Z. L. Metz Homes, LLC. of North Carolina, Defendants. Circuit Court of Cabell County, Civil Action No. 15-C-742. November 2018.

• CIT Bank, NA, Plaintiff, v. Shirley M. Bowen by her next friend Caroline Coffman, Defendant. Circuit Court of Hampshire County, West Virginia. Case No. 14-2016-C-97. June 2021.

• Radiosurgery Solutions, LLC, a California limited liability company; Channel Blue, Inc., a California corporation, Plaintiffs, v. Select Healthcare Solutions Fund II, LLC, a California limited liability company; Select Healthcare Solutions, LLC, a California limited liability company; Select Technology Partners, LLC, a California limited liability company; Matthew Cutler, an individual, Defendants. Superior Court of the State of California for the County of Los Angeles. Case No. BC632727. March 2022.

• Sergio Larios, Plaintiff, v. Specialized Loan Servicing LLC and WF Victoria Grantor Trust 2016-3, and Does 1-25, Defendants. Superior Court of the State of California – County of Los Angeles. Case No. 18SSTCP02482. April 2022.

• North Hills Group, Inc., Plaintiff, v. Danny Webb and Danny Webb Construction Company, Inc., Defendants. Circuit Court of Fayette County, West Virginia. Civil Action No. 19-C-2. May 2022

## Published Articles

• Kanawha Valley Home and Living, an article titled "Ten Tips to Secure a Mortgage. June 2014.

App'x. 0028

1    • SEAK Expert Witness Directory, an article titled, "Lender Liability Expert Witness: Improper
2    Activity by the Lender – Examples, Targets, and Signs" April 2020.
3
4    • SEAK Expert Witness Directory, an article titled, "Predatory Lending Expert Witness: Unfair
5    and Abusive Loan Terms – Examples, Targets, and Signs," March 2020.

App'x. 0029

# Appendix 2

To prepare this report for the Client in this matter, I reviewed, considered, and relied upon documents provided to me by counsel for the plaintiffs. The documents I reviewed, considered, and may have relied upon in preparing my expert opinions are as follows:

- Class Action Complaint. United States District Court. Northern District of Texas-Fort Worth Division. Case No. 4:22-cv-686.

Besides the document referenced above, I have also relied upon materials that are referenced in the footnotes of my report.

App'x. 0030

# Appendix 3

## Jason D. Koontz, CRC

3818 MacCorkle Ave, SE
Charleston, WV 25304
*Telephone (646) 397-3835   Cell 304-541-5394*
*Jasonkoontz1@gmail.com*
*Jasondkoontz.com*

### SUMMARY

Senior banking vice president with over 20 years of lending, cash management, and bank operations experience. Vast hands-on experience in bank lending practices, deposit accounts, and matters involving residential real estate. Certified Residential Appraiser. Certified in credit risk.

**Coast-to-coast experience as an expert witness. Expert witness engagements have involved commercial loans, residential mortgages, predatory lending, debt collection, underwriting, consumer protection, fraud, truth in lending, lender liability, loan servicing, deposit accounts, residential property valuation, bank policies, and USPAP compliance. Clients include individuals, small business owners, mortgage loan servicers, and some of the largest lenders in the US. Experienced in both state and federal cases (including class actions). Extensive testifying experience at deposition and trial.**

### PROFESSIONAL EXPERIENCE

**Jason D. Koontz**                                                                                     **Charleston, WV**
*Consultant*                                                                                *September 2013 to present*

- Providing expert and litigation support to attorneys representing financial institutions, businesses, and individuals. Services including loan review, analysis, residential appraisals, USPAP appraisal reviews, deposition, and trial testimony.
- Individual training for Bank Directors so that they may be more informed and engaged.
- Assistance to banking clients who are evaluating loan proposals or preparing a loan package for consideration.
- Residential appraisal services for financial institutions and individuals. Appraisal services include but are not limited to residential property appraisals involved in litigation.
- Retained in over 175 matters.

**The RPC Group, LLC**                                                                              **Scott Depot, WV**
*Consultant*                                                                         *July 2012 to September 2013*

- Provided consulting and litigation support to attorneys representing financial institutions, businesses, and individuals. Services included loan review, analysis, and expert witness services.
- Real estate appraisals and consulting.

**Summit Community Bank**                                                                          **Charleston, WV**
*Senior Vice President*                                                                  *August 1998 to July 2012*

- Generated and managed customer relationships for commercial loans up to $15,000,000. Loan types included: commercial real estate, commercial construction, multi-unit housing, equipment, lines of credit, letters of credit, parking garages, and airport financing. Involved in underwriting, loan closing process, loan servicing, and, if necessary, debt collection.
- Managed problem loans, including foreclosures and repossessions.
- Generated consumer loans, which includes residential mortgages, automobile loans, credit cards, construction loans, home equity lines of credit, and unsecured loans. Personally analyzed each request.
- Provided deposit services, including personal and commercial deposit accounts, escrow accounts, and trust accounts.

Page | 1                                   Jason D. Koontz, CRC                                    Revised 09/14/22

**App'x. 0031**

- Cash management product sales, including overnight investment, zero-balance arrangements, internet banking, remote deposit banking, and internet bill pay.

**Banc One Leasing Corporation**                           **Charleston, WV, and Dayton, OH**
*Account Executive*                                                *August 1997 to August 1998*

- Provided leasing solutions to middle-market customers (those with annual sales over $5,000,000) in the State of West Virginia and the greater Dayton, Ohio, markets.

**United National Bank**                                                   **Charleston, WV**
*Vice President*                                            *November 1991 to August 1997*

- Cultivated and managed commercial relationships for commercial loans.
- Served as a Cash Management Specialist and established a formal cash management program. Provided sales support to employees throughout the company.
- Analyzed commercial loan requests and provided recommendations as a Credit Analyst.
- Managed past due accounts in the consumer and commercial loan collections department. Assisted in foreclosures and repossessions.

**EDUCATION**

- Bachelor of Business Administration in Marketing, Marshall University, August 1991.
- Completed the Risk Management Association's Commercial Lending School, May 1993.
- Numerous seminars and training programs regarding the banking industry and residential real estate.

**CERTIFICATIONS**

- Risk Management Association – Credit Risk Certification, April 2012
- WV Real Estate Appraiser Licensing & Certification Board – Certified Residential Appraiser License number: WV CR1162

**PRESENTATIONS**

- U.S. Small Business Administration, titled "Am I Making Money?  Understanding the Numbers Behind Your Business," November 2017.
- U.S. Small Business Administration, titled "Am I Making Money?  Understanding the Numbers Behind Your Business," June 2017.
- U.S. Small Business Administration, titled "Am I Making Money?  Understanding the Numbers Behind Your Business," December 2016.
- U.S. Small Business Administration, titled "Navigating the Loan Application Process," August 2014.
- SCORE – Charleston, titled "Navigating the Loan Application Process and Options When the Bank Says No," July 2014.
- U.S. Small Business Administration, titled "Bankers and Balance Sheets," June 2014.
- Kanawha Valley Board of Realtors, titled "Navigating the Loan Application Process," August 2012.

**PUBLICATIONS**

- SEAK Expert Witness Directory, an article titled, "Improper Activity by the Lender – Examples, Targets, and Signs'" April 2020
- SEAK Expert Witness Directory, an article titled, "Unfair and Abusive Loan Terms – Examples, Targets, and Signs," March 2020
- Kanawha Valley Home & Living, an article titled "Ten Tips to Secure a Mortgage," June 2014.

Jason D. Koontz, CRC                    Revised 09/14/22

App'x. 0032

**OTHER**

- Currently, serve on the expert panel for Money.com.  Money is a personal finance brand and website. It was formerly also a monthly magazine first published by Time Inc.

- Served as a consultant for a video produced by Motion Masters, Inc., and distributed by Meridian Education Corporation, titled "Personal Finance Essentials: Financial Literacy for Young Earners—Credit Borrowing, and Debt," June 2011.

- WV Chapter of Score. Served as a volunteer and was Chairman of the Charleston Chapter.

App'x. 0033

# Appendix 4

**SBA Promissory Note**

| SBA Loan # | 4633557102 |
|---|---|
| SBA Loan Name | Paycheck Protection Program |
| Date | 4/15/20 |
| Loan Amount | $ |
| Interest Rate | 1.00% |
| Borrower | Jason Koontz |
| Operating Company | N/A |
| Lender | Star USA Federal Credit Union |

1. **PROMISE TO PAY:**

In return for the Loan, Borrower promises to pay to the order of the Lender the amount of $ _____ interest on the unpaid principal balance, and all other amounts required by this Note.

2. **DEFINITIONS:**

   a. "Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.
   b. "Guarantor" means each person or entity that signs a guarantee of payment of this Note.
   c. "Loan" means the loan evidenced by this Note.
   d. "Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.
   e. "SBA" means the Small Business Administration, an Agency of the United States of America.

3. **PAYMENT TERMS:**

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate is 1% per year, beginning on the date of this Note. To the extent the loan amount is not forgiven under the Paycheck Protection Program (Sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act)), Borrower must make equal monthly payments of principal and interest, beginning six (6) months from the date of this Note, until the maturity date, which is two (2) years from the date of the Note. This Note may be prepaid in part or in full, at any time, without penalty.

4. **DEFAULT:**

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

   a. Fails to do anything required by this Note and other Loan Documents;
   b. Defaults on any other loan with Lender;
   c. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;
   d. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

SBA PPP Promissory Note                                                 1

App'x. 0034

**BANK OF AMERICA** 

## Promissory Note

| Date | Loan Amount | Interest Rate after Deferment Period | Deferment Period |
|---|---|---|---|
| 04/08/2020 | | 1.00% fixed per annum | 6 months |

This Promissory Note ("Note") sets forth and confirms the terms and conditions of a term loan to ▇▇▇▇▇▇▇ (whether one or more than one, "Borrower") from Bank of America, NA, a national banking association having an address of P.O. Box 15220, Wilmington, DE 19886-5220 (together with its agents, affiliates, successors and assigns, the "Bank") for the Loan Amount and at the Interest Rate stated above (the "Loan"). The Loan is made pursuant to the Paycheck Protection Program under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). The funding of the Loan is conditioned upon approval of Borrower's application for the Loan and Bank's receiving confirmation from the SBA that Bank may proceed with the Loan. The date on which the funding of the Loan takes place is referred to as the "Funding Date". If the Funding Date is later than the date of this Note, the Deferment Period commences on the Funding Date and ends six months from the Funding Date. After sixty (60) days from the date the Loan is funded, but not more than ninety (90) days from the date the Loan is funded, Borrower shall apply to Bank for loan forgiveness. If the SBA confirms full and complete forgiveness of the unpaid balance of the Loan, and reimburses Bank for the total outstanding balance, principal and interest, Borrower's obligations under the Loan will be deemed fully satisfied and paid in full. If the SBA does not confirm forgiveness of the Loan, or only partly confirms forgiveness of the Loan, or Borrower fails to apply for loan forgiveness, Borrower will be obligated to repay to the Bank the total outstanding balance remaining due under the Loan, including principal and interest (the "Loan Balance"), and in such case, Bank will establish the terms for repayment of the Loan Balance in a separate letter to be provided to Borrower, which letter will set forth the Loan Balance, the amount of each monthly payment, the interest rate (not in excess of a fixed rate of one per cent (1.00%) per annum), the term of the Loan, and the maturity date (not to exceed two (2) years from the date Borrower applied to Bank for Loan forgiveness). No principal or interest payments will be due prior to the end of the Deferment Period. Borrower promises, covenants and agrees with Bank to repay the Loan in accordance with the terms for repayment as set forth in that letter (the "Repayment Letter"). Payments greater than the monthly payment or additional payments may be made at any time without a prepayment penalty but shall not relieve Borrower of its obligations to pay the next succeeding monthly payment.

In consideration of the Loan received by Borrower from Bank, Borrower agrees as follows:

1. DEPOSIT ACCOUNT/USE OF LOAN PROCEEDS: Borrower is required to maintain a deposit account with Bank of America, N.A. (the "Deposit Account) until the Loan is either forgiven in full or the Loan is fully paid by Borrower. Borrower acknowledges and agrees that the proceeds of the Loan shall be deposited by Bank into the Deposit Account. The Loan proceeds are to not be used by Borrower for any illegal purpose and Borrower represents to the Bank that it will derive material benefit, directly and indirectly, from the making of the Loan.

2. FLORIDA BORROWER. Borrower acknowledges and consents that, if Borrower's business is located in the state of Florida and documentary stamp taxes are required to be paid, then payment of documentary stamp taxes for the amount required under Florida law will be deducted from the Deposit Account by ACH debit, and Borrower authorizes and directs Bank to pay such tax. Should there be insufficient funds in the Deposit Account to pay all of this tax when due, Borrower agrees to pay such tax immediately upon request from Bank.

3. DIRECT DEBIT. If the Loan is not forgiven and a Loan Balance remains, Borrower agrees that on the due date of any amount due as set forth in the Repayment Letter, Bank will debit the amount due from the Deposit Account established by Borrower in connection with this Loan. Should there be insufficient funds in the Deposit Account to pay all such sums when due, the full amount of such deficiency be shall be immediately due and payable by Borrower.

4. FEE: If the Loan is not forgiven and a Loan Balance remains, Borrower shall pay a late payment charge assessed in the amount of five percent (5.00%) of the amount of the monthly payment, not to exceed $50.00, if the monthly payment is not received within ten (10) days of the due date set forth in the Repayment Letter.

5. INTEREST RATE: Bank shall charge interest on the unpaid principal balance of the Loan at the interest rate set forth above under "Interest Rate" from the date the Loan was funded until the Loan is paid in full.

6. REPRESENTATIONS, WARRANTIES AND COVENANTS. (1) Borrower represents and warrants to Bank, and covenants and agrees with Bank, that: (i) the uncertainty of economic conditions as of the date of the application for the Loan makes necessary the Loan to support the ongoing operations of Borrower; (ii) Borrower will use the funds of the Loan to retain at least 90% of its workforce, at full compensation and benefits, until September 30, 2020; (iii) Borrower intends to restore not less than 90% of the workforce of Borrower that existed as of February 1, 2020, and to restore all compensation and benefits to the workers of Borrower no later than four (4) months after the termination date of the public health emergency declared by the Secretary of Health and Human Services on January 31, 2020, under section 319 of the Public Health Services Act (42 U.S.C. 247d) in response to COVID–19; (iv), Borrower will not reduce its base compensation, wages, health care benefits, or other employee benefits during the term of the Loan; (v) Borrower will timely file quarterly reports with the SBA on Borrower's compliance with the requirements of the CARES Act; (vi) Borrower is created or organized in the United States or under the laws of the United States and has significant operations in and a majority of its employees based in the United States; (vii) Borrower is domiciled in the United States of America, with a workforce predominately located in the United States of America; (viii) Borrower is not a debtor in a bankruptcy, state court receivership, or other insolvency proceeding; (ix) Borrower will not pay dividends with respect to the common stock of the eligible business, or repurchase an equity security that is listed on a national securities exchange of Borrower or any parent company of Borrower while the Loan is outstanding, except to the extent required under a contractual obligation that is in effect as of the date of enactment of the CARES Act; (x) Borrower will not outsource or offshore jobs for the term of the Loan and two (2) years after completing repayment of the Loan; (xi) Borrower will not abrogate existing collective bargaining agreements for the term of the Loan and two (2) years after completing repayment of the Loan; (xii) and; Borrower will remain neutral in any union organizing effort with respect to Borrower for the term of the Loan; (2) At all times during the term of the Loan, Borrower represents and warrants to the Bank, that (i) if Borrower is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized; (ii) this Note, and any instrument or agreement required under this Note, are within

1

---



U.S. Small Business Administration

## NOTE

| SBA Loan # | PPP65971373-02 |
|---|---|
| SBA Loan Name | American Insurance Acquisition Inc. |
| Date | May 1, 2020 |
| Loan Amount | $4,600,500.00 |
| Interest Rate | 1.00%; Fixed Rate |
| Borrower | American Insurance Acquisition Inc., a Delaware Corporation |
| Operating Company | N/A |
| Lender | Fifth Third Bank, National Association, a federally chartered institution |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of

Four Million Six Hundred Thousand Five Hundred and 00/100 _____ Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

App'x. 0036



U.S. Small Business Administration

## NOTE

| SBA Loan # | 74161771-03 |
|---|---|
| SBA Loan Name | **Elite Legacy Education, Inc.** |
| Date | **04-24-2020** |
| Loan Amount | **$1,899,832.00** |
| Interest Rate | **1.00%** |
| Borrower | **Elite Legacy Education, Inc.** |
| Operating Company | N/A |
| Lender | **Pacific Premier Bank** |

**1.PROMISE TO PAY:**

In return for the Loan, Borrower promises to pay to the order of Lender the amount of **One Million Eight Hundred Ninety-nine Thousand Eight Hundred Thirty-two and 00/100** Dollars , interest on the unpaid principal balance, and all other amounts required by this Note.

**2.DEFINITIONS:**

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

**3.PAYMENT TERMS:**

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

**The interest rate under this Note shall be fixed at 1.00% per annum for the term of the Loan. Borrower will pay this loan in accordance with the following payment schedule. Beginning with the first loan payment due under this Note, Loan payments shall be deferred in their entirety for a period of six (6) months (the "Payment Deferral Period"). Upon the end of the Payment Deferral Period and beginning seven (7) months from the month this Note is dated, Borrower shall make seventeen (17) consecutive monthly payments of interest only and one (1) final payment of all outstanding principal plus all accrued unpaid interest (including all interest accrued during the Payment Deferral Period) on the date that is twenty-four (24) months from the date of this Note (the "Maturity Date"). All payments due under this Note shall be made on the first calendar day of the month when due, except for the final payment, which is due on the Maturity Date. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; and then to principal. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

> **Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:
>
> > a. Give Lender written notice;

Page 1/3

136046900

*02100000000006783691017OALS0950*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,005,767.00 | 05-01-2020 | 05-01-2022 | 6783691017 | 04A0 / 999 | | 21022 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "*****" has been omitted due to text length limitations.

**Borrower:** VERMILLION INC
12117 FM 2244 RD BLDG 3 STE 10
AUSTIN, TX 78738

**Lender:** BBVA USA
SBA PPP TX
2201 DONLEY DRIVE, SUITE 350
AUSTIN, TX 78758
8002391996

**Principal Amount: $1,005,767.00** **Date of Note: May 1, 2020**

**PROMISE TO PAY.** VERMILLION INC ("Borrower") promises to pay to BBVA USA ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Million Five Thousand Seven Hundred Sixty-seven & 00/100 Dollars ($1,005,767.00), together with interest on the unpaid principal balance from May 1, 2020, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 1.000% per annum based on a year of 360 days, until maturity. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in [illegible] each payment. Borrower's first payment is due December 1, 2020, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on May 1, 2022, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to interest, then to any fees or amounts for additional products or services you obtain in connection with this loan (such as debt cancellation/suspension protection, credit insurance, warranty coverage, etc.) that are payable with or as part of your payment, then to principal due, then to any unpaid collection costs and other charges due under this Note, with any remaining amount to the outstanding principal balance. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding, unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 or 366 days, as the case may be. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**TRANSACTIONS WITH AFFILIATES.** Borrower shall not directly or indirectly (including through its parent company(ies), subsidiary(ies), or affiliate(s)) transfer any proceeds of the Loan to, nor use them for the benefit of, a Bank Affiliate, including using any of the proceeds of the Loan to make any payment on (or with respect to) any loan or other debt from any Bank Affiliate. Borrower may request a list of Bank Affiliates, which is updated on a quarterly basis, from the Bank by contacting its relationship manager. The term "Bank Affiliate" means any entity (1) that is directly or indirectly (including ownership through a trust and beneficial ownership), controlling, controlled by, or under common control with Lender (such an entity a "Control Entity"), (2) in which a majority of its directors, trustees, or general partners (or individuals exercising similar functions) constitute a majority of the persons holding any such office with Lender or a Control Entity, (3) that is sponsored and advised on a contractual basis by Lender or another Bank Affiliate, or (4) that is an investment fund for which Lender or any other Bank Affiliate serves as an investment adviser. Ownership of fifteen percent (15%) or more of the ownership interest in an entity shall be deemed control of the entity, and each general partner shall be deemed to have control over a partnership.

To the extent the proceeds of this Loan will be used to purchase securities (regardless of whether such purchase is conducted through BBVA Securities Inc. or through another broker-dealer): (1) no securities of a Bank Affiliate (including those underwritten by a Bank Affiliate) shall be purchased during an issuance or underwriting period, or in a way that would transfer Loan proceeds to a Bank Affiliate; (2) no securities shall be purchased where a Bank Affiliate is selling them as principal (even in the open market); and (3) Borrower agrees to promptly notify Lender of any violation of this provision.

Failure to comply with the foregoing Transactions with Affiliates requirements at any time during the term of this Agreement, including renewals and extensions thereof, shall be deemed a Default and subject to the default provisions and remedies available to Lender.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: BBVA USA, SBA PPP TX, 2201 DONLEY DRIVE SUITE 350, AUSTIN, TX 78758.**

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 18.000% per annum based on a year of 360 days. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

# This is an example of a residential mortgage loan promissory note

Loan Number: ▮▮▮▮▮                                           MIN: ▮▮▮▮▮

Multistate                    **NOTE**                    FHA Case Number ▮▮▮▮▮

April 21, 2017                                              SNELLVILLE, GEORGIA
[Date]                                                      [City, State]

SNELLVILLE, GEORGIA 30078
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$168,028.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is ▮▮▮▮▮ A NEVADA LIMITED LIABILITY CORPORATION. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **5.000%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on **June 1, 2017**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest and other items in the order described in the Security Instrument before Principal. If, on **May 1, 2047**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

▮▮▮▮▮

LAS VEGAS, NEVADA   89145

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$902.01**.

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to any accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded

MULTISTATE FHA Fixed Rate Note                                              1/2015-b

IOS, Inc.                              Page 1 of 3

▮▮▮▮▮

Jason Koontz

App'x. 0039

TAB 3

## EXPERT REPORT OF WILLIAM M. MANGER, JR

### I.    Qualifications

1.      I served in the United States Small Business Administration (the "SBA") for a total of almost eight years, from 2005 to 2009 and again from 2017 to January 2021. Most recently, I was Chief of Staff of the SBA from March 2020 to January 2021, during which I oversaw and led the SBA's implementation of the Paycheck Protection Program (the "PPP"). In that role, I was responsible for promulgating PPP-specific rules and guidance, implementing PPP-specific processes at the SBA, and communicating with lenders, trade associations, government agencies, and members of Congress. I left the SBA in January 2021 and am now an independent consultant.

2.      Prior to and concurrent with my role as Chief of Staff, I was the Associate Administrator, Office of Capital Access at the SBA from March 2017 to January 2021. In that role, I was responsible for delivering approximately $30 billion annually to small businesses through the SBA's main lending programs, including the 7(a) Loan Program, 504 Loan Program, and the Microloan Program. I was responsible for drafting rules and regulations including the Standard Operating Procedures ("SOPs") that governed the loan programs. The SBA's SOPs detail the rules, policies, and procedures that govern eligibility for and participation in the SBA's loan programs.

3.      I was also involved in the creation of the SBA's PPP-specific IFRs and FAQs that modified the existing 7(a) regulations. Specifically, I was involved in the drafting, revising, and finalizing the April 2020 Final Rule and the January 2021 Final Rule (both defined below).

4.      Prior to serving in the SBA from 2017 to 2021, I was a Managing Director at Brock Capital Group, LLC, a boutique investment bank and consulting firm, from 2009 to March 2017.

5.      From 2007 to 2009, I served in the SBA as Associate Administrator, Office of Field Operations. In that role, I was responsible for the operational management of the SBA's field

infrastructure and oversaw nearly 1,000 employees at the SBA's ten regional and 68 district offices throughout the United States and its territories.  I provided policy guidance and assisted the Administrator in setting goals.  In addition, for several months in 2008, I also served as Associate Administrator, Office of Entrepreneurial Development, during which I oversaw the SBA's resource partners:  Small Business Development Centers, Women's Business Centers and SCORE.

6.     From 2005 to 2007, I was the Regional Administrator of the SBA for Region II, which covered all of New York, New Jersey, Puerto Rico and the US Virgin Islands.  I was responsible for the delivery of the SBA's financial assistance, management counseling, business development, and minority development activities throughout the Region.  I also was a member of the Management Board responsible for implementing policy.

7.     A copy of my resume is attached hereto as **Exhibit A**.

## II.     Background

8.     I was retained by Bailey & Glasser LLP as counsel to Greathouse, et al., the plaintiffs in this case.  The defendants are Capital Plus Financial, et al (CPF).  Based on information I received from counsel to the plaintiffs, including the complaint, defendant's brief in support of their motion to dismiss, plaintiffs' brief in opposition to defendant's motion to dismiss, as well as SBA Rules and SOPs, I understand that CPF is a Community Development Financial Institution (CDFI) that was authorized to make PPP loans under the CARES Act.  I also understand that plaintiffs contend that PPP loans made to them by CPF were not disbursed.

9.     I am being compensated for my expert services in connection with this case at a rate of $650 per hour.  My compensation is not contingent on the nature and substance of my opinions or on the outcome of the case.

### III.    The SBA's Section 7(a) Loan Program and PPP

10.    The SBA was formed during the Eisenhower Administration in 1953. The SBA's mission is to "aid, counsel, assist and protect the interests of small business concerns, to preserve free competitive enterprise and to maintain and strengthen the overall economy of our nation." (SBA, Organization, available at http://www.sba.gov/about-sba.organization).

11.    One way the SBA accomplishes its mission is by providing small businesses with access to credit through various lending programs, the most common of which is the 7(a) Loan Program. (The 7(a) Program is named after Section 7(a) of the Small Business Act. 15 U.S.C. § 636(a)). Under the 7(a) Program, the SBA facilitates lending to qualifying small businesses, which may not otherwise qualify for loans, by guaranteeing up to 85% of the value of loans made to them.

12.    In late March 2020, in response to the Covid-19 pandemic, the President signed into law the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which created the PPP. (Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020). The PPP was designed to aid small businesses and non-profits that were affected by the COVID-19 pandemic by providing emergency funding to make payroll and pay utilities, rent, and mortgage payments.

13.    The 7(a) Program served as the framework for the PPP, and like the 7(a) Program, the PPP encouraged lending to small businesses and non-profits by way of SBA-guaranteed private loans. However, in light of the pandemic's effects on small businesses, the PPP went further than the 7(a) Program. Under the PPP, for example, the SBA guaranteed 100% of qualifying loans, forgave the loans in their entirety if used for specified purposes, and waived its guaranty fees. Lenders collected loan-processing fees, in addition to 1% interest, but, due to the SBA's guarantee and forgiveness obligations, faced no financial risk from borrowers not repaying the loans.

14.     In my role as Chief of Staff, I was informed that the PPP had to be up and running one week after the CARES Act was signed into law. The SBA team and I worked around the clock to issue PPP-specific Interim Final Rules (IFRs), where needed, and to update technology systems to allow lenders to submit PPP loan applications. Within one week of the CARES Act being signed into law, lenders were able to submit applications and make loans under the PPP. In the first fourteen days of the PPP, the SBA processed nearly fourteen years' worth of loans. Ultimately, more than three quarters of a trillion dollars were made available to small businesses and not-for-profits through the program.

15.     The lenders that participated in the early days of the PPP were generally the same that participated in the 7(a) Program. The total number of initial lenders was approximately 1,700. The SBA worked to get thousands of additional lenders into the program and, when it was fully ramped up, more than 5,000 lenders were participating.

## IV.    SBA Rules Governing the 7(a) Program and the PPP

16.     In general, because of the two programs' similarities, the 7(a) Program's then-existing regulations and SOPs formed the framework for the implementation of the PPP. Except as provided for in PPP-specific IFRs and FAQs, the existing 7(a) regulations and SOPs governed the PPP.

17.     Following the passing of the CARES Act, the SBA issued the first PPP-specific IFR on April 15, 2020, which was titled "Business Loan Program Temporary Changes; Paycheck Protection Program" (the "April 2020 Final Rule"). (85 Fed. Reg. 20811 (Apr. 15, 2020)). Among other things, the April 2020 Final Rule provided incentives to lenders to make PPP loans by

providing that, for funding PPP loans of $350,000 or less, the SBA would pay to lenders a processing fee of 5% of the loan amount.

18.     Lenders could use their own form of a Promissory Note or utilize a standardized SBA Promissory Note as the legal instrument governing the terms between the lender and the borrower. It is my understanding that CPF utilized the SBA standardized Promissory Note for its lending transactions under PPP. Plaintiffs filed a copy of that Note in full with the Court along with their complaint which I have also reviewed in preparing this report. It is reasonable to assume that a PPP lender requesting a signed SBA Promissory Note from a borrower entered into an agreement to make a PPP loan with its accompanying specific terms of repayment and the possibility of forgiveness.

19.     The SBA wanted to ensure the prompt distribution of funds from participating lenders to PPP borrowers because of the consequences of the pandemic which notably included government-imposed lockdowns. Once a lender received SBA approval for a PPP loan by receiving a loan number through SBA's Etran system, the timing clock commenced. "The lender must make a one-time, full disbursement of the PPP loan within ten calendar days of loan approval; for the purposes of this rule, a loan is considered approved when the loan is assigned a loan number by SBA." (85 Fed. Reg. 26321 (May 4, 2020)). The rule goes on to state that a lender must report disbursement of a PPP loan by filing an SBA Form 1502 which triggers the payment by SBA of the processing fee to the lender. The pertinent section reads, "In addition to providing the ACH credit information to direct payment of the requested processing fee, lenders will be required to confirm that all PPP loans for which the lender is requesting a processing fee have been fully disbursed on the disbursement dates and in the loan amount reported. A lender must report through either Etran Servicing or the SBA Form 1502 report any PPP loans that have been cancelled before

disbursement or that have been cancelled or voluntarily terminated and repaid after disbursement." The section concludes by stating the intention of the Administrator of the SBA and the Secretary of the Treasury, "The Administrator, in consultation with the Secretary, determined that requiring lenders to report on disbursement within 20 calendar days of loan approval ensures that the disbursement of funds to eligible borrowers will occur rapidly."

20.     Under the CARES Act and the first round of PPP lending, many small businesses had difficulty obtaining small-sized PPP loans. That was because some lenders were not able to, or not willing to, devote the resources necessary to fund a small-sized PPP loan to collect a processing fee of 5% of the loan amount.

21.     In December 2020, Congress attempted to solve this problem by passing the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act ("Economic Aid Act"), increasing the available lender processing fees for PPP loans of $50,000 or less from 5% of the loan to the lesser of 50% or $2,500. (Title III of the Consolidated Appropriations Act of 2021. Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020)).

22.     While the change in the processing fee schedule was made to encourage lenders to make smaller loans to the smallest of small businesses, the processing fees were only to be paid by the SBA for loans that were disbursed. Lenders were to record full disbursement of PPP loans by filing an SBA Form 1502 with the Agency. Loans could be canceled with the SBA prior to disbursement for which no processing fee would be paid. If a lender was given a loan number by the SBA for a PPP loan and then submitted a Form 1502 but did not fully disburse the loan, this not only would be inconsistent with the program, but also would be in violation of the rules.

Dated this 16, day of December 2022

By:   _William M. Manger J._
          William M. Manger, Jr.

**Exhibit A**

**(Resume of William M. Manger, Jr.)**

# WILLIAM M. MANGER, JR.

631-255-2288 ▪ wmmanger@gmail.com
New York, NY ▪ Linkedin.com/in/bill-manger-7815565/

## SENIOR OPERATIONS LEADER
### *25+ years of executing significant strategic, operational and organizational agendas*

Senior operations leader and chief of staff with an unparalleled track record of delivering operational excellence to achieve strategic goals within the government, banking and finance sectors. Served at the highest levels of government, most recently as the architect of the immediate transformation of the US Small Business Administration to respond to the Cares Act by implementing the Paycheck Protection Program. Currently seeking to leverage vast operational leadership experience within the private sector.

✓ **Trusted advisor to senior leadership:** consistently appointed to co-lead and advise on large-scale and complex transformations and operational agendas. Known for simplifying complexity, anticipating and resolving problems, mitigating risks and adding strategic value.

✓ **Strategic integrator:** exceptional ability to serve at the nexus of an enterprise to align and operationalize across functions.

✓ **Highly adept communicator with commanding executive and leadership presence:** successfully communicates at all levels with organizational and political intelligence, confidence, situational sensitivity and directness.

✓ **Analytical and pragmatic decision-maker:** results-obsessed focus on streamlining to create greater efficiencies. Consistently recognized for sound judgment and thorough analysis of problems while moving quickly to implement the most effective solutions.

✓ **Inspiring and motivating leadership style:** demonstrates infectious energy that motivates teams and key stakeholders to unite and achieve a common vision.

### HIGHLIGHTS OF EXPERTISE

- Executive Leadership & Facilitation
- Strategic Planning
- Operations
- Cross-Functional Teaming
- Critical Thinking/Analysis
- Efficiency Identification
- Project Management/Execution
- Executive Communications
- Transformations
- Policy and Procedure Review
- Sales & Business Development
- Change Management

## PROFESSIONAL EXPERIENCE

**U.S. SMALL BUSINESS ADMINISTRATION** 2017 – 2021
CHIEF OF STAFF 2020 - 2021
As deputy to the Administrator, oversaw and managed the agency and its ~11,000 employees and contractors to deliver products and services for America's small businesses coordinating all functions including legal, finance, human capital, technology and field operations to provide financial assistance, government contracting, entrepreneurial development and disaster assistance.

*Key contributions:*
- Led transformation the agency to implement Paycheck Protection Program (PPP) in one week of it becoming law in the Cares Act. Provided over 5.2 million small businesses and non-profits with almost $550B in forgivable loans within ten-month timeframe during pandemic. Effort required immediate implementation of enhanced IT systems and $90M SaaS solution.
- Effectively communicated frequently with key stakeholders including lenders, trade associations, government agencies and members of the US House and US Senate.
- Increased lender participation from approximately 1,500 to almost 5,500, which included nationwide banks, regional banks, community banks, credit unions, fintechs, community development financial institutions, certified development companies, minority depository institutions and others.

ASSOCIATE ADMINISTRATOR, HEAD OF OFFICE OF CAPITAL ACCESS 2017 - 2021
The Office of Capital Access guarantees loans made by banks and other lending partners to small businesses that cannot otherwise obtain financing on reasonable terms. As the head of this office, managed $130B portfolio of direct and guaranteed loans, nine operation centers and staff of ~560 employees, including loan processors. Established policy, ran operations and oversaw risk management.

*Key contributions:*
- Delivered approximately $30 billion in loans annually to small businesses; improved loan processing time by 50% while also improving customer service. Also promoted lending in rural areas and identified Opportunity Zones.
- Successfully testified before Congress 7 times; spoke to many foreign delegations and international conferences. Represented the Administrator on US Treasury's CDFI Board and served on the executive board that approved approximately 80 SBIC licenses.

App'x. 0048
*Continued...*

**BROCK CAPITAL GROUP, LLC**                                                      **2009 – 2017**
MANAGING DIRECTOR
As a key member of the boutique investment bank and consulting firm, supervised the firm's day-to-day operations and coordinated and managed all advising, consulting and banking assignments with CalPERS.

*Key contributions:*
- Negotiated terms, structured, marketed and raised capital for real estate private placement deal that invested in single family homes in suburban NY and CT.
- Chaired the Professional Operations Committee which managed deal flow.

**U.S. SMALL BUSINESS ADMINISTRATION**                                           **2005 – 2009**
ASSOCIATE ADMINISTRATOR, HEAD OF OFFICE OF FIELD OPERATIONS                       *2007 – 2009*
Responsible for operational management of the agency's operations nationwide, managing ~1000 employees in 68 offices across 10 regions. Provided policy guidance and set annual metrics. Fully integrated the field with program offices in headquarters. Drove customer service focus and expansion in underserved markets.

ASSOCIATE ADMINISTRATOR, HEAD OF OFFICE OF ENTREPRENEURIAL DEVELOPMENT (A)        *2008*
Administered $115M in grants to provide counseling and training to small business entrepreneurs. Oversaw Small Business Development Centers and Women's Business Centers that provide technical and special assistance to small business.

REGIONAL ADMINISTRATOR                                                           *2005 – 2007*
Responsible for the delivery of the agency's financial assistance, management counseling, business development and minority enterprise development activities in New York, New Jersey, Puerto Rico and the US Virgin Islands. Managed a staff of 100 employees in five district offices throughout the region. Member of the Agency's Management Board responsible for establishing policy.

**BILL MANGER FOR CONGRESS**                                                      **2003 – 2004**
CANDIDATE
Ran for U.S. Congress in New York-1 district (Eastern Suffolk County LI). Responsible for raising over $1 million dollars for campaign.

**U.S. DEPARTMENT OF TRANSPORTATION**                                            **2001 – 2003**
SENIOR POLICY ADVISOR TO THE MARITIME ADMINISTRATOR
Responsible for coordinating and initiating policy proposals. Directly involved with the maritime response to 9/11. Reviewed and commented on all substantive documents including policy, legislation, budget and briefings for the Secretary and White House.

**VILLAGE OF SOUTHAMPTON**                                                        **1997 – 2001**
TRUSTEE
Twice elected member of five-person executive board, involved with all aspects of managing the municipality including legislation, labor negotiations, emergency services, budgeting, taxation and grants.

**THE ZANETT SECURITIES CORPORATION/ZANETT CAPITAL, INC.**                        **1996 – 1999**
ASSOCIATE - VICE PRESIDENT
Sourced potential companies to directly invest in; met with CEOs and CFOs to negotiate private placement terms.

## EDUCATION AND ADDITIONAL INFORMATION

EDUCATION:
Master of Business Administrative in Finance, **Columbia Business School**
Bachelor of Arts in Political Science, **Trinity College**

ADDITIONAL INFORMATION:
- Have served for over twenty-five years on the board of the Riot Relief Fund which was created after the Civil War riots to provide compensation to spouses and children of policemen and firemen killed in the line of duty
- Have run the New York City marathon twice
- Enjoy skiing in the US and Europe
- Have travelled to 48 states and six continents

# TAB 4

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| ERIC GREATHOUSE, ERNESTO COVARRUBIAS, TIFFANY SUMRALL, BARBARA MYLES, CORI PERICHO, JOHN PINKNEY, JOSHUA SMITH and ALICIA MENA, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>CAPITAL PLUS FINANCIAL, LLC, CROSSROADS IMPACT CORP., ERIC A. DONNELLY and ROBERT H. ALPERT,<br><br>        Defendants. | Case No. 4:22-cv-686-P |

**REPORT ON DAMAGES METHODOLOGY**

**PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA**

**December 20, 2022**

App'x. 0051

## TABLE OF CONTENTS

I.      SCOPE OF PROJECT AND REPORT ................................................................... 1

II.     CREDENTIALS ................................................................................................... 1

III.    CONCLUSION .................................................................................................... 4

IV.     FACTUAL BACKGROUND ABOUT CAPITAL PLUS FINANCIAL AND
        CROSSROADS IMPACT CORPORATION ........................................................ 4

V.      DAMAGES METHODOLOGY ............................................................................ 5

VI.     LIMITING FACTORS AND OTHER ASSUMPTIONS ...................................... 7

## I.    SCOPE OF PROJECT AND REPORT

1.    I was asked by Bailey & Glasser LLP, counsel for the Plaintiffs, to determine whether damages in this matter can be computed for all Class members using a common methodology that is consistent with the Plaintiffs' theory of liability. Plaintiffs allege that Capital Plus Financial, LLC ("CPF"), a wholly-owned subsidiary of Crossroads Impact Corporation ("Crossroads"), failed to fund Plaintiffs' Paycheck Protection Program ("PPP") loans that had been approved by the U.S. Small Business Administration ("SBA"). (Class Action Complaint, dated 9 August 2022 [the "Complaint"], ¶12). Plaintiffs also allege that CPF breached its contractual undertaking by failing to fund the SBA approved PPP loans and frustrated Plaintiffs' ability to avail themselves of the funds of the PPP loan program. (Complaint, ¶12).

2.    Toward this end, I reviewed a wide variety of information and documents, including but not limited to the Complaint, Brief in Support of Defendants CPF's and Crossroads' Motion to Dismiss, dated 17 October 2022, ECF No. 37 ("Defendants MTD Memorandum"), Plaintiffs' Brief in Opposition to Defendants MTD, dated 1 December 2022, ECF No. 43 ("Plaintiffs' MTD Brief"), the SBA PPP loan database, the SEC and regulatory filings of Defendant Crossroads, news articles, and other pertinent data and documents.

3.    Exhibit-1 lists the data and documents I reviewed and relied upon in the course of this engagement.

4.    This report presents my analysis and conclusion.

## II.    CREDENTIALS

5.    I am an Associate Professor of Finance at Babson College, and the founder and president of Crowninshield Financial Research, Inc., a financial economics consulting firm.

6.    I hold a Ph.D. in Economics from Yale University, a Master of Philosophy degree in Economics from Yale University, a Master of Arts degree in Economics from Yale University, and a Bachelor of Arts degree in Economics from Pomona College. I also hold the Chartered Financial Analyst ("CFA") designation, granted by the CFA Institute.

7.    At Babson College, I have taught undergraduate and MBA-level courses in Capital Markets, Investments, Equity Analysis, Fixed Income Analysis, Financial Management, Risk Management, Quantitative Methods, and Security Valuation. I have also taught executive

App'x. 0053

courses on investments and corporate financial management for numerous corporations. Other courses I have taught are listed in my curriculum vitae, which is attached as Exhibit-2.

8.   I have held the Chair in Applied Investments at Babson College and served as the Director of the Stephen D. Cutler Investment Management Center, a research and education center dedicated to the study and teaching of investments and capital markets.

9.   Prior to my joining the faculty at Babson College, I taught at Boston University. Preceding my academic posts, I was an Economist at the Federal Reserve Bank of Atlanta where my primary responsibilities were to monitor financial markets, analyze proposed regulation, and advise the Bank President in preparation for his participation in meetings of the Federal Open Market Committee – the government body responsible for monetary policy in the United States ("U.S.").

10.  I have published in the field of finance. My finance articles have appeared in the *Atlanta Federal Reserve Bank Economic Review*, *Derivatives Quarterly*, *Derivatives Weekly*, *The Engineering Economist*, *The Journal of Risk*, *The American Bankruptcy Institute Journal*, *The Journal of Financial Planning*, *The Journal of Forensic Economics*, *Managerial Finance*, *Risk Management*, *Primus*, and *The Review of Quantitative Finance and Accounting*. I am the author of *Finance and Accounting for Project Management*, published by the American Management Association. I wrote two chapters in the book *The Portable MBA in Finance and Accounting* – one on corporate financial planning and the other on risk management. I have presented research at the annual conventions of the American Finance Association, the Academy of Financial Services, the Multinational Finance Society, the Financial Management Association, the Taxpayers Against Fraud Education Fund Conference, and the International Conference on Applied Business Research. I also co-authored papers that have been presented at the Eastern Finance Association meetings, the Midwestern Finance Association meetings, and the Boston Area Finance Symposium. A list of all the publications I authored in the past ten years can be found in my curriculum vitae, which is attached as Exhibit-2.

11.  I have been selected to review papers for numerous finance journals and conferences, and I have reviewed finance textbook manuscripts for Prentice-Hall, Elsevier, Blackwell, and Southwestern Publishing. I have been quoted on matters relating to finance and investments in *The Wall Street Journal*, *The Washington Post*, *The New York Times*, *The Financial Times*, *The Boston Globe*, and *Bloomberg News*, and my research relating to financial analysis and

valuation has been discussed in *The Wall Street Journal*, *Bond Buyer*, and *Grant's Municipal Bond Observer*.

12.     I am a member of the American Finance Association, the Financial Management Association, the North American Case Research Association, the National Association of Forensic Economics, the CFA Institute, and the CFA Society Boston. I served as a member of the CFA Society Boston education committee and ethics subcommittee. I also served on the Fixed Income Specialization Examination Committee of the CFA Institute.

13.     The CFA designation is the premier credential for financial analysts worldwide. In order to receive this credential, applicants must pass a series of three exams covering such topics as economics, equity analysis, financial valuation, business analysis, quantitative methods, investment analysis, portfolio management, risk management, financial accounting, and ethical and professional standards. For over ten years I taught in the Boston University CFA Review Program and the CFA Society Boston Review Program – two of the leading review programs that prepared candidates for the CFA exams. In both of these programs I taught candidates at the most advanced level.

14.     In addition to my teaching, research, and academic community responsibilities, I practice extensively as a financial consultant. My clients are primarily law firms that are prominent in financial services and securities litigation. Past clients also include the U.S. Securities and Exchange Commission, the Internal Revenue Service, the Attorney General of the State of Illinois, and the National Association of Securities Dealers. As an expert in financial economics, over the past 25 years, I have conducted analyses and presented opinions related to financial markets, valuation, and damages in more than 150 cases. Exhibit-3 lists my prior testimony appearances over the past four years.

15.     I am the sole owner of the consulting firm Crowninshield Financial Research, Inc., which receives compensation for the work performed by me and the staff who assist me. My firm is being compensated at a rate of $950 per hour for my work, and a range of lower rates for analysts and other personnel who are assisting me on this case. My compensation is not contingent on my findings or on the outcome of this matter.

III.    **CONCLUSION**

16.    Damages in this matter can be computed in a straightforward manner for all Class members using a common methodology that is consistent with Plaintiffs' theory of liability.

IV.    **FACTUAL BACKGROUND ABOUT CAPITAL PLUS FINANCIAL AND CROSSROADS IMPACT CORPORATION**

17.    CPF is a real estate financial institution primarily in the business of originating, selling, and servicing mortgage loans. Capital Plus Financial describes itself as a "certified Community Development Financial Institution (CDFI) and certified B-Corp that supports Hispanic homeownership with a long-term, fixed-rate single-family mortgage product." (Annual Report for the period ending: 31 October 2021, Crossroads Systems Inc., dated 31 January 2022, ["FY 2021 Annual Report"] p. 5). Certification as a Community Development Financial Institution is granted by the U.S. Treasury. (Id., p. 5). The certification provides certain tax breaks to lenders. (Id., p. 5). CPF was a qualified and approved SBA-supervised PPP lender. (Id., p. 6). In late 2020, CPF began offering PPP loan origination services. (Id, p. 6).

18.    Throughout the time that CPF was an SBA-supervised PPP lender, it was a wholly-owned subsidiary of Crossroads, a publicly owned holding company traded on the OTCQX market under the ticker CRSS. (Id., p. 2). CPF was Crossroads' primary subsidiary (Id., p. 5). Crossroads reported in 2021 that it had a total of 34 employees. (Id., p. 5).

19.    In its annual report for fiscal year ("FY") 2021, ending 31 October 2021, Crossroads reported that CPF was one of the top five PPP lenders in the country. (Id., p. 6). According to the SBA website, CPF purportedly originated 472,036 PPP loans worth a total of $7.58 billion. ("Paycheck Protection Program (PPP) Approvals through 5/31/2021," *U.S Small Business Association*, p. 7). Plaintiffs allege that CPF falsely reported their PPP loans as funded to the SBA. (Complaint, ¶100).

20.    In FY 2020, the fiscal year prior to when CPF began processing PPP loans for the SBA, Crossroads reported total revenue of $36.6 million. (FY 2021 Annual Report, p. 12). The next year, however, in FY 2021 the fiscal year in which CPF began processing PPP loans, CPF generated PPP related revenues of $895 million, comprising loan administrative fees and interest income. (FY 2021 Annual report, p. 35). As of 31 July 2022, since CPF began processing PPP loans, it reported PPP related revenues of over $980 million in total. (Crossroads Systems Inc., Quarterly Report for the period ending 31 July 2022, p. 6).

App'x. 0056

21.     On 8 July 2021, Crossroads announced a special dividend of $238.9 million, or $40 per share of common stock. (Fiscal Second Quarter Shareholder Report for the Three Months Ended April 30, 2021, 8 July 2021, p. 4). Table-1 shows the beneficial ownership of insiders, and the estimated special dividend received.

**Table-1: Shares Beneficially Owned and Estimated Special Dividend Received**

| Beneficial Stock Holder | Shares Owned | | Estimated Cash Dividend Based On | |
|---|---|---|---|---|
| | **FY End 2020** | **FY End 2021** | **FY End 2020 Ownership** | **FY End 2021 Ownership** |
| Eric Donnelly | 532.8 K | 718.6 K | $21.3 M | $28.7 M |
| Farzana Giga | 990.2 K[1] | 618.7 K | $39.6 M | $24.7 M |
| Robert Alpert | 746.1 K | 546.1 K | $29.8 M | $21.8 M |
| Clark Webb | 746.1 K | 646.1 K | $29.8 M | $25.8 M |
| Claire Gogel | 193.4 K | 193.4 K | $7.7 M | $7.7 M |
| James Perez Foster | 0.6 K | 0.6 K | $24.0 K | $24.0 K |
| Ray Kembel | 0.4 K | 0.4 K | $16.0 K | $16.0 K |
| Mark Crockett | 466.2 K | 466.2 K | $18.6 M | $18.6 M |
| Charles A Vose III | 299.7 K | 485.5 K | $12.0 M | $19.4 M |

Sources: FY 2020 Annual Report, p. 6; and FY 2021 Annual Report, p. 7.
[1] Equal to the sum of Farzana Giga's FY 2020 shares owned (432,931) plus Westchester Standard, LLC's Shares Owned (557,225). Westchester Standard, LLC's holdings were managed by Farzana Giga.

## V.     DAMAGES METHODOLOGY

22.     Counsel for Plaintiffs asked me to opine on whether damages could be measured using a methodology that is consistent with Plaintiffs' theory of liability and can be commonly applied for all Class members with breach of contract claims.

23.     My understanding is that economic damages are the amount of compensation that would place Plaintiffs in the same economic condition that they would be in if Defendants had not engaged in the alleged wrongdoing and did not commit the alleged misdeeds.

24.     According to Plaintiffs' theory of liability, in the "but for" scenario where there was no alleged wrongdoing by Defendants, Class members would have received a quantity of funds that they did not receive in the actual scenario. Given the facts and circumstances of the instant case, from the perspective of economics, a Class member has suffered damages if they applied for a PPP loan through CPF, and was approved by the SBA for the PPP loan, but did not receive any, or all, of the funds in connection with the loan on account of Defendants' alleged wrongdoing.

App'x. 0057

25.    Therefore, assuming Plaintiffs establish liability, each Class member's damages are at a minimum the respective amount of their SBA-approved PPP loan that CPF failed to fund.[1] That is, each class member's damages are at least equal to the amount of the SBA-approved PPP loan minus the amount received, if any. Given the facts and circumstances of this case, and assuming Plaintiffs' allegations are true, the amount of the SBA-approved, but unfunded PPP loan is an appropriate and conservative measure of damages for every Class member. I also understand that in lieu of damages or to express damages differently, Plaintiffs would be amendable to receiving their PPP loan funding in full with interest.

26.    Measurement of this unfunded quantity is readily available from case and loan documentation. The amount of the SBA-approved PPP loan can be determined by the Loan Document submitted in connection with the loan. The amount of the loan that was received, if any, can be determined from the borrower's bank statements and CPF financial records.

27.    This measure of damages is conservative because it excludes consequential losses and harm sustained by Class members, beyond the quantity of funds not received, sustained on account of Class members being deprived of the funds. In particular, the measure does not include compensation for the value of business profits or opportunities lost on account of being deprived of funds. CPF's failure to fund the SBA-approved loans reasonably caused certain Class members financial harm as they may have lost the opportunity to maintain or grow their business. As explained in the Complaint, CPF's failure to fund the PPP loans resulted in certain Plaintiffs lost opportunities, for example: "CPF's failure to fund Greathouse's SBA-approved PPP loan deprived Greathouse of funds that would have directly assisted in the operation of his business and resulted in lost opportunities and other consequential damages." (Complaint, ¶124).

28.    Similarly, damages measured as the approved but unfunded amount of the PPP loan does not consider and compensate Plaintiffs for further direct financial losses and harm sustained by Plaintiffs as a consequence of their being deprived of funds. The Complaint provides an example of a borrower who allegedly suffered damages as a consequence of the CPF's failure to fund these SBA-approved loans. Plaintiff Myles stated, "My account had not been negative for a long time, but because I was informed that I had been approved, I went in debt to open a business bank account, pay over $2000 for a website, and many meetings." (Complaint, ¶159).

---

[1] This calculation excludes any prejudgment interest.

29.   Further, in the event that the court awards punitive damages to the Class, the aggregate punitive award can be allocated to Class members on a pro-rata basis, commensurate with their proportion of total economic damages.

30.   In sum, measuring damages for each Class member as the difference between the SBA-approved loan amount and the amount the Class member received, if any, is a conservative measure of the economic damages sustained by each Class member according to Plaintiffs' theory of liability, is consistent with Plaintiffs' theory of liability, and can be readily computed commonly for all Class members.

## VI.   LIMITING FACTORS AND OTHER ASSUMPTIONS

31.   This report is furnished solely for the purpose of court proceedings in the above named matter and may not be used or referred to for any other purpose.  The analysis and opinions contained in this report are based on information available as of the date of this report.  I reserve the right to supplement or amend this report, including in the event additional information becomes available.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**
**Documents and Other Information Considered**

## CASE DOCUMENTS

- Class Action Complaint, dated 9 August 2022.
- Brief in Support of Defendants Capital Plus Financial, LLC's and Crossroads Impact Corp.'s Motion to Dismiss, dated 17 October 2022.
- Plaintiffs' Brief in Opposition to Defendants Capital Plus Financial, LLC's And Crossroads Impact Corp.'s Motion To Dismiss, dated 1 December 2022.

## COMPANY REPORTS

- "Crossroads System Reports Fiscal First Quarter 2020 Financial Results," Company report, published 5 March 2020.
- "Crossroads System Reports Fiscal Second Quarter 2020 Financial Results," Company report, published 11 June 2020.
- "Crossroads System Reports Fiscal Third Quarter 2020 Financial Results," Company report, published 3 September 2020.
- "Crossroads System Reports Fiscal Fourth Quarter and Fiscal Year 2020 Financial Results," Company report, published 14 December 2020.
- "Crossroads System Reports Fiscal First Quarter 2021 Financial Results," Company report, published 4 March 2021.
- "Crossroads System Reports Fiscal Second Quarter 2021 Financial Results," Company report, published 14 June 2021.
- "Crossroads System Reports Fiscal Third Quarter 2021 Financial Results," Company report, published 14 September 2021.
- "Crossroads System Reports Fiscal Fourth Quarter and Fiscal Year 2021 Financial Results," Company report, published 14 December 2021.
- "Crossroads System Reports 2022 Fiscal First Quarter Report," Company report, published 15 March 2022.

## OTC MARKET FILINGS

- "2019 Annual Report For the Period Ending: 31 October 2019," 30 January 2020.
- "2020 Annual Report For the Period Ending: 31 October 2020," 28 January 2021.
- "2021 Annual Report For the Period Ending: 31 October 2021," 31 January 2022.

App'x. 0060

**Exhibit-1**
**Documents and Other Information Considered**

**DATA AND DATABASES**

- OTC Markets Group
- U.S. Small Business Administration Paycheck Protection Program Database

**OTHER**

- Any other documents cited in the report.

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**


Babson College
Finance Division
Babson Park, MA  02457
781-239-5275
Feinstein@Babson.edu

## EDUCATION

1989   YALE UNIVERSITY
       Ph.D. in Economics (Concentration in Finance)

1986   YALE UNIVERSITY
       M.Phil. in Economics

1983   YALE UNIVERSITY
       M.A. in Economics

1981   POMONA COLLEGE
       B.A. in Economics (Phi Beta Kappa, *cum laude*)


## TEACHING EXPERIENCE

1996 - present        BABSON COLLEGE
                      Babson Park, MA
                      Full-time Faculty, Finance Division
                      Associate Professor (2000-present)
                      Donald P. Babson Chair in Applied Investments (2002-2010)
                      Faculty Director of the Babson College Fund (2002-2009)
                      Director of the Stephen D. Cutler Investment Management Center
                      (2002-2007)
                      Assistant Professor (1996-2000)

1990 - 1995           BOSTON UNIVERSITY SCHOOL OF MANAGEMENT
                      Boston, MA
                      Full-time Faculty, Department of Finance

1993 - 1994           WASHINGTON UNIVERSITY, OLIN SCHOOL OF BUSINESS
                      St. Louis, MO
                      Visiting Assistant Professor, Department of Finance

App'x. 0062

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

## BUSINESS EXPERIENCE

| | |
|---|---|
| 2008 - present | CROWNINSHIELD FINANCIAL RESEARCH, INC.<br>Brookline, MA<br>President and Senior Expert |
| 1996 - 2008 | THE MICHEL-SHAKED GROUP<br>Boston, MA<br>Senior Expert (2001 - 2008)<br>Affiliated Expert (1996 - 2001) |
| 1987 - 1990 | FEDERAL RESERVE BANK OF ATLANTA<br>Economist |

## PROFESSIONAL DESIGNATIONS

1998   Awarded the Chartered Financial Analyst designation by the Association for Investment Management and Research.

## RESEARCH AWARDS

1999   Greater Boston Real Estate Board/Real Estate Finance Association – Research Grant and Featured Speaker at Real Estate Finance Association Meetings.

## PAPERS AND PUBLICATIONS

"Securities Litigation Event Studies in the Covid Volatility Regime," (with Miguel Villanueva) *Journal of Forensic Economics*, vol. 30, no. 1, 2022.

"Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," (with Miguel Villanueva) *Review of Quantitative Finance and Accounting*, vol. 57, no. 1, 2021.

"What A Solar Eclipse Has To Do With Market Efficiency," (with Daniel Bettencourt) *Law360.com*, 2017.

"Underestimation of Securities Fraud Aggregate Damages Due to Inter-Fund Trades," (with Gang Hu, Mark Marcus, and Zann Ali) *Journal of Forensic Economics*, September 2013, Vol. 24, No. 2, 161-173.

App'x. 0063

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"Lehman Equity Research Tipping: Evidence in the Stock Price Data," Working paper, March 2010. Cited in *New York Times* May 19, 2012, and made available on the *New York Times* website.

"Distortion in Corporate Valuation: Implications of Capital Structure Changes," (with Allen Michel and Jacob Oded) *Managerial Finance*, 2011, Vol. 37(8), 681-696.

"Market Signals of Investment Unsuitability," (with Alexander Liss and Steven Achatz) Law360.com, June 3, 2010. Available from http://www.law360.com/articles/170690.

"Planning Capital Expenditure," in *The Portable MBA in Financing and Accounting*, J. L. Livingstone and T. Grossman, editors, New York: Wiley, 3rd edition 2001, and 4th edition 2009.

"Financial Management of Risks," in *The Portable MBA in Financing and Accounting*, J. L. Livingstone and T. Grossman, editors, New York: Wiley, 2nd edition 1997, 3rd edition 2001, and 4th edition 2009.

"Fraud-on-the-Market Theory: Is a Market Efficient?" (with Allen Michel and Israel Shaked) *American Bankruptcy Institute Journal*, May 2005.

"Valuation of Credit Guarantees," (with Allen J. Michel and Israel Shaked) *Journal of Forensic Economics* 17(1), pp. 17-37, 2005.

"A Better Understanding of why NPV Undervalues Managerial Flexibility," (with Diane Lander) in *The Engineering Economist*, 2002, Volume 47, Number 4.

"Teaching the Strong-Form Efficient Market Hypothesis: A Classroom Experiment," *Journal of Financial Education*, fall 2000.

*A Future for Real Estate Futures: Potential Applications of Derivatives in Real Estate Investment and Finance* (with Linda Stoller). Monograph. Boston: Real Estate Finance Association / Greater Boston Real Estate Board, May 2000.

"The Risk Budget: Using Your Human Resources," (with John Marthinsen and John Edmunds) *Risk Management*, April 2000.

"Scenario Learning: A Powerful Tool for the 21st Century Planner," (with Jeffrey Ellis and Dennis Stearns) *The Journal of Financial Planning*, April 2000.

"Protecting Future Product Liability Claimants in the Case of Bankruptcy," (with Allen Michel and Israel Shaked) *American Bankruptcy Institute Journal*, January 2000.

App'x. 0064

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"Measuring Risk with the Bodie Put When Stocks Exhibit Mean Reversion," *The Journal of Risk*, Vol. 1, No. 3, 1999.

"Just-in-Time Mathematics: Integrating the Teaching of Finance Theory and Mathematics," (with Gordon Prichett) *Primus*, Vol. IX, No. 2, June 1999.

*Atlanta Park Medical Center v. Hamlin Asset Management.* (with Natalie Taylor). Babson Case Collection, Harvard Business School Press, 1998.
"Dealing with Delta," *Derivatives Week*, VII, No. 44, November 2, 1998.

"Expected Return in Option Pricing: A Non-Mathematical Explanation," *Derivatives Week*, VII, No. 35, August 31, 1998.

"When Hedges Fail: The Put Paradox and its Solution," *Derivatives Quarterly*, Vol. 4, No. 2, Winter 1997.

*Finance and Accounting for Project Management.* New York: American Management Association, 1996.

"International Investing," in *Irwin's Directory of Emerging Market Brokerages*. New York: Irwin, 1996.

"The Hull and White Implied Volatility," Boston University Working Paper #92-51, 1992.

"Immunizing Against Interest Rate Risk Using the Macaulay Duration Statistic: An Assessment," (with Don Smith) in *Financial Systems and Risk Management*, the proceedings of the US-Japan Forum on Financial Strategy in the 1990s, sponsored by Osaka Foundation of International Exchange and Boston University, August 1991.

"Covered Call Options: A Proposal to Ease LDC Debt," (with Peter Abken) *Federal Reserve Bank of Atlanta Economic Review*, March/April 1990. Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"Forecasting Stock-Market Volatility Using Options on Index Futures," *Federal Reserve Bank of Atlanta Economic Review*, May/June 1989. Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"The Black-Scholes Formula is Nearly Linear in Sigma for At-the-Money Options; Therefore Implied Volatilities from At-the-Money Options are Virtually Unbiased," Federal Reserve Bank of Atlanta Working Paper #88-9, December 1988.

App'x. 0065

Exhibit-2
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"The Effect of the 'Triple Witching Hour' on Stock Market Volatility," (with William Goetzmann) *Federal Reserve Bank of Atlanta Economic Review*, September/October 1988. Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"Stock Market Volatility," *Federal Reserve Bank of Atlanta Economic Review*, November/December 1987.

Book review of *In Who's Interest: International Banking and American Foreign Policy*, by Benjamin J. Cohen, Yale University Press, in *Federal Reserve Bank of Atlanta Economic Review*, Summer 1987.

## PRESENTATIONS

"SPAC Public Warrant Valuation Using Iterative Monte Carlo Simulation," (with Ayussh Ahuja, Achraf Krafssi, and Dukalion Tsapalas) at the Financial Management Association Annual Meeting, October 2021.

"Stock Price Reactivity to Earnings Announcements: A Cross-Sectional Analysis of the *Cammer/Krogman* Factors," (with Miguel Villanueva) at the Boston Area Finance Symposium, April 2018.

"Stock Price Reactivity to Earnings Announcements: A Cross-Sectional Analysis of the *Cammer/Krogman* Factors," (with Miguel Villanueva) at the Eastern Finance Association Conference, April 2018.

"Determining the Defendant's Ability to Pay," at Taxpayers Against Fraud Education Fund Conference, October 2010.

"The Computation of Damages in Securities Fraud Cases," at the Grant and Eisenhofer Institutional Investor Conference, December 2002.

"The Role of the Financial Expert in Complex Litigation," at the Financial Management Association Conference, October 2000.

"Entrepreneurial Incentives and Resource Allocation Among Corporate Venturing Initiatives," (with Joel Shulman and U. Srinivasa Rangan), Babson Entrepreneurship Research Conference, May 2000.

"Application of Real Options in Purchasing Strategies," (with Juan Orozco), presented at the International Applied Business Research Conference, March 2000.

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"A Future for Real Estate Futures," (with Linda Stoller) at the Fairfield County chapter of the Real Estate Finance Association, November 1999, and at the Greater Boston Real Estate Board, November 2000.

"Atlanta Park Medical Center v. Hamlin Asset Management," (with Natalie Taylor) at the 1999 convention of the North American Case Research Association.

"Using Future Worlds™ in the Financial Planning Process," (with Jeffrey Ellis) at the Institute of Certified Financial Planners Masters Retreat, October 1999.

"Toward a Better Understanding of Real Options: A Weighted Average Discount Rate Approach," at the 1999 Financial Management Association Conference, the 1999 European Financial Management Association Conference, and the 1999 Multinational Finance Society Conference.

"Just-In-Time Mathematics: Integrating the Teaching of Finance Theory and Mathematics," (with Gordon Prichett) at the 1999 Financial Management Association Conference.

"Alternative Dow Investments for the Individual Investor: Diamonds, Synthetics, and the Real Thing," at the 1999 Academy of Financial Services Convention.

"Evidence of Yield Burning in Municipal Refundings," at Financial Management Association Convention, October 1997; Government Finance Officers Association, 1997; and Northeast Regional Convention of the National Association of State Treasurers, 1997.

"Teaching the Strong-Form Efficient Market Hypothesis," at Conference on Classroom Experiments in the Teaching of Economics at University of Virginia, September 1995.

"Efficient Consolidation of Implied Standard Deviations," (with Shaikh Hamid) at Midwest Finance Association, March 1995.

"A Test of Intertemporal Averaging of Implied Volatilities," (with Shaikh Hamid) at Eastern Finance Association, April 1995.

"Taking Advantage of Volatility:  Non-linear Forecasting and Options Strategies," (with Hassan Ahmed) at Chicago Board of Trade / Chicago Board Options Exchange Conference on Risk Management, February 1992.

"Immunizing Against Interest Rate Risk Using the Macaulay Duration Statistic: An Assessment," (with Don Smith) at Japan-U.S. Conference on Financial Strategies in the 1990s, Osaka, Japan, August 1991.

15

App'x. 0067

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"The Hull and White Implied Volatility," at American Finance Association Convention, December 1990.


**REVIEWED ARTICLES AND BOOKS FOR:**

Harvard Business School Publishing
Elsevier
Journal of Economic Education
Journal of Forensic Economics
Journal of Risk
Financial Review
North American Case Research Association
Financial Management
Journal of Business
Journal of Money, Credit and Banking
Quarterly Review of Economics and Finance
Blackwell
Prentice Hall
Southwestern Publishing


**COURSES TAUGHT**

Advanced Derivative Securities (MBA)
Babson College Fund (Undergraduate and MBA)
Capital Markets (MBA)
Continuous-Time Finance (Doctoral)
Corporate Finance (MBA and Executive)
Corporate Financial Strategy (MBA)
Cross-Functional Management (Integrated curriculum, Undergraduate) Equity Markets (MBA)
Derivatives: Theory and Practice (MBA)
Financial Reporting and Corporate Finance (MBA)
Financial Management (MBA)
Fixed Income Analysis (Undergraduate and MBA)
Introduction to Derivative Securities (Executive)
International Finance (Executive)
Integrated Management (Undergraduate)
Investments (MBA and Executive)
Mod B: Decision Making and Applications, Finance stream (MBA)
Options and Futures (Undergraduate)
Risk Management (MBA)
Portfolio Theory / Management Information Systems (Executive)

16

App'x. 0068

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

Quantitative Methods for Investment Management (Undergraduate and MBA)
Security Valuation (Undergraduate and MBA)

## TEACHING AWARDS

Reid Teaching Award, Washington University, Olin School of Business, 1993-94.

## SELECT LIST OF MEDIA CITATIONS

"Is Insider Trading Part of the Fabric?" by Gretchen Morgenson, *The New York Times*, May 19, 2012.

"Bankers Rigging Municipal Contract Bids Admit to Cover-Up Lies," by William Selway and Martin Z. Braun, *Bloomberg Markets Magazine*, November 24, 2010.

"Hospital Move Presents Buy-Out Groups with New Risks," by Francesco Guerra, Christopher Bowe, and Rebecca Knight, *Financial Times*, July 15, 2006.

"Funds of Knowledge Add Value," by Rebecca Knight, *Financial Times*, March 12, 2006.

"City's Financial Picture Worse Than Ever, Sanders Says," by Matthew T. Hall, *San Diego Union-Tribune*, January 7, 2006.

"Downer: Stock Market Takes Another Dive," by John Chesto, *Boston Herald*, July 23, 2002.

"Banks, Developers, Are Main Beneficiaries," [editorial column] by Steven Feinstein, *The Boston Globe*, March 31, 2002, p. C4.

"Washington Investing: What Michael Saylor is Really Worth," by Jerry Knight, *The Washington Post*, March 6, 2000.

"IBM Retools Pensions," by Stephanie Armour, *USA Today*, May 4, 1999.

"L.A. MTA's Law Firm Says Lissack Strategy Will be a Replay," by Andrea Figler, *Bond Buyer,* September 30, 1998.

"Fed Key Player in Rescue of Floundering Hedge Fund," by Andrew Fraser, Associated Press, September 25, 1998.

App'x. 0069

**Exhibit-2**
**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"Top Banks Plan Bailout for Fund," by Andrew Fraser, Associated Press, September 24, 1998.

"Clarion Call to the Small Investor," by Jo-Ann Johnston, *The Boston Globe*, March 4, 1998.

"L.A. Authority Study Shows Rampant Yield Burning Abuse," by Michael Stanton, *The Bond Buyer*, April 22, 1997.

"Dispute Over Yield Burning Dominates GFOA Session," by Michael Stanton, *The Bond Buyer*, January 29, 1997.

"Men Behaving Badly (Yield Burning)," *Grants Municipal Bond Observer*, January 24, 1997.

"Municipal Bond Dealers Face Scrutiny," by Peter Truell, *The New York Times*, December 17, 1996.

"Iowa Market Takes Stock of Presidential Candidates," by Stanley W. Angrist, *The Wall Street Journal*, August 28, 1995.

"Looking for Clues in Options Prices," by Sylvia Nasar, *The New York Times*, July 18, 1991.

"For Fed, A New Set of Tea Leaves," by Sylvia Nasar, *The New York Times*, July 5, 1991.


**MEMBERSHIP IN PROFESSIONAL SOCIETIES**

American Finance Association
CFA Society Boston
Chartered Financial Analyst Institute
Financial Management Association
Foundation for Advancement of Research in Financial Economics (founding member)
National Association of Forensic Economics
North American Case Research Association

App'x. 0070

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided in the Last Four Years**

In Re Inovalon Holdings, Inc. Securities Litigation
Case No. 1:16-cv-04923-VM
United States District Court
Southern District of New York
Deposition Testimony
December 2018

In Re First Solar, Inc. Securities Litigation
Case No. 2:12-cv-00555-DGC
United States District Court
District of Arizona
Deposition Testimony
January 2019

In Re Puma Biotechnology, Inc. Securities Litigation
Case No. 8:15-cv-00865-AG-JLG
United States District Court
Central District of California
Deposition Testimony
April 2017
Deposition Testimony
June 2018
Trial Testimony
January 2019

In Re Seaworld Entertainment, Inc. Securities Litigation
Case No. 3:14-cv-02129-MMA-AGS
United States District Court
Southern District of California
Deposition Testimony
March 2019

In Re Southern Company Securities Litigation
Case No. 1:17-cv-00241-MHC
United States District Court
Northern District of Georgia
Atlanta Division
Deposition Testimony
December 2018
Testimony at Evidentiary Hearing
May 2019

App'x. 0071

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided in the Last Four Years**

In Re American Realty Capital Properties, Inc. Securities Litigation
Master File No. 1:14-cv-08668-ER
United States District Court
Southern District of New York
Deposition Testimony
June 2017
Testimony at Evidentiary Hearing
August 2017
Deposition Testimony
July 2019

In Re Equifax, Inc. Securities Litigation
Consolidated Case No. 1:17-Cv-03463-TWT
United States District Court
Northern District of Georgia
Atlanta Division
Deposition Testimony
July 2019

In Re Twitter, Inc. Securities Litigation
Case No. 3:16-cv-05314-JST
United States District Court
Northern District of California
San Francisco Division
Deposition Testimony
September 2019

In Re Chemical And Mining Company Of Chile, Inc. Securities Litigation
Case No. 1:15-cv-02106-ER-GWG
United States District Court
Southern District of New York
Deposition Testimony
October 2019

In Re OvaScience, Inc. Securities Litigation
Case No. 1:17-cv-10511-IT
United States District Court
District of Massachusetts
Deposition Testimony
December 2019

App'x. 0072

**Exhibit-3**

### Steven P. Feinstein, Ph.D., CFA
### Testimony Provided in the Last Four Years

In Re Grupo Televisa Securities Litigation
Civil Action No. 1:18-cv-01979-LLS
United States District Court
Southern District Of New York
Deposition Testimony
April 2020

In Re Blackberry Limited Securities Litigation
Case No. 13-cv-07060-CM-KHP
United States District Court
Southern District Of New York
Deposition Testimony
July 2018
Deposition Testimony
July 2020

In Re Microchip Technology, Inc. Securities Litigation
Case No. 2:18-cv-02914-JJT
United States District Court
District of Arizona
Deposition Testimony
October 2020

In Re Johnson & Johnson Securities Litigation
Civil Action No. 3:18-cv-01833-FLW-TJB
United States District Court
District of New Jersey
Deposition Testimony
October 2020

In Re Envision Healthcare Corporation Securities Litigation
Civil Action No. 3:17-cv-01112
United States District Court
Middle District of Tennessee
Nashville Division
Deposition Testimony
January 2021

In Re Novo Nordisk Securities Litigation
Civil Action No. 3:17-cv-209-BRM-LHG
United States District Court
District of New Jersey
Deposition Testimony
February 2021

App'x. 0073

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided in the Last Four Years**

In Re Jeld-Wen Holding, Inc. Securities Litigation
Civil Action No. 3:20-cv-00112-JAG
United States District Court
Eastern District of Virginia
Richmond Division
Deposition Testimony
January 2021
Deposition Testimony
February 2021

In Re Vale S.A. Securities Litigation
Civil Action No. 19-cv-526-RJD-SJB
United States District Court
Eastern District of New York
Deposition Testimony
March 2021

In Re EQT Corporation Securities Litigation
Master File No. 2:19-cv-00754-MPK
United States District Court
Western District of Pennsylvania
Deposition Testimony
May 2021
Deposition Testimony
July 2021

In Re Endo International PLC Securities Litigation
Case No. 2:17-cv-05114-MMB
United States District Court
Eastern District of Pennsylvania
Deposition Testimony
July 2021

In Re McKesson Corporation Securities Litigation
Master File No. 3:18-cv-06525-CRB
United States District Court
Northern District of California
Deposition Testimony
August 2021

App'x. 0074

## Exhibit-3

### Steven P. Feinstein, Ph.D., CFA
### Testimony Provided in the Last Four Years

In Re Perrigo Company PLC Securities Litigation
Master File No. 2:18-cv-02074
United States District Court
District of New Jersey
Deposition Testimony
October 2021

In Re Wells Fargo & Company Securities Litigation
Master File No. 3:18-cv-03948-JD
United States District Court
Northern District of California
Deposition Testimony
November 2021

In Re Microchip Technology, Inc. Securities Litigation
Case No. 2:18-cv-02914-JJT
United States District Court
District of Arizona
Deposition Testimony
January 2022

In Re Super Micro Computer, Inc. Securities Litigation
Master File No. 4:18-cv-00838-JST
United States District Court
Northern District of California
Deposition Testimony
January 2022

In Re Cardinal Health, Inc. Securities Litigation
Master File No. 2:19-cv-03347
United States District Court
Southern District of Ohio
Eastern Division
Deposition Testimony
May 2022

In Re Gannett Co., Inc. ERISA Litigation
Civil Action No. 1:18-cv-00325-AJT-JFA
United States District Court
Eastern District of Virginia
Alexandria Division
Deposition Testimony
May 2022

App'x. 0075

Exhibit-3

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided in the Last Four Years**

In Re Apple Inc. Securities Litigation
Case No. 4:19-cv-02033-YGR
United States District Court
Northern District of California
Oakland Division
Deposition Testimony
June 2021
Deposition Testimony
July 2022

In Re Sealed Air Co. Securities Litigation
Case No. 1:19-cv-10161-LLS
United States District Court
Southern District of New York
Deposition Testimony
July 2022

In Re Aegean Marine Petroleum Network, Inc. Securities Litigation
Case No. 18 Civ. 4993 (NRB)
United States District Court
Southern District of New York
Deposition Testimony
November 2022

In Re Synchrony Financial Securities Litigation
Case No. 3:18-cv-01818-VAB
United States District Court
District of Connecticut
Deposition Testimony
December 2022

App'x. 0076

# TAB 5

# Expert Witness Statement of William Briggs

Eric Greathouse et al., individually and behalf of all others similarly situated
vs.
Capital Plus Financial, LLC, et al.,

## I.    Qualifications

My name is William Briggs. I operate a consulting firm based in Arlington, Virginia.

From November 2017 to January 2021, I served in multiple roles at the United States Small Business Administration (SBA). Prior to my appointment at the United States Small Business Administration, I was employed in multiple positions in and out of public service advising clients, companies, and officials.

I was appointed by the President and his designees to serve in the Office of Capital Access located at the Small Business Administration headquarters building in Washington, DC.  During my three years of service in the Office of Capital Access, I served as Senior Advisor to the Associate Administrator of the Office of Capital Access and was subsequently promoted to Deputy Associate Administrator of the Office of Capital Access in January 2020.

In December 2020, I was appointed as Acting Associate Administrator of the Office of Capital Access and reported directly to the Administrator of the United States Small Business Administration, overseeing all SBA loan programs including the Paycheck Protection Program. I served in this capacity until January 20, 2021.

The mission of the Office of Capital Access is to help make capital available, through banks and other lending partners, to small businesses that would not be able to access credit conventionally at reasonable rates and terms.

The Office of Capital Access administers three main loan programs including the 7(a) loan program, the 504 loan program, and the Microloan program. The 7(a) loan program is the flagship loan program for participating lenders and helps tens of thousands of small businesses access capital every year.

The Paycheck Protection Program was built off the 7(a) loan program framework while also having unique characteristics befitting an emergency loan program.

From March 2020 to January 2021, I oversaw operations, communications, public engagement and daily management of the Paycheck Protection Program or "PPP" as it commonly identified in the media and among the public.

In this capacity, I served as a lead headquarters official at the United States Small Business Administration explaining Paycheck Protection Program rules, guidelines, and design to lenders, trade associations, borrowers, Administration officials, elected officials, federal regulators, and related entities.

App'x. 0078

I publicly posted and widely disseminated information and updates about the program to the public at large and am an expert on the program from its inception through January 20, 2021 including its operations, its designs, and many facets of the program and its execution.

## II.     Purpose & Summary

I have been retained by counsel for the plaintiffs in this case, to provide expert testimony in this case. I am being compensated for my work in this case by plaintiffs' counsel at the rate of $1,000 per hour and my compensation is not contingent on my work.

My testimony is focused on aspects of the Paycheck Protection Program that were administered by the Small Business Administration.

The Paycheck Protection Program was meant to help eligible small businesses and their employees survive the worst economic crisis since the Great Depression. The program's designs and intent were meant to be an alleviation of some of the economic stress.

The federal government, via the Small Business Administration's loan programs and systems and in consultation with the Treasury Department, deputized thousands of lenders to process millions of loans applications and subsequently disburse funds to eligible small businesses in a timely manner.

Timely disbursement of funds to borrowers was both a design feature and a core lender requirement of the program. The volume of participating lenders was another component to meet the public policy aim of rapid disbursement of Paycheck Protection Program funds. These features helped preserve small business employment and prevented future economic costs associated with widescale unemployment.

The plaintiffs assert that they did they not receive loan funds after completing all required loan documentation, obtaining a SBA loan number for their loan, and having messages that there loan was "being funded by the SBA".

The plaintiffs claim that they were "locked in" with the lender and therefore unable to access funds from another lender. The plaintiffs also assert that SBA records provided to the agency by Capital Plus Financial, LLC show these funds as disbursed.

Then, having not received funds, one borrower asserts she was noticed by SBA as being eligible apply for loan forgiveness as if she had received loan proceeds.

If the general fact pattern above is valid as asserted by the plaintiffs, this is not only suboptimal result for the borrowers but seems to counteract the intent of an emergency loan program meant to provide timely financial assistance in challenging economic times.

Overall, the program's intent was to help – not hurt – the borrower, assuming the borrower was eligible to receive funding and submitted a complete loan application and required documentation to an approved lender in a timely manner.

App'x. 0079

Many of these allegations can likely be verified by a thorough review of the required lender reports to the federal government, loan documents, bank statements of the plaintiffs and lender, customer communications, SBA lender portal communications, etc. Such discovery will likely be illuminative given that the Paycheck Protection Program was almost entirely an electronic and digital process for most borrowers and lenders.

Recent developments evidence concerns as to how the Capital Plus Financial, LLC acted as a Paycheck Protection Program lender in addition to the plaintiffs' complaint.

A December 2022 Congressional oversight committee report suggested that Capital Plus Financial, LLC experienced significant operational and management challenges, including oversight of its third-party financial technology vendors which may have primarily engaged with borrowers during the loan application process.

The Small Business Administration has also publicly announced an investigation into the activities of Capital Plus Financial, LLC for operational and management challenges.

## III. Program specifically designed to help borrowers access timely financial assistance

The mandatory shutdowns designed to slow the spread of the COVID-19 virus and accompanying economic fallout in March 2020 were rapidly evolving predicaments. In response, the Paycheck Protection Program was created as an emergency forgivable loan program specifically designed to get small businesses much needed capital as quickly as possible.

While built upon the 7(a) loan program framework administered by the Small Business Administration and, in consultation with the Treasury Department, the Paycheck Protection Program was designed to be a much simpler loan process for both borrower and lender alike.

Forms were streamlined, documentation requirements were limited, and normal underwriting standards typical of government guaranteed lending were not included in the program's mandates, all in service of getting funds quickly disbursed. The program evolved over time to include more controls and responsibilities on the lender to enhance borrower eligibility and overall program compliance.

## IV. Some Paycheck Protection Program lender requirements

In order to expedite the disbursement of this massive funding in a relatively short amount of time, the Paycheck Protection Program required the utilization of thousands of lenders and third parties including accounting firms and technology partners.

In order to become a Paycheck Protection Lender, lenders were assessed in part by their prior relationship and engagement with Small Business Administration loan programs prior to the enactment of the CARES Act. The CARES Act is the law which created the Paycheck Protection Program.

App'x. 0080

For example, a lender who had actively originated small business loans guaranteed by the Small Business Administration was classified as having an active Loan Guarantee Agreement, SBA Form 750, signed and considered in "active status" within the agency's records.

If a lender did not have an "active" Loan Guarantee Agreement (SBA Form 750) and was a federally insured bank, credit union or farm credit lender, the federally-insured institution would complete and submit a Form 3506 to SBA for approval and access to the Small Business Administration computer system that processed Paycheck Protection Program loans.

Community Development Financial Institutions (CDFI) are federally insured and regulated entities. Thus, Capital Plus Financial, LLC would have used Form 3506 to apply and be accepted as a Paycheck Protection Program lender.

Form 3506 specifically requires federally-insured lenders such as Capital Plus Financial to adhere to the following provisions as part of being a Paycheck Protection Program lender:

> 2. Application for Guaranty. This Agreement governs only "covered loans," duly approved under delegated authority hereafter for guaranty by SBA, that are subject to the Paycheck Protection Program under the CARES Act and the Economic Aid Act, sections 7(a)(36), 7(a)(37), and 7A of the Small Business Act, any rules or guidance that has been issued by SBA implementing the Paycheck Protection Program, or any other applicable Loan Program Requirements, as defined in 13 CFR § 120.10, as amended from time to time (collectively "PPP Loan Program Requirements").

> 3. Approval of Guaranty. Lender will process and approve covered loans under delegated authority from SBA. Lender assumes all obligations, responsibilities, and requirements associated with delegated processing of covered loans made under the Paycheck Protection Program. Any change in the terms or conditions stated in the loan authorization shall be made in accordance with PPP Loan Program Requirements. For purposes of making covered loans to an eligible recipient under the Paycheck Protection Program, Lender is responsible, to the extent set forth in the PPP Loan Program Requirements, for all decisions concerning the eligibility (including size) of a borrower for a covered loan. Lender may issue a covered loan approved under PPP procedures without prior SBA review and approval of the processing and underwriting of the loan by executing a PPP Authorization.

> 4. Closing and Disbursement of Covered Loans. Lender must close and disburse each covered loan in accordance with the terms and conditions of the PPP Authorization and PPP Loan Program Requirements. Lender must ensure that a note and all other Loan Documents (as defined in this paragraph) and additional documents are properly executed and take such other actions necessary to fulfill the requirements of the Paycheck Protection Program. SBA is entitled, at any time, to examine and obtain copies of all notes, certifications and documentation (herein, collectively, called "Loan Documents"), and all other records held by Lender which relate to covered loans made pursuant to the Paycheck Protection

App'x. 0081

Program.

    5. Administration of Covered Loans. Lender will hold the Loan Documents and receive all payments of principal and interest unless Lender is required to transfer or assign the note to SBA or a third party at SBA's direction. Lender must service and liquidate all covered loans made under the Paycheck Protection Program in accordance with PPP Loan Program Requirements. Except when SBA directs otherwise, all servicing actions will be the responsibility of Lender, which must follow accepted standards of loan servicing employed by prudent lenders.

Of note in Section 4, the "Lender must close and disburse each covered loan in accordance with the terms and conditions of the PPP Authorization and PPP Loan Program Requirements. Lender must ensure that a note and all other Loan Documents (as defined in this paragraph) and additional documents are properly executed and take such other actions necessary to fulfill the requirements of the Paycheck Protection Program."

The lender was ultimately responsible for the proper origination, processing, disbursement, servicing, customer interaction and related caretaking of their Paycheck Protection Program loan portfolio. These requirements and duties are why lenders were provided fees for these services. These fees were to be paid from the federal government only after the loan in question was fully disbursed by the lender to the borrower as required by the program rules.

From the perspective of the Small Business Administration, the lender was responsible for the management of the relationship with the borrower as opposed to the agency given the Paycheck Protection Program was not a direct loan program. A "direct loan program" in this reference is where the borrower applies directly to a federal government agency for loans directly funded and administered exclusively by the federal government. During the pandemic, the Small Business Administration administered a separate direct loan program (the Economic Injury Disaster Loan Program) in addition to the Paycheck Protection Program.

## V.    Timely disbursement requirement or timely loan cancelation

From the earlier days of the program, the intent was to limit typical administrative paperwork burdens to allow for the lender to quickly disburse funds to the borrower once an eligible borrower had submitted the required loan documentation.

This intent was also meant to benefit eligible borrowers: having submitted the required streamlined loan application and required documentation to an approved lender, they would receive funding from their lender in a timely fashion after the lender submitted the loan and had it processed (i.e. received a loan number) by the Small Business Administration.

As noted in program rules regarding loan documentation, including the use of promissory notes, a lender could use their own promissory notes that were consistent with program rules "to ensure that critical PPP loans are disbursed as efficiently as possible."

App'x. 0082

A program regulation for participating lenders was a ten-day disbursement requirement after the Small Business Administration processed the lender's loan application submission and provided a loan number back to the lender.

The lender would use this loan number on the loan promissory note and related loan documents as part of the process to ultimately fund the loan. If a promissory note and related loan documents are signed by both parties, the expectation generally was that the loan be funded within ten days per program guidelines.

If a loan was not disbursed for whatever reason, the lender was generally expected to work with an eligible borrower to resolve issues affecting disbursement or – failing to resolve the challenges of disbursing the loan – cancel the loan in the Small Business Administration systems within twenty (20) days.

Program rules state that "Notwithstanding this limitation, lenders are not responsible for delays in disbursement attributable to a borrower's failure to timely provide required loan documentation, including a signed promissory note. Loans for which funds have not been disbursed because a borrower has not submitted required loan documentation within 20 calendar days of loan approval shall be cancelled by the lender…"

As detailed in program rules regarding loan disbursements, "A single loan disbursement will eliminate the risk of delays in processing loan disbursement installments, advance the goal of payroll continuity for employees, and provide borrowers with faster access to the full loan amount so that they can immediately cover payroll costs."

These requirements also ensured that the loan amount was not incorrectly accounted in the Small Business Administration loan program financial management systems and thus debited from the remaining amount of program funds.

If loans were not consistently disbursed within the ten-day disbursement period or cancelled within twenty days due to no disbursement, there could inaccurate total program funds available and possibly less overall program funding to help eligible small businesses.

The lender also had incentive to disburse a loan in a timely fashion as that is when the lender could accurately report the loan as disbursed to the Small Business Administration and then receive the lender fee in an amount based on the size of the loan dollar amount.

During the course of the program, most lenders in most instances were quickly able to disperse funds within this timeframe. In instances where lenders were unable to meet the ten-day disbursement window, lenders were generally expected to work with eligible borrowers to resolve any issues that prevented the proper disbursement of the loans.

**V. Once borrower information entered into SBA loan systems, borrowers couldn't obtain another loan by a different lender unless lender canceled the loan application**

The Small Business Administration implemented operational and systematic enhancements in the course of administering the program to increase overall program integrity and efficacy.

App'x. 0083

The plaintiff's complaint states the following:

> Once the SBA approved a PPP loan and assigned it a loan number, the applicant could not apply for a PPP loan with any other lender because the applicant could not make all of the required certifications on another PPP loan application. Thus, once approved, the borrower was essentially "stuck" with the lender to whom it applied for the PPP loan, meaning that the borrower had to rely exclusively on the good faith of the lender to actually fund the loan.

> For both first draw and second draw PPP loans, a PPP loan applicant had to certify that they had not and would not receive another first draw or second draw loan, respectively.

This statement is further influenced by the existence of system controls implemented by the Small Business Administration to prevent borrowers from violating the certification not to apply for and receive another loan when that borrower already had a loan application pending with another lender.

If a borrower had submitted his or her application to one lender and that application was then submitted to the Small Business Administration for processing, there were controls to prevent that borrower from going to a different lender and having another loan similarly processed (i.e. provided a loan number).

This systematic feature had the effect of "locking-in" a borrower to a lender in order to receive a Paycheck Protection Program loan and preventing a borrower from receiving a separate loan approval from a different lender.

By design, the borrower had no access to the loan program systems and was not able to modify their loan status, amount, or similar information. The lender – in its management of the relationship with the eligible borrower as opposed to SBA – could alter or update some of this information.

If SBA has issued a loan number, but the loan has not yet been disbursed, the lender could cancel the loan in the loan program systems and the eligible applicant could then apply for a new loan using the appropriate forms and documentation with a different approved lender.

## VI.    Lender reporting process to effectuate lender fee payments

The lender is and was ultimately responsible for reporting on a consistent basis the status of the loans in their Paycheck Protection Program loan portfolio to the Small Business Administration, including loans that were disbursed or cancelled.

Lenders were required to both report First Draw PPP Loans and Second Draw PPP loans that were fully disbursed to SBA via SBA Form 1502 (1502 report). Lenders were required to electronically submit SBA Form 1502 reporting information to the SBA within 20 calendar days after disbursement of a PPP loan. Lenders were required to confirm that all PPP loans for which the lender was requesting a processing fee have been fully disbursed on the disbursement dates and in the loan amounts reported.

7

As part of the 1502 reporting process, lenders were required to certify to four statements in total which included the following three statements:

"...all First Draw Loans and Second Draw Loans included in the report were fully disbursed to the borrowers on the disbursement dates entered and in the loan amounts entered in the report;

all information in the report is true and correct; and

the report has been submitted by an authorized employee or agent of Lender acting within the scope of Lender's authority and Lender acknowledges responsibility for all entries and certifications made on its behalf."

After submitting the initial SBA Form 1502 report, lenders were and are required submit PPP loan information to SBA on a monthly basis. Lenders were and are required to provide monthly 1502 reports that include loan status information for their PPP loans regardless of whether the borrower made a payment in the current month. Lenders were required and must continue reporting on a loan until the lender notifies SBA that the loan has been paid in full.

If a lender failed to disburse after the loan received a loan number in the ten-day timeframe or cancel the loan according to program guidelines, the lender generally should not have reported a loan as fully disbursed and received a lender fee.

## VII.    Borrower reported as having received disbursed loan could be noticed to apply for loan forgiveness

The Paycheck Protection Program was designed as a forgivable loan program, whereby small businesses could obtain uncollateralized, low-interest loans from an approved lender and use the proceeds to cover the costs of employees' paychecks – up to a certain amount – and some related non-payroll expenses. If the loan proceeds were used in an approved manner, the borrower was eligible to apply to have the loan completely forgiven.

In all circumstances, the loan was 100% guaranteed by the United States Small Business Administration with the full faith and credit of the United States federal government. The guarantee provides that – in the event of a default or some circumstance where the borrower is unable to obtain forgiveness or repay the loan – the lender would be able to recover the value of the loan plus interest. This provision was included to encourage lenders to actively participate in the program without risk of financial loss.

Once an eligible borrower had received the loan proceeds and used them according to program rules and timelines, a borrower could apply to have the loan debt forgiven. While the initial program envisioned eligible borrowers applying for loan forgiveness solely with their lender as had been done in the loan application and origination process, program design was later altered to allow the borrowers to apply directly for forgiveness via the Small Business Administration forgiveness portal.

Lenders had the option of either conducting the forgiveness process as originally envisioned – and therefore completely manage the interaction with the borrower during the forgiveness phase – or provide certain borrower information to the Small Business Administration to help

App'x. 0085

effectuate the forgiveness process for the lender. Lenders were not released from certain duties and functions regarding the forgiveness process even if they opted to use the forgiveness portal process provided by SBA.

In either forgiveness process, the eligible borrower would apply for loan forgiveness, certify to and or provide sufficient documentation showing the proper use of loan proceeds, and then have a high degree of likelihood in having the loan forgiven as evidenced by public forgiveness records.

However, as noted earlier, the loan program system records of disbursement as entered by the lender or lender's systems, could not be altered by the borrower, even in forgiveness process. The borrower would again be subject to the lender accurately reporting to the Small Business Administration the proper disbursement or cancellation and related information of their Paycheck Protection Program loans.

What is unusual in one section of the plaintiffs' complaint is that a borrower – having allegedly received a loan number but no funding is then noticed by the SBA as being eligible to apply for loan forgiveness.

Such notification would suggest that SBA's system of record recorded the plaintiff as having received a loan and therefore eligible to apply for forgiveness. If the SBA system information is not accurate and not updated by the lender, it could result in records showing that the unfunded borrower being potentially obligated to pay back the loan amount with interest.

No reasonable borrower could reasonably be expected to apply for loan forgiveness having not received actual loan funds.

If systems report a borrower's unfunded loan as disbursed while not having applied for or received loan forgiveness and - if no adjustments are made to the SBA system of record - the unfunded borrower could be incorrectly designated by SBA's systems as being required to start making payments to satisfy the original loan promissory note conditions.

In such an instance, the borrower would theoretically lose money if she or he repaid a loan on which he or she never received funds. Doing so in this specific example could leave a borrower worse off than before which was not the intent of the program.

Many of these assertions can likely be validated or disproved by a thorough review of required reporting documentation and various communications made by and transmitted between the lender, SBA, and the borrowers listed in the plaintiffs' complaint.

*William Briggs*

9

App'x. 0086

# TAB 6

*Greathouse, et al. v. Capital Plus Financial, LLC, et al.*
**Case No. 4:22-cv-00686-P (N.D. Tex.)**

**Plaintiffs' Proposed Trial Plan**

This Proposed Trial Plan summarizes the issues, claims and defenses that Plaintiffs[1] presently anticipate will be tried on a classwide basis.

Plaintiffs submit this Proposed Trial Plan as part of their motion for class certification prior to obtaining any discovery. Defendants moved for a protective order on October 17, 2022 seeking to stay discovery pending the Court's adjudication of their motions to dismiss. ECF No. 39. Plaintiffs filed a response in partial opposition to Defendants' motion for a protective order on November 7, 2022, and identified the limited discovery Plaintiffs seek concerning class certification and as to certain issues raised in Defendants' pending motions to dismiss if those motions to dismiss are not denied outright. ECF No. 41. *See also* ECF No. 46 Tab A ¶¶ 6-7, 9 (identifying the specific discovery sought). By Order on December 13, 2022, the Court denied Defendants' motion for a protective order. ECF No. 47. Plaintiffs reserve the right to supplement and amend this Proposed Trial Plan prior to trial, including as to any issues that arise in fact and expert discovery, any changes in the governing substantive law, or otherwise as the Court may direct or permit.

## I.     Background

This action concerns defendant CPF's failure to fund SBA-approved PPP loans of Plaintiffs and other SBA-approved but unfunded borrowers. Plaintiffs were approved by the SBA for their PPP loans and given SBA loan numbers; entered into and returned to CPF the standard form Loan Documents (¶ 116; ECF No. 4); never received any PPP loan proceeds; and remain bound under their Loan Documents to pay back to CPF those loans with interest. ¶ 232; ECF No. 4 at 3. A number of other SBA-approved but unfunded borrowers have publicly voiced similar complaints about CPF's failure to fund their loans. ¶ 214(a)-(h). Based on CPF's false reporting to the SBA that Plaintiffs' loans were disbursed so CPF could obtain PPP loan processing fees, SBA data identifies Plaintiffs' loans as "disbursed" even though the loans were not disbursed to Plaintiffs. ¶¶ 12, 122-23, 138-39, 149-50, 160-61, 172-73, 184-85, 196-97, 210-11.

In total, CPF committed to make 472,036 PPP loans for over $7.5 billion principal in 2021 through May 31, 2021 -- the second most PPP loans by any other lender in 2021, and more than the total number of PPP loans in 2021 made by Bank of America, PNC Bank, TD Bank and Wells Fargo combined. ¶ 9.

---

[1]     Unless otherwise capitalized terms have the meaning set forth in the Table of Abbreviations in the brief accompanying Plaintiffs' motion for class certification contemporaneously filed herewith; all paragraph citations are to Plaintiffs' Class Action Complaint (ECF No. 1); all emphasis is added; all page cites to ECF filings are to the ECF, rather than native, page number; and all internal quotations and citations are omitted.

For their respective roles, defendant CPF was paid by the SBA $930 million in PPP loan processing fees and expects $1.1 billion in such fees; upstreamed to Crossroads all those fees; Crossroads reported in SEC filings that *it* obtained the $930 million "windfall" from PPP lending which increased its revenues *2,446%* to $932.7 million in FY 2021 compared to $36.6 million in FY 2020 (¶¶ 76, 82, 89); and Crossroads in turn, just weeks after the new applicant PPP lending window closed on May 31, 2021, declared and in July 2021 paid a special dividend to its shareholders in which it paid over $149.9 million in cash personally to Donnelly and Alpert. ¶¶ 11, 14-15, 76, 81-84. Donnelly resigned from his position as CEO of CFP immediately after the special dividend was paid.

At the time the special dividend was declared and paid, Donnelly (at 37.8%) and Alpert (at 25%) owned a controlling equity stake in Crossroads. ¶ 80. In addition at all times relevant, Donnelly was also the dual CEO of both Crossroads and CPF, and CPF was wholly owned by Crossroads (¶¶ 7, 80-81). Donnelly, Alpert and other corporate insiders, including Farzana Giga ("Giga"), who simultaneously serves as CPF's and Crossroads's dual CFO, signed the Loan Documents for CPF, and also as a Crossroads shareholder participated in the special dividend, owned approximately 66% of Crossroads's equity. ¶¶ 7, 80, 84, 91, 93. In addition to the over $149.9 million in cash that Donnelly and Alpert were paid by the special dividend, including off the backs of Plaintiffs' and other unfunded borrowers' PPP loans, Donnelly and Giga also received over $8.8 million each in cash bonuses in 2021. ¶ 15.

Crossroads recently disclosed that *its* "outstanding advances on the PPPLF at July 31, 2022 was $1,260,012,462" and that CPF's PPP lending is the subject of government investigations. *See* https://crossroads.com/wp-content/uploads/2022/09/Q3-2022-OTC-Disclosure-Statement-FINAL_091222.pdf Item 5 at p. 10 and note 12 at p.27 (last visited Nov. 29, 2022). *See also* 2022_Q4 OTC Financial Statement Workbook - Release (crossroads.com) at 1 (PPPLF advance was $1,108,965,758 at Oct. 31, 2022) (last visited Dec. 19, 2022).

More recently, the U.S. Congressional House Select Subcommittee on the Coronavirus Crisis (the "House Select Subcommittee") issued on December 1, 2022 its staff report "We Are Not the Fraud Police: How Fintechs Facilitated Fraud in the Paycheck Protection Program" which contains findings regarding CPF's and Crossroads's PPP lending practices. *See* https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/2022.12.01%20How%20Fintechs%20Facilitated%20Fraud%20in%20the%20Paycheck%20Protection%20Program_0.pdf (link to Congressional report) (last visited Dec. 9, 2022).

Similarly, on December 8, 2022, the SBA issued a press release stating that the House Select Subcommittee report "details serious problems of fraud and self-dealing by lenders" and that the SBA has "launched a full investigation of the lenders" including defendant "Capital Plus" to "ensure that federal financial regulators have a coordinated response to wrongdoing by lenders." *See* https://www.sba.gov/article/2022/dec/08/us-small-business-administration-statement-house-select-subcommittee-coronavirus-crisis-report (link to SBA press release) (last visited Dec. 9, 2022).

## II.      The Proposed National Class and California and North Carolina Subclasses

Plaintiffs seek to certify the National Class, plaintiffs Covarrubias and Smith seek to certify the California Subclass, and plaintiff Myles seeks to certify the North Carolina Subclass under Fed. R. Civ. P. 23(a) and (b)(3) and Local Civil Rule 23.2 specifically as follows (collectively, the "Classes"):

**National Class**:  all persons and entities in the United States and its territories Guam, Northern Mariana Islands, Puerto Rico and U.S. Virgin Islands who, in 2021, applied for PPP loans with defendant CPF as the lender for whom the SBA provided an SBA loan number, and who executed and submitted their Loan Documents but did not receive the PPP loan proceeds;

**California Subclass**: all persons and entities in California who, in 2021, applied for PPP loans with defendant CPF as the lender for whom the SBA provided an SBA loan number, and who executed and submitted their Loan Documents but did not receive the PPP loan proceeds; and

**North Carolina Subclass**:  all persons and entities in North Carolina who, in 2021, applied for PPP loans with defendant CPF as the lender for whom the SBA provided an SBA loan number, and who executed and submitted their Loan Documents but did not receive the PPP loan proceeds.

Excluded from the Class and Subclasses are the Defendants, any entities in which Defendants have a controlling interest, Defendants' agents and employees, any Judge to whom this action is assigned, and any member of such Judge's staff and immediate family.

## III.      Proving Liability Through Predominantly Common Evidence

### A.      General

Plaintiffs allege in Count I breach of contract claims against CPF; in Count II breach of contract claims against Crossroads; in Count III unjust enrichment claims against CPF and Crossroads only in the alternative, to the extent that Plaintiffs' breach of contract claims fail to adequately compensate Plaintiffs given Defendants' position that the Loan Documents are not enforceable contracts; and in Count IV unjust enrichment claims against Donnelly and Alpert. Counts I through IV are alleged by Plaintiffs on behalf of the National Class. Plaintiffs Covarrubias and Smith allege in Count V UCL claims against all Defendants on behalf of the California Subclass, again only in the alternative to the extent Plaintiffs' breach of contract claims fail to adequately compensate the members of the California Subclass. And plaintiff Myles alleges in Count VI NCUDTPA claims against all Defendants on behalf of the North Carolina Subclass.

Plaintiffs intend to establish liability for each of the six claims using evidence common to themselves and the members of the Classes. Examples of such common evidence include:

-       the standard form Loan Documents that Plaintiffs and the members of the Classes entered into with defendant CPF

- applicable PPP regulations governing the funding of PPP loans, obtaining advances from the PPPLF, and loan status and ongoing loan reporting obligations

- expert testimony, including without limitation the expert reports of Plaintiffs' experts Jason D. Koontz, William M. Manger, Jr., William Briggs and Steven P. Feinstein filed contemporaneously herewith

- other documents and testimony of the parties and non-parties, including without limitation documents CPF and Crossroads submitted to the House Select Subcommittee and other documents and emails such as emails indicating Donnelly and other CPF officials were advised of CPF's failure to fund SBA-approved PPP loans (¶ 106)

- financial statements Crossroads filed with the SEC and other publicly issued statements made by Defendants

- additional evidence to be developed as discovery progresses.

### B.   Elements of Plaintiffs' Breach of Contract Claim

In general, a claim for breach of contract requires proof of (1) a valid contract, (2) the plaintiff's performance, (3) the defendant's breach, and (4) damages resulting from the breach. *Marketshare Telecom, LLC v. Ericsson, Inc.*, 198 S.W.3d 908, 923 (Tex. App. 2006). As reflected in Tab 13 of the Appendix in support of Plaintiffs' motion for class certification filed contemporaneously herewith, the laws of the other jurisdictions encompassed within the National Class are materially in accord.

#### 1.   Existence of an Enforceable Contract

-- Plaintiffs intend to prove the existence of an enforceable contract by common evidence such as

- the parties' standard form Note and accompanying Loan Documents which, among other provisions, identifies the specific PPP loan, SBA loan number and amount of the loan; specifies that the parties to the Note are, respectively, the Class member borrower and the "Lender" CPF; provides that "[t]his loan is made pursuant to the PPP"; requires the borrower to pay back the principal of the loan plus interest if the PPP loan is not forgiven; contains other PPP loan repayment terms and events of default and the lender's rights in the event of the borrower's default; and contains general provisions, including specifically that "[a]ll individuals and entities signing this Note are jointly and severally liable"

- the Additional and Correction Documents Agreement (Errors and Omissions Agreement) that accompanies the Note and provides additional terms and states at the outset: "In consideration of Capital Plus Financial, LLC, located at 2247 Central Drive, Bedford, Texas 76021 (hereinafter called 'Lender') making the above loan, each of the undersigned, jointly and severally, do hereby agree as follows …."

- the "Notice - No Oral Agreements" document that is also part of the Loan Documents and governs the "Loan by Lender, Capital Plus Financial, LLC to Borrower"; identifies each Class member borrower; and is executed by both CPF by its (and Crossroads's dual) CFO Giga, and each putative Class member borrower

- applicable PPP regulations governing PPP loan funding, obtaining advances from the PPPLF, loan status and ongoing loan reporting obligations

- testimony by the parties and non-parties

- reports prepared by and testimony of Plaintiffs' experts

## 2.   <u>Breach of Contract</u>

-- Plaintiffs intend to prove CPF breached the parties' Loan Documents by common evidence such as:

- Plaintiffs' signing of and performance under the Loan Documents and in obtaining an SBA loan number approving their loan

- the provisions of the Loan Documents cited above

- applicable PPP regulations including for example the SBA's funding rule which in relevant part states as follows: "The lender *must* make a one-time, full disbursement of the PPP loan within 10 calendar days of loan approval; for the purposes of this rule, a loan is considered approved when the loan is assigned a loan number by SBA." 86 Fed. Reg. 3692, 3710

- CPF's PPPLF Pledge and Advance Request forms to the PPPLF to obtain funds from the PPPLF secured by, and to fund, PPP loans

- other reports and other statements of CPF to the PPPLF and SBA regarding PPP loans and PPP loan funding, such as the monthly SBA Form 1502 reports CPF submitted to the SBA

- emails and other documents indicating that Donnelly and other CPF officials were aware of CPF's failure to fund SBA-approved loans

- testimony by the parties and non-parties

- reports prepared by and testimony of Plaintiffs' experts

-- Plaintiffs intend to prove Crossroads breached the parties' Loan Documents by common evidence such as:

- the evidence identified above regarding CPF's breaches of the parties' Loan Documents

- Crossroads's SEC filings, Donnelly's and Alpert's letters to shareholders and Crossroads's other public statements such as those concerning its activities regarding PPP lending and the revenues *it* obtained from PPP lending

- other documents and testimony of the parties and non-parties

- reports prepared by and testimony of Plaintiffs' experts

3.    **Causation**

-- Plaintiffs intend to prove that CPF's and Crossroads's breaches were the cause of Plaintiffs' damages by common evidence such as:

- the evidence identified above regarding CPF's and Crossroads's breaches of the parties' Loan Documents

- other documents and testimony of the parties and non-parties

- reports prepared by and testimony of Plaintiffs' experts

App'x.0093

4.   **Damages**

-- Plaintiffs intend to prove that CPF's and Crossroads's breaches
damaged Plaintiffs by common evidence such as:

- the evidence identified above regarding CPF's and
Crossroads's breaches of the parties' Loan Documents

- other documents and testimony of the parties and non-
parties

- reports prepared by and testimony of Plaintiffs' experts

C.   **Unjust Enrichment**

"Recovery for unjust enrichment arises from the equitable principle that a person
receiving benefits, which were unjust for him to retain, should make restitution. *Villarreal v.
Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App. - San Antonio 2004, pet. denied). 'To
recover for unjust enrichment, a plaintiff must show that the defendant has obtained a benefit
from her by fraud, duress, or the taking of an undue advantage.'" *Nguyen v. Watts*, 605 S.W.3d
761, 789 (Tex. App. 2020). As reflected in Tab 14 of the Appendix in support of Plaintiffs'
motion for class certification filed contemporaneously herewith, the laws of the other jurisdictions
encompassed within the National Class are also materially in accord.

1.   **Enrichment**

-- Plaintiffs intend to prove, again in the alternative to the extent that their
contract claim fails to provide adequate relief to the National Class (¶
252), that defendants CPF and Crossroads were enriched by common
evidence such as:

- Crossroads's SEC filings, Donnelly's and Alpert's letters to
shareholders and Crossroads's other public statements such
as those concerning its and CPF's PPP lending and loan
processing fees and the revenues Crossroads reported that *it*
obtained from PPP lending

- Crossroads's SEC filings, board minutes and other
Crossroads documents regarding the special dividend it
declared and paid to Donnelly, Alpert, Giga and other
Crossroads shareholders in July 2021

- other documents and testimony of the parties and
non-parties

- reports prepared by and testimony of Plaintiffs' experts

2.   **Unfairness**

-- Plaintiffs intend to prove that defendants CPF's and Crossroads's enrichment was unfair to Plaintiffs by common evidence such as:

- Crossroads's SEC filings, Donnelly's and Alpert's letters to shareholders letters and Crossroads's other public statements such as those concerning its and CPF's PPP lending and loan processing fees and the revenues Crossroads reported that *it* obtained from PPP lending

- applicable SBA PPP rules governing the payment of loan processing fees on only disbursed PPP loans

- other documents and testimony of the parties and non-parties, including testimony that Plaintiffs were unable to secure another PPP loan and are now on the hook to replay the loan plus interest

- reports prepared by and testimony of Plaintiffs' experts

3.   **Restitution**

-- Plaintiffs intend to demonstrate that defendants CPF and Crossroads should return to Plaintiffs at least certain of the benefits CPF and Crossroads received from PPP lending including income on any PPPLF advances CPF obtained for the PPP loans of Plaintiffs and the other members of National Class by common evidence such as:

- Crossroads's SEC filings, Donnelly's and Alpert's letters to shareholders and Crossroads's other public statements such as those concerning its and CPF's PPP lending and loan processing fees and the revenues Crossroads reported that *it* obtained from PPP lending

- applicable SBA PPP rules including for example the SBA's funding rule and the rules governing advances from the PPPLF and the payment of PPP loan processing fees by the SBA

- other documents and testimony of the parties and non-parties

- reports prepared by and testimony of Plaintiffs' experts

-- Plaintiffs intend to prove that defendants Donnelly and Alpert were unjustly enriched by common evidence such as:

- the same common evidence for Plaintiffs' unjust enrichment claims against CPF and Crossroads

- other documents and testimony of the parties and non-parties

- reports prepared by and testimony of Plaintiffs' experts

### D.   California UCL

Under the UCL, "[a] business act or practice is unlawful under the [UCL] if it violates a rule contained in some other state or federal statute." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1673 (2017). *See also Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) ("Unlawful acts are anything that can properly be called a business practice and that at the same time is forbidden by law ... be it civil, criminal, federal, state, or municipal, statutory, *regulatory*, or court-made …") (cleaned up). Similarly, a business act is unfair under the UCL "when it offends established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Cmty. Assisting Recovery, Inc. v. Aegis Sec. Ins. Co.*, 92 Cal. App. 4th 886, 894 (2001).

-- Plaintiffs Covarrubias and Smith intend to prove, again only in the alternative to the extent that their contract claim fails to provide adequate relief to the California Subclass (¶ 288), that Defendants violated both the unlawful and unfairness prongs of the UCL by common evidence such as:

- the same common evidence Plaintiffs intend to use to prove their contract and unjust enrichment claims

### E.   NCUDTPA

Plaintiff Myles claims that Defendants violated the NCUDTPA by misrepresenting CPF's intention to actually fund her SBA-approved loan, and locking her into and being reliant exclusively on CPF to fund her loan. *See, e.g., Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989) (a NCUDTPA plaintiff can show "substantial aggravating circumstances" justifying treble damages by proving "deception … in the formation of the contract").

-- Plaintiff Myles intends to prove her NCUDTPA claim by common evidence such as:

- the same common evidence Plaintiffs intend to use to prove their contract, unjust enrichment and UCL claims

### F.       Proving Damages

Plaintiffs' proof regarding damages also involves common evidence classwide. For example, Defendants argue in their motion to dismiss that Plaintiffs do not seek loan funding as part of their request for relief.  *See* ECF No. 37 at 11. Although that argument is incorrect because Plaintiffs seek loan funding (*see* ¶¶ 243, 289; ECF No. 43 at 15, 17-18), more fundamentally the issue of whether Plaintiffs are entitled to loan funding and/or damages and other relief raises factual and legal issues which likewise by definition apply classwide, since all putative members of the proposed Classes were similarly damaged by being deprived of SBA-approved PPP loans; by being locked into and reliant on CPF to fund their loans in accordance with the Loan Documents and PPP regulations; and by being obligated under the Loan Documents to pay back to CPF PPP loans they never received plus interest. Further, as Professor Steven P. Feinstein concludes in his accompanying Report on Damages Methodology (at ¶ 16), "[d]amages in this matter can be computed in a straightforward manner for all Class members using a common methodology consistent with Plaintiffs' theory of liability."

Allocation of a jury award may take place after trial and may be based on each Class member's specific PPP loan amount or *pro rata* portion of his/her/its PPP loan amount plus interest.

TAB 7

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

|  |  |
|---|---|
| Eric Greathouse, Ernesto Covarrubias, Tiffany Sumrall, Barbara Myles, Cori Pericho, John Pinkney, Joshua Smith and Alicia Mena, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>Capital Plus Financial, LLC, Crossroads Impact Corp., Eric A. Donnelly and Robert H. Alpert,<br><br>      Defendants. | Case No. 4:22-cv-686-P |

## DECLARATION OF LAWRENCE J. LEDERER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Lawrence J. Lederer, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am over 18 years old, am competent to make this declaration which I do based on my personal knowledge, and am a partner of Bailey & Glasser LLP, one of the attorneys for the Plaintiffs[1] in this litigation.

2.     I submit this declaration in support of Plaintiffs' motion for class certification which also is being filed with the Court contemporaneously herewith. As set forth in Plaintiffs' motion for class certification, Plaintiffs seek to certify the National Class, plaintiffs Covarrubias

---

[1]     Unless otherwise noted, all capitalized terms have the meaning set forth in the Table of Abbreviations in the brief in support of Plaintiffs' motion for class certification filed contemporaneously herewith.

App'x. 0099

and Smith seek to certify the California Subclass, and plaintiff Myles seeks to certify the North

Carolina Subclass (collectively, the "Classes").

      3.      Local Civil Rule 23.2(b)(1) states that a brief accompanying a motion for class

certification "must specifically set out … the approximate number of class members[.]" Plaintiffs

are presently unable to estimate the approximate number of members of the Classes because they

have not been provided with any discovery from Defendants to date. Further, it may be that

Defendants *exclusively* have the information necessary to identify the respective number of SBA-

approved borrower members of the Classes whose PPP loans CPF failed to fund, as well as

information regarding the status of the PPPLF advances CPF obtained as to those unfunded PPP

loans. Defendants have instead and from the outset resisted producing any discovery and, on

October 17, 2022, filed a motion for a protective order requesting that all discovery be stayed

pending adjudication of Defendants' motions to dismiss. ECF No. 39. Plaintiffs filed a brief in

partial opposition to Defendants' motion for a protective order on November 7, 2022. ECF No.

41. Defendants filed a reply brief on November 18, 2022. ECF No. 42. On December 13, 2022,

the Court denied Defendants' motion for a protective order. On December 20, 2022, Plaintiffs

served each Defendant with opening document requests and interrogatories, including but not

limited to seeking information to identify the size of the Classes, along with a draft of a proposed

confidentiality order and request that the parties meet under Rule 26(f). Given this timeline,

however, and the deadline for Plaintiffs to timely file their motion for class certification (*see*

ECF No. 27 ¶ 3), Plaintiffs respectfully request the opportunity to file supplemental information

identifying the size of the Classes under Local Rule 23.2(b)(1) or an amended motion for class

certification following a reasonable opportunity to obtain discovery which Plaintiffs have already

sought to commence.

4.      Each of the Plaintiffs has actively participated in this litigation from the time they retained Plaintiffs' counsel. Each Plaintiff has also submitted a declaration also filed contemporaneously herewith attesting to their desire and fitness to serve as class representatives.

5.      Plaintiffs' counsel includes Kendall Law Group, PLLC, Bailey & Glasser, LLP, Nolan Heller Kauffman LLP and Friday, Eldredge & Clark, LLP. Plaintiffs' counsel have been retained by Plaintiffs on a contingent basis, have paid the costs of this litigation, and are committed to prosecuting and funding this action through trial and appeal to its ultimate resolution. Plaintiffs' counsel have, among other things, investigated the facts; researched applicable law and PPP regulations; prepared and filed a detailed complaint; researched and filed briefs and other documents in Plaintiffs' successful opposition to Defendants' motion for a protective order; researched and filed briefs and accompanying documents in opposition to each of Defendants' motions to dismiss; coordinated closely with the Plaintiffs; fielded many inquiries from putative class members and others seeking to be added as plaintiffs; undertaken a wide-ranging search and retained four highly qualified experts including two former senior SBA officials who helped oversee PPP lending, William Briggs and William M. Manger, Jr., an expert in commercial lending Jason D. Koontz, and an expert in capital markets Steven P. Feinstein, Ph.D., CFA, and worked closely with those experts each of whom has submitted a report also filed contemporaneously herewith; and researched and prepared Plaintiffs' motion for class certification and accompanying papers, including Plaintiffs' proposed trial plan and other documents, among many other activities in this case. Accordingly, I believe Plaintiffs' counsel should be appointed counsel for the Classes in accordance with Rule 23(g).

DONE AND EXECUTED this 22nd day of December, 2022.

_____
Lawrence J. Lederer

App'x. 0101

TAB 8

ERIC GREATHOUSE

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| Eric Greathouse, Ernesto Covarrubias, Tiffany Sumrall, Barbara Myles, Cori Pericho, John Pinkney, Joshua Smith and Alicia Mena, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>Capital Plus Financial, LLC, Crossroads Impact Corp., Eric A. Donnelly and Robert H. Alpert,<br><br>      Defendants. | Case No. 4:22-cv-686-P |

### DECLARATION OF ERIC GREATHOUSE IN SUPPORT OF
### PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Eric Greathouse, pursuant to 28 U.S.C. § 1746, and under penalty of perjury under the laws of the United States of America, declare to the best of my knowledge, information and belief as follows:

1. I submit this Declaration in support of plaintiffs' Motion for Class Certification. Unless otherwise specifically noted, I have personal knowledge about the information in this Declaration and, if called as a witness, counsel and would competently testify thereto.

2. I have retained plaintiffs' counsel to prosecute this litigation for me as a class action, specifically the firms of Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC.

3. I am committed to the continued vigorous prosecution of this case and ready, willing and able to serve as a class representative.

4. Since the inception of my participation in this case, I have worked closely with counsel for the plaintiffs; received numerous status reports from counsel; produced to my counsel documents relevant to CPF's failure to fund my PPP loan; and engaged in a variety of related tasks.

5. I understand that I owe a fiduciary duty to all members of the proposed class to provide fair and adequate representation, and to continue to work actively with counsel to seek the highest recovery possible for the class consistent with good faith and meritorious advocacy. I intend to continue to provide fair and adequate representation for the benefit of the class. I am willing to testify at deposition and trial if necessary.

6. I believe that the Court should certify the class and subclasses as requested; certify me and the other applicable plaintiffs as class representatives; and appoint Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC as class counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of December 2022.

12-13-2022

Eric Greathouse

2

# ERNESTO COVARRUBIAS

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| Eric Greathouse, Ernesto Covarrubias, Tiffany Sumrall, Barbara Myles, Cori Pericho, John Pinkney, Joshua Smith and Alicia Mena, individually and on behalf of all others similarly situated, <br><br>         Plaintiffs, <br><br> v. <br><br> Capital Plus Financial, LLC, Crossroads Impact Corp., Eric A. Donnelly and Robert H. Alpert, <br><br>         Defendants. | Case No. 4:22-cv-686-P |

**DECLARATION OF ERNESTO COVARRUBIAS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Ernesto Covarrubias, pursuant to 28 U.S.C. § 1746, and under penalty of perjury under the laws of the United States of America, declare to the best of my knowledge, information and belief as follows:

    1.    I submit this Declaration in support of plaintiffs' Motion for Class Certification. Unless otherwise specifically noted, I have personal knowledge about the information in this Declaration and, if called as a witness, counsel and would competently testify thereto.

    2.    I have retained plaintiffs' counsel to prosecute this litigation for me as a class action, specifically the firms of Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC.

    3.    I am committed to the continued vigorous prosecution of this case and ready, willing and able to serve as a class representative.

App'x. 0106

4.      Since the inception of my participation in this case, I have worked closely with counsel for the plaintiffs; received numerous status reports from counsel; produced to my counsel documents relevant to CPF's failure to fund my PPP loan; and engaged in a variety of related tasks.

5.      I understand that I owe a fiduciary duty to all members of the proposed class to provide fair and adequate representation, and to continue to work actively with counsel to seek the highest recovery possible for the class consistent with good faith and meritorious advocacy.  I intend to continue to provide fair and adequate representation for the benefit of the class.  I am willing to testify at deposition and trial if necessary.

6.      I believe that the Court should certify the class and subclasses as requested; certify me and the other applicable plaintiffs as class representatives; and appoint Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC as class counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **14** day of December 2022.

*Ernesto Covarrubias*
Ernesto Covarrubias

App'x. 0107

# TIFFANY SUMRALL

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| Eric Greathouse, Ernesto Covarrubias, Tiffany Sumrall, Barbara Myles, Cori Pericho, John Pinkney, Joshua Smith and Alicia Mena, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Capital Plus Financial, LLC, Crossroads Impact Corp., Eric A. Donnelly and Robert H. Alpert, <br><br> Defendants. | Case No. 4:22-cv-686-P |

**DECLARATION OF TIFFANY SUMRALL IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Tiffany Sumrall, pursuant to 28 U.S.C. § 1746, and under penalty of perjury under the laws of the United States of America, declare to the best of my knowledge, information and belief as follows:

1.      I submit this Declaration in support of plaintiffs' Motion for Class Certification. Unless otherwise specifically noted, I have personal knowledge about the information in this Declaration and, if called as a witness, counsel and would competently testify thereto.

2.      I have retained plaintiffs' counsel to prosecute this litigation for me as a class action, specifically the firms of Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC.

3.      I am committed to the continued vigorous prosecution of this case and ready, willing and able to serve as a class representative.

App'x. 0109

4.      Since the inception of my participation in this case, I have worked closely with counsel for the plaintiffs; received numerous status reports from counsel; produced to my counsel documents relevant to CPF's failure to fund my PPP loan; and engaged in a variety of related tasks.

5.      I understand that I owe a fiduciary duty to all members of the proposed class to provide fair and adequate representation, and to continue to work actively with counsel to seek the highest recovery possible for the class consistent with good faith and meritorious advocacy. I intend to continue to provide fair and adequate representation for the benefit of the class. I am willing to testify at deposition and trial if necessary.

6.      I believe that the Court should certify the class and subclasses as requested; certify me and the other applicable plaintiffs as class representatives; and appoint Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC as class counsel.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this _14_ day of December 2022.


                                            _____Tiffany Sumrall_____
                                            Tiffany Sumrall


2

BARBARA MYLES

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

Eric Greathouse, Ernesto Covarrubias,
Tiffany Sumrall, Barbara Myles, Cori
Pericho, John Pinkney, Joshua Smith and
Alicia Mena, individually and on behalf of
all others similarly situated,

Case No. 4:22-cv-686-P

Plaintiffs,

v.

Capital Plus Financial, LLC, Crossroads
Impact Corp., Eric A. Donnelly and Robert
H. Alpert,

Defendants.

## DECLARATION OF BARBARA MYLES IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Barbara Myles, pursuant to 28 U.S.C. § 1746, and under penalty of perjury under the

laws of the United States of America, declare to the best of my knowledge, information and

belief as follows:

1.    I submit this Declaration in support of plaintiffs' Motion for Class Certification.

Unless otherwise specifically noted, I have personal knowledge about the information in this

Declaration and, if called as a witness, counsel and would competently testify thereto.

2.    I have retained plaintiffs' counsel to prosecute this litigation for me as a class

action, specifically the firms of Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday,

Eldredge & Clark, LLP, and Kendall Law Group, PLLC.

3.    I am committed to the continued vigorous prosecution of this case and ready,

willing and able to serve as a class representative.

App'x. 0112

4.      Since the inception of my participation in this case, I have worked closely with counsel for the plaintiffs; received numerous status reports from counsel; produced to my counsel documents relevant to CPF's failure to fund my PPP loan; and engaged in a variety of related tasks.

5.      I understand that I owe a fiduciary duty to all members of the proposed class to provide fair and adequate representation, and to continue to work actively with counsel to seek the highest recovery possible for the class consistent with good faith and meritorious advocacy. I intend to continue to provide fair and adequate representation for the benefit of the class. I am willing to testify at deposition and trial if necessary.

6.      I believe that the Court should certify the class and subclasses as requested; certify me and the other applicable plaintiffs as class representatives; and appoint Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC as class counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of December 2022.

Barbara Myles
Barbara Myles

2

App'x. 0113

CORI PERICHO

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| Eric Greathouse, Ernesto Covarrubias, Tiffany Sumrall, Barbara Myles, Cori Pericho, John Pinkney, Joshua Smith and Alicia Mena, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>Capital Plus Financial, LLC, Crossroads Impact Corp., Eric A. Donnelly and Robert H. Alpert,<br><br>　　　　　Defendants. | Case No. 4:22-cv-686-P |

**DECLARATION OF CORI PERICHO IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Cori Pericho, pursuant to 28 U.S.C. § 1746, and under penalty of perjury under the laws of the United States of America, declare to the best of my knowledge, information and belief as follows:

1.　　　　I submit this Declaration in support of plaintiffs' Motion for Class Certification. Unless otherwise specifically noted, I have personal knowledge about the information in this Declaration and, if called as a witness, counsel and would competently testify thereto.

2.　　　　I have retained plaintiffs' counsel to prosecute this litigation for me as a class action, specifically the firms of Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC.

3.      I am committed to the continued vigorous prosecution of this case and ready, willing and able to serve as a class representative.

4.      Since the inception of my participation in this case, I have worked closely with counsel for the plaintiffs; received numerous status reports from counsel; produced to my counsel documents relevant to CPF's failure to fund my PPP loan; and engaged in a variety of related tasks.

5.      I understand that I owe a fiduciary duty to all members of the proposed class to provide fair and adequate representation, and to continue to work actively with counsel to seek the highest recovery possible for the class consistent with good faith and meritorious advocacy.  I intend to continue to provide fair and adequate representation for the benefit of the class.  I am willing to testify at deposition and trial if necessary.

6.      I believe that the Court should certify the class and subclasses as requested; certify me and the other applicable plaintiffs as class representatives; and appoint Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC as class counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of December 2022.

Cori Pericho

2

# JOHN PINKNEY

App'x. 0117

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| Eric Greathouse, Ernesto Covarrubias, Tiffany Sumrall, Barbara Myles, Cori Pericho, John Pinkney, Joshua Smith and Alicia Mena, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>Capital Plus Financial, LLC, Crossroads Impact Corp., Eric A. Donnelly and Robert H. Alpert,<br><br>　　　　Defendants. | Case No. 4:22-cv-686-P |

## DECLARATION OF JOHN PINKNEY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, John Pinkney, pursuant to 28 U.S.C. § 1746, and under penalty of perjury under the laws of the United States of America, declare to the best of my knowledge, information and belief as follows:

1.　　I submit this Declaration in support of plaintiffs' Motion for Class Certification. Unless otherwise specifically noted, I have personal knowledge about the information in this Declaration and, if called as a witness, counsel and would competently testify thereto.

2.　　I have retained plaintiffs' counsel to prosecute this litigation for me as a class action, specifically the firms of Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC.

3.      I am committed to the continued vigorous prosecution of this case and ready, willing and able to serve as a class representative.

4.      Since the inception of my participation in this case, I have worked closely with counsel for the plaintiffs; received numerous status reports from counsel; produced to my counsel documents relevant to CPF's failure to fund my PPP loan; and engaged in a variety of related tasks.

5.      I understand that I owe a fiduciary duty to all members of the proposed class to provide fair and adequate representation, and to continue to work actively with counsel to seek the highest recovery possible for the class consistent with good faith and meritorious advocacy.  I intend to continue to provide fair and adequate representation for the benefit of the class.  I am willing to testify at deposition and trial if necessary.

6.      I believe that the Court should certify the class and subclasses as requested; certify me and the other applicable plaintiffs as class representatives; and appoint Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC as class counsel.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 13 day of December 2022.


John Pinkney


2

JOSHUA SMITH

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| Eric Greathouse, Ernesto Covarrubias, Tiffany Sumrall, Barbara Myles, Cori Pericho, John Pinkney, Joshua Smith and Alicia Mena, individually and on behalf of all others similarly situated, <br><br>          Plaintiffs, <br><br> v. <br><br> Capital Plus Financial, LLC, Crossroads Impact Corp., Eric A. Donnelly and Robert H. Alpert, <br><br>          Defendants. | Case No. 4:22-cv-686-P |

## DECLARATION OF JOSHUA SMITH IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Joshua Smith, pursuant to 28 U.S.C. § 1746, and under penalty of perjury under the laws of the United States of America, declare to the best of my knowledge, information and belief as follows:

1.      I submit this Declaration in support of plaintiffs' Motion for Class Certification. Unless otherwise specifically noted, I have personal knowledge about the information in this Declaration and, if called as a witness, counsel and would competently testify thereto.

2.      I have retained plaintiffs' counsel to prosecute this litigation for me as a class action, specifically the firms of Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC.

3.      I am committed to the continued vigorous prosecution of this case and ready, willing and able to serve as a class representative.

4.      Since the inception of my participation in this case, I have worked closely with counsel for the plaintiffs; received numerous status reports from counsel; produced to my counsel documents relevant to CPF's failure to fund my PPP loan; and engaged in a variety of related tasks.

5.      I understand that I owe a fiduciary duty to all members of the proposed class to provide fair and adequate representation, and to continue to work actively with counsel to seek the highest recovery possible for the class consistent with good faith and meritorious advocacy. I intend to continue to provide fair and adequate representation for the benefit of the class. I am willing to testify at deposition and trial if necessary.

6.      I believe that the Court should certify the class and subclasses as requested; certify me and the other applicable plaintiffs as class representatives; and appoint Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC as class counsel.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 14 day of December 2022.


_Joshua Smith_

Joshua Smith


2

# ALICIA MENA

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| Eric Greathouse, Ernesto Covarrubias, Tiffany Sumrall, Barbara Myles, Cori Pericho, John Pinkney, Joshua Smith and Alicia Mena, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>Capital Plus Financial, LLC, Crossroads Impact Corp., Eric A. Donnelly and Robert H. Alpert,<br><br>          Defendants. | Case No. 4:22-cv-686-P |

**DECLARATION OF ALICIA MENA IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Alicia Mena, pursuant to 28 U.S.C. § 1746, and under penalty of perjury under the laws of the United States of America, declare to the best of my knowledge, information and belief as follows:

1.      I submit this Declaration in support of plaintiffs' Motion for Class Certification. Unless otherwise specifically noted, I have personal knowledge about the information in this Declaration and, if called as a witness, counsel and would competently testify thereto.

2.      I have retained plaintiffs' counsel to prosecute this litigation for me as a class action, specifically the firms of Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC.

3.      I am committed to the continued vigorous prosecution of this case and ready, willing and able to serve as a class representative.

App'x. 0124

4.      Since the inception of my participation in this case, I have worked closely with counsel for the plaintiffs; received numerous status reports from counsel; produced to my counsel documents relevant to CPF's failure to fund my PPP loan; and engaged in a variety of related tasks.

5.      I understand that I owe a fiduciary duty to all members of the proposed class to provide fair and adequate representation, and to continue to work actively with counsel to seek the highest recovery possible for the class consistent with good faith and meritorious advocacy.  I intend to continue to provide fair and adequate representation for the benefit of the class.  I am willing to testify at deposition and trial if necessary.

6.      I believe that the Court should certify the class and subclasses as requested; certify me and the other applicable plaintiffs as class representatives; and appoint Bailey & Glasser, LLP, Nolan Heller Kauffman LLP, Friday, Eldredge & Clark, LLP, and Kendall Law Group, PLLC as class counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of December 2022.

_____
Alicia Mena

# TAB 9



**FIRM RESUME**

Kendall Law Group was founded by former federal judge Joe Kendall. It is a boutique trial law firm exclusively representing plaintiffs. Led by Judge Kendall, the firm brings value-added assistance to their clients in complex class action, securities, and business litigation matters.

Since 2002, in class action cases, Joe Kendall has participated in obtaining over 1 billion dollars for clients.. He has served as lead, co-lead, or local counsel in numerous merger & acquisition, derivative, securities fraud, consumer and other class action cases in both state and federal courts, including: *Gazda v. Ryan et al.*, Case No. 3:04-cv-02113-K (N.D. Tex.); *Sunset Management LLC v. American Realty Investors, Inc et al.,* Case No. 3:04-cv-02162-K (N.D. Tex.); *NECA-IBEW Pension Fund v. The Neiman Marcus Group Inc et al.,* Case No. 3:05-cv-00898-L (N.D. Tex.); *Alaska U.F.C.W Pension Trust v. Kleisner et al.,* Case No. 3:05-cv-01323-B (N.D. Tex.); *Hulliung v. Bolen et al,* Case No. 3:06-cv-01083-N (N.D. Tex.); *Patrick Wheeler v. Frozen Food Express Industries, Inc et al.*, Case No. 3:13-cv-02823-P (N.D. Tex.); *Linda K. Blankman v. Bradley et al.,* Case No. 3:15-cv-00339-L (N.D. Tex.); *Bazini et al v. Bradley et al.*, Case No. 3:15-cv-00389-L (N.D. Tex.); *Berlin v. Regency Energy Partners LP et al.*, Case No. 3:15-cv-00519-L (N.D. Tex.); *Budde et al v. Global Power Equipment Group Inc et al.*, Case No. 3:15-cv-01679-M (N.D. Tex.); *Benouis v. Match Group Inc et al.,* Case No. 3:19-cv-02356-S (N.D. Tex.); *Harrison v. XTO Energy Inc et al.*, Case No. 4:09-cv-00768-Y (N.D. Tex.); *Atayi v. AZZ, Inc. et al.*, Case No. 4:19-cv-00928-A (N.D. Tex.); *Erica P John Fund Inc et al. v. Halliburton Company et al,* Case No. 3:02-cv-01152-M (N.D. Tex.); *Schwartz, et al v. TXU Corp.,* Case No. 3:02-cv-02243-K (N.D. Tex.); *Rogers v. TXU Corp, et al.,* Case No. 3:02-cv-02586-K (N.D. Tex.); *Jorgensen, et al v. TXU Corp, et al.,* Case No. 3:02-cv-

1

02600-K (N.D. Tex.); *Taubenfeld v. Hotels.com, et al.,* Case No. 3:03-cv-00069-N (N.D. Tex.); *In re Michaels Stores, Inc. Securities Litigation*, Case No. 3:03-cv-00246-M (N.D. Tex.); *In re Carreker Corporation Securities Litigation,* Case No. 3:03-cv-00250-B (N.D. Tex.); *Sims v. Michaels Stores, Inc, et al.*, Case No. 3:03-cv-00278-M (N.D. Tex.); *Green v. Hotels.com, et al.*, Case No. 3:03-cv-00279-N (N.D. Tex.); *McKnight, et al v. TXU Corp., et al.,* Case No. 3:03-cv-00289-K (N.D. Tex.); *JIS Trading Group v. TXU Corp., et al.*, Case No. 3:03-cv-00290-K (N.D. Tex.); *Steele, et al v. Hotels.com, et al.,* Case No. 3:03-cv-00323-N (N.D. Tex.); *In re Blockbuster Inc. Securities Litigation,* Case No. 3:03-cv-00398-M (N.D. Tex.); *Massachusetts State Carpenters Pension Fund v. Fleming Companies Inc et al.,* Case No. 3:03-cv-00460-M (N.D. Tex.); *Heller v. Michaels Stores, Inc et al.*, Case No. 3:03-cv-00499-M (N.D. Tex.); *Futransky v. Michael Stores Inc et al.*, Case No. 3:03-cv-00511-M (N.D. Tex.); *AIG Annuity Insurance Company et al v. Ebbers et al.,* Case No. 3:03-cv-01566-L (N.D. Tex.); *Robbins v. Brick et al.*, Case No. 3:03-cv-01687-M (N.D. Tex.); *Imperial County v. Brick et al.*, Case No. 3:03-cv-01688-M (N.D. Tex.); *Ryan v. Flowserve Corporation et al.,* Case No. 3:03-cv-01769-B (N.D. Tex.); *TDH Partners LLP v. Ryland Group Inc et al.,* Case No. 3:04-cv-00073-B (N.D. Tex.); *Massachusetts Laborers Annuity Fund et al v. Odyssey Healthcare, Inc et al.,* Case No. 3:04- cv-00844-N(N.D. Tex.); *Caldarola v. Odyssey Healthcare, Inc et al.,* Case No. 3:04- cv-00988-N (N.D. Tex.); *In re UICI Securities Litigation,* Case No. 3:04-cv-01149-P (N.D. Tex.); *Fener v. Belo Corporation et al,* Case No. 3:04-cv-01836-D (N.D. Tex.); *In re SourceCorp Inc. Securities Litigation,* Case No. 3:04-cv-02351-N (N.D. Tex.); *Lentz v. Citadel Security Software Inc et al.,* Case No. 3:05-cv-00100-D (N.D. Tex.); *Holland v. Citadel Security Software Inc et al.*, Case No. 3:05-cv-00184-D (N.D. Tex.); *Pipefitters Local No. 636 Defined Benefit Plan v. Ryland Group, Inc. et al.,* Case No. 3:06-cv-00022-B (N.D. Tex.); *Laborers National Pension Fund v. AOL Time Warner Inc et al.,* Case No. 3:06-cv-00220-K (N.D.

Tex.); *Hansen v. Fradella et al.*, Case No. 3:06-cv-01096-N (N.D. Tex.); *In re Affiliated Computer Services Derivative Litigation,* Case No. 3:06-cv-01110-O (N.D. Tex.); *Galatoire v. Fradella et al.*, Case No. 3:06-cv-01205-N (N.D. Tex.); *In re Affiliated ComputerServices Derivative Litigation,* Case No. 3:06-cv-01212-M (N.D. Tex.); *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corporation et al.,* Case No. 3:06-cv-01470-N (N.D. Tex.); *Massachusetts Laborers Annuity Fund v. Michaels Stores Inc et al.,* Case No. 3:06-cv-01635-N (N.D. Tex.); *Beatrice et al v. Home Solutions of America, Inc et al.,* Case No. 3:06- cv-01665-N (N.D. Tex.); *City of Pontiac Police and Fire Retirement System v. Kartsotis et al.,* Case No. 3:06-cv-01672-F (N.D. Tex.); *Minich v. Kartsotis et al.,* Case No. 3:06-cv-01977-P (N.D. Tex.); *Crowell v. Mannatech Inc et al.,* Case No. 3:07-cv-00238-K (N.D. Tex.); *Vella v. Kartsotis et al.*, Case No. 3:07-cv-00955-F (N.D. Tex.); *Rines v. Heelys Inc et al.,* Case No. 3:07-cv-01468-K (N.D. Tex.); *Securities and ExchangeCommission v. Stanford International Bank Case No. Ltd et al.,* Case No. 3:09-cv-00298-N (N.D. Tex.); *Buettgen v. Harless et al.,* Case No. 3:09-cv-00791-K (N.D. Tex.); *Heffner v. Harless et al.,* Case No. 3:09-cv-00938-K (N.D. Tex.); *Goldberg v. Klein et al.*, Case No. 3:09-cv-01049-K (N.D. Tex.); *Bill Rains et al v Zale Corporation, et al.,* Case No. 3:09-cv-02133-B (N.D. Tex.); *Lawyer v. Zale Corporation et al.,* Case No. 3:09-cv-02218-B (N.D. Tex.);  *Hopson v. MetroPCS Communications Inc et al.,* Case No. 3:09-cv-02392-G *Richardson v. SolarWinds Inc et al.*, Case No. 3:10-cv-02085-B (N.D. Tex.); *North Port Firefighters' Pension et al v. Temple-Inland Inc. et al,* Case No. 3:11-cv-03119-B (N.D. Tex.); *Bauman v. Simmons et al.*, Case No. 3:11-cv-03607-M (N.D. Tex.); *Brady v. Kosmos Energy, Ltd. et al.,* Case No. 3:12-cv-00373-B (N.D. Tex.); *Mounger v. Kosmos Energy Ltd et al.,* Case No. 3:12-cv-02383-B (N.D. Tex.); *Hohenstein v. Behringer Harvard REIT I, Inc. et al.*, Case No. 3:12-cv-03772-G (N.D. Tex.); *Herrley v. Frozen Food Express Industries, Inc.*, Case No. 3:13-cv-03004-B (N.D. Tex.); *Wallis v. Frozen Food Express Industries Inc et al.,* Case No. 3:13-cv-03104-B (N.D.

3

App'x. 0129

Tex.); *Securities and Exchange Commission v. Arcturus Corporation et al.,* Case No. 3:13-cv-04861-K (N.D. Tex.); *Kumar v. Santander Consumer USA Holdings Inc. et al.,* Case No. 3:14-cv-03746-K (N.D. Tex.); *Panes v. Trinity Industries Inc et al.,* Case No. 3:15-cv-01316-N (N.D. Tex.); *Isolde v. Trinity Industries Inc et al.,* Case No. 3:15-cv-02093-K (N.D. Tex.); *Budde v. Global Power Equipment Inc et al.,* Case No. 3:15-cv-02120-M (N.D. Tex.); *Steck v. Santander Consumer USA Holdings Inc. et al.,* Case No. 3:15-cv-02129-K (N.D. Tex.); *Kenney v. Pier 1 Imports Inc. et al.,* Case No. 3:15-cv-02798-D (N.D. Tex.); *Town of Davie Police Pension Plan v. Pier 1 Imports Inc et al.,* Case No. 3:15-cv-03415-S (N.D. Tex.); *In re United Development Funding IV Securities Litigation,* Case No. 3:15-cv-04030-M (N.D. Tex.); *McCloskey et al v. Match Group Inc et al.,* Case No. 3:16-cv-00549-S (N.D. Tex.); *Securities and Exchange Commission v. Narayan et al.,* Case No. 3:16-cv-01417-M (N.D. Tex.); *Securities and Exchange Commission v. Faulkner et al.,* Case No. 3:16-cv-01735-D (N.D. Tex.); *Ramirez v. Exxon Mobil Corporation et al.,* Case No. 3:16-cv-03111-K (N.D. Tex.); *Ashraf v. Energy Transfer Partners LP et al.,* Case No. 3:17-cv-00118-B (N.D. Tex.); *Irving Firemen's Relief & Retirement System v. Signet Jewelers Limited et al.,* Case No. 3:17-cv-00875-D (N.D. Tex.); *Sciabacucchi v. State National Companies Inc. et al.,* Case No. 3:17-cv-02412-C (N.D. Tex.); *Block v. Interoil Corporation et al.,* Case No. 3:18-cv-00007-X (N.D. Tex.); *Iglesias v. Southcross Energy Partners, L.P. et al.,* Case No. 3:18-cv-00158-N (N.D. Tex.); *Franchi v. Southcross Energy Partners LP et al.,* Case No. 3:18-cv-00179-N  (N.D. Tex.); *Cunha v. La Quinta Holdings Inc et al.,* Case No. 3:18-cv-00540-S (N.D. Tex.); *Rosenblatt v. La Quinta Holdings, Inc. et al.,* Case No. 3:18-cv-00558-K (N.D. Tex.); *Robinson v. RSP Permian Inc. et al.,* Case No. 3:18-cv-01047-L (N.D. Tex.); *Rosenblatt v. RSP Permian Inc et al.,* Case No. 3:18-cv-01117-B (N.D. Tex.); *Franchi v. Nationstar Mortgage Holdings Inc et al.,* Case No. 3:18-cv-01170-B (N.D. Tex.); *Chun v. Fluor Corporation et al.,* Case No. 3:18-cv-01338-X (N.D. Tex.); *In re*

4

App'x. 0130

*Forterra, Inc Securities Litigation*, Case No. 3:18-cv-01957-X (N.D. Tex.); *Peak et al v. Zion Oil & Gas Inc et al.*, Case No. 3:18-cv-02067-X (N.D. Tex.); *Brooks v. United Development Funding III et al.*, Case No. 3:18-cv-03097-X (N.D. Tex.); *Strahan v. Cambium Learning Group Inc et al.*, Case No. 3:18-cv-03123-K (N.D. Tex.); *Fox et al v. United Development Funding III et al.*, Case No. 3:19-cv-00274-M (N.D. Tex.); *Linenweber v. Southwest Airlines Co et al.*, Case No. 3:20-cv-00408-K (N.D. Tex.); *Union Asset Management Holding AG v. Fluor Corporation et al.*, Case No. 3:20-cv-00518-X (N.D. Tex.); *Shen v. Exela Technologies Inc et al.*, Case No. 3:20-cv-00691-D (N.D. Tex.); *Schulze v. Hallmark Financial Services Inc et al.*, Case No. 3:20-cv-01130-X (N.D. Tex.); *Torres v. Berry Corporation et al.*, Case No. 3:20-cv-03464-S (N.D. Tex.); *Securities and Exchange Commission v. Randall*, Case No. 3:21-cv-00979-N (N.D. Tex.); *Damore v. RadioShack Corporation et al.*, Case No. 4:07-cv-00179-A (N.D. Tex.); *Pappas et al v. Simpson et al.*, Case No. 4:10-cv-00094-Y (N.D. Tex.); *Ruedelstein v. U.S. Concrete, Inc. et al.*, Case No. 4:17-cv-00266-O (N.D. Tex.); *Mullins v. AZZ, Inc. et al.*, Case No. 4:18-cv-00025-Y (N.D. Tex.); *Fox et al v. United Development Funding III et al.*, Case No. 4:20-cv-00150-O (N.D. Tex.); *In Re Six Flags Entertainment Corporation Derivative Litigation*, Case No. 4:20-cv-00262-P (N.D. Tex.); *Martin et al v. Reid-Anderson et al.*, Case No. 4:20-cv-00311-P (N.D. Tex.); *Albayrak v. Reid-Anderson et al.*, Case No. 4:20-cv-00312-P (N.D. Tex.); *Genesee County Employees' Retirement System v. FirstCash Holdings Inc et al.*, Case No. 4:22-cv-00033-P (N.D. Tex.); *van der Gracht de Rommerswael v. Speese et al.*, Case No. 4:17-cv-00227-ALM-CMC (E.D. Tex.); *Alaska Electrical Pension Fund v. Brown et al.*, Case No. 6:04-cv-00464-LED (E.D. Tex.); *Wayne County Employees Retirement System v. Brown et al.*, Case No. 6:04-cv-00466-LED (E.D. Tex.); *Sippy v. Powell, et al.*, Case No. 2:03-cv-00222-TJW (E.D. Tex.); *Acaldo v. Pilgrim's Pride Corporation et al.*, Case No. 2:08-cv-00419-JRG (E.D. Tex.); *Howes v. Pilgrim's Pride Corporation et al.*, Case No. 2:08-cv-00443-JRG

(E.D. Tex.); *Nemky v. Trinity Industries, Inc. et al*., Case No. 2:15-cv-00732-JRG (E.D. Tex.); *Barry Family LP v. Electronic Data Sys, et al*., Case No. 4:02-cv-00300-LED (E.D. Tex.); *Braun, et al v. Electronic Data Sys, et al.,* Case No. 4:02-cv-00304-LED (E.D. Tex.); *Harnik v. Electronic DataSys, et al*., Case No. 4:02-cv-00308-LED (E.D. Tex.); *Bridgewater Partners v.Electronic Data Sys, et al*., Case No. 4:02-cv-00310-LED (E.D. Tex.); *Vanderwarter v. Electronic Data Sys, et al*., Case No. 4:02-cv-00314-LED (E.D. Tex.); *Thorne-Thomsen v. EDS, et al*., Case No. 4:02-cv-00321-LED (E.D. Tex.); *Britt v. EDS, et al*., Case No. 4:02-cv-00322-LED (E.D. Tex.); *Sved v. EDS, et al*., Case No. 4:02-cv-00323-LED (E.D. Tex.); *Zia v. EDS, et al.,* Case No. 4:02-cv-00329-RAS-DDB (E.D. Tex.); *Kluemper v. EDS, et al*., Case No. 4:02-cv-00331-LED (E.D. Tex.); *McLoughlin v. Electronic Data, et al*., Case No. 4:02-cv-00335-LED (E.D. Tex.); *Stanton Pharmacy v. EDS, et al.,* Case No. 4:02-cv-00336-LED (E.D. Tex.); *Fink v. Electronic Data, et al*., Case No. 4:02-cv-00365-LED (E.D. Tex.); *Angeloni v. Microtune Inc, et al*., Case No. 4:03-cv-00056-RAS-DDB (E.D. Tex.); *Morris v. Microtune Inc, et al*., Case No. 4:03-cv-00064-RAS-DDB (E.D. Tex.); *Yakuboff v. Microtune Inc, et al*., Case No. 4:03-cv-00066-RAS-DDB (E.D. Tex.); *Clark v. Microtune Inc, et al*., Case No. 4:03-cv-00082-RAS-DDB (E.D. Tex.); *Xu v. Microtune Inc, et al*., Case No. 4:03-cv-00115-RAS-DDB (E.D. Tex.); *Aiken v. Microtune Inc, et al*., Case No. 4:03-cv-00123-RAS-DDB (E.D. Tex.); *Fontana v. Microtune Inc, et al*., Case No. 4:03-cv-00133-RAS-DDB (E.D. Tex.); *Pipefitters Local v. Microtune Inc, et al*., Case No. 4:03-cv-00158-RAS-DDB (E.D. Tex.); *Wahl, et al v. Daisytek, et al*., Case No. 4:03-cv-00212-PNB (E.D. Tex.); *Chambers v. Daisytek, et al.,* Case No. 4:03-cv-00250-PNB (E.D. Tex.); *Sippy v. Powell, et al*., Case No. 4:03-cv-00328-PNB (E.D. Tex.); *Morris v. Fontaine, et al*., Case No. 4:03-cv-00409-PNB (E.D. Tex.); *PLA LLC v. Advanced Neuromodulation Systems Inc et al*., Case No. 4:05-cv-00078-RAS-DDB (E.D. Tex.); *RAI Investment Club v. Advanced Neuromodulation Systems Inc et al*., Case No. 4:05-cv-00094-RAS-DDB (E.D. Tex.);

6

*Hall v. Rent-A-Center, Inc. et al.*, Case No. 4:16-cv-00978-ALM-CMC (E.D. Tex.); *Oklahoma Law Enforcement Retirement System v. Adeptus Health Inc. et al.*, Case No. 4:17-cv-00449-ALM (E.D. Tex.); *Witmer v. Dr. Pepper Snapple Group, Inc. et al.*, Case No. 4:18-cv-00209-ALM-KPJ (E.D. Tex.); *Celeste v. Intrusion Inc. et al.,* Case No. 4:21-cv-00307-SDJ (E.D. Tex.); *Gaynor v. Fleming Companies, et al.*, Case No. 5:02-cv-00178-TJW (E.D. Tex.); *Dolan v. Fleming Companies, et al.*, Case No. 5:02-cv-00190-TJW (E.D. Tex.); *Sved v. Fleming Companies, et al.*, Case No. 5:02-cv-00198-TJW (E.D. Tex.); *Edwards v. Fleming Companies, et al.,* Case No. 5:02-cv-00204-TJW (E.D. Tex.); *Patterson v. Fleming Companies, et al.*, Case No. 5:02-cv-00205-TJW (E.D. Tex.); *Feder v. Electronic Data Sys, et al.*, Case No. 5:02-cv-00207-DF (E.D. Tex.); *Huk v. Fleming Companies, et al.*, Case No. 5:02-cv-00208-TJW (E.D. Tex.); *Gordon v. Fleming Companies, et al.*, Case No. 5:02-cv-00212-TJW (E.D. Tex.); *Rudisill v. Fleming Companies, et al.*, Case No. 5:02-cv-00218-TJW (E.D. Tex.); *Eglinton v. Fleming Companies, et al.*, Case No. 5:02-cv-00222-TJW (E.D. Tex.); *Jackson Capital Mgt v. Fleming Companies, et al.*, Case No. 5:02-cv-00223-TJW (E.D. Tex.); *Horwitz, et al v. Electronic Data Sys, et al.*, Case No. 5:02-cv-00232-TJW (E.D. Tex.); *Miller v. Electronic Data Sys, et al.*, Case No. 5:02-cv-00233-DF (E.D. Tex.); *Thompson v. Electronic Data, et al.*, Case No. 5:02-cv-00248-DF-CMC (E.D. Tex.); *Massachusetts State v. Hansen, et al.*, Case No. 5:03-cv-00083-TJW (E.D. Tex.); *Massachusetts State v. Fleming Companies, et al.*, Case No. 5:03-cv-00204-TJW (E.D. Tex.); *Feder v. Electronic Data Sys, et al.*, Case No. 6:03-cv-00110-LED (E.D. Tex.); *Horwitz, et al v. Electronic Data Sys, et al.*, Case No. 6:03-cv-00111-LED (E.D. Tex.); *Miller v. Electronic Data Sys, et al.*, Case No. 6:03-cv-00112-LED (E.D. Tex.); *Thompson v. Electronic Data, et al.*, Case No. 6:03-cv-00113-LED (E.D. Tex.); *Barry Family LP v. Electronic Data Sys, et al.*, Case No. 6:03-cv-00114-LED (E.D. Tex.); *Braun, et al v. Electronic Data Sys, et al.*, Case No. 6:03-cv-00115-LED (E.D. Tex.); *Harnik v. Electronic Data Sys, et al.,* Case No. 6:03-

7

cv-00116-LED (E.D. Tex.); *Bridgewater Partners v. Electronic Data Sys, et al.*, Case No. 6:03-cv-00117-LED (E.D. Tex.); *Vanderwarter v. Electronic Data Sys, et al.*, Case No. 6:03-cv-00118-LED (E.D. Tex.); *Thorne-Thomsen v. EDS, et al.*, Case No. 6:03-cv-00119-LED (E.D. Tex.); *Britt v. EDS, et al.*, Case No. 6:03-cv-00120-LED(E.D. Tex.); *Sved v. EDS, et al.*, Case No. 6:03-cv-00121-LED (E.D. Tex.); *Zia v. EDS, et al.*, Case No. 6:03-cv-00122-LED (E.D. Tex.); *Kluemper v. EDS, et al.*, Case No. 6:03-cv-00123-LED (E.D. Tex.); *McLoughlin v. Electronic Data, et al.*, Case No. 6:03-cv-00124-LED (E.D. Tex.); *Stanton Pharmacy v. EDS,et al.*, Case No. 6:03-cv-00125-LED (E.D. Tex.); *Fink v. Electronic Data, et al.*, Case No. 6:03-cv-00128-LED (E.D. Tex.); *Marcus v. J.C. Penney Company, Inc. et al.*, Case No. 6:13-cv-00736-RWS-KNM (E.D. Tex.); *Gilbert v. J.C. Penney Company, Inc. et al.*, Case No. 6:13-cv-00810-RWS-KNM (E.D. Tex.); *Johnson v. J.C. Penney Company, Inc. et al.*, Case No. 6:14-cv-00722-KNM (E.D. Tex.); *PFS Investments Inc et al v. De Leeuw et al.*, Case No. 6:16-cv-00429-MHS-JDL (E.D. Tex.); *Oklahoma Law Enforcement Retirement System v. Adeptus Health Inc. et al.*, Case No. 6:16-cv-01243-RWS(E.D. Tex.); *Kim v. Adeptus Health Inc. et al.*, Case No. 6:17-cv-00150-RWS (E.D. Tex.); *McKnight v. TXU Corp, et al.*, Case No. 9:02-cv-00274-JH (E.D. Tex.); *Trading Group v. TXU Corp, et al.*, Case No. 9:02-cv-00307-JH JIS (E.D. Tex.); *The Duck Pond CRT Ltd v. PAA Natural Gas Storage, L.P. et al.*, Case No. 4:13-cv-03170 (S.D. Tex.); *Rougier v. Applied Optoelectronics, Inc. et al.*, Case No. 4:17-cv-02399 (S.D. Tex.); *Heck v. Orion Group Holdings, Inc. et al.*, Case No. 4:19-cv-01337 (S.D. Tex.); *Hoffman v. RCI Hospitality Holdings, Inc. et al.*, Case No. 4:19-cv-01841 (S.D. Tex.); *Ludovissy et al v. Bellicum Pharmaceuticals, Inc. et al.*, Case No. 4:19-cv-02450 (S.D. Tex.); *Miller et al. v. Cadence Bancorporation et al.*, Case No. 4:19-cv-03492 (S.D. Tex.); *Miskella v. Christmann et al.*, Case No. 4:21-cv-01836 (S.D. Tex.); *Brodeen v. Christmann et al.*, Case No. 4:21-cv-02082 (S.D. Tex.); *Pirelli Armstrong, et al v. Hanover Compressor*, et al., Case No. 4:02-cv-00410 (S.D. Tex.);

8

*Lampkin, et al v. UBS Painewebber Inc, et al.*, Case No. 4:02-cv-00851 (S.D. Tex.); *Anderson v. Hanover Compressor, et al.,* Case No. 4:02-cv-02306 (S.D. Tex.); *Equitec-Cole Roesler v. McClanahan, et al.,* Case No. 4:02-cv-04048 (S.D. Tex.); *Securities & Exchange v. Rocky Mountain Energy, et al.,* Case No. 4:03-cv-01133 (S.D. Tex.); *Capstone Asset Management Company v. AOL Time Warner Inc et al.*, Case No. 4:06-cv-00306 (S.D. Tex.); *Brodsky v. Superior Offshore International, Inc et al.*, Case No. 4:08-cv-01297 (S.D. Tex.); *In Re: Repros Therapeutics, Inc. Securities Litigation*, Case No. 4:09-cv-02530 (S.D. Tex.); *Simpson et al v. Repros Therapeutics, Inc et al.*, Case No. 4:09-cv-03127 (S.D. Tex.); *In Re: BP plc Securities Litigation,* Case No. 4:10-md-02185 (S.D. Tex.); *Davis et al v. Duncan Energy Partners L.P. et al.*, Case No. 4:11-cv-02486 (S.D. Tex.); *Matthews v. Rynd et al.*, Case No. 4:11-cv-02706 (S.D. Tex.); *Phillips v. Harvest Natural Resource et al.*, Case No. 4:13-cv-00801 (S.D. Tex.); *Myers v. Harvest Natural Resources, Inc. et al.,* Case No.  4:13-cv-01139 (S.D. Tex.); *Knoll v. Phillips et al.*, Case No. 4:13-cv-01528 (S.D. Tex.); *Wolfson v. PNGS GP LLC et al.*, Case No. 4:13-cv-03483 (S.D. Tex.); *Cady v. Key Energy Services, Inc. et al.*, Case No. 4:14-cv-02368 (S.D. Tex.); *Davidson v. Key Energy Service, Inc. et al.*, Case No. 4:14-cv-02403 (S.D. Tex.); *Ogden v. Cobalt International Energy, Inc. et al.*, Case No.  4:15-cv-00139 (S.D. Tex.); *John Hancock Capital Series et al v. BP, PLC et al.*, Case No. 4:15-cv-02704 (S.D. Tex.); *Ho v. Flotek Industries, Inc. et al.*, Case No. 4:15-cv-03327 (S.D. Tex.); *Walpole v. Flotek Industries, Inc. et al.*, Case No. 4:15-cv-03383 (S.D. Tex.); *Edgar v. Anadarko Petroleum Corporation et al.,* Case No. 4:17-cv-01372 (S.D. Tex.); *Stern v. Atwood Oceanics, Inc. et al.,* Case No. 4:17-cv-01942 (S.D. Tex.); *Composto v. Atwood Oceanics, Inc. et al.*, Case No. 4:17-cv-01968 (S.D. Tex.); *Carter v. Atwood Oceanics, Inc. et al.,* Case No. 4:17-cv-02013 (S.D. Tex.); *Scarantino v. Parkway, Inc. et al.*, Case No. 4:17-cv-02441 (S.D. Tex.); *Panella v. Tesco Corporation et al.*, Case No. 4:17-cv-02904 (S.D. Tex.); *The Vladimir Gusinsky Rev. Trust v. Tesco Corporation et al.*,

9

Case No. 4:17-cv-02918 (S.D. Tex.); *Scarantino v. Calpine Corporation et al.*, Case No. 4:17-cv-03256 (S.D. Tex.); *Paskowitz v. Dynegy Inc. et al.*, Case No. 4:18-cv-00027 (S.D. Tex.); *McIntyre v. Chicago Bridge & Iron Company N.V. et al.*, Case No. 4:18-cv-00273 (S.D. Tex.); *The George Leon Family Trust v. Chicago Bridge & Iron Company N.V. et al.*, Case No. 4:18-cv-00314 (S.D. Tex.); *Witmer v. Layne Christensen Company et al.*, Case No. 4:18-cv-01051 (S.D. Tex.); *Paik v. Fair et al.*, Case No. 4:18-cv-02513 (S.D. Tex.); *Edwards v. McDermott International, Inc. et al.*, Case No. 4:18-cv-04330 (S.D. Tex.);*Vladimir Gusinsky Rev. Trust v. Rowan Companies PLC et al.*, Case No. 4:18-cv-04341 (S.D. Tex.); *Van 'T Hoofd v. Nobilis Health Corp. et al.*, Case No. 4:18-cv-04727 (S.D. Tex.); *Manopla v. Lexicon Pharmaceuticals, Inc. et al.*, Case No. 4:19-cv-00301 (S.D. Tex.); *Kokareva v. Bristow Group Inc. et al.*, Case No. 4:19-cv-00509 (S.D. Tex.); *Assad v. Penn Virginia Corporation et al.*, Case No. 4:19-cv-00656 (S.D. Tex.); *In Re: Anadarko Petroleum Corporation Securities Litigation*, Case No. 4:20-cv-00576 (S.D. Tex.); *Griggs v. Crown Castle International Corp. et al.*, Case No. 4:20-cv-00843 (S.D. Tex.); *Alexander et al v. Conn's Inc. et al.*, Case No. 4:20-cv-01705 (S.D. Tex.); *Ahnefeldt et al v. Dickson et al.*, Case No. 4:20-cv-02539 (S.D. Tex.); *Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation et al.*, Case No. 4:21-cv-02045 (S.D. Tex.); *Coggins v. Camber Energy, Inc. et al.*, Case No. 4:21-cv-03574 (S.D. Tex.); *Justin Pierce and Hillary Kay, Derivatively on Behalf of AT&T Inc. v. Randall L. Stephenson, et al.*, Cause No. DC-14-13645, (193rd District Court, Dallas County, Texas); *Jacob Hulsebus, et al. v. Belo Corp., et al.*, Cause No. DC-13-06601, (68th District Court, Dallas County, Texas); *Ron Phillips and Scott Moorehead, Derivatively on Behalf of CLST Holdings, Inc., v. Timothy S. Durham, et al.*, Cause No. DC-10-07655 (134th District Court, Dallas County, Texas); *Regan Held, et al., v. C. Kelly Hall, et al.*, Cause No. CC-11-05258-D, (County Court No. 4, Dallas County, Texas); *David Flecker, Individually and on Behalf of All Others Similarly Situated and Derivatively*

10

*on Behalf of Pioneer Southwest Energy Partners L.P.*, Cause No. DC-13-05371-G (134th District Court, Dallas County, Texas); *In re U.S. Home Systems, Inc. Shareholder Litigation*, Cause No. CC-12-04962-B (County Court No. 2, Dallas County, Texas); *Terry Neff, Derivatively on Behalf of Weatherford International Ltd., et al., v. Nicholas F. Brady, et al.*, Cause No. 2010-40764 (270th District Court, Harris County, Texas); *In re Burlington Northern Santa Fe Corporation Shareholder Class Action Litigation,* Cause No. 348-241465-09, (348th District Court, Tarrant County, Texas) *Dillingham v. Schmitz,* Cause No. 2005C119934 (288th District Court, Bexar County, Texas); *Holowach v. Gilliland, et al.*, Cause No. 017-221963-07 (17th District Court, Tarrant County, Texas); *Levy Investments v. Donald Steen, et al.,* Cause No. DC-07-00208 (101st District Court Dallas County, Texas); *In re Petco Animal Supplies, Inc., Shareholder Litigation,* Case No. GIC 869399 (Superior Court, San Diego, California); *Frank Capovilla v. Lone Star Technologies, Inc., et al.,* Cause No. DC-07-002979 (14th District Court, Dallas County, Texas); *Louis Dudas v. Encore Medical Corporation, et al.,* Cause No. D-1-GN-002495 (345th District Court, Travis County, Texas); *Waggoner v. Ryan, et al,* Cause No. CC-05-13893 (County Court at Law No. 2, Dallas County, Texas); *Evans v. Paulson, et al.,* Cause No. 05-01818-JMR-FLN (D. Minn.); In *re Accuray, Inc. Shareholder Derivative* Litigation, Case No. C 09 05580 CW (N.D. Cal.); *In re Microtune, Inc. Litigation,* Cause No. 219-03729-2010 (219th District Court, Collin County, Texas); *Edward Ferguson v. Louis Raspino, et al.*, Cause No. 2010-23805 (281st District Court, Harris County, Texas); *In re Duncan Energy Partners L.P. Shareholder Litigation*, Cause No. 2011-13981 (269th District Court, Harris County, Texas); and many others.

11

App'x. 0137

**JOE KENDALL**

Former United States District Judge Joe Kendall is the owner of Kendall Law Group. Mr. Kendall served on the federal bench in the Northern District of Texas from 1992-2002, appointed by President George Herbert Walker Bush. He was unanimously confirmed by the U.S. Senate. At the time of his appointment, he was the youngest U.S. District Judge in the country. He also served as state district judge of the 195th Judicial District Court in Dallas from 1987-1992. In his judicial career, he has presided over approximately 500 jury trials and disposed of over 11,000 cases. Mr. Kendall has a B.B.A. from the Cox School of Business at Southern Methodist University and a law degree from Baylor University. Mr. Kendall served as a Commissioner on the United States Sentencing Commission from 1999 through 2002, appointed by President Bill Clinton.

Since leaving the bench for economic reasons and returning to trial work, Mr. Kendall has had tremendous success at the prosecution of patent and class action litigation either as lead, co-lead or local counsel.

While on the federal bench, Mr. Kendall handled class actions of various types and presided over numerous civil jury trials, including complex litigation, securities, antitrust, qui tam, medical malpractice, products liability, and patent infringement cases. He presided over a multi-district litigation case, and also environmental and CERCLA cases. He is the author of more than 250 judicial opinions published in the federal reporters or legal research databases. In his career as a lawyer, Mr. Kendall has personally tried more than 100 jury trials to judgment.

Additionally, Mr. Kendall taught new federal judges for the Federal Judicial Center in Washington, D.C. and has taught docket management techniques to experienced federal judges throughout the country. He is a former board member of the Federal Judges Association and was editor of *In Camera*, the newsletter of the Federal Judges Association.

App'x. 0138

# TAB 10

**HOME OFFICE:**

**WEST VIRGINIA**
209 Capitol Street
Charleston, WV 25301

**ADDITIONAL OFFICES:**

ALABAMA

CALIFORNIA

DELAWARE

FLORIDA

IDAHO

ILLINOIS

IOWA

MASSACHUSETTS

MISSOURI

NEW JERSEY

WASHINGTON, D.C.

WEST VIRGINIA

**Toll Free: 877-852-0342**
**Facsimile: 304-342-1110**

# BAILEY GLASSER LLP

www.baileyglasser.com

## Introduction

For over twenty years, Bailey Glasser has handled the most challenging and consequential corporate and litigation legal issues for our clients – regionally and nationwide.  Founded in West Virginia, we have represented many entities and every governor of West Virginia since our inception.

On the litigation side, we are equally comfortable and adept in the role of plaintiff or defendant. Our trial lawyers bring a trial-focused approach to litigation to vigorously protect the interests of clients. The firm concentrates its practice in the areas of complex commercial and class action litigation, with a particular emphasis in energy and finance. We currently represent individuals and classes of consumers, and a variety of corporate and governmental entities throughout the United States.

Bailey Glasser's corporate practice handles business matters ranging from the negotiation and execution of billions of dollars in commercial transactions, to IPOs, to assisting foreign businesses with investments in US assets. We act as outside general counsel to numerous companies, as set forth below.

## Firm History

Bailey Glasser was founded by Benjamin Bailey and Brian Glasser in 1999. Now heading towards our 25th anniversary, our firm has grown to include over 85 lawyers with 18 offices across the country. The firm is recognized by Chambers USA as

### Accolades include:

*Chambers USA* (2019-2022) – *Commercial Litigation, Corporate/Commercial*

*Best Law Firms in America* - Commercial Litigation and Bet-the-Company Litigation and Best Law Firm for High Stakes Litigation

*Best Lawyers* – Commercial Litigation, Corporate Law and M&A Law, Employee Benefits Law, and more

*Best Lawyers – Lawyer of the Year* – Criminal Defense: White Collar, Brian Glasser

*Forbes* - Top Corporate Law Firm (2019)





a Band 1 firm in Commercial Litigation, and Forbes recognized us as a Top Corporate Law Firm (2019). In 2021, we had 18 attorneys recognized in Best Lawyers in America for commercial litigation, energy law, criminal (white collar) defense, bet-the company litigation, class action, banking and finance litigation, Employee Benefits litigation, and more.

Ben Bailey is a former federal prosecutor and General Counsel to the Governor of West Virginia. He recently served as one of 23 lawyers on the Plaintiffs' Steering Committee for the Volkswagen Diesel Emissions MDL pending in the Northern District of California. He previously served as one of nine lawyers in the country on the Plaintiffs' Lead Counsel Committee for the Economic Loss Cases in the Toyota Sudden Acceleration MDL in the Middle District of California, which settled for $1.6 billion. Ben has an AV Preeminent Rating of 5.0 out 5 on Martindale Hubbell, is recognized by Chambers USA as a Band 1 attorney in Commercial Litigation, is included in the National Trial Lawyers Top 100, and has been selected to Super Lawyers for the past ten years in the areas of General Litigation, Environmental Litigation, and Criminal Law. Ben graduated from Harvard Law School and served as a law clerk to District Judge John T. Copenhaver, Jr.

Brian Glasser is a Rhodes Scholar, a graduate of Harvard Law School, and recognized nationally as an exceptionally talented trial lawyer. Along with Ben Bailey, Brian has spearheaded the rapid growth of the firm into a national litigation powerhouse. Brian's reputation as a fierce litigator and fearless negotiator precedes him.

Brian, like Ben, is recognized in Chambers USA as a Band 1 attorney for commercial litigation, and he holds an additional Chamber recognition for his corporate and commercial prowess. Brian has been listed for ten consecutive years in Best Lawyers in America for commercial litigation and white-collar criminal defense. In 2019, Brian was named Lawyer of the Year for white collar criminal defense. Like Ben, Brian was previously included in The National Trial Lawyers Top 100. Brian began his legal career as a law clerk on the United States Court of Appeals for the Fourth Circuit for the Honorable M. Blaine Michael.

### Bailey Glasser Litigation Capabilities

Litigation of every kind has been the cornerstone of Bailey Glasser's success since our inception. We have initiated and defended billion-dollar actions nationwide in state courts, federal courts, and before arbitrators and mediators. Our opposing counsel has included some of the largest law firms in the country and we have emerged victorious. We represent the full spectrum of business interests and industries, from solo entrepreneurs to multi-national corporations, from coal miners to fashion designers.

Bailey Glasser's trial lawyers bring vast experience in resolving business disputes including antitrust, class actions of

*In its 2022 USA Guide, **Chambers & Partners** notes that Bailey Glasser has an "has the expertise to handle any situation and it absolutely makes you feel like you are its only client." **Chambers & Partners** goes on to say that Bailey Glasser's "lawyers are creative problem-solvers. They are excellent at finding solutions where none appear to exist."*



every kind, breach of contract, breach of fiduciary duty, tortious interference, fraud, fraudulent transfer actions, and numerous other federal and state statutes. And although at Bailey Glasser

"we try cases," we also recognize that a preferred outcome may be obtained by negotiation or at an early stage in a lawsuit. Our demonstrated willingness and skill in taking cases to trial gives our clients an advantage throughout the litigation process.

### Electronically-Stored Information Practice Group

 Another advantage we bring to our litigation practice is our unique Electronically-Stored Information ("ESI") Group that not only helps our clients drill down into discovery during cases, but also helps control costs. Bailey Glasser's Electronically Stored Information (ESI) team employs a firm command of evolving best practices, emergent technologies, and established legal principles and rules to ensure that our corporate and individual clients preserve, collect, and manage ESI, and conduct e-Discovery, with strategic confidence. Katherine Charonko, a member of this proposed team and the ESI Practice Group Leader, is a thought leader and pioneer in the field of ESI and is a Certified e-Discovery Specialist ("CEDS"), a globally recognized credential. She regularly speaks on ESI issues around the country.

Charonko has been appointed to leadership roles in e-Discovery in three multidistrict litigations and provides efficient, cost-effective, and detail-oriented support for all significant BG litigations from beginning to end. Charonko's practice group evaluates technical and ESI needs; crafts litigation holds; coordinates custodial interviews; conducts document collections; implements aggressive preservation management; negotiates and drafts ESI protocols and protective orders; manages massive discovery libraries; conducts document review; navigates discovery challenges presented by the European Union's General Data Protection Regulation (GDPR) and other privacy regulations; and provides trial support. No modern litigation can happen well without this function and BG is well situated to handle all e-Discovery issues that can arise.

App'x. 0144

**Representative Telephone Consumer Protection Act (TCPA) Plaintiffs' Class Action Cases Include:**

**Krakauer v. Dish Network. L.L.C.,** No. 1:14-CV-00333-CCE-JEP (M.D. NC) - Won five-day jury trial and a treble damages award from the court, resulting in $61.3 million judgment against DISH Network for thousands of telemarketing calls placed to numbers on the National Do Not Call Registry in violation of the TCPA; co-led the trial team, and argued the appeal resulting in a complete affirmance by the US Court of Appeals for the Fourth Circuit. The class, led by class representative Dr. Thomas Krakauer of Bahama, North Carolina, alleged Dish was liable for more than 51,000 telemarketing calls placed by a defunct DISH dealer to persons whose telephone numbers were on the National Do Not Call Registry.

**In re: Monitronics Int'l, Inc. Telephone Consumer Protection Act Litigation,** MDL No. 2493 (N.D. W. Va.) – The firm served as co-lead MDL counsel which resulted in winning a $28 million TCPA settlement for nationwide class of consumers who received alarm-system telemarketing calls.

**Hankins v. Alarm.com, No. 4:15-cv-06314** (N.D. CA) - The firm successfully represented a class of consumers in a certified TCPA class action against Alarm.com. Alarm.com agreed to pay $28 million to settle a TCPA class action, which involved allegations it sent unlawful telemarketing communications to more than 1.2 million consumers. This was one of the largest TCPA class action settlements on record.

**Desai v. ADT Security, No. 11 C 1925** (N.D. IL) - Served on a team of lawyers that won one of the largest ever vicarious-liability TCPA settlements – $15 million for a nationwide class of consumers subjected to nuisance telemarketing calls.

**Mey v. Frontier Communications ADT Security, No. 3:13-cv-01191** (CT) - Obtained an $11 million class action settlement against Frontier Communications for telephone calls that violated the TCPA by placing thousands of illegal telemarketing calls. The class, led by class representative by Diana Mey, alleged that calls commissioned by Frontier and placed to them by Virido on the Five9 predictive dialer pursuant to a contract between Frontier and Virido using a list of telephone numbers that Frontier provided. The complaint alleged that the calling practices violated the TCPA's Do Not Call provisions and the statute's prohibition against autodialed and prerecorded calls to cellphones.



**Partner**
## Lawrence "Larry" Lederer

Philadelphia, PA
1622 Locust Street
Philadelphia, PA 19103
T: 215.274.9420 F: 202.463.2103
llederer@baileyglasser.com

---

**"Also, counsel, I've said it before at the preliminary approval stage, I do want to compliment all counsel for how they litigated this case in a thoroughly professional manner. All parties were zealously represented in the highest ideals of the profession, legitimately and professionally …."**

*Somogyi, et al. v. Freedom Mortgage Corp.* **(recovery of $9.5 million cash plus corporate remedial relief).**

Larry Lederer has extensive experience litigating securities, commercial, and consumer class actions and other cases in federal and state courts throughout the United States. Cases that Larry has litigated have resulted in substantial recoveries for the clients and classes he has represented. Larry's work has received praise by several courts before whom he has litigated, as well as other honors.

Larry has represented and advised a number of state government clients, often in conjunction with their respective state attorney's general office, in a wide array of matters throughout his over 30-year career. These matters have included pharmaceutical, environmental, consumer protection, and other cases.

Larry has successfully litigated several cases involving complex financial instruments against some of the largest financial institutions in the world and has a deep understanding of the financial services industry. Larry's clients have included government pension plans, hedge funds, bankruptcy estates, and others, and his work has resulted in his selection in each of the past four years as one of the *Lawdragon 500 Leading Plaintiff Financial Lawyers* in the United States.

### Awards & Accolades

*Best Lawyers*, Lawyer of the Year, Mass Tort Litigation / Class Action - Plaintiffs (2023)
*Best Lawyers,* Mass Tort Litigation / Class Actions – Plaintiffs (2022- 2023)

7

App'x. 0146

*Lawdragon,* 500 Leading Plaintiff Financial Lawyers in the US, 2019-2022
*Law 360,* 2022 Pennsylvania Editorial Advisory Board
*Martindale-Hubbell,* Highest rating, AV Preeminent, Legal Abilities and Ethical Standards
*Super Lawyers,* Pennsylvania, 2006-2022

**Practice Areas**

Appellate and Supreme Court Practice
Class Actions
Commercial Litigation
Consumer Litigation
Environmental
Product Liability
Telephone Consumer Protection Act (TCPA)

**Education**

LL.M, Georgetown University Law Center, 1988
J.D., Western New England College School of Law, 1987
B.A., University of Pittsburgh, 1984

**Admissions**

Pennsylvania
District of Columbia
Eastern District of Pennsylvania
Western District of Pennsylvania
U.S. Court of Appeals for the Second Circuit
U.S. Court of Appeals for the Eleventh Circuit
U.S. Supreme Court

**Representative Matters**

- A class action under the Telephone Consumer Protection Act resulting in a recovery of $9.5 million in cash plus corporate remedial relief, *Somogyi, et al. v. Freedom Mortgage Corp.*, No. 17-cv-6546 (RMB/JS) (D.N.J.). In preliminarily approving the settlement on February 19, 2020, the Court stated as follows: "This Court has personal knowledge that the case was vigorously and appropriately and professionally litigated …. So to your credit, you did a terrific job for your class. I commend you on a very appropriately litigated case."

- A securities class action involving a private placement of synthetic CDOs against Goldman, Sachs & Co. *See Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261 (S.D.N.Y. 2014) (granting class certification); *Goldman, Sachs & Co. v. Dodona I, LLC*, No. 14-419 (2d Cir. June 27, 2014) (denying Rule 23(f) appeal). Case settled following summary judgment for $27.5 million for the investor class.

- A securities class action against Merrill Lynch resulting in a recovery of $475 million, *In re Merrill Lynch & Co. Inc. Securities, Derivative and ERISA Litigation*, Master File No. 07-cv-9633 (JSR) (DFE) (S.D.N.Y.). This case involved Merrill Lynch's financial exposures to subprime mortgage-related assets, and represents one of the largest recoveries ever under the Private Securities Litigation Reform Act. Larry served as Court-appointed co-lead counsel for lead plaintiff State Teachers Retirement System of Ohio. During a hearing on July 27, 2009, Judge Jed S. Rakoff stated that lead plaintiff had made "very full and well-crafted" and "excellent submissions"; that there was a "very fine job done by plaintiffs' counsel in this case"; and that the attorney fees requested were "eminently reasonable" and "appropriately modest."

- Outside counsel to one state attorney's general office in what became a multi-state civil law enforcement proceeding joined by several other state attorneys general that resulted in landmark mortgage modifications and related relief for hundreds of thousands of borrowers nationwide against Countrywide Financial Corp. (and its parent, Bank of America) valued at approximately $8.6 billion.

- Outside counsel in a securities "opt-out" action for the State of New Jersey, Dept. of Treasury, Division of Investment in *State of New Jersey, Dept. of Treasury, Division of Investment v. Richard Fuld, et al.*, No. MER-L-677-09 (N.J. Sup. Ct.). The case involved the collapse of Lehman Bros. The claim was that Lehman officers and directors and Lehman's outside accountant, Ernst & Young, misled the State of New Jersey pension funds to invest in an offering of Lehman preferred stock and other Lehman securities months before Lehman's September 2008 bankruptcy. The State of New Jersey Division of Investment is one of the largest public pension fund managers in the United States, managing over $84.3 billion in assets (as of Dec. 31, 2020) for approximately 800,000 present and former New Jersey state teachers, firemen, policemen, judicial officers, and other active and retired New Jersey state employees and their families. Following removal and coordination of New Jersey's action with the related federal multidistrict class action litigation, *In re Lehman Brothers Securities and ERISA Litigation*, No. 09-MD-2017 (LAK), New Jersey recovered over $13 million from the defendants, representing – on a *net* basis, after all attorneys' fees and costs were deducted – many multiples above what New Jersey would have recovered from the related class action litigation.

- Obtained recoveries in many other large securities class action and opt-out cases such as *Commonwealth of Pennsylvania Public School Employees' Ret. Sys. v. Citigroup Inc.*, No. 11-2583, 2011 U.S. Dist. LEXIS 55829 (E.D. Pa. May 20, 2011) (granting plaintiffs' motion to remand); *Commonwealth of Pennsylvania Public School Employees' Ret. Sys. v. Time-Warner, Inc.*, No. 002103 (Pa. Common Pleas Ct., Phila. Cty.) (case settled following denial of defendants' preliminary objections); *In re Waste Management, Inc. Securities Litigation*, 194 F. Supp. 2d 590 (S.D. Tex. 2002); *Kelly v. McKesson HBOC, Inc.*, C.A. No. 99C-09-265, 2002 Del. Super. LEXIS 39 (Del. Super. Jan. 17, 2002) (denying defendants' motion to dismiss); *In re Michael R. Milken and Associates Securities Litigation*, MDL No. 924, Master File No. M21-62 (MP) (S.D.N.Y.) (approving $1.3 billion settlement with Michael R. Milken and some 500 other persons and entities); *In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138 (2d Cir. 1993) (affirming $1.3 billion settlement); *Presidential Life Ins. Co. v. Milken*, 946 F. Supp. 267 (S.D.N.Y. 1996) (approving $50 million settlement against some 500 defendants); *In re Ivan F. Boesky Securities Litigation*, 948 F.2d 1358 (2d Cir. 1991) (affirming approval of partial $29 million settlement; subsequent class, derivative, and other settlements approved totaling in excess of $200 million).

**Community and Professional Activities**

Philadelphia Bar Association

American Bar Association

Board Member, Legacy Youth Tennis & Education Center, 2016-2020

Captain, University of Pittsburgh Men's Varsity Tennis Team, 1983-1984



Partner
**Michael L. Murphy**

Charleston, WV
209 Capitol Street
Charleston, WV 25301
**T: 202.548.7789 F: 202.463.2103**
mmurphy@baileyglasser.com

Michael Murphy has extensive experience in state and federal class action litigation, complex commercial litigation, *qui tam* and false claims matters, *parens patriae* litigation, antitrust litigation, First Amendment matters, and bankruptcy cases.

Over nearly two decades, Mike has been involved in countless litigation matters ranging from multi-district litigation involving Fortune 100 corporations to commercial disputes between small companies. These proceedings have involved consumer data breach, antitrust, and products liability matters.

He has worked with public companies to develop antitrust compliance programs and codes of conduct to comply with the DOJ Antitrust Division's guidance.

Mike has also participated in a number of bankruptcy proceedings ranging from the *Blixseth v. Yellowstone Club Liquidating Trust* to assisting individuals with bankruptcy proceedings through the DC Bar's pro bono Bankruptcy Clinic.

**Awards & Accolades**

*Chambers USA*, District of Columbia; Litigation: Mainly Plaintiffs (2022)

**Government Service / Previous Employment**

Judicial Extern, Hon. Paul L. Friedman, U.S. District Court for the District of Columbia (2001 - 2002)



Michael Murphy

Research Analyst; Staff Director, International Brotherhood of Teamsters (1993 - 1999)

**Practice Areas**

Appellate and Supreme Court Practice
Arbitration & Dispute Resolution
Bankruptcy & Business Reorganization
Commercial Litigation

13

Consumer Litigation
Electronically Stored Information (ESI)
Environmental
MDL Panels
Product Liability

**Education**

J.D., The Catholic University of America Columbus School of Law, 2002, *cum laude*, Law Review, Winner – John H. Fanning Labor Law Writing Competition
M.S., University of Wisconsin-Madison, 1993
B.S., California State University-Fresno, 1991

**Admissions**

District of Columbia
New York
West Virginia
Washington
U.S. Supreme Court
U.S. Court of Appeals for the Ninth Circuit
U.S. District Court, District of Columbia
U.S. District Court, Western District of Michigan
U.S. District Court, Southern District of New York
U.S. District Court, Northern District of Ohio
U.S. District Court, Western District of Washington
U.S. District Court, Northern District of West Virginia
U.S. District Court, Southern District of West Virginia

**Representative Matters**

- Obtained, as co-trial counsel, a verdict on behalf of Ramaco Resources Inc. of approximately $32.7 million against Chubb related insurance companies for breach of contract in a denial of insurance coverage case. The trial court subsequently reduced the verdict. The matter will be appealed.

- Serves on the plaintiffs' discovery committee in *In re Blue Cross Blue Shield Antitrust Litigation*, a multi-district litigation matter alleging nationwide market allocation and price-fixing antitrust violations by the Blue Cross Blue Shield Association and its members throughout the United States; currently pending before the US District Court for the Northern District of Alabama

- Serves on the management committee for a consortium of law firms representing a number of Governors, State Attorneys General, and Underground Storage Tank Funds in ongoing investigations, mediations, and litigations against the major oil companies in efforts to recoup improper overpayments obtained by the oil companies; through these efforts return more than $100 million to the various states

- Served as pro bono counsel for the Two Rivers Public Charter School after it was targeted by protesters upset the school happened to be located next door to a Planned Parenthood facility that was under construction; defeated the multiple defendants' motions to dismiss as well as their Anti-SLAPP motions; currently on appeal and pending before the District of Columbia Court of Appeals

- Represented individual and institutional investors related to auction rate securities and other investment vehicles as a member of PIABA

- Represented the BSA | The Software Alliance, an association of leading software manufacturers including Apple, Adobe Systems, and Microsoft, in investigating and prosecuting software piracy and copyright infringement matters

**Community and Professional Activities**

American Association for Justice
Public Justice
Public Investors Arbitration Bar Association



**Of Counsel**
**Bart D. Cohen**

Philadelphia, PA
1622 Locust Street
Philadelphia, PA 19103
T: 215.274.9420 F: 202.463.2103
bcohen@baileyglasser.com

Bart Cohen has over 25 years of experience in class actions and other complex litigation, with an emphasis on federal antitrust litigation. A member of Bailey Glasser's litigation team, Bart handles complex litigation for clients. An attorney with a degree in computer science and professional software development experience, his background benefits his clients as he is able to efficiently manage information technology issues in the matters he handles.

Bart is a second-generation attorney, first inspired to become a lawyer by his father (who has now been practicing for over 60 years), and now inspired by pursuing truth and justice on behalf of his clients.

Bart is a frequent contributor to legal publications, including *Law360*, *The Legal Intelligencer*, and in several publications of the American and Philadelphia Bar Associations. He has been identified as "a very strong litigator" in the *Legal 500* in 2009 and 2010, and has been designated a "Pennsylvania Super Lawyer," a distinction awarded to only five percent of the attorneys in the state, in each of ten years.

Bart is a graduate of the Georgetown University Law Center. He also graduated from the University of Pennsylvania with two bachelor's degrees, from the Wharton School and the School of Engineering and Applied Science.

**Awards & Accolades**
*Super Lawyers*, Pennsylvania, 2011-2021
*The Legal 500*, 2009, 2010

**Practice Areas**
Automotive
Banking & Financial Services
Class Actions
Consumer Litigation

11

**Education**

J.D., Georgetown University Law Center, 1989
B.S. and B.A.S, University of Pennsylvania, 1984

**Admissions**

Pennsylvania
U.S. District Court, Eastern District of Pennsylvania
U.S. Court of Appeals for the Third Circuit

**Representative Matters**

- ***In re Wawa, Inc. Data Security Litigation*, 2:19-cv-06019 (E.D. Pa.):** I played a key role in earning my New York-based firm a lead counsel position, by getting a complaint on file promptly after news of the Wawa data breach became public, and by virtue of my knowledge of the Philadelphia firms with whom we were competing. I was responsible for the firm's day-to-day role in the case, in which a settlement for up to $9 million has been preliminarily approved.

- ***In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720 (E.D.N.Y.):** I played a key role in earning my firm a lead counsel position representing an injunctive relief class of over seven million merchants who accept Visa and Mastercard payment cards, based on my earlier experience in the case, and my drafting the firm's briefs in a hotly-contested battle for lead counsel positions. I have since filled a role immediately below that of the four co-lead counsel, taking responsibility for formulating settlement positions (which involve complex payment network rules) and managing certain dispositive briefs. We recently got the class certified, based in part on my understanding of rarely litigated issues regarding Rule 23(b)(2).

# TAB 11



80 State Street, 11th Floor
Albany, New York 12207
Direct Dial: (518) 449-3300

  

## STATEMENT OF QUALIFICATIONS

**1.    Introduction**

Nolan Heller Kauffman is a business law firm located in Albany, New York. Since its founding in 1964, Nolan Heller Kauffman has gained a reputation as one of the top law firms in Upstate New York's Capital Region.  The Firm's practice extends throughout New York State and beyond.   The Firm's attorneys have been prominent in the professional, civic, business and political life of New York's Capital Region for nearly 60 years.   U.S. News & World Report has rated the Firm a Tier 1 law firm in Bankruptcy and Creditor-Debtor Rights/Insolvency and Reorganization Law. Several of Firm's attorneys have been named Super Lawyers in the Upstate Edition of Super Lawyers magazine. The Firm bears an AV rating from the Martindale-Hubbell Directory of Attorneys.

The Firm is a New York limited liability partnership, managed by Justin A, Heller and Madeline H. Kibrick Kauffman, its managing partners.  The Firm is comprised of 6 partners, 4 of-counsel attorneys, 4 associate attorneys and administrative staff. The Firm has achieved a significant level of technological advancement, is highly computerized and networked, and meets stringent data security and privacy standards.

Nolan Heller Kauffman provides a full range of legal services in business and commercial matters, with particular emphasis on commercial litigation in the financial services and lending areas.  The Firm's practice areas include business transactions, commercial litigation, commercial real estate, land use, zoning and planning law, banking, creditor's rights, bankruptcy and reorganizations, corporate law, construction and surety law, governmental relations, municipal law, public finance, and securities.   Our clients include publicly-traded and privately-held businesses, financial institutions, real estate developers, municipalities and state governmental agencies, contractors, entrepreneurs and technology start-ups.

**2.    Relevant Experience**

Since its inception, Nolan Heller Kauffman has routinely represented banks and other lenders, as well as borrowers, in connection with business, real estate and other commercial loan transactions. Our attorneys are experienced and skilled in all aspects of commercial financing transactions, including negotiating loan terms, drafting loan documents, analyzing and advising on security and collateral issues, addressing real estate title issues, and handling closings, in connection with a wide variety of transactions, such as those involving: complex commercial real estate and asset-based credit facilities, construction lending, commercial leasing transactions, municipal finance, commercial portfolio sales, mezzanine lending, syndicated and participated loan transactions, and depository account control agreements.

Nolan Heller Kauffman's attorneys are experienced in all manner of loan, collateral and contract documentation, and regularly undertake a detailed analysis of original contract, loan, and mortgage documentation, including a review of original due diligence materials and collateral

2

files; a review of current financial statements and other reporting documentation; and an analysis of real estate title, UCC filings and other matters affecting collateral.

In the area of litigation relating to lending transactions, Nolan Heller Kauffman has decades of substantial creditors' rights litigation experience in state and federal court, including promissory note and guaranty actions, uniform commercial code issues, commercial foreclosures, receiverships, attachments, replevins and seizure orders, and defense of lender liability claims. Nolan Heller Kauffman's attorneys are particularly knowledgeable and experienced in the enforcement of creditors' rights under loan documentation, and is routinely engaged by banks and financial institutions to pursue enforcement of difficult lending and collection matters.

The Firm has also gained substantial experience with the Payroll Protection Program, including advising bank clients on the PPP, and counseling PPP borrower clients on a variety of PPP related issues, including PPP loan repayment, PPP loan forgiveness and PPP loan forgiveness appeals.

App'x. 0158

**JUSTIN A. HELLER, MANAGING PARTNER**
**NOLAN HELLER KAUFFMAN LLP**
**80 State Street, 11th Floor**
**Albany, New York 12207**
P: 518.433.3300
jheller@nhkllp.com

Justin A. Heller is a managing partner of Nolan Heller Kauffman LLP. Nolan Heller Kauffman is a business law firm established in 1964, with 15 attorneys, providing a full range of legal services in business and commercial matters including creditors' rights and insolvency-related matters, commercial litigation, secured and unsecured financing transactions, commercial real estate, corporate and general commercial law, and environmental law counseling and litigation. Nolan Heller Kauffman has gained a reputation as one of the New York Capital Region's preeminent law firms, and the Firm's practice extends throughout New York State and beyond

Justin concentrates his practice in the areas of financial transactions, creditors' rights and bankruptcy, business and commercial law and litigation. Justin has been a bankruptcy, creditors' rights and commercial litigation attorney for the more than 30 years. In the area of creditors' rights, Justin regularly represents lenders in commercial loan workouts and restructurings, liquidations, foreclosures, litigation, seizures and receiverships. Justin regularly represents secured and unsecured creditors in all facets of Chapter 11 bankruptcy cases, including preference and other litigation, contested valuations, cash collateral proceedings, bankruptcy sales and plan confirmation. Justin also has vast experience representing borrowers in workouts and litigation, and regularly serves as debtor's counsel in Chapter 11 bankruptcy proceedings. Justin also serves as a court appointed receiver, in both state and federal court litigation.

Outside the areas of creditors' rights and bankruptcy, a significant portion of Justin's practice is devoted to a broad range of commercial and business litigation in state and federal court and in arbitration proceedings, including all manner of contract and commercial disputes, business torts, shareholder and partnership disputes, real estate disputes and estate and trust litigation.

As a business lawyer, Justin regularly provides counsel and representation to business clients in corporate, financial, transactional and general business matters.

Justin is a member of the American Arbitration Association Roster of Neutrals, and is a past President of the Capital Region Bankruptcy Bar Association. Justin has been named as a top bankruptcy and creditor/debtor rights attorney in New York Super Lawyers Upstate Edition for 2008 through 2022.

**Education**:

Law School:    Albany Law School of Union University (J.D., cum laude); Justinian Society
College:    Ohio Wesleyan University (B.A.)

**Admitted**:    New York; U.S. District Court, Eastern, Northern, Southern and Western Districts of New York; Second Circuit Court of Appeals.

4

App'x. 0159

**Representative Matters**:

- *Columbia Mem. Hosp. v Hinds*, 38 N.Y.3d 253 (2022). Counsel for policyholders in cases involving disputes over whether the medical provider/employee or medical practice/employer was entitled to the proceeds of demutualization and sale of the Medical Liability Mutual Insurance Company, culminating in appeal to the New York Court of Appeals. The Court held that the policyholders were solely entitled to the proceeds, addressing New York unjust enrichment law and establishing state-wide precedent for similar disputes pending throughout New York State, many of which have been handled by the Firm.

- *KeyBank National Association v. Monolith Solar Associates LLC, et al.*, (N.D.N.Y. Case No. 1:19-cv-1562), counsel for court appointed receiver of large New York solar power facility developer, owner and operator. This is a highly complex case, involving several secured creditor parties and sale of solar asset portfolios.

- *473 W. End Realty Corp.*, 507 BR 496 (Bankr SDNY 2014) (denying motion for stay pending appeal; *see also Laroe Estates, Inc. v TD Bank, N.A. (In re 473 W. End Realty Corp.)*, 2014 US Dist LEXIS 77036 (SDNY 2014). Counsel for secured creditor in contested Chapter 11 bankruptcy case involving large real estate development project, in which court granted secured creditor relief from stay approximately one month after date of bankruptcy petition, and subsequently issued written Memorandum Decision denying debtor's motion for stay pending appeal.

- *Green Oak Stockade View Apartments, LLC* (NDNY Bankr; Case No. 16-12162); *See Green Oak Stockade View Apts., LLC v Natl. Bank of Coxsackie*, 2018 US Dist LEXIS 52437 (NDNY 2018) (granting motion to dismiss debtor's appeal of lift stay order). Counsel for senior secured creditor in contested Chapter 11 case involving 56 unit apartment complex, in which secured creditor opposed debtor's motion to sell property and sought various relief, including relief from stay or appointment of trustee, and culminating in order granting relief from stay to complete foreclosure.

- Appointment as Receiver by federal district court for the Northern District of New York in *The Federal Trade Commission v. Pairsys, Inc., et al.* (NDNY Case No. 14-1192 [TJM/SFH]), a tech support scam case brought by the Federal Trade Commission.

- Appointed by New York State Supreme Court (Warren County) in *Pioneer Savings Bank v. Hacker Boat Co., Inc., et al.* (Index No 62870), as receiver of a boat manufacturing business.

- Appointed by New York State Supreme Court (Rensselaer County) in *Fannie Mae v. 1329 15th Street, LLC et al.* (Index No. 238911) and *Fannie Mae v. 77 11th Street, LLC, et al.* (Index No. 128910), as receiver of two large student housing facilities.

5

- *Lawrence Agency Corporation, A. W. Lawrence & Co., Inc., Lawrence Healthcare, Lawrence United Corporation, Laurence United Corp. of Southern California* (Bankr. NDNY; Lead Case No. 97-11302). Debtor's counsel representing related group of insurance agency companies. These were highly complex and contested bankruptcy proceedings involving large numbers of asset sales, adversary proceeding and claims objections, and culminating in the confirmation of Chapter 11 plans for each of the debtor companies.

- *Lincoln Logs, Ltd.* (Bankr. NDNY; Case No. 08-13079). Chapter 11 Trustee in orderly liquidation of national log home manufacturing and distributing business, involving large number of claims objections, preference claim adversary proceedings, and creditor claims objections, culminating in court approval of liquidation plan, and completion of liquidation process and distribution to creditors.

- *Christopher's Partner, LLC v Christopher's of Colonie, LLC, 38 Misc 3d 1233[A], (Sup Ct, Albany County 2008).* Counsel for plaintiff/secured creditor in state court UCC-Article 9 seizure action, in which court granted application for order of seizure following trial on defendant's defenses.

- *Berardi v Berardi*, 108 AD3d 406 (1st Dept 2013). Counsel for defendant/appellant in appeal of decision by New York Supreme Court (New York County) granting in part and denying in part motion to dismiss complaint by minority shareholder for shareholder oppression and breach of fiduciary duty. The First Dept. ruled in favor of defendant and dismissed the complaint in its entirety.

6

**BRENDAN J. CAROSI, PARTNER**
**NOLAN HELLER KAUFFMAN LLP**
**80 State Street, 11th Floor**
**Albany, New York 12207**
P: 518.433.3300
bcarosi@nhkllp.com

Brendan J. Carosi is a partner in Nolan Heller Kauffman, LLP. Mr. Carosi's practice focuses on business and commercial law and litigation, creditors' rights and bankruptcy. Prior to joining Nolan Heller Kauffman, Mr. Carosi was an associate with White & Case LLP, gaining a broad range of commercial litigation, intellectual property litigation and mergers & acquisitions experience. He graduated summa cum laude from Boston University and magna cum laude from Fordham University School of Law, where he was a member of the Fordham Law Review.

**Education**:

Law School:    Fordham University School of Law, magna cum laude, member of the Fordham Law Review
College:        Boston University, summa cum laude

**Admitted**:

New York; Massachusetts; U.S. District Court for the Northern and Southern Districts of New York

**Representative Matters**:

Ongoing representation of two lenders in breach of contract and fraud litigation arising from their purchase of participation interests from a bank that loaned over $40 million dollars to the perpetrator of a decade-long bank fraud scheme.

Representation of a secured lender in litigation involving the liquidation of a personal injury law firm and the recovery of the lender's collateral comprised of legal fees due on cases taken and resolved by the firm's former attorneys.

Representation of a national banking association in connection with contentious litigation between a borrower and a developer seeking specific performance of an agreement to build a large New York university's bookstore and student/fitness center.

Representation of national and regional banking institutions in commercial mortgage foreclosure actions throughout New York State, and in litigation to collect defaulted loans involving businesses located throughout New York State and Massachusetts.

Counsel for policyholders in cases involving disputes over whether the medical provider/employee or medical practice/employer was entitled to the proceeds of demutualization and sale of the Medical Liability Mutual Insurance Company, culminating in appeal to the New York Court of Appeals.  The Court held that the policyholders were solely entitled to the proceeds, addressing New York unjust enrichment law and establishing state-wide precedent for similar disputes pending throughout New York State, many of which have been handled by the Firm.

**MATTHEW ZAPALA, ASSOCIATE**
**NOLAN HELLER KAUFFMAN LLP**
**80 State Street, 11th Floor**
**Albany, New York 12207**
P: 518.433.3300
mzapala@nhkllp.com

Matthew Zapala joined Nolan Heller Kauffman LLP in July 2020 after serving as Career Law Clerk to the Honorable Robert E. Littlefield, Jr., U.S. Bankruptcy Judge (NDNY). Matthew concentrates his practice in the areas of bankruptcy and business reorganization, creditors' rights, and commercial litigation. Prior to his clerkship, Matthew was an associate attorney with an established Albany law firm, practicing in the areas of creditors' rights, landlord/tenant litigation, and commercial litigation. While in law school, Matthew was an Associate Editor of the Albany Law Review, and recipient of the Wann Family Prize for Excellence in Business Law and Litigation.

Since the early stages of the Paycheck Protection Program ("PPP"), Matthew has represented PPP loan borrowers in disputes with PPP lenders in a variety of matters in federal and state court. Issues litigated in these matters have included the wrongful restraint and collection of PPP loan funds, the failure to fund PPP loans, and eligibility. In addition to litigating PPP loan issues, Matthew has also helped clients navigate disputes with PPP lenders outside of Court relating to repayment and PPP loan forgiveness. Matthew and the Firm have also advised PPP lenders relating PPP loan eligibility, forgiveness, and PPP loan guaranties.

# TAB 12



400 W. Capitol Ave.
Suite 2000
Little Rock, AR 72201
501-376-2011

3350 S. Pinnacle Hills Pkwy
Suite 301
Rogers, AR 72758
479-695-2011

www.FridayFirm.com

# WHO WE ARE

**FRIDAY, ELDREDGE & CLARK, LLP** is a full-service law firm representing businesses, nonprofits, healthcare organizations, government entities and individual clients in Arkansas and across the United States. The firm is the largest in Arkansas with more than 90 attorneys and offices in Little Rock and Rogers.

Recognized as one of the oldest law firms in Arkansas, we have had the privilege of representing clients for nearly 150 years. We attribute our success to a strong foundation of devoted internal leadership and a continuous, sharp focus on our clients' needs. We believe this foundation, along with offering services in more than 50 areas of the law, has allowed us to become the largest law firm in Arkansas.

Known for our rich history and vast scope of services, we are committed to further development and growth within the firm and our community to best serve our clients.  Clients are our focus — every day.

## 150
**YEARS IN BUSINESS**
Tracing its history back to 1871, the firm is one of the oldest law firms in Arkansas.

## 100+
**SUPPORT PERSONNEL**
A team of paralegals, legal assistants and support staff form to support our clients.

## 90+
**ATTORNEYS**
The firm is the largest law firm in Arkansas with 90+ attorneys on its roster.

## 50+
**PRACTICE AREAS**
Areas of focus include tax, litigation, labor, bonds and business.

**MORE ONLINE**
Practice areas:
www.**FridayFirm**.com/practice-areas

Attorneys:
www.**FridayFirm**.com/attorneys

# HOW WE ARE HONORED

## 72
**BEST LAWYERS IN AMERICA**
*Best Lawyers 2021* ranked 72 of the firm attorneys; 9 are named as "Ones to Watch."

## 49
**SUPER LAWYERS**
*Mid-South Super Lawyers* 2020 ranked 49 attorneys; 11 are named "Rising Stars."

## 32
**LEADERS IN THEIR FIELD**
Chambers & Partners recognized 32 attorneys in *Chambers USA 2020* and *Chambers High Net Worth*.

## 16
**LAWYERS OF THE YEAR**
*Best Lawyers* 2021 named 16 of the firm's attorneys "Lawyers of the Year" in Arkansas.

## 8
**TOP 50: SUPER LAWYERS**
*Mid-South Super Lawyers* "Top 50: Arkansas" list includes 8 of the firm's attorneys in 2020.

App'x. 0167

# PRACTICE AREAS

## GOVERNMENT

- Constitutional Law
- Government Relations, Lobbying & Regulatory
- Public Finance

## EMPLOYEE BENEFITS

- Executive Compensation
- Health & Welfare Plans
- Retirement Plans
- Tax-Exempt & Governmental Plans

## TAX LAW

- Corporate Tax
- Employee Benefits
- Mergers & Acquisitions
- State & Local Tax
- Tax Controversies

## TRUST & ESTATE PLANNING

- Charitable Giving
- Family Business Planning
- Probate & Trust Administration

# WE PRACTICE IN 50+ AREAS OF LAW

App'x. 0168

## BUSINESS & CORPORATE

- Agricultural Law
- Antitrust
- Commercial Litigation & Regulatory
- Construction Law
- Corporate Tax
- Energy, Natural Resources & Utilities
- Environmental Law
- Franchise & Direct Selling
- Health Law
- Insurance & Regulatory
- Intellectual Property
- Mergers & Acquisitions
- Real Estate
- Securities
- Torts & Insurance

## FINANCIAL & COMMERCIAL

- Antitrust
- Banking & Finance
- Bankruptcy & Creditors' Rights
- Corporate Governance
- Finance & Commercial Transactions
- Mergers & Acquisitions

## LABOR & EMPLOYMENT

- Covenants not to Compete
- Education
- Employee Benefits
- Employment Litigation
- Immigration & Employer Compliance
- Labor Relations
- Wage & Hour
- Workers' Compensation

## LITIGATION

- Alternative Dispute Resolution
- Antitrust
- Appellate Law
- Class Actions
- Commercial Litigation & Regulatory
- Employment Litigation
- Intellectual Property
- Medical Malpractice
- Personal Injury Litigation
- Pharmaceutical & Medical Device Litigation
- Product Liability
- Professional Malpractice
- Qui Tam
- Railroad Litigation
- Torts & Insurance
- Trade Secrets
- Trucking & Transportation

## PUBLIC FINANCE

- Bonds
- Education
- Municipal Law

*By offering a wide range of services, we are able to provide our clients single-source convenience for their legal needs.*

App'x. 0169

# LITIGATION

In our litigious society, lawsuits are a frequent, but unwanted, source of anxiety for individuals and businesses. When represented by Friday, Eldredge & Clark, you are given assurance and confidence that your advocate/attorney can competently and persuasively represent your interests to the end.

We recognize that each case is unique. Careful collaboration with our clients in developing a strategy for a case is one of our strong suits. Our experience gives you insight into the likely course of a case, and we work with you to develop a case plan to achieve the optimal outcome you deserve. We zealously work for our clients, with your best interest as our chief concern. Exceeding your expectations is our objective.

Our Litigation Practice Group is made up of more than 40 attorneys who focus their work on a particular area of the law. The group is the largest and most experienced in the state with a combined total of more than 900 years of legal experience. The group includes eight Fellows in the American College of Trial Lawyers and six attorneys in the American Board of Trial Advocates.

# OUR COMMITMENT

Our commitment to community goes beyond the practice of law. The firm strongly believes in supporting civic, philanthropic, professional, educational and charitable activities and organizations to improve our community.

**COMMUNITY SUPPORT** - More than 100 organizations benefit annually from the combined efforts of the firm's financial support and our attorneys' commitment to community service. Human services, health causes, educational institutions, arts and cultural programs, historical societies and civic and professional groups all benefit from these efforts. Our Friday Cares (#FridayCares) program pools the firm's resources, time and money to support special causes each year.

**DIVERSITY** - The firm is committed to being a more diverse workplace by encouraging an environment that fosters growth, respect and engagement. Our Equality, Equity and Diversity Committee was established to cultivate a more accessible and inclusive work environment. We are a charter member of the Law Firm Antiracism Alliance (LFAA), which has a membership of more than 200 law firms across the country. LFAA members are working on a number of large-scale initiatives to advance race equity and social justice in the legal profession.

**CIVIC OUTREACH** - Serving the legal community is a key component to our civic outreach efforts. Many of our attorneys serve or have served in leadership roles in local, state and national bar associations in an effort to advance ethical behavior and professional respect in the legal community.

**EDUCATION** - Our attorneys spend countless hours each year educating clients in various industries and businesses. This includes publishing articles and hosting seminars on various topics such as healthcare issues, employment matters and tax laws.

## 100+
**ORGANIZATIONS**
Various community and nonprofit groups benefit from the firm's financial support and attorneys' volunteer efforts.

## 23
**ALUMNI - LGLR**
Leadership Greater Little Rock (LGLR) is a nine-month program designed to empower community leaders.

## 8
**FELLOWS - ACTL**
American College of Trial Lawyers (ACTL) is an invite only fellowship of experienced trial lawyers.

## 6
**FELLOWS - ACTEC**
American College of Trust & Estate Counsel (ACTEC) is a national organization whose fellowship is by invitation only.

## 6
**ADVOCATES - ABOTA**
American Board of Trial Advocates (ABOTA) honors accomplishments in civil jury trials.

## 2
**FELLOWS - ACTC**
The American College of Tax Counsel (ACTC) recognizes significant contributions in the tax system.

App'x. 0171

# KATHERINE C. CAMPBELL

*LITIGATION*
**PARTNER**

📞 479-695-6040
✉ kcampbell@fridayfirm.com
📠 501-537-2945
▪ 3350 South Pinnacle Hills Pkwy Suite 301 Rogers, Arkansas 72758

# BIOGRAPHY

**Katherine C. Campbell** is a partner in the Litigation Practice Group at Friday, Eldredge & Clark. She serves as litigation counsel for individuals and businesses in complex business and commercial disputes including employment claims, collective action wage and hour claims, and breach of contract matters.

She graduated *summa cum laude* in 2013 from the University of Arkansas School of Law.

Prior to joining the firm, Katherine was an associate at Wiley Rein LLP in Washington, DC and served as a law clerk to the Honorable D. Price Marshall Jr. of the U.S. District Court for the Eastern District of Arkansas.

Katherine has been named as an "Associate to Watch" by Chambers and Partners and "One to Watch" by *Best Lawyers in America*.

## Education

* University of Arkansas School of Law, J.D., summa cum laude, 2013
  * Editor-in-Chief, Law Review
  * Awarded Best Brief and Best Oralist, Ben Altheimer Moot Court Competition
  * Recipient of the Bogle-Sharp Award
  * Awarded the Judge Thomas Butt Excellence in Legal Writing Prize

* University of Georgia, B.A., Journalism in Public Relations and B.A., International Affairs, summa cum laude, 2007
  * Recipient of the Mary Love Collins Award



**FRIDAY** | **ELDREDGE**
& **CLARK**
App'x. 0172
www.FridayFirm.com   f in ▸

## Noteworthy

- Appointed CLE Board, Arkansas Supreme Court, 2021
- Law clerk to the Honorable D. Price Marshall Jr.
- Named "One to Watch" in Best Lawyers In America, 2021 & 2022
  - Antitrust Law
  - Appellate Practice
  - Litigation - Labor and Employment
  - Commercial Litigation
  - Labor and Employment Law - Management

- Ranked in Chambers USA: America's Leading Lawyers for Business, Litigation as "Associate to Watch"
- Publication: Arkansas and Mandatory Arbitration: Is the Feeling Really Mutual?, 65 ARK. L. REV. 343, 2012

## Associations and Memberships

- American Cancer Society - Arkansas, Board Member
- Arkansas Bar Association

## Admissions

- Arkansas, 2013
- District of Columbia, 2015
- District of Columbia District Court, 2015
- United States Supreme Court, 2018
- United States Court of Appeals for the Fourth Circuit, 2016
- United States District Court for the Eastern District of Arkansas, 2018
- United States District Court for the Western District of Arkansas, 2018

# TAB 13

# BREACH OF CONTRACT ELEMENTS

| State | Breach of Contract Elements |
|-------|------------------------------|
| Alabama | A breach of contract claim requires (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. *Barrett v. Radjabi-Mougadam*, 39 So. 3d 95, 98 (Ala. 2009); *see also S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995). |
| Alaska | A plaintiff stating a breach of contract claim must allege (1) the existence of a contract, (2) breach, (3) causation, and (4) damages. *Nicdao v. Chase Home Fin.*, 839 F. Supp. 2d 1051, 1068 (D. Alaska 2012) (Alaska law); *see also Great W. Sav. Bank v. George W. Easley Co.*, 778 P.2d 569, 577-78 (Alaska 1989); *Brooks Range Petroleum Corp. v. Shearer*, 425 P.3d 65, 79 (Alaska 2018). |
| Arizona | "To bring an action for the breach of the contract, the plaintiff has the burden of proving the existence of the contract, its breach and the resulting damages." *Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (Ariz. 1975) (en banc); *see also Thomas v. Montelucia Villas, LLC*, 302 P.3d 617, 621 (Ariz. 2013). |
| Arkansas | "A person may be liable for breach of contract if the complaining party can prove the existence of an agreement, breach of the agreement, and resulting damages." *Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 33 S.W.3d 128, 133 (Ark. 2000); *see also Smith v. Eisen*, 139, 245 S.W.3d 160, 169 (2006). |
| California | The elements for breach of contract are (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff. *Oasis West Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011); *D'Arrigo Bros. of California v. United Farmworkers of Am.*, 224 Cal. App. 4th 790, 800, (2014); *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014). |
| Colorado | The elements of a breach of claim are: "(1) the existence of a contract, (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff." *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (internal citations omitted); *see also Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008). |
| Connecticut | The elements of a breach of contract claim are (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 87 A.3d 534, 540 (Conn. 2014); *Sullivan v. Thorndike*, 934 A.2d 827, 833 (2007). |

| State | Breach of Contract Elements |
|---|---|
| Delaware | The elements of a breach of contract claim are (1) the existence of the contract, (2) the breach of an obligation imposed by that contract, and (3) resultant damage to the plaintiff. *VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *GEICO Gen. Ins. Co. v. Green*, 276 A.3d 462 (Del. 2022). |
| D.C. | "To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009); *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015). |
| Florida | "The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *Abbott Labs., Inc. v. General Elec. Capital*, 765 So.2d 737, 740 (Fla. Dist. Ct. App. 2000); *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. Dist. Ct. App. 2017). |
| Georgia | "The elements of a right to recover for a breach of contract are the breach and the resultant damages to the party who has the right to complain about the contract being broken." *Budget Rent-A-Car of Atlanta, Inc. v. Webb*, 220 Ga.App. 278, 279, 469 S.E.2d 712, 713 (Ga. App. 1996). *Roberts v. JP Morgan Chase Bank, Nat'l Ass'n*, 802 S.E.2d 880, 884 (Ga. 2017). |
| Hawaii | "The elements of breach of contract, [Plaintiff] had to establish: (1) a contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damages to plaintiff." *Hawaii State Fed. Credit Union v. Kahapea*, 497 P.3d 1103 (Haw. Ct. App. 2021); *see also uCalipjo v. Purdy*, 144 Haw. 266, 273, 439 P.3d 218, 225 (2019); *Evergreen Eng'rg, Inc. v. Green Energy Team LLC*, 884 F. Supp. 2d 1049, 1059 (D. Haw. 2012). |
| Idaho | "The elements for a claim for breach of contract are: (a) the existence of the contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages." *Mosell Equities, LLC v. Berryhill & Co.*, 154 Idaho 269, 278, 297 P.3d 232, 241 (2013); *Safaris Unlimited, LLC v. Von Jones*, 353 P.3d 1080, 1084 (2015). |
| Illinois | The elements of a claim for breach of contract are (1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages. *Village of S. Elgin v. Waste Mgmt. of Ill., Inc.*, 810 N.E.2d 658, 669 (Ill. App. 2004); *Gallagher Corp. v. Russ*, 721 N.E.2d 605, 611 (Ill. App. 1999). |
| Indiana | The elements of a claim for a breach of contract are the existence of a contract, the defendant's breach thereof, and damages. *Haegert v. Univ. of Evansville*, 955 |

| State | Breach of Contract Elements |
|---|---|
|  | N.E.2d 753, 758 (Ind. Ct. App. 2011); *Morris v. Crain*, 71 N.E.3d 871, 880 (Ind. Ct. App. 2017). |
| Iowa | The elements of a claim for breach of contract are (1) the existence of a contract, (2) the terms and conditions of the contract, (3) that plaintiff has performed under the contract, (4) the defendant's breach of the contract in some particular way, and (5) that plaintiff has suffered damages as a result. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010); *Hansen Co., Inc. v. RedNet Env't Servs.*, 909 N.W.2d 228 (Iowa Ct. App. 2017). |
| Kansas | "In an action based on a contract, the burden of proof is on the plaintiff to show: (1) execution and existence of the contract alleged in the petition; (2) sufficient consideration to support the contract; (3) performance or willingness to perform in compliance with the contract alleged; and (4) the defendant's breach insofar as such matters are in issue." *Commercial Credit Corp. v. Harris*, 212 Kan. 310, 313, 510 P.2d 1322, 1325 (Kan. 1973); *DeHaemers v. DeHaemers*, 371 P.3d 374 (Kan. Ct. App. 2016). |
| Kentucky | The elements of a claim for breach of contract are (1) a contract between the parties, (2) a breach of that contract, and (3) damages caused by the breach. *Texas Capital Bank, N.A. v. First Am. Title Ins. Co.*, 822 F. Supp. 2d 678, 682 (W.D. Ky. 2011); *Jordan v. Hibbeln*, 2018 WL 3090442, at *5 (Ky. Ct. App. June 22, 2018). |
| Louisiana | The elements of a claim for breach of contract are "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Denham Homes, L.L.C. v. Teche Federal Bank*, 182 So. 3d 108, 119, 2014–1576 (La. App. 2015); *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain*, LLC, 193 So. 3d 1110, 1115 (La. 2015). |
| Maine | To state a claim for breach of contract, the plaintiff must demonstrate the existence of a contract, that the defendant breached a material term of the contract, and that the breach caused the plaintiff damages. *Tobin v. Barter*, 89 A.3d 1088, 1091-92 (Me. 2014); *Wuestenberg v. Rancourt*, 226 A.3d 227, 232 (Me. 2020). |
| Maryland | To state a claim for breach of contract, a plaintiff must allege the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach of that obligation by defendant. *RRC Ne, LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 442 (Md. 2010); *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). |
| Massachusetts | The elements of a breach of contract action are: (1) an agreement was made between the plaintiffs and the defendant supported by valid consideration; (2) the plaintiffs have been ready, willing, and able to perform; (3) the defendant's breach |

| State | Breach of Contract Elements |
|---|---|
| | has prevented them from performing; and (4) the plaintiffs have suffered damage as a result. *Singarella v. City of Boston*, 342 Mass. 385, 387, 173 N.E.2d 290, 291 (Mass.1961);*Hoang v. Eternal Salon, Inc.*, 81 N.E.3d 822 (Mass. App. Ct. 2017). |
| Michigan | A party bringing a breach of contract claim must establish (1) that there was a contract, (2) which the other party breached, (3) thereby resulting in damages to the party claiming breach. *Miller-Davis Co. v. Ahrens Constr., Inc.*, 495 Mich. 161, 178, 848 N.W.2d 95, 104 (Mich. 2014); *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 829 (Mich. 2016). |
| Minnesota | "The elements of a breach of contract claim are (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (internal quotation omitted); Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 833 (Minn. 2011). |
| Mississippi | "A breach-of-contract case has two elements: (1) "the existence of a valid and binding contract," and (2) a showing "that the defendant has broken, or breached it." *Maness v. K & A Enterprises of Mississippi, LLC*, 250 So. 3d 402, 414 (Miss. 2018); *see also Bus. Commc'ns, Inc. v. Banks*, 90 So.3d 1221, 1224 (Miss. 2012). |
| Missouri | "To make a claim for breach of contract, the plaintiff must show the existence of a contract or agreement and the terms of that agreement, that the plaintiff performed or tendered performance, that the defendant did not perform, and that the plaintiff was thereby damaged." *Shirley's Realty, Inc. v. Hunt*, 160 S.W.3d 804, 807 (Mo. App. 2005) (internal quotation omitted); *Moore v. Armed Forces Bank, N.A.*, 534 S.W.3d 323, 327 (Mo. Ct. App. 2017). |
| Montana | "The essential elements of a breach of contract claim are: (1) a valid and enforceable contract; (2) breach of an express or implied contract duty or obligation; and (3) resulting contract damages." *Kostelecky v. Peas in a Pod LLC*, 410 Mont. 239, 270, 518 P.3d 840, 859 (Mont. 2022); *Tobacco River Lumber Co. v. Yoppe*, 577 P.2d 855, 856 (Mont. 1978). |
| Nebraska | To plead a breach of contract, the plaintiff must allege (1) the existence of a contract, (2) a breach, and (3) damages resulting from that breach. *Krzycki v. Genoa Nat'l Bank*, 496 N.W.2d 916, 923 (Neb. 1993); *Henriksen v. Gleason*, 263 Neb. 840, 841, 643 N.W.2d 652, 654 (Neb. 2002). |
| Nevada | "To succeed on a breach of contract claim, a plaintiff must show four elements: (1) formation of a valid contract; (2) performance or excuse of performance by the plaintiff; (3) material breach by the defendant; and (4) damages." *Laguerre v.* |

| State | Breach of Contract Elements |
|---|---|
| | *Nevada Sys. of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011); *Brochu v. Foote Enterprises, Inc.*, 128 Nev. 884, 381 P.3d 596 (2012). |
| New Hampshire | "A breach of contract occurs when there is a failure without legal excuse[] to perform any promise which forms the whole or part of a contract." *Poland v. Twomey*, 156 N.H. 412, 415 (2007); *Audette v. Cummings*, 165 N.H. 763, 767, 82 A.3d 1269, 1273 (N.H. 2013). |
| New Jersey | To prevail on a claim for breach of contract, the plaintiff must prove (1) a valid contract, (2) the plaintiff performed under the contract, (3) the defendants breached the contract, and (4) that breach damaged the plaintiff. *Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482 (2016); *Goldfarb v. Solimine*, 245 N.J. 326, 338, 245 A.3d 570, 577 (N.J. 2021). |
| New Mexico | To prevail on a breach of contract claim, the plaintiff must allege (1) that a valid contract exists, (2) that the defendant breached that contract, and (3) that breach caused the plaintiff damages. *Armijo v. Wal- Mart Stores, Inc.*, 142 N.M. 557, 568 (N.M. Ct. App. 2007); *Ormrod v. Hubbard Broad., Inc.*, 328 F. Supp. 3d 1215, 1227 (D.N.M. 2018). |
| New York | A claim for breach of contract requires proof of (1) a valid contract, (2) performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages resulting from that breach. *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994); *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44 (2022). |
| North Carolina | "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000); *see also Soc'y for Hist. Pres. of Twentysixth N. Carolina Troops, Inc. v. City of Asheville*, 872 S.E.2d 134, 140 (N.C. Ct. App. 2022). |
| North Dakota | "The elements of a prima facie case for breach of contract are: (1) the existence of a contract; (2) breach of the contract; and (3) damages which flow from the breach." *Serv. Oil, Inc. v. Gjestvang*, 861 N.W.2d 490, 496 (N.D. 2015); *Three Aces Properties LLC v. United Rentals (N. Am.), Inc,* 952 N.W.2d 64, 69 (N.D. 2020). |
| Ohio | To assert a claim for breach of contract, a plaintiff must prove (1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) a breach by the defendant, and (4) damage to the plaintiff caused by the breach. *Powell v. Grant Med. Ctr.*, 148 Ohio App. 3d 1, 10 (2002); *Quest Workforce Sols., L.L.C. v. Job1USA, Inc.*, 75 N.E.3d 1020, 1030 (Ohio Ct. App. 2016). |

| State | Breach of Contract Elements |
|---|---|
| Oklahoma | To recover on a claim for breach of contract, a plaintiff must prove (1) the formation of a contract, (2) the breach of that contract, and (3) damages resulting from that breach. *Digital Design Group, Inc. v. Information Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001); *Morgan v. State Farm Mut. Auto. Ins. Co.*, 488 P.3d 743, 748 (Okla. 2021). |
| Oregon | To state a claim for breach of contract, the plaintiff must prove (1) that there was a valid contract, (2) the plaintiff fully performed under the contract, (3) the defendant breached the contract, and (4) that breach resulted in damages to the plaintiff. *Jensen v. Hillsboro Law Group, PC*, 287 Ore. App. 697, 706 n.7 (2017); *Moyer v. Columbia State Bank*, 505 P.3d 26, 33 (Ore. 2021), review denied, 369 Or. 705, 509 P.3d 116 (Ore. 2022). |
| Pennsylvania | To state a claim for breach of contract, the plaintiff must allege (1) the existence of a contract between the plaintiff and the defendant, (2) a breach of a duty imposed by the contract, and (3) damages resulting from the breach. *Boyd v. Rockwood Area Sch. Dist.*, 907 A.2d 1157, 1165 (Pa. Commw. Ct. 2006); *Omicron Systems Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. 2004). |
| Rhode Island | To state a claim for breach of contract, the plaintiff must allege (1) that a contract exists between the plaintiff and the defendant, (2) that the defendant breached that contract, and (3) that breach caused (4) damages to the plaintiff. *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2010); *Fogarty v. Palumbo*, 163 A.3d 526, 541 (R.I. 2017). |
| South Carolina | A claim for breach of contract requires proof of (1) a valid contract, (2) the defendant's breach of that contract, and (3) damages caused by that breach. *Full v. E. Fire & Cas. Ins. Co.*, 240 S.C. 75, 89 (1962); *Hotel & Motel Holdings, LLC v. BJC Enterprises, LLC*, 780 S.E.2d 263, 272 (S.C. Ct. App. 2015). |
| South Dakota | The elements for a breach of contract claim are (1) an enforceable promise, (2) a breach of that promise, and (3) damages resulting from the breach. *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (S.D. 2006); *Bowes Constr., Inc. v. S. Dakota Dep't of Transp.*, 793 N.W.2d 36, 43 (S.D. 2010). |
| Tennessee | The elements for a breach of contract claim are (1) an enforceable contract, (2) nonperformance amounting to a breach, and (3) damages caused by that breach. *ARC MedLife, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. App. 2005). *Tolliver v. Tellico Vill. Prop. Owners Ass'n, Inc.*, 579 S.W.3d 8, 25 (Tenn. Ct. App. 2019). |
| Texas | A claim for a breach of contract requires proof of (1) a valid contract, (2) the plaintiff's performance, (3) the defendant's breach, and (4) damages resulting from |

| State | Breach of Contract Elements |
|---|---|
| | the breach. *Marketshare Telecom, LLC v. Ericsson, Inc.*, 198 S.W.3d 908, 923 (Tex. Ct. App. 2006); *Atrium Med. Ctr., LP v. Houston Red C LLC*, 546 S.W.3d 305, 311 (Tex. App. 2017), *aff'd*, 595 S.W.3d 188 (Tex. 2020). |
| Utah | The elements for a breach of contract claim are (1) a contract, (2) performance by the party seeking recovery, (3) a breach of performance by the other party, and (4) damages. *Bair v. Axiom Designs, LLC*, 20 P.3d 388, 392 (Utah 2001); *Syme v. Symphony Grp. LLC*, 437 P.3d 576, 582 (Utah 2018). |
| Vermont | "In the obligation assumed by a party to a contract is found his duty, and his failure to comply with the duty constitutes a breach." *Lapoint v. Dumont Const. Co.*, 128 Vt. 8, 10, 258 A.2d 570, 571 (1969); *Ben & Jerry's Homemade, Inc. v. Coronet Priscilla Ice Cream Corp.*, 921 F. Supp. 1206, 1212 (D. Vt. 1996); *In re Montagne*, 425 B.R. 111, 122 (Bankr. D. Vt. 2009). |
| Virginia | A claim for breach of contract requires a plaintiff to prove (1) a legal obligation from the defendant to the plaintiff, (2) a breach of that obligation, and (3) damages resulting from that breach. *Brown v. Harms*, 251 Va. 301, 306 (1996); *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 344, 784 S.E.2d 296, 299 (Va. 2016). |
| Washington | A claim for breach of contract requires the plaintiff to prove (1) a valid contract between the parties, (2) a breach of that contract, and (3) damages resulting from that breach. *Lehrer v. Dep't of Social & Health Servs.*, 101 Wash. App. 509, 516 (2000); *Univ. of Washington v. Gov't Emps. Ins. Co.*, 200 Wash. App. 455, 467, 404 P.3d 559, 566 (Wash. 2017). |
| West Virginia | To bring a claim for breach of contract in West Virginia, the plaintiff must allege (1) that a contract exists between the parties, (2) that the defendant breached a contractual term or terms, and (3) that damages resulted from that breach. *Patrick v. PHH Mortg. Corp.*, 998 F. Supp. 2d 478, 492 (N.D. W.Va. 2014); *Sneberger v. Morrison*, 235 W. Va. 654, 669, 776 S.E.2d 156, 171 (2015). |
| Wisconsin | To state a claim for breach of contract in Wisconsin, the complaint must allege (1) a contract between the plaintiff and defendant creating obligations from the defendant to the plaintiff, (2) a failure by the defendant to perform, and (3) damages to the plaintiff resulting from that failure. *Brew City Redevelopment Group, LLC v. The Ferchill Group*, 714 N.W.2d 582, 588 (Wis. App. 2006); *Sears, Roebuck & Co. v. Bayshore Town Ctr., LLC*, 377 Wis. 2d 335, 900 N.W.2d 871. (2017) |
| Wyoming | The elements for a breach of contract claim in Wyoming are (1) an enforceable contract, (2) an unjustified failure to perform under that contract, and (3) the |

| State | Breach of Contract Elements |
|---|---|
|  | entitlement of the injured party to damages. *Reynolds v. Tice*, 595 P.2d 1318, 1323 (Wyo. 1979); *Kappes v. Rhodes*, 2022 WY 82, ¶ 17, 512 P.3d 31, 36 (Wyo. 2022). |
| Guam | To establish a breach of contract, a plaintiff must prove (1) the existence of the contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) resulting damages to the plaintiff. *Hemlani v. Hemlani*, 2015 Guam 16, ¶ 19 (Guam Apr. 29, 2015); *Gov't of Guam v. Kim*, 2015 Guam 15, ¶ 60 (Guam Apr. 28, 2015); *United States for use & benefit of Porges Elec. Grp., Inc. v. Travelers Cas. & Sur. Co. of Am.*, No. CV 15-00024, 2021 WL 1395767, at *5 (D. Guam Apr. 13, 2021). |
| Northern Marianas Islands | Breach of contract occurs upon the non-performance of a contractual duty of immediate performance. *Del Rosario v. Camacho,* 2001 WL 34883245, at *16 (N. Mar. I. Mar. 12, 2001); *Claassens v. Rota Health Ctr.*, 2021 WL 3278026, at *5 (N. Mar. I. Aug. 2, 2021). |
| Puerto Rico | An action for damages for breach of contract only lies when the damage suffered exclusively arises as a consequence of the breach of an obligation specifically agreed upon, which damage would not occur without the existence of a contract. *Ramos Lozada v. Orientalist Rattan Furniture Inc.*, 130 P.R. Dec. 712 (1992); *Soc. de Gananciales v. Velez & Asoc.,* 145 P.R. Dec. 508, 98 TSPR 54 (1998). |
| U.S. Virgin Islands | To establish a breach-of-contract claim, a party must plead that a contract existed, that there was a duty created by that contract, that such duty was breached, and that the party suffered damages as a result. *Merchants Com. Bank v. Oceanside Vill., Inc.*, 64 V.I. 3, 14–15; *Phillip v. Marsh-Monsanto*, 66 V.I. 612, 620 (2017). |

# RULE ADOPTING THE "PLAIN MEANING" OR "FOUR CORNERS" RULE OF CONTRACT INTERPRETATION FOR UNAMBIGUOUS CONTRACTS

| State | Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts |
|---|---|
| Alabama | When its terms are clear and certain, the court, and not the jury, has the duty to determine the meaning of the agreement. In order to ascertain the intention of the parties, the clear and plain meaning of the terms of the agreement are to be given effect, and the parties are presumed to have intended what the terms clearly state. *Bay Lines, Inc. v. Stoughton Trailers, Inc.*, 838 So. 2d 1013, 1018 (Ala. 2002) (citations omitted); *see also Terry Cove N., Inc. v. Baldwin Cnty. Sewer Auth., Inc.*, 480 So. 2d 1171, 1173 (Ala. 1985). |
| Arkansas | "When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed." *Holytrent Properties v. Valley Park Limited*, 71 Ark. App. 336, 339-40; 32 S.W. 3d 27, 29-30 (2000)); *see also Cumming v. Putnam Realty, Inc.*, 92 S.W.3d 698, 80 Ark. App. 153, 159 (2002); *Fryer v. Boyett*, 64 Ark. App. 7, 11, 978 S.W.2d 304, 306 (1998). |
| Colorado | "[W]ritten contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language. Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract. Absent such ambiguity, we will not look beyond the four corners of the agreement in order to determine the meaning intended by the parties." *USI Properties East, Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997) (citations omitted); see also *Am. Fam. Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 120-21 (Co. 2016). |
| Connecticut | When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. *Bentz v. Halsey*, 54 Conn. App. 609, 616, 736 A.2d 931 (1999). On the other hand, "when an ambiguous term is at issue, the trial court can examine the extrinsic evidence to resolve the question of the parties' intent." *Larson v. Jacobson*, 38 Conn. App. 186, 190, 659 A.2d 753 (1995); *see also Briggs v. Briggs*, 817 A.2d 112, 117 (Conn. App. Ct. 2003), *appeal denied*, 821 A. 2d. 767 (Ct. 2003); *Konover v. Kolakowski*, 186 Conn. App. 706, 719–20, 200 A.3d 1177, 1186 (2018). |

App'x. 0185

| State | Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts |
|---|---|
| Delaware | "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions. On the contrary, when we may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010); *see also City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). |
| D.C. | "If the court determines that the contract is unambiguous, it should rely on the contract's terms to provide the best objective manifestation of the parties' intent. However, if the provisions of the contract are ambiguous, the correct interpretation becomes a question for a factfinder." *Debnam v. Crane Co.*, 976 A.2d 193, 197–98 (D.C. 2009); see also *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999); *In re Corriea*, 719 A.2d 1234, 1239 (D.C. 1998). |
| Florida | "It is fundamental that where a contract is clear and unambiguous in its terms, the court may not give those terms any meaning beyond the plain meaning of the words contained therein. Where the terms are unambiguous, the parties' intent must be discerned from the four corners of the document." *Dows v. Nike, Inc.*, 846 So. 2d 595, (Fla. Dist. Ct. App. 2003) (citations omitted); *see also Gold Crown Resort Mktg. Inc. v. Phillpotts*, 272 So. 3d 789, 792 (Fla. Dist. Ct. App. 2019). |
| Georgia | "Where the terms of a written contract are clear and unambiguous, the court will look to the contract alone to find the intention of the parties." *Health Serv. Ctr. v. Boddy*, 359 S.E.2d 659) (Ga. 1987); *see also Blockum v. Fieldale Farms Corp.*, 573 S.E.2d 36, 39 (Ga. 2002); *Garrett v. S. Health Corp. of Ellijay*, 320 Ga. App. 176, 182, 739 S.E.2d 661, 667 (2013). |
| Hawaii | Courts should interpret the terms of a contract "according to their plain, ordinary meaning and accepted use in common speech. The court should look no further than the four corners of the document to determine whether an ambiguity exists" *State Farm Fire and Casualty Co. v. Pacific Rent-All, Inc.*, 90 Hawai'i 315, 324, 978 P.2d 753, 762 (1999) (citations omitted); *see also Stanford Carr Dev. Corp. v. Unity House, Inc.*, 111 Haw. 286, 298, 141 P.3d 459, 471 (2006). |

| State | Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts |
|---|---|
| Idaho | "When interpreting a contract, a court's primary objective is to discover the mutual intent of the parties at the time they entered the contract. If the terms of the contract are unambiguous, intent can be ascertained as a matter of law by looking to the four corners of the document. Subjective, undisclosed intent is immaterial to a contract's interpretation. Rather, the court gives force and effect to the words of the contract without regard to what the parties to the contract thought it meant or what they actually intended for it to mean." (Citations omitted). *Stanger v. Walker Land & Cattle, LLC*, 169 Idaho 566, 573, 498 P.3d 1195, 1202 (Idaho 2021); *see also Sky Canyon Properties, LLC v. Golf Club at Black Rock, LLC*, 315 P.3d 792, 794 (Idaho 2013). |
| Illinois | "If the language of the contract is facially unambiguous, then the 'four corners' rule requires the trial court to interpret the contract as a matter of law without the use of parol evidence. If, however, the language of the contract is susceptible to more than one meaning, then an ambiguity is present and parol evidence may be admitted to aid the trier of fact in resolving the ambiguity." *Dean Mgmt., Inc. v. TBS Const., Inc.*, 790 N.E.2d 934, 940 (Ill. App. 2003); *see also Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). |
| Indiana | "[W]hen the contract terms are unambiguous, we do not go beyond the four corners of the contract to investigate meaning. The four corners rule states that where the language of a contract is unambiguous, the parties' intent is to be determined by reviewing the language contained within the four corners of the contract, and parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence." *Five Star Roofing Sys., Inc. v. Armored Guard Window & Door Grp., Inc.*, 191 N.E.3d 224, 236–37 (Ind. Ct. App. 2022) (citations omitted); *see also Allstate Ins. Co. v. Boles*, 481 N.E.2d 1096, 1101 (Ind. 1985). *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002). |

| State | Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts |
|---|---|
| Iowa | "Generally, when we interpret contracts, we look to the language contained within the four corners of the document. In the construction of written contracts, the cardinal principle is that the intent of the parties must control, and except in cases of ambiguity, this is determined by what the contract itself says. If the intent of the parties is clear and unambiguous from the words of the contract itself, we will enforce the contract as written." (Citations omitted). *DuTrac Cmty. Credit Union v. Radiology Grp. Real Est., L.C.*, 891 N.W.2d 210, 216 (Iowa 2017); *see also Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862-863 (Iowa 1991). |
| Kansas | "Absent a contract being ambiguous, a court must give effect to the intent of the parties as expressed within the four corners of the instrument." *Blair Constr., Inc. v. McBeth*, 44 P.3d 1244, 1252-53 (Kan. 2002); *see also Levin v. Maw Oil & Gas, LLC*, 234 P.3d 805, 814 (Kan. 2010). |
| Kentucky | "When no ambiguity exists in the contract, we look only as far as the four corners of the document to determine the parties' intentions." *3D Enterprises Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005); *see also Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002). |
| Louisiana | When a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the court should rely on the document. *Tunstall v. Stierwald*, 809 So. 2d 916, 922 (La. 2002); *see also Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007). |
| Maine | The interpretation of an unambiguous contract "must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence." *Portland Valve Inc. v. Rockwood Sys. Corp.*, 460 A.2d 1383, 1387 (Me. 1983); *see also American Protection Ins. Co. v. Acadia Ins. Co.*, 814 A.2d 989, 993 (Me. 2003); *H & B Realty, LLC v. JJ Cars, LLC*, 2021 ME 14, ¶ 13, 246 A.3d 1176, 1182 (Me. 2021). |

| State | Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts |
|---|---|
| Maryland | "We employ in Maryland an objective approach to contract interpretation, according to which, unless a contract's language is ambiguous, we give effect to that language as written without concern for the subjective intent of the parties at the time of formation. This undertaking requires us to restrict our inquiry to the four corners of the agreement, and ascribe to the contract's language its customary, ordinary, and accepted meaning." *Ocean Petroleum, Co. v. Yanek*, 5 A.3d 683, 690 (Md. 2010) (citations omitted); *see also Honeycutt v. Honeycutt*, 822 A.2d 551, 558 n.5 (Md. App. 2003). |
| Massachusetts | Where there is nothing ambiguous in the language of the contract, "the court cannot subvert its plain meaning." *Freelander v. G.&K. Realty Corp.*, 357 Mass. 512, 516, 258 N.E.2d 786 (1970); *see also Balles v. Babcock Power Inc.*, 70 N.E.3d 905, 911 (Mass. 2017) ("When contract language is unambiguous, it must be construed according to its plain meaning."). |
| Michigan | "We must look for the intent of the parties in the words used in the instrument. This court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Zurich Ins. Co. v. CCR & Co.*, 226 Mich. App. 599, 604, 576 N.W.2d 392, 395 (1997); *see also City of Grosse Pointe Park v. Michigan Mun. Liab. & Prop. Pool*, 473 Mich. 188, 197–98, 702 N.W.2d 106, 113 (2005). |
| Minnesota | "If a contract is unambiguous, the contract language must be given its plain and ordinary meaning, and shall be enforced by courts even if the result is harsh." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346–47 (Minn. 2003); *see also Brown v. Weeres Indus., Inc.*, 375 N.W.2d 64, 66 (Minn. Ct. App. 1985). |
| Mississippi | "This Court must construe the agreement as made by the parties and give the words of the document their commonly accepted meaning. If no ambiguity exists, this Court will accept the plain meaning of the instrument as the intent of the parties." *Parkerson v. Smith*, 817 So. 2d 529, 541 (Miss. 2002); *see also Royer Homes of Mississippi, Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (Miss. 2003). |

| State | Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts |
|---|---|
| Missouri | "Where the parties have expressed their final and complete agreement in writing and there is no ambiguity in the contract, the intent of the parties must be determined solely from the four corners of the contract itself." *Corbett v. Gerstein*, 95 S.W.3d 118, 120 (Mo. Ct. App. 2002); *see also Smith v. Keystone Mut. Ins. Co.*, 579 S.W.3d 275, 280 (Mo. Ct. App. 2019). |
| Montana | "Because we conclude that [the policy] is unambiguous, we enforce it as written." *Counterpoint, Inc. v. Essex Ins. Co.*, 967 P.2d 393, 396 (Mont. 1998); *see also Krajacich v. Great Falls Clinic, LLP*, 276 P.3d 922, 926 (Mont. 2012). |
| Nebraska | "A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. The terms of a contract are to be accorded their plain and ordinary meaning as ordinary, average, or reasonable persons would understand them." *Daehnke v. Nebraska Dep't of Soc. Servs.*, 557 N.W.2d 17, 21 (Neb. 1996) (Citations omitted); *see also Boutilier v. Lincoln Benefit Life Ins. Co.*, 681 N.W.2d 746, 750 (Neb. 2004). |
| Nevada | "We will enforce a contract as written where the language is clear and unambiguous. . . . Generally, the parties' intent must be discerned from the four corners of the contract. *MMAWC, LLC v. Zion Wood Obi Wan Tr.*, 448 P.3d 568, 571 (Nev. 2019) (cleaned up); see also *National Union Fire Ins. v. Caesars Palace*, 792 P.2d 1129, 1130 (Nev. 1990); *Farmers Ins. Exch. v. Young*, 832 P.2d 376, 379 n.3 (Nev. 1992). |
| New Hampshire | "Absent ambiguity,… the parties' intent will be determined from the plain meaning of the language used in the contract." *Royal Oak Realty Trust v. Mordita Realty Trust*, 777 A.2d 869 (N.H. 2001); *see also Lawyers Title Ins. Corp. v. Groffi*, 808 A.2d 44, 48 (N.H. 2002); *Birch Broad., Inc. v. Capitol Broad. Corp.*, 161 N.H. 192, 196, 13 A.3d 224, 228 (2010). |
| New Jersey | "[W]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written." *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112 (N.J. Super. Ct. App. Div. 2002); *see also Namerow v. PediatriCare Assocs., LLC*, 218 A.3d 839, 843 (N.J. Ch. Div. 2018). |

| *State* | *Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts* |
|---|---|
| New York | "Unless the court finds ambiguity, the rules governing the interpretation of ambiguous contracts do not come into play. Thus, when interpreting an unambiguous contract term evidence outside the four corners of the document is generally inadmissible to add to or vary the writing." *R/S Assocs. v. New York Job Dev. Auth.*, 771 N.E.2d 240 (N.Y. 2002) (cleaned up); *see also United Mgmt. Admin. & Mktg. Servs., Inc. v. Interstate Nat. Dealer Servs., Inc.*, 102 A.D.3d 766, 766 (N.Y. app. Div. 2013). |
| North Carolina | "When the parties use clear and unambiguous terms, the contract should be given its plain meaning, and the court can determine the parties' intent as a matter of law." *Alaimo Family Chiropractic v. Allstate Ins. Co.*, 574 S.E.2d 496, 498 (N.C. Ct. App. 2002); *see also Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 335–36, 777 S.E.2d 272, 279 (2015). |
| North Dakota | "When interpreting an insurance policy, we look first to the insurance contract itself. If the contract is self-explanatory and subject to only one meaning, our inquiry is at an end." *Hanneman v. Continental Western Ins. Co.*, 575 N.W.2d 445, 450 (N.D. 1998) (citations omitted); *see also Borsheim Builders Supply, Inc. v. Manger Ins., Inc.*, 917 N.W.2d 504, 509 (N.D. 2018);  N.D. Cent. Code Ann. § 9-07-02 ("The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity."). |
| Ohio | "Contract terms are to be given their plain and ordinary meaning, and when the contract is clear and unambiguous, the court may look no further than the four corners of the [contract] to find the intent of the parties." *Allstate Ins. Co. v. Eyster*, 939 N.E.2d 1274, 1280 (Ohio App. 2010); *see also McDaniel v. Rollins*, 2005 WL 1421754, *7 (Ohio App. 2005). |
| Oklahoma | "If a contract is complete in itself, and when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended.[22] That intention cannot be divined from extrinsic evidence but must be gathered from a four-corners' examination of the instrument." *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 546 (Okla. 2003); *see also May v. Mid-Century Ins. Co.*, 151 P.3d 132, 140 (Okla. 2006); Okla. Stat. Ann. tit. 15, §§ 154-55. |

| State | Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts |
|---|---|
| Oregon | "When considering a written contractual provision, the court's first inquiry is what the words of the contract say …. To determine that, the court looks at the four corners of a written contract, and considers the contract as a whole with emphasis on the provision or provisions in question. The meaning of disputed text in that context is then determined. In making that determination, the court inquires whether the provision at issue is ambiguous. Whether terms of a contract are ambiguous is a question of law. In the absence of an ambiguity, the court construes the words of a contract as a matter of law." *Eagle Industries, Inc. v. Thompson*, 321 Ore. 398, 405, 900 P.2d 475 (1995) (citations omitted); *see also Yogman v. Parrott*, 937 P.2d 1019, 1021 (Or. 1997); *Ortiz v. State Farm Fire & Cas. Co.*, 260 P.3d 678, 681 (Or. App. 2011). |
| Pennsylvania | "We have previously held that a basic tenet of contract law is that when the language of a contract is clear and unambiguous its meaning must be determined by an examination of the content of the contract itself. Therefore, it is axiomatic that this Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation." *Wineburgh v. Wineburgh*, 816 A.2d 1105, 1108 (Pa. Super Ct. 2002); *see also Stephan v. Waldron Elec. Heating & Cooling LLC*, 100 A.3d 660, 665 (Pa. Super Ct. 2014). |
| Rhode Island | "This Court interprets the terms of an insurance policy according to the same rules of construction governing contracts. We look at the four corners of a policy, viewing it in its entirety, affording its terms their plain, ordinary and usual meaning. The test to be applied is not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean." *Town of Cumberland v. Rhode Island Interlocal Risk Mgmt. Tr., Inc.*, 860 A.2d 1210, 1215 (R.I. 2004) (citations omitted); *see also Rotelli v. Catanzaro*, 686 A.2d 91, 95 (R.I. 1996); *GBM Acquisitions, Inc. v. Adams*, 823 A.2d 1121 (R.I. 2003). |
| South Carolina | "[T]his Court is required to give effect to the plain meaning of the words in an unambiguous contract." *Schulmeyer v. State Farm Fire & Cas. Co.*, 579 S.E.2d 132, 135 (S.C. 2003); *see also State Acc. Fund v. S.C. Second Inj. Fund*, 693 S.E.2d 441, 445 (S.C. Ct. App. 2010). |

| State | Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts |
|---|---|
| South Dakota | "If the contract is plain and unambiguous extrinsic evidence is not considered because the intent of the parties can be derived from within the four corners of the contract." *Kernelburner, L.L.C. v. MitchHart Mfg., Inc.*, 765 N.W.2d 740, 742 (S.D. 2009); *see also Icehouse, Inc. v. Geissler*, 636 N.W.2d 459 (S.D. 2001). |
| Tennessee | In construing an insurance contract, "the paramount rule… is to ascertain the intent of the parties. That intent is to be derived from the four corners of the policy giving effect to all parts. However, where the policy is ambiguous, the intent of the parties may be derived from extrinsic evidence outside the policy." *Blue Diamond Coal v. Holland-Am. Ins. Co.*, 671 S.W.2d 829, 833 (Tenn. 1984); *see also Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). |
| Texas | "As with any contract, absent a pleading of ambiguity, the courts will interpret the meaning and intent of an insurance policy from the four corners of the document without the aid of the extrinsic evidence." *Carrabba v. Emps. Cas. Co.*, 742 S.W.2d 709, 716 (Tex. App. 1987); *see also Calpine Producer Servs., L.P. v. Wiser Oil Co.*, 169 S.W.3d 783, 787 (Tex. App. 2005). |
| Utah | "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 40 P.3d 599, 605 (Utah 2002); *see also Saleh v. Farmers Ins. Exch.*, 133 P.3d 428, 434 (Utah 2006). |
| Virginia | "[W]e consider the words of a contract within the four corners of the instrument itself. It is construed as written, without adding terms that were not included by the parties. When the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 201 (Va. 2012) (citations omitted); *see also Std. Banner Coal Corp. v. Rapoca Energy Co.*, 576 S.E.2d 435, 437 (Va. 2003); *T.M. Delmarva Power, L.L. C. v. NCP of Virginia, L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002). |

| State | Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts |
|---|---|
| West Virginia | "In construing the terms of a contract, we are guided by the common-sense canons of contract interpretation. One such canon teaches that contracts containing unambiguous language must be construed according to their plain and natural meaning." *Fraternal Ord. of Police, Lodge No. 69 v. City of Fairmont*, 196 W. Va. 97, 101, 468 S.E.2d 712, 716 (1996); *see also State v. Elder*, 165 S.E.2d 108 (W. Va. 1968). *State ex rel. McKenzie v. Smith*, 569 S.E.2d 809, 822 (W. Va. 2002). |
| Wisconsin | "We construe the contract language according to its plain or ordinary meaning. If the contract is unambiguous, our attempt to determine the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence. Only when the contract is ambiguous, meaning it is susceptible to more than one reasonable interpretation, may the court look beyond the face of the contract and consider extrinsic evidence to resolve the parties' intent." *Town Bank v. City Real Est. Dev., LLC*, 793 N.W.2d 476, 484 (Wisc. 2010) (citations omitted); *see also Huml v. Vlazny*, 716 N.W.2d 807, 820 (Wisc. 2006). |
| Wyoming | "In [interpreting a contract], we first look to the specific terms of the contract and give them their plain and ordinary meaning. Plain meaning is that meaning which the language would convey to reasonable persons at the time and place of its use. If the language of the contract is clear and unambiguous, then we secure the parties' intent from the words of the agreement as they are expressed within the four corners of the contract." *Comet Energy Servs., LLC v. Powder River Oil & Gas Ventures, LLC*, 185 P.3d 1259, 1261-62 (Wyo. 2008) (citations omitted); *see also Amoco Prod. Co. v. EM Nominee P'ship Co.*, 2 P.3d 534, 540 (Wyo. 2000). |
| Guam | "Guam adheres to the traditional 'plain meaning' approach to contract interpretation, looking to the four corners of the contract to determine whether any ambiguity exists as a matter of law." *Duenas v. George & Matilda Kallingal, P.C.*, 2012 Guam 4, ¶ 13 (Guam May 17, 2012); *see also Wasson v. Berg*, 2007 Guam 16, ¶ 17 (Guam Dec. 3, 2007). |

| State | Rule Adopting the "Plain Meaning" or "Four Corners" Rule of Contract Interpretation for Unambiguous Contracts |
|---|---|
| Northern Marianas Islands | "When interpreting contract terms, we look to the parties' intent. To determine intent, we examine only the four corners of the contract and give the terms their plain grammatical meanings, unless there is ambiguity." *N. Marianas Hous. Corp. v. BankPacific, Ltd.*, No. 2018-SCC-0008-CIV, 2021 WL 1248567, at *3 (N. Mar. I. Apr. 2, 2021) (citations omitted); *see also Fusco v. Matsumoto*, No. 2009-SCC-0030-CIV, 2011 WL 12673474, at *7 (N. Mar. I. Dec. 30, 2011). |
| Puerto Rico | Under Puerto Rico law, "if the terms of a contract are clear and leave no doubt as to the intensions of the contracting parties, the literal sense of its stipulations shall be observed. A court may not consider extrinsic evidence if it finds that the terms of an agreement are clear." *Cecort Realty Dev. Inc. v. Llompart-Zeno*, 100 F. Supp. 3d 145, 164 (D.P.R. 2015); *see also Fernandez-Fernandez v. Municipality of Bayamon*, 942 F. Supp. 89, 94 (D.P.R. 1996). |
| U.S. Virgin Islands | "If a contract is unambiguous, the meaning of its terms is a question of law, and contract construction, that is, the legal operation of the contract, is a question of law. When a court interprets a contract, its task is not to reveal the subjective intentions of the parties, but what their words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used. Where the language of the contract is clear and unambiguous, the parties' intent must be derived from the plain meaning of the contract's terms." *Hendricks v. Clyne*, 2019 VI SUPER 14U, ¶ 7; *see also Addie v. Kjaer*, 51 V.I. 463, 475 (D.V.I. Feb. 23, 2009). |

# RULE ADOPTING THE "CORBIN" RULE OF CONTRACT INTERPRETATION FOR UNAMBIGUOUS CONTRACTS

| State | Rule Adopting the "Corbin" Rule of Contract Interpretation For Unambiguous Contracts |
|---|---|
| Alaska | "The objective of contract interpretation is to determine and enforce the reasonable expectations of the parties. When interpreting contracts, we consider the contract's language as well as relevant extrinsic evidence .... The parties' expectations are assessed by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including subsequent conduct of the parties." *Calais Co. v. Ivy*, 303 P.3d 410, 418 (Alaska 2013); *see also Rockstad v. Global Fin. & Inv. Co.*, 41 P.3d 583, 586 (Alaska 2002). |
| Arizona | Under the restrictive "plain meaning" view of the parol evidence rule, evidence of prior negotiations may be used for interpretation only upon a finding that some language in the contract is unclear, ambiguous, or vague. Under this approach, "if a writing, or the term in question, appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature." Under the view embraced by Professor Corbin and the Second Restatement, there is no need to make a preliminary finding of ambiguity before the judge considers extrinsic evidence. Instead, the court considers all of the proffered evidence to determine its relevance to the parties' intent and then applies the parol evidence rule to exclude from the fact finder's consideration only the evidence that contradicts or varies the meaning of the agreement. Writing for a unanimous court in *Smith v. Melson, Inc.*, 135 Ariz. 119, 121-22, 659 P.2d 1264, 1266-67 (1983), Chief Justice Holohan expressly committed Arizona to the Corbin view of contract interpretation.... The better rule is that the judge first considers the offered evidence and, if he or she finds that the contract language is "reasonably susceptible" to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties. The meaning that appears plain and unambiguous on the first reading of a document may not appear nearly so plain once the judge considers the evidence. In such a case, the parol evidence rule is not violated because the evidence is not being offered to contradict or vary the meaning of the agreement. To the contrary, it is being offered to explain what the parties truly may have intended. We believe that this rule embodies the concepts endorsed by Corbin and adopted by this court ten years ago in *Melson. Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138-40 (Ariz. 1993) (citations omitted); *see also Apollo Educ. Grp., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 250 Ariz. 408, 411, 480 P.3d 1225, 1228 (2021) (explaining that Arizona interprets contract language "in the broader context of the overall contract"). |

| State | Rule Adopting the "Corbin" Rule of Contract Interpretation For Unambiguous Contracts |
|---|---|
| California | "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968) (en banc); *see also Morey v. Vannucci*, 75 Cal. Rptr. 2d 573, 578 (Cal. App. 1998) ("Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible."). |
| New Mexico | "Prior to 1991, contract interpretation in New Mexico subscribed to the four-corners or plain meaning standard. . . . [The New Mexico] Supreme Court abandoned the four-corners standard in recognition of the difficulty of ascribing meaning and content to terms and expressions in the absence of contextual understanding. In its place, our Supreme Court established that in determining whether a term or expression to which the parties have agreed to is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance….The court is no longer restricted to the bare words of the agreement in interpreting the intent of the parties to a contract, but may also consider the context in which the agreement was made to determine whether the party's words are ambiguous." *Benz v. Town Ctr. Land, LLC*, 314 P.3d 688, 694-95 (N.M. Ct. App. 2013); see also *Home & Land Owners, Inc., v. Angel Fire Resort Operations, L.L.C.*, 69 P.3d 243, 250 (N.M. Ct. App. 2003). |
| Vermont | "In determining whether the language is ambiguous, it is appropriate to consider the circumstances surrounding the agreement. . . . Ambiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *Kelly v. Lord*, 783 A.2d 974, 991 (Vt. 2001) (citations omitted); *see also Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 579, 556 A.2d 81, 84 (1988). |
| Washington | "Washington follows the 'objective manifestation theory' of contract interpretation, under which the focus is on the reasonable meaning of the contract language to determine the parties' intent. We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent. And we view the contract as a whole, interpreting particular language in the context of other contract provisions. To assist in determining the meaning of contract language, we also apply the 'context rule[.]' This rule allows examination of the context surrounding a contract's |

2

| State | Rule Adopting the "Corbin" Rule of Contract Interpretation For Unambiguous Contracts |
|---|---|
|  | execution, including the consideration of extrinsic evidence to help understand the parties' intent. However, extrinsic evidence is to be used to determine the meaning of specific words and terms used and not to show an intention independent of the instrument or to vary, contradict or modify the written word. If a contract provision's meaning is uncertain or is subject to two or more reasonable interpretations after analyzing the language and considering extrinsic evidence (if appropriate), the provision is ambiguous." *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wash. App. 706, 712–13, 334 P.3d 116, 120 (2014); *see also Est. of Carter v. Carden*, 11 Wash. App. 2d 573, 581–82, 455 P.3d 197, 201–02 (2019). |

3

App'x. 0199

# THE LAW EXISTING AT THE TIME A CONTRACT IS MADE BECOMES A PART OF THE CONTRACT AND GOVERNS THE TRANSACTION

| *State* | *The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction* |
|---|---|
| Alabama | "We acknowledge that a contract presumes that the applicable law is the law that is in effect at the time the contract is executed." *Lynd v. Marshall Cnty. Pediatrics, P.C.*, 263 So. 3d 1041, 1050 (Ala. 2018) (internal citations omitted).<br><br>"Every contract is made with reference to existing law and every law affecting the contract is read into and becomes a part of the contract when made." *Macon Cty. Greyhound Park, Inc. v. Knowles*, 39 So.3d 100, 108 (Ala. 2009) (quoting *Barber Pure Milk Co. v. Alabama State Milk Control Bd.*, 275 Ala. 489, 494, 156 So.2d 351, 355 (1963). |
| Alaska | "As a general rule, applicable laws in existence at the time of a contract's formation about which the parties are presumed to know are incorporated into the contract and become a part of it as though they had been expressly set forth in the contract." *Ellingstad v. State, Dep't of Nat. Res.*, 979 P.2d 1000, 1008 (Alaska 1999).<br><br>The enforceability of contract provisions is to be determined by the statutes in effect at the time the contract is executed. *Stephan & Sons, Inc. v. Municipality of Anchorage*, 629 P.2d 71, 78 & n.19 (Alaska 1981). |
| Arizona | "A valid statute is automatically part of any contract affected by it, even if the statute is not specifically mentioned in the contract." *Higginbottom v. State*, 203 Ariz. 139, 51 P.3d 972, 975 (2002).<br><br>"Regardless of the language of a contract, it is always to be construed in light of the statute, of the law then in force." *Ervco, Inc. v. Texaco Ref. & Mktg., Inc.*, 422 F. Supp. 2d 1084, 1087 (D. Ariz. 2006) (internal citations omitted). |
| Arkansas | "It is also well settled that the law in effect at the time a contract is made forms a part of the contract as if it had been expressed in the contract." *Woodend v. Southland Racing Corp.*, 337 Ark. 380, 384, 989 S.W.2d 505, 507 (1999); *see also Mahurin v. Oaklawn Jockey Club*, 299 Ark. 13, 771 S.W.2d 19 (1989). |
| California | "If the holding of numerous cases, such as *Wood v. Lovett*, 313 U.S. 362, 61 S.Ct. 983, 85 L.Ed. 1404 (1941), that the laws which subsist at the time and place of making of a contract form a part of it as if they were expressly referred to, has any applicability to a case such as this, it must be that the law providing the remedy as well as that providing the substantive right itself should be 'read into' the contract, so that the expressly provided remedy would be the only one available to enforce the right. The result, then, is that if the employee brings an action, as here, based on his contract of employment, the contract should be interpreted, construed and enforced just as would any contract." *Lerwill v. Inflight Motion Pictures, Inc.*, 343 F. Supp. 1027, 1029 (N.D. Cal. 1972).<br><br>"It is a fundamental rule of construction of contracts that all applicable laws in existence when an agreement is made, which laws the parties are presumed to know |

| State | The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction |
|---|---|
| | and have in mind, necessarily enter into the contract and form a part of it without any stipulation to that effect, as if they were expressly referred to and incorporated in the contract." *People v. Hadley*, 257 Cal. App. 2d Supp. 871, 882, 64 Cal. Rptr. 777, 784 (App. Dep't Super Ct. 1967) (internal citations omitted). "Thus, for this Court to alter the clear language of the statute would in effect be to create an additional contractual burden where none was intended or assumed by the parties." *Id.* |
| Colorado | "Parties are presumed to contract with reference to existing principles of law, and in the absence of clear contractual language the relationship is governed by the rules mandated by law." *Sobolewski v. Boselli & Sons, LLC*, 342 F. Supp. 3d 1178, 1187 (D. Colo. 2018) (citing *Dean Witter Reynolds Inc. v. Variable Annuity Life Ins. Co.*, 373 F.3d 1100, 1106 (10th Cir. 2004)). "The existing law at the time and place of the making of the contract ... becomes a part of the contract." *Shaw v. Sargent Sch. Dist. No. RE-33-J ex rel. Bd. of Educ.*, 21 P.3d 446, 450 (Colo. App. 2001). |
| Connecticut | "As a general matter, parties are presumed to have contracted with knowledge of the existing law, and contract language must be interpreted in reference thereto.... Unless the agreement indicates otherwise, a statute existing at the time an agreement is executed becomes part of it and must be read into it just as if an express provision to that effect were inserted therein." *LMK Enterprises, Inc. v. Sun Oil Co.*, 860 A.2d 1229 (Conn. App. 2004) (cleaned up); *see also Hatcho Corp. v. Della Pietra*, 485 A.2d 1285, 1288 (Conn. 1985). |
| Delaware | In the law of contracts, it is a recognized principle that existing laws form a part of a contract. *Koval v. Peoples*, 431 A.2d 1284, 1285 (Del. Super. Ct. 1981) (internal citations omitted). "The rule is well established that the laws in force at the time and place of making the contract enter into, and form a part of it as if they had been expressly referred to, or incorporated in, its terms. The obligation of the contract is measured by the standard of the laws existing at the time of the making of the contract." *Trader v. Jester*, 40 Del. 66, 1 A.2d 609, 613 (Del. Super. Ct. 1938) (internal citations omitted). |

| *State* | *The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction* |
|---|---|
| D.C. | "It is a general rule that reference in a contract to extraneous writings renders them part of the agreement for indicated purposes; but even more pervasively it is to be accepted that laws which subsist at the time and place of the making of a contract and where it is to be performed enter into and form a part of it as if they were expressly referred to or incorporated in its terms." *Maryland Nat. Cap. Park & Plan. Comm'n v. Lynn*, 514 F.2d 829, 833 (D.C. Cir. 1975) (citing Wood v. Lovett, 313 U.S. 362 (1941)); *see also Washington v. D.C.*, 137 A.3d 170, 177 (D.C. 2016). |
| Florida | "Equally well settled is the principle that valid, applicable statutes in effect at the time and in the place that the contract is made and to be performed become a part of the contract as if expressly referred to and incorporated therein." *Barnes v. Burger King Corp.*, 932 F. Supp. 1441, 1443 (S.D. Fla. 1996) (citing *Humphreys v. State*, 108 Fla. 92, 145 So. 858 (1933)); *see also State ex rel Ellis v. Tampa Waterworks Co.,* 56 Fla. 858, 47 So. 358 (1908). |
| Georgia | "[T]he laws which exist at the time and place of the making of a contract, enter into and form a part of it; and the parties must be presumed to have contracted with reference to such laws and their effect on the subject matter." *Satterfield v. S. Reg'l Health Sys., Inc.*, 634 S.E.2d 530, 531 (Ga. App. 2006) (cleaned up); *see also Magnetic Resonance Plus v. Imaging Systems Intl.* 543 S.E.2d 32, 34 (Ga. 2001). |
| Hawaii | "A contract is presumed to include all applicable statutes and settled law relating to its subject matter." *Gabriel v. Island Pac. Acad., Inc.*, 140 Haw. 325, 336, 400 P.3d 526, 537 (2017). "Section 363 of 17A Am.Jur.2d Contracts (2016) states: Contracting parties are presumed to contract in reference to the existing law, and to have in mind all the existing laws relating to the contract, or to the subject matter thereof. All existing applicable or relevant statutes, and settled law of the land at the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention. By virtue of this rule, the laws which exist at the time and place of making a contract and at the place where it is to be performed, affecting its validity, construction, operation, performance, enforcement, and discharge, enter into and form a part of it as if they were expressly referred to or incorporated into its terms." *Id.* (citing Section 363 of 17A Am.Jur.2d Contracts (2016)); *see also City and City, of Honolulu v. Kam*, 48 Haw. 349, 402 P.2d 683 (1965). |
| Idaho | "Under Idaho law, contracts impliedly incorporate extant laws as well as policies of administrative agencies." *Idaho Aids Found., Inc. v. Idaho Hous. & Fin. Ass'n*, 422 F. Supp. 2d 1193, 1206 (D. Idaho 2006) (citing *Zattiero v. Homedale School Dist. No. 370,* 51 P.3d 382, 385 (Idaho 2002)). |

| State | The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction |
|---|---|
| | "This Court has held that it is axiomatic that extant law is written into and made a part of every written contract. . . . Existing law becomes part of a contract, just as though the contract contains an express provision to that effect, unless a contrary intent is disclosed." *Path to Health, LLP v. Long*, 383 P.3d 1220, 1227 (Iado 2016) (cleaned up); *see also Primary Health Network, Inc. v. State, Dep't of Admin.*, 52 P.3d 307, 310 (Idaho 2002)). |
| Illinois | "As a general principle of contract law, statutes and laws in existence at the time a contract is executed are considered part of the contract." *Braye v. Archer-Daniels-Midland Co.*, 676 N.E.2d 1295, 1303 (Ill. 1997); *see also Larned v. First Chicago Corp.*, 636 N.E.2d 1004, 1005–06 (Ill. App. 1994). |
| Indiana | "[U]nless the contract provides otherwise, all applicable law in force at the time the agreement is made impliedly forms a part of the agreement," because "the parties are presumed to have had the law in mind." *Schwartz v. Heeter*, 994 N.E.2d 1102, 1106 (Ind. 2013) (citing *Ethyl Corp. v. Forcum–Lannom Assocs., Inc.*, 433 N.E.2d 1214, 1220 (Ind. Ct. App.1982)).<br><br>"[A]ll applicable law in force at the time the agreement is made impliedly forms a part of the agreement without any statement to that effect." *Acheron Med. Supply, LLC v. Cook Med. Inc.*, 958 F.3d 637, 646–47 (7th Cir. 2020) (citing *Miller v. Geels*, 643 N.E.2d 922, 928 (Ind. Ct. App. 1994)). |
| Iowa | "Contracting parties are presumed to contract in reference to the existing law, which becomes a part of the contract." *United Suppliers, Inc. v. Hanson*, 876 N.W.2d 765, 780 (Iowa 2016) (citing *In re Receivership of Mt. Pleasant Bank & Trust Co.*, 426 N.W.2d 126, 134 (Iowa 1988)).<br><br>"When a contract addresses an area of law regulated by a statute, the statutory provisions and restrictions are a part of the parties' contract." *Blackford v. Prairie Meadows Racetrack & Casino, Inc.*, 778 N.W.2d 184, 189 (Iowa 2010) (citing *Lee v. Grinnell Mut. Reins.*, 646 N.W.2d 403, 406–07 (Iowa 2002)). |
| Kansas | "In addition, unless a contrary intent is demonstrated, contracting parties are presumed to have in mind all existing and applicable statutes and case law relating to the contract." *Fisherman Surgical Instruments, LLC v. Tri-anim Health Servs., Inc.*, 502 F. Supp. 2d 1170, 1179–80 (D. Kan. 2007) (citing *Anderson v. Nat'l Carriers, Inc.*, 240 Kan. 101, 105, 727 P.2d 899, 903 (1986)). "Accordingly, unless a contrary intent is shown, all existing applicable or relevant and valid statutes, ordinances and regulations, and settled law at the time the contract was made, become a part of the contract and must be read into it." *Id.*; *see also Steele v. Latimer*, , 521 P.2d 304, 310 (Kan. 1974). |

| *State* | *The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction* |
|---|---|
| Kentucky | "Kentucky law embraces the general proposition that constitutional and statutory provisions in effect at the time a contract is made become a part of the contract. . . .The sweeping language of this rule has application in many different contexts. However, in the context of contract interpretation, the principle may essentially function as a rule of construction: when a statutory change places the meaning of a contractual term in question, the court will presume that the parties had in mind the law in existence at the time of contract formation." *BJM, Inc. v. Melport Corp.*, 18 F. Supp. 2d 704, 705 (W.D. Ky. 1998) (cleaned up); *see also Whitaker v. Louisville Transit Co.,* 274 S.W.2d 391, 394 (Ky. 1954); *City of Florence v. Owen Elec. Coop.,* 832 S.W.2d 876, 882 (Ky. 1992). |
| Louisiana | "[L]aws existing at the time a contract is entered into are incorporated into and form a part of the contract as though expressly written." *Alford v. Chevron U.S.A. Inc.*, 13 F. Supp. 3d 581, 598 (E.D. La. 2014), order amended on reconsideration (June 4, 2014) (quoting *Green v. New Orleans Saints,* 781 So.2d 1199, 1203 (La. 2000); *see also Bd. of Comm'rs of Orleans Levee Dist. v. Dep't of Natural Res.,* 496 So.2d 281, 294 (La. 1986). |
| Maine | "Existing statutes governing the subject matter of a contract must in normal circumstances be read as a constituent part thereof." *Campbell v. First Am. Title Ins. Co.*, 644 F. Supp. 2d 126, 136 (D. Me. 2009) (citing *Skidgell v. Universal Underwriters Ins. Co.,* 697 A.2d 831, 833 (Me. 1997)); *see also Molleur v. Dairyland Ins. Co.,* 942 A.2d 1197, 1201 (Me. 2008) ("A contract for insurance necessarily incorporates all relevant mandatory statutory provisions."). |
| Maryland | "It is well-established in Maryland that laws subsisting at the time of the making of a contract enter into and form a part thereof as if expressly referred to or incorporated in its terms, and the principle embraces alike those provisions which affect the validity, construction, discharge and enforcement of the contract." *John Deere Const. & Forestry Co. v. Reliable Tractor, Inc.*, 957 A.2d 595, 599 (Md. 2008) (citations omitted); see also *Dennis v. Mayor and City Council of Rockville,* 406 A.2d 284, 287 (Md. 1979); *Lema v. Bank of America,* 826 A.2d 504, 516 (Md. 2003). |
| Massachusetts | "Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms." *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 383 (D. Mass. 2020) (cleaned up); *see also Feakes v. Bozyczko*, 369 N.E.2d 978, 980 (Mass. 1977). |
| Michigan | "It is also settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they |

| State | The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction |
|---|---|
| | were expressly referred to and incorporated in its terms." *Ziegler v. Witherspoon*, 331 Mich. 337, 352–53, 49 N.W.2d 318, 327 (1951); *see also City of Pontiac v. Simonton*, 261 N.W. 103 (Mich. 1935); *McDonald v. Farm Bureau Ins. Co.*, 480 Mich. 191, 201, 747 N.W.2d 811, 818 (2008). |
| Minnesota | "The laws existing at the time and place of the making of the contract, and where it is to be performed, enter into and form part of it." *In re Individual 35W Bridge Litig.*, 787 N.W.2d 643, 653 (Minn. Ct. App. 2010), aff'd, 806 N.W.2d 820 (Minn. 2011) (quoting *Hoff v. First State Bank*, 174 Minn. 36, 39, 218 N.W. 238, 239 (1928)).<br><br>Absent any contrary indication, the laws in existence at the time a contract is executed are presumed by the parties to be part of the contract. *See, Metro. Sports Facilities Comm'n v. Gen. Mills, Inc.*, 460 N.W.2d 625, 629 (Minn. Ct. App. 1990), aff'd, 470 N.W.2d 118 (Minn. 1991). |
| Mississippi | "It is axiomatic in Mississippi that the 'law in force at the time that a contract is made forms a part of it and is written into the contract as much as if expressly incorporated therein.'" *Ivison v. Ivison*, 762 So. 2d 329, 335 (Miss. 2000) (quoting *Mississippi Valley Gas Co. v. Boydstun*, 230 Miss. 11, 31, 92 So.2d 334, 340 (1957)); *see also* *Tucker Printing Co. v. Bd. of Sup'rs of Attala Cnty.*, 171 Miss. 608, 158 So. 336 (1934). |
| Missouri | "It is a fundamental rule that the laws which exist at the time and place of making a contract, and at the place where it is to be performed, affecting its validity, construction, enforcement, termination and discharge, enter into and form a part of the contract as if they were expressly referred to or incorporated therein." *Sharp v. Interstate Motor Freight Sys.*, 442 S.W.2d 939, 945 (Mo. 1969) (en banc); *see also Christy v. Petrus*, 365 Mo. 1187, 1191, 295 S.W.2d 122, 125 (1956) (en banc); *In Erwin v. City of Palmyra*, 119 S.W.3d 582, 585 n.2 (Mo. Ct. App. 2003). |
| Montana | "It is well established that laws existing at the time a contract is formed become part of the contract." *Strauser v. RJC Inv., Inc.*, 445 P.3d 803, 806 n.1 (Mont. 2019); *see also Somers v. Cherry Creek Dev., Inc.*, 439 P.3d 1281, 1283 (Mont. 2019). |
| Nebraska | "[E]very contract is made with reference to and subject to the existing law, and every law affecting the contract is read into and becomes a part thereof." *Haakinson & Beaty Co. v. Inland Ins. Co.*, 344 N.W.2d 454, 458 (Neb. 1984). |

| State | The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction |
|---|---|
| | "In any event it is the general rule that contracts include applicable statutory provisions, whether specifically mentioned or not, and therefore the grounds for termination in this case would and do include both the statutory provisions and the specific additional contractual provisions, if valid." *Bickford v. Bd. of Educ. of Sch. Dist. No. 82 of Hall Cnty.*, 336 N.W.2d 73, 74 (Neb. 1983). |
| Nevada | "Parties are presumed to contract with reference to existing statutes. Applicable statutes will generally be incorporated into the contract; however, other legal principles may govern the legal relationship where they are expressly set forth in the contract." *Gilman v. Gilman*, 956 P.2d 761, 767 (Nev. 1998) (citation omitted); *see also All Star Bail Bonds, Inc. v. Eighth Jud. Dist. Ct.*, 326 P.3d 1107, 1110 (Nev. 2014). |
| New Hampshire | "The laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *Stankiewicz v. City of Manchester*, 938 A.2d 873 (N.H. 2007) (quotation omitted).). <br><br> "[T]he laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *Trustees of Phillips Exeter Academy v. Exeter*, 27 A.2d 569 (N.H. 1940) (quotation omitted); *see also Stankiewicz v. City of Manchester*, 156 N.H. 587, 590, 938 A.2d 873, 876 (2007). |
| New Jersey | The second interpretive principle is that "[p]arties in New Jersey are ... presumed to have contracted with reference to the existing law." *Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C. v. Lowenstein Sandler, P.C.*, 839 A.2d 52, 56 (N.J. App. Div. 2003). <br><br> "[T]he law is a silent factor in every contract." *Silverstein v. Keane*, 115 A.2d 1 (N.J. 1955); *see also Assocs. Home Equity Servs., Inc. v. Troup*, 778 A.2d 529, 542 (N.J. App. Div. 2001). |
| New Mexico | "[A] contract incorporates the relevant law in force at the time of its creation ..." *Townsend v. State ex rel. State Highway Dep't*, 871 P.2d 958, 960 (N.M. 1994); *see also State Farm Mut. Auto. Ins. Co. v. Valencia*, 905 P.2d 202, 204 (N.M. Ct. App. 1995). <br><br> "Provided that a contract is enforceable, we generally construe it in light of the law that was in existence at the time the contract was signed, in line with our policy of enforcing the parties' intent and justified expectations at the time they made their agreement." *Safeway, Inc. v. Rooter 2000 Plumbing & Drain SSS*, 297 P.3d 347, 351 (N.M. App. Ct. 2012), *rev'd on other grounds*, 368 P.3d 389, 401 (N.M. 2016). |

| State | The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction |
|---|---|
| New York | "[I]t is basic that, unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made and the contract will be construed in the light of such law." *Dolman v. U.S. Tr. Co. of N.Y.*, 138 N.E.2d 784, 787 (N.Y. 1956); *see also Arrigoni v. Consol. Rail Corp.*, 155 A.D.2d 357, 358 (N.Y. App. Div. 1989). |
| North Carolina | "[L]aws which subsist at the time and place of the making of a contract ... enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *N. Carolina Ass'n of Educators, Inc. v. State*, 786 S.E.2d 255, 264 (N.C. 2016) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429–30 (1934)). <br><br> "It is a well recognized principle of law in this jurisdiction that the laws in force at the time of the execution of a contract become a part of the contract. This embraces laws which affect the contract's validity, construction, discharge and enforcement." *Wise v. Harrington Grove Cmty. Ass'n, Inc.*, 584 S.E.2d 731, 739 (N.C. 2003) (quoting *Pike v. Wachovia Bank & Tr. Co.,* 161 S.E.2d 453, 465 (N.C. 1968)). |
| North Dakota | "We also construe contracts in light of existing statutes, which become part of and are read into the contract as if those provisions were included in it." *Egeland v. Cont'l Res., Inc.*, 616 N.W.2d 861, 864 (N.D. 2000); *see also Storbeck v. Oriska School Dist.,* 277 N.W.2d 130, 134 (N.D.1979); *Reed v. Univ. of N. Dakota*, 1999 ND 25, 589 N.W.2d 880, 886 n.4. |
| Ohio | "The laws existing at the time of the making of a contract enter into and form a part of the contract as fully as if expressly incorporated in the contract." *Eastwood Loc. Sch. Dist. Bd. of Edn. v. Eastwood Edn. Assn.*, 875 N.E.2d 139, 143 (Ohio Ct. App. 2007). <br><br> "It is an elementary principle that any law relating to a contract which is in existence at the time of the execution of the contract becomes a part of such contract." *E. Mach. Co. v. Peck*, 117 N.E.2d 593, 596 (Ohio 1954). |
| Oklahoma | "The existing applicable law is part of every contract as if it were expressly referred to or incorporated within the agreement." *Welty v. Martinaire of Oklahoma, Inc.,* 867 P.2d 1273, 1276 (Okla. 1994); *see also Pub. Serv. Co. of Oklahoma v. State ex rel. Oklahoma Corp. Comm'n*, 115 P.3d 861, 884 (Okla. 2005). |

| State | The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction |
|---|---|
| Oregon | "The law of the land applicable thereto is a part of every valid contract." *Ocean Accident & Guarantee Corp. v. Albina Marine Iron Works*, 260 P. 229, 230 (Or. 1927); *see also Butterfield v. State*, 987 P.2d 569, 576 (Or. App. 1999). |
| Pennsylvania | "[T]he laws in force when a contract is entered into become part of the obligation of contract with the same effect as if expressly incorporated in its terms." *DePaul v. Kauffman*, 272 A.2d 500, 506 (Pa. 1971) (citations omitted); *see also Clairton City Sch. Dist. v. Mary*, 541 A.2d 849, 851 (Pa. Commw. Ct. 1988). |
| Rhode Island | "As a general rule of construction, contractual language must be interpreted in light of existing law, the provisions of which are regarded as implied terms of the contract, regardless of whether the agreement refers to the governing law." *Sch. Comm. of Town of N. Kingstown v. Crouch*, 808 A.2d 1074, 1079 (R.I. 2002) (citation omitted).<br><br>"It is a fundamental rule that all contracts are made subject to any law prescribing their effect or conditions to be observed in their performance. The statute is as much a part of the contract as if the statute had been actually written into the contract. This is so even though the parties knew nothing of the statute and did not include the provision or even though they knew of the legislation and expressly agreed upon the exact contrary." *Sterling Eng'g & Const. Co. v. Town of Burrillville Hous. Auth.*, 108 R.I. 723, 726, 279 A.2d 445, 447 (1971) |
| South Carolina | "It is a fundamental rule of contract construction that the law existing at the time and place of the making of a contract is a part of the contract." *City of N. Charleston v. N. Charleston Dist.*, 346 S.E.2d 712, 715 (S.C. 1986); *see also Ayres v. Crowley*, 30 S.E.2d 785, 788 (S.C. 1944). |
| South Dakota | South Dakota law "requires existing statutes to be read into an insurance policy as if they were express provisions." *Farmland Ins. Companies of Des Moines, Iowa v. Heitmann*, 498 N.W.2d 620, 623 (S.D. 1993); *see also Epiphany Roman Cath. Church v. German Ins. Co.*, 16 S.D. 17, 91 N.W. 332, 333 (1902). |
| Tennessee | "It is well established that the laws affecting enforcement of a contract, and existing at the time and place of its execution, enter into and form a part of the contract." *Kee v. Shelter Ins.*, 852 S.W.2d 226, 228 (Tenn. 1993).<br><br>"It is well settled that laws affecting construction or enforcement of a contract existing at the time of its making form a part of the contract." *Cary v. Cary*, 675 S.W.2d 491, 493 (Tenn. Ct. App. 1984). |

| State | The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction |
|---|---|
| Texas | The laws existing at the time a contract is made becomes a part of the contract and governs the transaction. *Wessely Energy Corp. v. Jennings*, 736 S.W.2d 624, 626 (Tex. 1987).<br><br>"The laws, at least as to substantial rights and remedies, existing at the time a contract is made, become a part of the contract." *Langever v. Miller*, 124 Tex. 80, 76 S.W.2d 1025, 1026–27 (1934) |
| Utah | "It has always been recognized that a contract contains, implicitly, the laws existing at the time it is completed." *Beehive Med. Elecs., Inc. v. Indus. Comm'n*, 583 P.2d 53, 60 (Utah 1978); *see also Washington Nat. Ins. Co. v. Sherwood Assocs.*, 795 P.2d 665, 669 (Utah Ct. App. 1990). |
| Vermont | "The merit system statute and lawful regulations thereunder in effect write into the contract of each employee the conditions which they embody." *Smith v. Highway Bd.*, 91 A.2d 805, 809 (Vt. 1952). |
| Virginia | "Thus, contracts are deemed to implicitly incorporate the existing law and the reserved power of the state to amend the law or enact additional laws for the public welfare." *Smith v. Commonwealth*, 743 S.E.2d 146, 150 (Va. 2013).<br><br>"In addition, [o]ne of the basic rules of construction of contracts is that the law in force at the date of making a contract determines the rights of the parties under the contract. The law effective when the contract is made is as much a part of the contract as if incorporated therein." *Hering v. Hering*, 533 S.E.2d 631, 634 (Va. App. 2000). |
| Washington | "All parties had notice of the board's power to refuse an assignment of an existing license, or to refuse to issue a new one, because existing law is a part of every contract, and must be read into it." *Fischler v. Nicklin*, 319 P.2d 1098, 1100 (Wash. 1958); *see also Shoreline Cmty. Coll. Dist. No. 7 v. Emp. Sec. Dep't*, 842 P.2d 938, 947 (Wash. 1992). |
| West Virginia | "[T]he laws which subsist at the time and place where a contract is made and to be performed enter into and become a part of it to the same extent and effect as if they were expressly incorporated in its terms." *Cabot Oil & Gas Corp. v. Huffman*, 705 S.E.2d 806, 815 (W. Va. 2010); *see also Bruce McDonald Holding Co. v. Addington, Inc.*, 825 S.E.2d 779, 790-91 (W. Va. 2019). |
| Wisconsin | "This is because, in general, the laws in existence at the time of the contract are incorporated into that contract." *Dairyland Greyhound Park, Inc. v. Doyle*, 719 N.W.2d 408, 432 (Wisc. 2006). |

| State | The Law Existing at the Time a Contract is Made Becomes a Part of the Contract and Governs the Transaction |
|---|---|
| | "In general, the laws in existence at the time a contract is formed are incorporated into that contract." *Yacoub v. Yacoub*, 915 N.W.2d 729 (Wisc. 2018). |
| Wyoming | "In Wyoming, the parties to a contract are presumed to enter into their agreement in light of existing principles of law." *Union Pac. Res. Co. v. Texaco, Inc.*, 882 P.2d 212, 222 (Wyo. 1994).<br><br>"We acknowledge that parties to a contract are presumed to enter into their agreement in light of existing principles of law" and the "existing principles of law enter into and become a part of a contract as though referenced and incorporated into the terms of the agreement." *Schell v. Scallon*, 433 P.3d 879, 887 (Wyo. 2019) (citations omitted). |

# TAB 14

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| Alabama | "[A] plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Invs.*, LLC, 77 So. 3d 139, 145 (Ala. 2011); *see also Portofino Seaport Vill., LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008) | |
| Alaska | "A party seeking to recover for unjust enrichment must show (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof." *Ware v. Ware,* 161 P.3d 1188, 1197 (Alaska 2007); *see also Beluga Min. Co. v. State Dept, of Natural Res.,* 973 P.2d 570, 579 (Alaska 1999). | |
| Arizona | "An unjust enrichment claim requires proof of (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." *Perdue v. La Rue*, 250 Ariz. 34, 42, 474 P.3d 1197, 1205 (Ariz. Ct. App. 2020); *see also Wang Elec., Inc. v. Smoke Tree Resort*, 283 P.3d 45 (Ariz. Ct. App. 2012). | Must be absence of justification and Plaintiff must have no adequate remedy at law. |
| Arkansas | Unjust enrichment "is the principle that one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly." *Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 210 S.W.3d 101, 112 (Ark. 2005); *see also Hatchell v. Wren,* 211 S.W.3d 516, 522 (Ark. 2005); *Frigillana v. Frigillana,* 584 S.W.2d 30, 35 (Ark. 1979). | |

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| California | "The elements of an unjust enrichment claim are the receipt of a benefit and the unjust retention of the benefit at the expense of another." *Peterson v. Cellco P'ship.,* 80 Cal. Rptr. 3d 316, 323 (Cal. Ct. App. 2008); *see also Lectrodryer v. SeoulBank,* 77 Cal. App. 4th 723, 726, 91 Cal. Rptr. 2d 881, 883 (Cal. Ct. App. 2000). | |
| Colorado | "To prevail on an unjust enrichment claim, a party must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Pulte Home Corp., Inc. v. Countryside Cmty. Ass'n, Inc.,* 382 P.3d 821, 833 (Colo. 2016); *see also Harris Group, Inc. v. Robinson,* 209 P.3d 1188, 1205 (Colo. Ct. App. 2009). | Plaintiff must have no adequate remedy at law. |
| Connecticut | "Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy .... Plaintiffs seeking recovery ... must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Geriatrics, Inc. v. McGee,* 332 Conn. 1, 24-25, 208 A.3d 1197, 1211 (Conn. 2019); *see also New Hartford v. Conn. Res, Recovery Auth.,* 970 A.2d 592, 609 (Conn. 2009). | |
| Delaware | "[A] plaintiff must plead and later prove (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Garfield on behalf of ODP Corp. v. Allen,* 277 A.3d 296, 341 (Del. Ch. 2022); *see also Nemec v. Shrader,* 991 A.2d 1120, 1130 (Del. 2010). | Must be absence of justification and Plaintiff must have no adequate remedy at law. |
| D.C. | "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Comms., Inc. v. Thompson,* 878 A.2d 1218, 1222 (D.C. 2005); *see also 4934, Inc v. Dist. Of Columbia Dept, of Emp't Servs.,* 605 A.2d 50, 56 (D.C. 1992). | |

App'x. 0214

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| Florida | "The essential elements of unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Gutierrez v. Sullivan*, 338 So. 3d 971, 975 (Fla. Dist. Ct. App. 2022); *see also Jackson-Jester v. Aziz.*, 48 So. 3d 88, 90 (Fla. Dist. Ct. App. 2010), *reh'g denied* (Dec. 3, 2010). | |
| Georgia | "Unjust enrichment applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." *Tuvim v. United Jewish Cmities, Inc.,*680 S.E.2d 827, 829-30 (Ga. 2009); *see also Engram v. Engram,* 463 S.E.2d 12, 15 (Ga. 1995). | |
| Hawaii | "A valid claim for unjust enrichment requires only that a plaintiff prove that he or she conferred a benefit upon the opposing party and that the retention of that benefit would be unjust." *Porter v. Hu,* 169 P.3d 994, 1005 (Haw. App. Ct. 2007); *see also Small v. Badenhop,* 701 P.2d 647, 654 (Haw. 1985). | |
| Idaho | "Unjust enrichment exists where (1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof." *Stevenson v. Windermere Real Est./Cap. Grp., Inc.,* 275 P.3d 839, 842 (Idaho 2012); *see also Harris, Inc. v. Foxhollow Constr. & Trucking, Inc.,* 264 P.3d 400, 410 (Idaho 2011). | |

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| Illinois | "To state a cause of action upon a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment and that defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience." *Hatcher v. Hatcher*, 158 N.E.3d 326, 330 (Ill. App. Ct. 2020); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023, 1043 (Ill. App. Ct. 2015). | |
| Indiana | "To prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Zoeller v. E. Chicago Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009); *see also Pond v. McNellis*. 845 N.E.2d 1043, 1056-57 (Ind. Ct. App. 2006). | Requires only enrichment, detriment, and retention an unjust result. |
| Iowa | "The doctrine of unjust enrichment is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another or receive property or benefits without paying just compensation." *State, Dept, of Human Servs. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154-55 (Iowa 2001); *see also Hunting Sols. Ltd. Liab. Co. v. Knight*, 902 N.W.2d 592 (Iowa Ct. App. 2017). | Requires only enrichment, detriment, and retention an unjust result. |
| Kansas | "The theory of unjust enrichment rests upon three elements: (1) a benefit conferred; (2) an appreciation or knowledge of the benefit by the one receiving the benefit; and (3) the acceptance or retention of the benefit under such circumstances as to make it inequitable to retain the benefit without payment of its value." *In re Estate of Sander*, 156 P.3d 1204, 1220 (Kan. 2007); *see also Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996). | |

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| Kentucky | The elements of unjust enrichment claim are "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Guerin v. Fulkerson*, 354 S.W.3d 161, 165 (Ky. Ct. App. 2011); *see also Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009). | |
| Louisiana | "To recover, the claimant must prove: 1) enrichment of the defendant; 2) impoverishment of the plaintiff; 3) a connection between the enrichment and the impoverishment; 4) no justification for the alleged unjust enrichment; and 5) the lack of any other remedy at law." *Quilio & Associates v. Plaquemines Parish Gov't*, 931 So. 2d 1129, 1137 (La. Ct. App. 2006), *writ denied sub nom.* 937 So. 2d 850 (La. 2006); *see also Minyard v. Curtis Products, Inc.*, 205 So. 2d 422, 432 (La. 1967). | Must be absence of justification and Plaintiff must have no adequate remedy at law. |
| Maine | "A claim for unjust enrichment requires the complaining party to "show that: (1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Platz Assocs. v. Finley*, 973 A.2d 743, 750 (Me. 2009); *see also Maine Eye Care Assocs. P.A. v. Gorman*, 942 A.2d 707, 712 (Me. 2008). | |
| Maryland | "Unjust enrichment consists of three elements:<br>1. A benefit conferred upon the defendant by the plaintiff;<br>2. An appreciation or knowledge by the defendant of the benefit; and<br>3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007); *see also Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000). | |

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| Massachusetts | "Unjust enrichment is defined as retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Santagate v. Tower*, 833 N.E.2d 171, 176, 180 (Mass. App. Ct. 2005); *see also Keller v. O'Brien*, 683 N.E.2d 1026, 1029 (Mass. 1997). | Plaintiff must have no adequate remedy at law. |
| Michigan | "[U]nder the equitable doctrine of unjust enrichment, a person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. App. Ct. 2006); *see also Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 663 (Mich. 1991). | Requires only enrichment, detriment, and retention an unjust result. |
| Minnesota | "To establish a claim for unjust enrichment, the plaintiff must show: (1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it." *Hall v. Reynolds*, No. A17-1095, 2018 WL 700191, at *2 (Minn. Ct. App. Feb. 5, 2018); *see also Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195-96 (Minn. Ct. App. 2007). | Defendant must have engaged in wrongful conduct. |
| Mississippi | "An unjust enrichment action is based on a promise, which is implied in law, that one will pay a person what he is entitled to according to 'equity and good conscience.' Thus, the action is based on the equitable principle "that a person shall not be allowed to enrich himself unjustly at the expense of another." *1704 21st Ave., Ltd. v. Gulfport*, 988 So. 2d 412, 416 (Miss. Ct. App. 2008); *see also Dew v. Langford*, 666 So.2d 739, 765 (Miss. 1995). | |
| Missouri | "Unjust enrichment requires a showing that: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Charter Commc'ns Operating, LLC v. SATMAP Inc.*, 569 S.W.3d 493, 510-11 (Mo. Ct. App. 2018); *see also Hargis v. JLB Corp.*, 357 S.W.3d 574, 586 (Mo. 2011). | |

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| Montana | "The essential elements of an unjust enrichment claim are: (1) a benefit conferred on one party by another; (2) the other's appreciation or knowledge of the benefit; and (3) the other's acceptance or retention of the benefit under circumstances that would render it inequitable for the other to retain the benefit without compensating the first party for the value of the benefit." *Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 595 (Mont. 2018); *see also Albinger v. Harris,* 48 P.3d 711, 716 (Mont. 2002); *Robertus v. Candee,* 670 P.2d 540, 542 (Mont. 1983). | |
| Nebraska | "To recover on a claim for unjust enrichment, the plaintiff must show that (1) the defendant received money, (2) the defendant retained possession of the money, and (3) the defendant in justice and fairness ought to pay the money to the plaintiff." *Zook v. Zook*, 312 Neb. 128, 133, 978 N.W.2d 156, 161 (2022); *see also Hoffman v. Reinke Mfg. Co., Inc.,* 416 N.W.2d 216, 219 (Neb. 1987). | |
| Nevada | "Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 257 (Nev. 2012); *see also Mainor v. Nault*, 101 P.3d 308, 317 (Nev. 2004) (abrogated on different grounds). | |
| New Hampshire | "A trial court may require an individual to make restitution for unjust enrichment if he has received a benefit which would be unconscionable for him to retain. To entitle one to restitution, it must be shown that there was unjust enrichment either through wrongful acts or passive acceptance of a benefit that would be unconscionable to retain." *Kowalski v. Cedars of Portsmouth Condo. Ass'n,* 769 A.2d 344, 347 (N.H. 2001); *see also Pella Windows & Doors, Inc. v. Faraci.* 580 A.2d 732, 732-33 (N.H. 1990); *Petrie-Clemons v. Butterfield,* 441 A.2d 1167, 1171-72 (N.H. 1982). | Wrongful acts or passive acceptance of a benefit that would be unconscionable to retain. |

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| New Jersey | "To demonstrate unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust and that the plaintiff 'expected remuneration' and the failure to give remuneration unjustly enriched the defendant." *EnviroFinance Grp., LLC v. Env't Barrier Co., LLC*, 113 A.3d 775, 790 (N.J. Super. Ct. App. Div. 2015); *see also VRG Corp. v. GKN Realty Corp.,* 641 A.2d 519, 526 (N.J. 1994). | |
| New Mexico | "To prevail on an unjust enrichment claim, a party must demonstrate that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowing the other to retain the benefit would be unjust." *Lucero v. Nationwide Mut. Ins. Co.*, No. 19-CV-0311 KK/JHR, 2022 WL 4598482, at *13 (D.N.M. Sept. 30, 2022); *see also City of Rio Rancho v. Amrep Sw. Inc.*, 260 P.3d 414, 428-29 (N.M. 2011). | |
| New York | "A plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182, 944 N.E.2d 1104 (N.Y. 2011); *see also Georgia Malone & Co., Inc. v. Ralph Rieder,* 86 A.D.3d 406, 408 (N.Y. App. Div. 2011), *affd sub now* 973 N.E.2d 743 (N.Y. 2012); *Am. Exp. Travel Related Servs. Co., Inc. v. Seidenfeld,* 1 Misc. 3d 907(A), (N.Y. Sup. Ct. 2003). | Requires only enrichment, detriment, and retention an unjust result. |
| North Carolina | "Under a claim for unjust enrichment, a plaintiff must establish certain essential elements: (1) a measurable benefit was conferred on the defendant, (2) the defendant consciously accepted that benefit, and (3) the benefit was not conferred officiously or gratuitously." *Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.,* 712 S.E.2d 670, 677 (N.C. Ct. App. 2011); *see also Progressive Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 647 S.E.2d 111, 116 (N.C. Ct. App. 2007). | |

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| North Dakota | "Five elements must be established to prove unjust enrichment: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of a justification for the enrichment and impoverishment; and (5) an absence of a remedy provided by law." *McGhee v. Mergenthal*, 735 N.W.2d 867, 872 (N.D. 2007); *see also Schroeder v. Buchholz*, 622 N.W.2d 202, 207 (N.D. 2001). | Must be absence of justification and Plaintiff must have no adequate remedy at law. |
| Ohio | "To prevail on an unjust-enrichment claim, a plaintiff must prove: (1) a benefit conferred by a plaintiff upon a defendant, (2) knowledge by the defendant of the benefit, and (3) retention of the benefit by the defendant under circumstances in which it would be unjust to do so without payment." *Vancrest Mgmt. Corp. v. Mullenhour*, 140 N.E.3d 1051, 1067 (Ohio Ct. App. 2019); *see also Warnecke v. Chaney*, 956 N.E.2d 908, 913 (Ohio Ct. App. 2011). | |
| Oklahoma | "Unjust enrichment arises from the failure of a party to make restitution in circumstances where it is inequitable, or one party holds property that, in equity and good conscience, it should not be allowed to retain." *Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 828 (Okla. 2016); *see also Robinson v. Southerland,* 123 P.3d 35, 45 (Okla. Civ. App. 2005). | |
| Oregon | "The elements of the quasi-contractual claim of unjust enrichment are (1) a benefit conferred, (2) awareness by the recipient that she has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it." *Wilson v. Gutierrez*, 261 Or. App. 410, 414, 323 P.3d 974, 978 (2014); *see also Summer Oaks Ltd. P'ship v. McGinley,* 55 P.3d 1100, 1104 (Or. Ct. App. 2002). | |

| *State* | *Elements of an Unjust Enrichment Claim* | *Additional Elements or Variations* |
|---|---|---|
| Pennsylvania | "The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Stoeckinger v. Presidential Fin. Corp. of Del. Valley,* 948 A.2d 828, 833 (Pa. Super. Ct. 2008); *see also Meehan v. Cheltenham Twp.,* 189 A.2d 593, 595 (Pa. 1963). | |
| Rhode Island | "To recover for unjust enrichment, a claimant must prove: (1) that he or she conferred a benefit upon the party from whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient accepted the benefit under such circumstances that it would be inequitable for the recipient to retain the benefit without paying the value thereof." *S. Cnty. Post & Beam, Inc. v. McMahon*, 116 A.3d 204, 210-11 (R.I. 2015); *see also Narragansett Elec. Co. v. Carbone*, 898 A.2d 87, 99 (R.I. 2006). | |
| South Carolina | The elements of unjust enrichment are "(1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by the defendant of the benefit under conditions that make it unjust for him to retain it without paying its value." *Stevens & Wilkinson of S.C., Inc. v. City of Columbia*, 762 S.E.2d 696, 704 (S.C. 2014); *see also Columbia Wholesale Co., Inc. v. Scudder May N.V,* 440 S.E.2d 129, 130 (S.C. 1994). | |
| South Dakota | "Unjust enrichment occurs when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying." *Dowling Fam. P'ship v. Midland Farms*, 865 N.W.2d 854, 862 (S.D. 2015); *see also Johnson* v. *Larson,* 779 N.W.2d 412, 416 (S.D. 2010). | |

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| Tennessee | "[T]o establish an unjust enrichment claim, one must prove: 1) a benefit conferred upon the defendant by the plaintiff'; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Lascassas Land Co., LLC v. Allen*, 2020 WL 1983798, at *7 (Tenn. Ct. App. Apr. 27, 2020); *see also Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). | |
| Texas | "Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain. A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage." *Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App. 2009); *see also The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 731 (Tex. App. 2008). | Defendant must have engaged in wrongful conduct. |
| Utah | "To establish a claim for unjust enrichment, a plaintiff must show: (1) a benefit conferred ...; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention of the benefi] by the conferee ... under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *U.S. Fid. v. U.S. Sports Specialty*, 270 P.3d 464, 468 (Utah 2012); *see also Rawlings v. Rawlings*, 240 P.3d 754, 762-63 (Utah 2010). | |
| Vermont | The elements of unjust enrichment are "whether (1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." *Reed v. Zurn*, 992 A.2d 1061, 1066 (Vt. 2010); *see also Legault v. Legault*, 459 A.2d 980, 984 (Vt. 1983). | |

App'x. 0223

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| Virginia | The elements of unjust enrichment are "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 650 (Va. 2020); *see also Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008). | |
| Washington | "[I]n order to establish an unjust enrichment claim, the plaintiff must demonstrate that "(1) the defendant receive[d] a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." *Nat'l Sur. Corp. v. Immunex Corp.*, 297 P.3d 688, 701 (Wash. 2013); *see also Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008). | |
| West Virginia | "The law of unjust enrichment indicates that if one person improves the land of another either through the direction of services to the land, or through the affixation of chattels to the land, that person is entitled to restitution for the improvements if certain other circumstances are present. The Court has also indicated that if benefits have been received and retained under such circumstance that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving the benefits to pay their reasonable value *Realmark Devs., Inc. v. Ranson*, 542 S.E.2d 880, 884-85 (W. Va. 2000); *see also Marshall v. Elmo Greer & Sons, Inc.*, 456 S.E.2d 554, 557 (W. Va. 1995). | |
| Wisconsin | "The elements of unjust enrichment . . . are (1) a benefit conferred upon the defendant by the plaintiff, (2) knowledge or appreciation of the benefit by the defendant, and (3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him or her to retain it without paying the value thereof." *Ludyjan v. Cont'l Cas. Co.*, 747 N.W.2d 745, 748 (Wis. App. Ct. 2008); *see also Buckett v. Jante*, 767 N.W.2d 376, 380 (Wis. App. Ct. 2009). | |

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| Wyoming | The elements of unjust enrichment are "1) valuable services were rendered; 2) to the party to be charged; 3) which services were accepted, used and enjoyed by the charged party; and 4) under circumstances that reasonably notified the party being charged that the other party would expect payment for the services. Recovery is appropriate only when the benefited party would be unjustly enriched." *Horn v. Wooster*, 165 P.3d 69, 76 (Wyo. 2007); *see also Jacoby v. Jacoby*, 2004 WY 140, ¶ 10, 100 P.3d 852, 855 (Wyo. 2004). | |
| Guam | The elements of unjust enrichment are "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *In re Moylan*, 2011 Guam 16, ¶ 69 (Guam Oct. 18, 2011). | |
| Northern Marianas Islands | "To prove a claim for unjust enrichment, a claimant must show: (1) the defendant was enriched; (2) the enrichment came at the plaintiff's expense; and (3) equity and good conscience militate against permitting the defendant to retain what the plaintiff seeks to recover." *Syed v. Mobil Oil Mariana Islands, Inc.*, No. 2011-SCC-0010-CIV, 2012 WL 6738436, at *9 (N. Mar. I. Dec. 31, 2012); *see also Saipan Air, Inc. v. Stukes*, No. 1:12-CV-00015, 2014 WL 6978488, at *5 (D. N. Mar. I. Dec. 8, 2014). | |
| Puerto Rico | "To prove a claim for unjust enrichment under Puerto Rico law, the following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause." *Rivera v. Marriott Int'l, Inc.*, 456 F. Supp. 3d 330, 339 (D.P.R. 2020); *see also Montalvo v. LT's Benjamin Recs., Inc.*, 56 F. Supp. 3d 121, 136 (D.P.R. 2014). | Plaintiff must have no adequate remedy at law. |

| State | Elements of an Unjust Enrichment Claim | Additional Elements or Variations |
|---|---|---|
| U.S. Virgin Islands | "A cause of action for quantum meruit, also known as unjust enrichment, will ordinarily lie in a case where the defendant receives something of value to which he is not entitled and which he should restore to the plaintiff." *Cacciamani & Rover Corp. v. Banco Popular De Puerto Rico*, 61 V.I. 247, 251 (V.I. 2014); *see also Walters v. Walters*, 60 V.I. 768, 776 (V.I.2014). |  |