UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ERIC GREATHOUSE, ET AL.,

    Plaintiffs,

v.                                                    No. 4:22-CV-0686-P

CAPITAL PLUS FINANCIAL LLC, ET AL.,

    Defendants.

## OPINION & ORDER

Before the Court are Defendants' Motions to Dismiss (ECF Nos. 31, 34, 36). For the reasons stated below, the motions are **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' unjust enrichment claims against all Defendants are **DISMISSED**. To the extent Defendants seek to dismiss Plaintiffs' other claims, the motions are **DENIED**.

## INTRODUCTION

In 2020, Congress put their trust—to the tune of $800 billion—into private lenders to help alleviate the effects of the burdensome federal, state, and local regulations that crippled businesses and the livelihoods of millions of families across the country. As with any $800 billion government program, the trust placed in the actors carrying it out was often undeserved. Like magic, bad actors arrive wherever hundred-billion-dollar government programs occur.

In this case, Plaintiffs allege that Defendants were bad actors who capitalized on the exorbitant government fees given for approving PPP loans while never disbursing the funds to countless businesses in need. And because of the striking allegations in their complaint, this Court must allow many of Plaintiffs' claims to proceed. When such an egregious abuse of public trust is apparent, the Court cannot dismiss this case on the pleadings alone.

## FACTUAL & PROCEDURAL BACKGROUND

In 2020, Congress passed the CARES Act, which provided for the Payroll Protection Program ("PPP")—a loan assistance program for businesses financially burdened by restrictions imposed on the country by local, state, and federal officials. This extraordinary act required a comprehensive plan to disburse billions of dollars to countless businesses in a very short window of time. Because of the logistical challenges that approving loans for millions of American businesses presented, the government worked with private lenders to streamline the approval process.

The approval and loan disbursal process promulgated by the SBAs rulemaking followed a 7-step process:

1. The business sent in the required information on an application to show eligibility for the PPP program.
2. The lender approved the application and sent notice to the SBA.
3. The SBA issues an "SBA number" to the loan, signifying its approval.
4. The lender makes a one-time, full disbursement of the PPP funds within 10 days of loan approval.
5. After disbursing the funds, the lender received the fees they are statutorily entitled to.
6. The lender monitors the loan and reviews the businesses' use of the funds to establish whether loan forgiveness applies.
7. The loan is either forgiven, forgiven in part, or paid back in whole by the business.

To assist lenders with the approval process, the Federal Reserve Bank of the United States also instituted the Paycheck Protection Program Liquidity Facility ("PPPFL"), which advanced funds through non-recourse loans to lenders who could provide proof of approvals and disbursements of PPP loans as collateral.

Defendant Capital Plus Financial LLC ("Capital Plus")—a wholly owned subsidiary of Defendant Crossroads Inc.—stepped up to the plate and began approving loans through the process authorized by the CARES Act and subsequent rulemaking procedures. And they did so at

an astonishing pace. In less than five months, Capital Plus approved an astonishing 472,036 PPP loans. The volume of loans approved was so numerous that they were the second largest lender of PPP loans in 2021 by volume—assigning more loans than the combined efforts of many major financial behemoths. Indeed, Capital Plus enlisted help from outside providers to process loans due to capacity constraints. To make monetary matters even more astonishing, Capital Plus—due to their massive quantity of "approved" loans—drew down nearly $7.5 billion in funding from the PPPFL program.

The plan instituted by Capital Plus and its parent company, Crossroads, paid off as they amassed an astonishing $970.5 million in revenue—a 2,446% increase from the year before. In many shareholder letters and releases, Crossroads—through their directors including Defendants Alpert and Donnelly—talked about the success of the PPP lending craze and the income it was generating for the parent company. In some SEC filings directors touted the $930 million "windfall" from PPP lending. And they also often discussed strategies and other directives that Crossroads aimed toward regarding the lending program—often referring to Capital Plus and Crossroads as a single entity. One of the immediate strategies implemented with the new windfall of cash was a $238.9 million dividend that was quickly paid out after the PPP window closed. Most of the money went to insiders in the company like Defendants Alpert and Donnelly who together owned 62.8% of outstanding shares. This resulted in a $149,918,480 payday between the two individuals.

But while income soared for Capital Plus and Crossroads, complaints from individuals approved for loans did as well. Plaintiffs allege that—although they received SBA numbers—funds were never disbursed to them and others. In effect, Capital Plus and Crossroads collected the fees associated with approval and interest on the $7.5 billion in PPPFL funds but never completed their obligation to countless individuals who were in dire straits financially. Even worse, Plaintiffs could not go to another lender as they were restricted from processing any other applications once a valid SBA number was assigned to them. And further, Plaintiffs allege that because the SBA number was assigned to

them, they are still under legal obligations to pay back money that they never received.

Because of the alleged faults of Crossroads, Capital Plus, and its directors, a group of Plaintiffs bring this suit under the Class Action Fairness Act seeking redress of their injuries under four theories: (1) Breach of Contract; (2) Unjust Enrichment; (3) California's Unfair Competition Law ("UCL"); and (4) North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA").

## B. The Parties

### 1. Plaintiffs

Plaintiff Eric Greathouse is a citizen of Arkansas who owns an insurance inspection business. Plaintiff Tiffany Sumrall is a citizen of Texas who owns a landscaping business. Plaintiff Cori Pericho is a citizen of Hawaii who owns a messenger and delivery service. Plaintiff John Pinkney is a citizen of Texas who owns a cable communications business. Plaintiff Alicia Mena is a citizen of Arizona who owns a housecleaning business. These Plaintiffs collectively seek to represent a nationwide class and bring two claims for breach-of-contract and unjust enrichment.

Plaintiff Barbara Myles is a citizen of North Carolina who owns a business that assists independent artists. Myles seeks to represent a North Carolina subclass and brings a claim under the NCUDTPA in addition to claims for breach-of-contract and unjust enrichment.

Lastly, Plaintiff Ernesto Covarrubias is a citizen of California who owns an auto repair business. Plaintiff Joshua Smith is also a citizen of California who is an operates a delivery and human resource and consulting business. Covarrubias and Smith seek to represent a California subclass and bring a claim under the UCL in addition to claims for breach-of-contract and unjust enrichment.

All Plaintiffs were assigned an SBA number by Capital Plus, but never received PPP funds.

### 2. Corporate Defendants

Defendant Crossroads is a publicly traded Delaware corporation with its principal place of business in Dallas, Texas.

Defendant Capital Plus is a Texas limited liability company with its principal place of business in Bedford, Texas. Capital Plus is a wholly owned subsidiary of Crossroads.

### 3. Individual Defendants

Defendant Donnelly has continually served as a Director and CEO of Defendant Crossroads since December 2017. Donnelly also simultaneously served as CEO of Defendant Capital Plus from 2014 until August 30, 2021.

Defendant Alpert is the Chairman of the Board of Directors of Defendant Crossroads. Alpert has served in this role since 2017. Alpert also holds leadership positions with other Texas-based companies that engage in business with the Corporate Defendants through investment advisory services.

## LEGAL STANDARD

### A. Rule 12(b)(1)

Article III of the Constitution limits federal-court jurisdiction to "cases" or "controversies." U.S. CONST. art. III, § 2. To satisfy this requirement, a plaintiff must establish that he has a "personal stake" in the lawsuit. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732–33 (2008). Because standing is a central concern of subject-matter jurisdiction, it is properly addressed under Rule 12(b)(1). *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016). The party seeking federal jurisdiction has the burden of establishing standing. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992).

### B. Rule 12(b)(2)

After personal jurisdiction has been raised in a 12(b)(2) motion, "the party seeking jurisdiction bears the burden of proof but must only present a prima facie case." *Luv N' care, Ltd. v. Insta–Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). In determining whether a plaintiff meets its

burden, a district court must "accept the plaintiff's uncontroverted allegations as true and resolve all conflicts of jurisdictional facts contained in the parties' affidavits and other documentation in the plaintiff's favor." *Jones v. Artists Rts. Enf't Corp.*, 789 F. App'x 423, 425 (5th Cir. 2019).

## C. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court, in turn, must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins.,* 509 F.3d 673, 675 (5th Cir. 2007). If there are well-plead factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

## ANALYSIS

Due to the many arguments contained in Defendants' three motions, the Court proceeds to address them in the following order: (1) Article III standing; (2) arguments particular to the Individual Defendants; (3) arguments particular to the Corporate Defendants; and (4) arguments applicable to claims brought against all Defendants. The Court addresses each issue in turn.

## A. Article III Standing

Article III's case-or-controversy requirement demands that a plaintiff show he has standing to sue. This prevents courts from "being used to usurp the powers of the [other] political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). This doctrine thus preserves the "proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Historically, this concept meant that a plaintiff only needed a "legally cognizable cause of action." *Sierra v. City of Hallandale Beach, Fla.*, 996 F.3d 1110, 1115 (11th Cir. 2021) (Newsom, J., concurring). But over

many decades, the Supreme Court jumbled together an opaque standing doctrine that came to its full fruition in 1992. Like most cobbled together doctrines not found in the text of the Constitution, this standard has provided no modicum of predictability or clarity to the lower courts other than the ability to shrink the size of their dockets.[1]

Regardless of the nature of this doctrine, "it is now all but gospel"[2] that a plaintiff must show "(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Failure to establish these elements "deprives the federal courts of jurisdiction to hear the suit." *Rivera v. Wyeth–Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002). But courts must "assume, for purposes of the standing analysis, that [Plaintiffs are] correct on the merits of [their] claim." *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019).

Defendants argue that Plaintiffs lack Article III standing to pursue their claims. Their specific arguments are addressed below under each corresponding element.

### 1. Injury in Fact

Defendants assert that Plaintiffs suffered no injury. "Injury in fact" requires that a plaintiff allege an invasion of a legally protected interest. *See Lujan*, 504 U.S. at 560. This inquiry further divides into several nebulous subtests—an injury in fact must be (1) concrete, not abstract, (2) particularized, not generalized, and (3) actual or imminent, not conjectural or hypothetical. *Id.* at 1548; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408–09 (2013); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974). Though neatly organized, these

---

[1] *See* Cass R. Sunstein, *Standing and the Privatization of Public Law*, 88 COLUM. L. REV. 1432, 1436-38 (1988); *see also* Robert J. Pushaw Jr., *Bridging the Enforcement Gap in Constitutional Law: A Critique of the Supreme Court's Theory That Self-Restraint Promotes Federalism*, 46 Wm. & Mary L. Rev. 1289, 1327 (2005) ("[T]he Court's refusal to admit explicitly that it was acting on policy rather than constitutional grounds resulted in further analytical confusion.").

[2] *See Sierra*, 996 F.3d at 1115 (Newsom, J., concurring).

categories are often better suited to acquit Clodius rather than forming a solid basis for dismissal.[3]

Plaintiffs allege that their concrete injuries are (1) the deprivation of the use of their PPP loan funds, (2) the inability to seek alternative funding for their PPP loan after Defendants failed to fund the loans, (3) the lost opportunities incident upon Capital Plus's failure to fund Plaintiffs' loans during the pandemic, and (4) the continuing obligation to repay loan funds that they never received.[4]

These injuries are concrete because they already happened when payments were not remitted; particularized because they deal with each Plaintiffs' individual loan; actual because the payment has not occurred; or—in the case of the obligation to repay with interest—imminent as the loan repayments continue to loom over Plaintiffs. And though Defendants may have qualms about why the payments were not remitted, the Court must assume that Plaintiffs are correct on the merits at this stage.

Injury in fact is present.

## 2. Causation

A plaintiff has standing if he can demonstrate a "personal injury fairly traceable to the defendant's allegedly unlawful conduct." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021). Causation does not "require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (citing *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). But a plaintiff's injuries

---

[3] "Clodius, at any rate, escaped; most of the judges giving their opinions so written as to be illegible that they might not be in danger from the people by condemning him, nor in disgrace with the nobility by acquitting him." Plutarch, John Langhorne & William Langhorne, PLUTARCH'S LIVES 272 (1804).

[4] Plaintiffs also potentially lost the opportunity to apply for loan forgiveness. Borrowers can apply for loan forgiveness any time up to the maturity date of the loan. It is unclear whether the maturity date of the loan was set when SBA approved Plaintiffs' PPP loan request and released the funds to Capital Plus for disbursal to Plaintiffs or whether the maturity date is not finalized until Plaintiffs receive the loan funds. Still, Plaintiffs injuries are enough to stand on their own.

can't be "the result of the independent action of some third party not before the court." *Bennett*, 520 U.S. at 167.

Plaintiffs argue that Capital Plus's actions caused their injuries because they received the PPP loan funding from the government but failed to release it to Plaintiffs even though the SBA had approved their PPP loan applications. Defendants counter that they tried to release the funds to Plaintiffs' accounts but could not do so because of account blocks or faulty paperwork submitted by Plaintiffs. And while Defendants' arguments may have merit, the Court must accept the merits of Plaintiffs' arguments as true. At bottom, Plaintiffs plausibly claim that Defendants' refusal or failure to remit the loan payments they were entitled to caused their injuries.

Causation is met.

3. <u>Redressability</u>

Redressability "limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). And this requires a plaintiff to show that a favorable decision will likely redress the injury. *Inclusive Communities Project, Inc. v. Dep't. of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). A plaintiff need only allege the recovery to which they are entitled and "[w]hether recovery for such a claim is permitted under governing law is a separate question." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007). It is thus "sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered." *Id.*

Defendants assert that redressability is not met for two reasons. *First*, the relief requested in the complaint exceeds Plaintiffs' alleged injuries. And *second*, Plaintiffs have not shown or alleged that their PPP loans would be forgiven—making any payment insignificant. The Court disagrees.

As to the first assertion, the Court finds that the requested relief does not exceed Plaintiffs' alleged injuries. Plaintiffs plead multiple causes of action in the alternative—which they could do at this stage. Defendants—as a result—seek to improperly dive into the merits of

Plaintiffs' claims at a time when they only need to allege redressability in line with the claims they assert. *Cole*, 484 F.3d at 723.

As to the second assertion, it does not matter whether the loans are forgivable or not. In *Sprint Communications*, Justice Breyer—writing for the majority—held that an assignee had standing to sue even when the assignee was contractually obligated to remit the litigation proceeds to an assignor. *Sprint Communs. Co., L.P. v. APCC Servs.*, 554 U.S. 269, 286-87, 128 S. Ct. 2531, 2542 (2008). The majority opinion reasoned that redressability focuses on "whether the injury that a plaintiff alleges is likely to be redressed through the ligation—not on what the plaintiff ultimately intends to do with the money he recovers." *Id.* Redressability was met even though the plaintiff would be required to hot-potato the money away to a non-party immediately. *Id.*

Here, a legal victory would redress the injuries for which the Plaintiffs bring suit. Plaintiffs' injuries relate to the failure to receive the PPP loans they were entitled to after they received an SBA loan number. Indeed, one of the injuries alleged includes the debt now owed to the SBA by Plaintiffs. And if the Plaintiffs prevail, the fact that they might hot-potato any recovery to the SBA is irrelevant under current precedent.

Redressability is met. And having met all the elements of Article III standing, the Court next turns to Defendants' objections.

## B. Individual Defendants: Donnelly & Alpert

Donnelly and Alpert ("Individual Defendants") assert arguments and defenses related to their positions within the corporate framework of Crossroads and Capital Plus. The Court addresses each argument in turn.

Donnelly first asserts that this Court does not have personal jurisdiction over him. But before analyzing personal jurisdiction, the Court must address whether the fiduciary-shield doctrine applies to Donnelly.

1.  Fiduciary-Shield Doctrine

The fiduciary-shield doctrine prohibits a court from exercising personal jurisdiction over an individual whose only actions in the forum state were taken in the individual's capacity as a corporate representative—even if the court has personal jurisdiction over the corporation itself. *See Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985). But the fiduciary-shield doctrine is "removed if the individual's personal interests motivate his actions." *Lewis v. Fresne*, 252 F.3d 352, 359 n.6 (5th Cir. 2001). To prove this, a plaintiff must allege "individual participation in the unlawful conduct challenged in the Complaint." *Fed. Trade Comm'n v. Educare Ctr. Servs., Inc.*, 414 F. Supp. 3d 960, 980 (W.D. Tex. 2019). As a result, Plaintiffs must plead Donnelly's (1) individual participation in the unlawful conduct and (2) personal interest in the unlawful conduct.

The operative facts of the complaint allege Donnelly's individual participation:

- "[Donnelly] controlled and directed Crossroads's and CPF's PPP lending activities and directly participated in CPF's and Crossroads's violations and failure to fund the SBA-approved PPP loans at issue and personally profited therefore."[5]
- "Donnelly and Alpert controlled both Crossroads and CPF. Defendants Donnelly and Alpert also controlled and directed Crossroads's and CPF's PPP lending activities."[6]
- "As a direct and proximate result of defendants Donnelly's and Alpert's conduct, Plaintiffs and the Class have suffered and continue to suffer injury."[7]

The complaint also paints a picture rife with personal interest. Donnelly owned 37.8% of outstanding shares of a company where a $238.9 million dividend was up streamed from Capital Plus after profits went from $26 million to $997 million in one year. Donnelly personally earned $90,227,080 in dividends as a result. This qualifies as a personal

---

[5] ECF No. 1 at 62, 65
[6] ECF No. 1 at 58.
[7] ECF No. 1 at 59.

benefit. And combined with the context that Crossroads, through a small regional Community Development Financial Institution, processed more PPP loans than Bank of America, PNC Bank, TD Bank and Wells Fargo combined—despite similar financial incentives—also suggests that this was something beyond "business as usual."

The fiduciary-shield doctrine does not apply to Donnelly. So the Court turns to personal jurisdiction.

### 1. Personal Jurisdiction – Donnelly

Donnelly argues that this Court does not have personal jurisdiction over him because he is a nonresident of Texas and his only contacts with the state come in his official capacity with Capital Plus and Crossroads. The Court disagrees.

Federal courts sitting in diversity may exercise personal jurisdiction if: "(1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the due process guarantees of the United States Constitution." *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010). And because Texas's long-arm statute "extends as far as constitutional due process allows," courts only need to consider the due process inquiry. *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009).

This requires a plaintiff to show: (1) minimum contacts between the defendant and the forum state and; (2) that the assertion of jurisdiction is fair and reasonable. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, (1945); *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018). The Court thus addresses both elements.

### a. Minimum Contacts

While physical presence or residency are not required for personal jurisdiction, a defendant must have "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316.

A court may assert specific jurisdiction over a nonresident defendant "whose contacts with the forum state are singular or sporadic only *if* the cause of action asserted arises out of or is related to those contacts." *Int'l*

*Energy Ventures Mgmt. v. United Energy Grp., Ltd.*, 818 F.3d 193, 212 (5th Cir. 2016) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014)). The Court considers three prongs in making this determination:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).

The first prong requires that the contacts asserted are not "random, fortuitous, or attenuated." *Moncrief Oil, Int'l. Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007). But a single act by the defendant directed at the forum state can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted. *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 418 (5th Cir. 1993). This analysis must "look to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Put simply, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is a defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.*

Donnelly argues that his contacts with Texas are limited and sporadic. The Court disagrees.

Donnelly's conduct surrounding this suit directs and avails itself of the privileges of conducting business in Texas. Donnelly attended meetings in Texas, directed communications into Texas, and performed work for Texas entities[8] that served many citizens of Texas. Indeed, his

---

[8] Donnelly continues to serve as a manager and director of Capital Plus. *See* Texas Comptroller of Public Accounts, *Capital Plus Financial, LLC Report*, https://mycpa.cpa.state.tx.us/coa/coaSearchBtn.

Donnelly also serves as CEO, director, and board member of Crossroads which is headquartered in Dallas, Texas (¶ 26), and has served as CEO and director since December 2017. *See see also Texas Comptroller of Public Accounts, Crossroads Systems, Inc. Report*, https://mycpa.cpa.state.tx.us/coa/coaSearchBtn.

status as a "registered" agent for Capital Plus requires that he must "continuously maintain" a presence in the state and "maintain a business office at the same address as the entity's registered office." TEX. BUS. ORGS. CODE ANN. § 5.201. Notwithstanding his choice to live in a different state, these contacts are systematically intertwined with and avail himself to Texas. The first element is met.

The second prong requires "a connection between the forum and the specific claims at issue." *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017). At bottom, "there must be . . . [a related] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Ford Motor Co.*, 141 S. Ct. at 1025.

According to Plaintiffs' complaint, Donnelly—as the dual CEO of Crossroads and Capital Plus—orchestrated a plan to fund over 472,000 PPP loans. As a result, Donnelly's companies received over $930 million in loan processing fees. The complaint further alleges that Donnelly exercised significant control over Capital Plus and Crossroads and directed decisions on PPP lending. This included establishing corporate policies and supervising Capital Plus's PPP lending activities. Under Donnelly's direction, Capital Plus ratcheted up its participation in PPP lending to exploit higher lender fees and to use unfunded and other PPP loans as collateral to secure billions of dollars in PPPLF loan advances. Donnelly's contacts that avail him of Texas's privileges are intertwined with the facts that give rise to this suit. His position in a Texas company and direction and control over it are both the basis for his availment and central to the facts alleged in Plaintiffs' complaint.

Plaintiff thus meets its burden of satisfying the first two elements. Because of this, the burden now shifts to Donnelly to prove that it would be unfair to exercise personal jurisdiction over him. To meet this burden, the defendant must make a "compelling case" that exercising jurisdiction would be unfair. *See Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) ("[O]nce minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant."). Courts make the fairness determination by

assessing five factors: (1) the burden on the defendant having to litigate in the forum; (2) the forum state's interests in the lawsuit; (3) the plaintiff's interests in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies. *See Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 421 (5th Cir. 1993).

*First*, Donnelly notes that he travels to Texas for business and other matters. Additional trips for the occasional hearing or trial are not unduly burdensome. Indeed, Donnelly is litigating in this district already—in a case in which he did not challenge personal jurisdiction. *See Oto Analytics Inc. v. Capital Plus Fin. LLC*, Case No. 3:21-cv-2636 (N.D. Tex.) (Boyle, J.). And even if it were "inconvenient" for Donnelly to make the occasional trip to Fort Worth, "once minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant." *Wien Air Alaska, Inc.*, 195 F.3d at 215. *Second*, Texas is interested in protecting its consumers and ensuring that companies within its borders comply with its law. And this case involves allegations of harm done to Texas citizens by Texas companies. *Third*, Plaintiffs are interested in relief from harm allegedly done to them, and this forum is appropriate for redressing the harm. *Fourth*, the judicial system's interest is met as this Court affords a proper forum for this suit where alleged harms can be remedied. *Fifth*, the states share an interest in the efficient resolution of cases, especially ones that allegedly caused harm on a national scale.

All fairness factors thus favor personal jurisdiction. And the Court thus has personal jurisdiction over Donnelly.

## 2. Liability Shield – Alpert and Donnelly

The Individual Defendants next contend they should be dismissed from the case as their companies' liability shields cover them. The Court disagrees.

Under Texas law, the shareholder or affiliate of a corporation:

> may not be held liable to the corporation or its obligees with respect to . . . any *contractual obligation* of the corporation

or any matter relating to or arising from the obligation on the basis that *the holder, beneficial owner, subscriber, or affiliate* is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory.

Tex. Bus. Orgs. Code § 21.223(a)(2) (emphasis added).[9] An exception exists if the defendant "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate." *Id.* § 21.223(b).

Here, Donnelly and Alpert both fall into affiliate shareholder status. And because they fall into the text of the statute, the Court must address two things: (1) whether the claims against them "arise out of" or "relate to" a contractual obligation of the corporation; and (2) whether the complaint sufficiently alleges that the Individual Defendants perpetrated an actual fraud.

### i.    *"Relating to" or "arising out of"*

The first issue is whether the claims against Donnelly and Alpert "arise out of" or "relate to" a contractual obligation. The terms "relating to" and "arising out of" are broad and flexible and should be construed as such.

Plaintiffs assert that because they do not make any contractual claims against the Individual Defendants, the liability shield afforded by § 21.223(a)(2) does not apply. The Court disagrees.

Plaintiff's claims are noncontractual in nature and relate to three causes of action: unjust enrichment, the UCL, and the NCUDTPA. Plaintiffs allege that the Individual Defendants led, directed, and controlled their companies to engage in business practices leading to their unjust enrichment at the expense of the SBA and the loss of Plaintiffs. And while Plaintiffs attempt to creatively plead around the liability shield by claiming that they are only concerned with the dividend and SBA fees, it does not change the proximity of the

---

[9] Although § 21.223 refers only to corporations, Tex. Bus. Orgs. Code Ann. § 101.002(a) extends its reach to limited liability companies as well.

Individual Defendants' actions to the contractual issue. Plaintiffs' only tie to the SBA fees at issue is their contractual relationship with Capital Plus. At bottom, the gravamen of Plaintiffs' claims arise from the unfulfilled loans, which they assert is a breach of contract in the same complaint. Without this contractual relationship, Plaintiffs have no ground to stand on as to why the Individual Defendants were unjustly enriched or engaged in unfair business practices related to them. Thus, all of Plaintiffs' noncontractual claims relate to or arise from the conduct surrounding the unfulfilled loan agreements—which are contractual in nature.

Plaintiffs' claims fall under § 21.223(a)(2). And thus, for their claims against the Individual Defendants to survive, they must show that actual fraud is present.

### ii. *Actual Fraud & Direct Personal Benefit*

Evading limited liability requires a plaintiff to show that: "(1) the affiliate caused the corporation to be used to perpetrate and did perpetrate an actual fraud on the obligee; and (2) the fraud was primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate." *Thomas v. Hughes*, 27 F.4th 995, 1016 (5th Cir. 2022) (citing TEX. BUS. ORGS. CODE § 21.223(a)(2)).

"Actual fraud"—as required by § 21.223(a)(2)—is distinct from the tort of fraud and only requires a plaintiff to show "dishonesty of purpose or intent to deceive." *Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex. 1964); *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.). Because Rule 9(b) states that "conditions of a person's mind may be alleged generally," actual fraud is evaluated under Rule 12(b)(6) and not the more restrictive Rule 9 standard. *Weston Grp., Inc. v. Sw. Home Health Care, LP*, No. 3:12-CV-1964-G, 2014 WL 940329, at *2 (N.D. Tex. Mar. 11, 2014) (Fitzwater, J.). As a result, courts "may deduce fraudulent intent from all of the facts and circumstances." *Spring St. Partners*, 730 F.3d 427, 443 (5th Cir. 2013) (emphasis in original). And "courts generally look at the totality of a shareholder's actions to determine whether he committed actual fraud." *Weston Grp.*, 2014 WL 940329, at *2. Thus, "all that is required at the pleading stage is a

general allegation of [a defendant's] dishonest purpose or deceitful intent with respect to [the company] and its transactions." *AHBP LLC v. Lynd Co.*, No. SA-22-CV-00096-XR, 2023 WL 139149, at *7 (W.D. Tex. Jan. 9, 2023) (citing *Archer,* 390 S.W.2d at 740 (Tex. 1964)).

Defendants assert that Plaintiff does not plead actual fraud with enough specificity and only relies on a conclusory statement that Alpert and Donnelly "directed" and "controlled" the companies. The Court disagrees.

Considering the full context of the complaint and all allegations in it, actual fraud is met. Plaintiffs allege that Alpert and Donnelly "controlled and directed Crossroads's and CPF's PPP lending activities," including a lending scheme where the company acted "acted intentionally, knowingly, and maliciously" to maximize SBA fees and disregard loan obligations to Plaintiffs. ECF No. 65 at ¶¶ 303, 306. Indeed, despite having fewer resources than more prominent financial institutions, a modest regional LLC under Donnelly and Alpert's control managed to process a larger volume of PPP loans than Bank of America, PNC Bank, TD Bank, and Wells Fargo combined. This resulted in the approval of "472,036 PPP loans totaling over $7.5 billion in funds" in a very short time window. ¶¶ 9, 75, 79, 87, 90. And while Plaintiffs do not allege fraud in the complaint, the "overarching theme of the [Plaintiffs'] complaint, regardless of the accompanying legal labels," is that Alpert and Donnelly led and directed CFP and Crossroads to maximize fees in order to enrich themselves and other insiders in the company. *Gold Coast Commodities, Inc. v. Crum*, 68 F.4th 963, 969 (5th Cir. 2023). But doing so was at the detriment of those who applied for loans. Indeed, the only people enriched by the alleged scheme were insiders after issuing the dividend. And while Plaintiffs use no magic words in their complaint, "all the facts and circumstances" surrounding the conduct alleged support a finding of actual fraud.[10] *Latham*, 320 S.W.3d at 607

---

[10] S*ee also Spring St. Partners*, 730 F.3d at 445 (finding actual fraud where the context of the complaint showed that defendant created an LLC to shift assets and allowed the company's charter to lapse after litigation began); *In re Arnette*, 454 B.R. 663, 694–95 (Bankr. N.D. Tex. 2011) (holding that a party committed actual fraud by making material misrepresentations, failing to disclose important information, and never intending to comply with the terms of the parties' agreement); *Latham*, 320

("[A]ctual fraud means *conduct* involving either dishonesty of purpose or intent to deceive." (emphasis added)).

Personal benefit requires a plaintiff to plead that "funds derived from the corporations' allegedly fraudulent conduct were pocketed by or diverted to the individual defendant." *Bates Energy Oil & Gas v. Complete Oilfield Svcs.*, 361 F. Supp. 3d 633, 665 (W.D. Tex. 2019). If funds are only used for a corporation's benefit or are diverted to other ventures, a plaintiff's claim fails. *Id.*

Here, personal benefit is met for a hundred-million reasons. The Individual Defendants both received paydays in a quickly announced dividend—equal to nearly 80% of the outstanding share price at the time. Alpert (25%) and Donnelly (37.8%) together owned 62.8% of a company's outstanding shares where the $238.9 million dividend was quickly upstreamed and paid out to shareholders after the PPP window closed. In the end, Alpert and Donnelly collectively pocketed $149,918,480 in cash from the special dividend. This easily meets the standard of a personal benefit.

*   *   *

Because actual fraud is present in the context of Plaintiffs' complaint and the Individual Defendants personally benefited from their alleged conduct, the liability shield does not apply to the Individual Defendants, and they must face the claims brought against them.

The Court now addresses the jurisdictional and preliminary issues brought by the Corporate Defendants' motions.

## C. Capital Plus Financial & Crossroads

### 1. Alter Ego - Crossroads

Crossroads asserts that it must be dismissed from the case because they are a member of Capital Plus and shielded under limited liability.

---

S.W.3d at 610 ("A rational juror could also have decided Latham's contextual conduct represented dishonesty of purpose or an intent to deceive, *i.e.*, actual fraud.").

Federal district courts sitting in diversity must "apply the conflict of laws rule of the state in which it sits to determine which state's substantive law should be applied." Because the forum state is Texas, the Court applies Texas' conflict of laws to its alter ego analysis. Texas law dictates that the state of incorporation controls. *See* TEX. BUS. ORG. CODE ANN. § 1.104; *Alberto v. Diversified Grp. Inc.*, 55 F.3d 201, 203 (5th Cir. 1995). Where the claim seeks to hold a parent company liable for the obligations of a subsidiary, the subsidiary's state of incorporation provides the applicable law. See *ASARCO LLC v. Americas Min. Corp.*, 382 B.R. 49, 64–65 (S.D. Tex. 2007). And as Capital Plus—the subsidiary in this situation—is organized under the laws of Texas, the Court looks to Texas law.

As stated before, Texas law dictates that the shareholder or affiliate of a corporation "may not be held liable to the corporation or its obligees with respect to . . . any *contractual obligation* of the corporation or any matter relating to or arising from the obligation on the basis that *the holder, beneficial owner, subscriber, or affiliate* is or was the alter ego of the corporation." TEX. BUS. ORGS. CODE § 21.223(a)(2) (emphasis added).[11] To defeat this, Plaintiffs must show that a defendant "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate." *Id.* § 21.223(b).

Here, Crossroads is a shareholder/member, so the statute applies. So—once again—the Court must address two things: (1) whether the claims against them "arise out of" or "relate to" a contractual obligation of the corporation; and (2) whether the complaint sufficiently alleges that the Individual Defendants perpetrated an actual fraud.

### i.    "Relating to" or "arising out of"

The first issue is whether the claims against Crossroads "arise out of" or "relate to" a contractual obligation. As established in the section

---

[11] Although § 21.223 refers only to corporations, TEX. BUS. ORGS. CODE §101.002(a) extends its reach to limited liability companies as well.

dealing with the Individual Defendants, the claims asserted by Plaintiffs are contractual in nature.

As stated in depth before, the breach-of-contract claim is clearly contractual, and the other claims arise out of and relate to the alleged contractual relationship with Capital Plus.[12] At issue is the conduct surrounding the unfulfilled loan agreements—which are contractual in nature.

Plaintiffs' claims thus fall under § 21.223(a)(2). And for their claims against Crossroads to survive, they must show that actual fraud is present.

### ii.   *Actual Fraud & Direct Personal Benefit*

Once again, to evade limited liability a plaintiff to show that "(1) the affiliate caused the corporation to be used to perpetrate and did perpetrate an actual fraud on the obligee; and (2) the fraud was primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate." *Thomas*, 27 F.4th at 1016 (citing Tex. Bus. Orgs. Code § 21.223(a)(2)).

Crossroads asserts that Plaintiffs do not plead actual fraud with enough specificity and that they only rely on conclusory statements of regular business activity—insufficient to pierce the corporate veil of Capital Plus. The Court disagrees.

As stated before "actual fraud" requires a plaintiff to show "dishonesty of purpose or intent to deceive." *Archer*, 390 S.W.2d at 740; *Latham*, 320 S.W.3d at 607 (Tex. App.—Dallas 2010, no pet.). Courts "may deduce fraudulent intent from all of the facts and circumstances." *Spring St. Partners*, 730 F.3d at 443 (emphasis in original). And "all that is required at the pleading stage is a general allegation of [a defendant's] dishonest purpose or deceitful intent with respect to [the company] and its transactions." *AHBP LLC*, 2023 WL 139149, at *7 (citing *Archer,* 390 S.W.2d at 740). In a business-transaction context that might be routine in a vacuum, actual fraud can be inferred from the proximity or volume of transactions in context with other circumstances. *See Spring St.*

---

[12] *See supra* at p. 16.

*Partners*, 730 F.3d at 445 (finding actual fraud where the context of the complaint showed that defendant created an LLC to shift assets and allowed the company's charter to lapse after litigation began); *In re Arnette*, 454 B.R. at 694–95 (holding that a party committed actual fraud by making material misrepresentations, failing to disclose important information, and never intending to comply with the terms of the parties' agreement).

In *Weston Group*, the court found that a plaintiff's allegations were sufficient to plead actual fraud. *Weston Grp*, 2014 WL 940329, at *5. There the plaintiffs alleged that (1) a business promised to pay but never followed through, (2) an LLC was used to funnel money between different companies, and (3) the corporate defendant received government benefits that were supposed to go to plaintiffs but were funneled upstream to insiders instead. *Id.* The court reasoned that even though the regular movement of money between companies is not enough to plead actual fraud, the movements of money alongside the other allegations and circumstances "[rose] above the level of a conclusory description." *Id.* (citing *Shandong Yinguang Chem. Indus. Joint Stock Company, Ltd. v. Potter,* 607 F.3d 1029, 1032–33 (5th Cir. 2010)).

Like the pleadings in *Weston Group*, which alleged (1) unfulfilled payments, (2) upstreamed money, and (3) improperly used government benefits, here, Plaintiffs allege the same but on a grander scale. Plaintiffs allege that Crossroads exercised its control over Capital Plus and its PPP lending scheme. The primary purpose of the alleged plan was to maximize SBA fees to the detriment of loan obligations it owed to Plaintiffs. ECF No. 65 at ¶¶ 303, 306. Captial Plus approved "472,036 PPP loans totaling over $7.5 billion in funds" in a short time window. ¶¶ 9, 75, 79, 87, 90. Again, the "overarching theme of the [Plaintiffs'] complaint, regardless of the accompanying legal labels," is that Crossroads saw a window to maximize fees earned at the detriment of those who applied for loans to enrich itself and other insiders in the company. *Gold Coast Commodities*, 68 F.4th at 969. An awareness of the nearly half-a-million loan agreements was often noted in Crossroads financial statements and shareholder letters. And Crossroads also often

noted strategies and timelines on the company's policy toward these loans. So this was anything but a regular business transaction or transfer between parent and subsidiary—it was a transformational plan executed with the full knowledge and control of Crossroads.

Indeed, Crossroads's involvement in the PPP became the main event as it reported that "the Company' received $970.5 million in total revenue of which $930 million was PPP loan fees in 2021 compared to just $27.5 million in total revenue the prior year." ECF No. 1 at 4. The subsidiary LLCs' profits on the back of the PPP program dwarfed those of the parent corporation. It was a modern-day gold rush as Crossroads—knowing that many of Plaintiffs' loans remained unfunded—upstreamed hundreds of millions of dollars in PPP-related loan processing fees and PPPLF loan advances. And once the PPP window closed, Crossroads paid out a $238.9 million dividend to its insiders and kept the rest of the profit for the corporation's benefit.

Lastly, the funds at issue were not corporate funds owned by Crossroads. These funds were earned because of Capital Plus and Crossroads engaging in an emergency government benefit program. Plaintiffs allege that Crossroads kept fees for processing the loans and sat on PPPFL advances from the federal reserve and milked interest on the nearly $7.5 billion in cash it gained from that was intended to cover loan disbursements that Plaintiffs were entitled to. Plaintiffs even allege that the PPPFL funds were obtained by lying about loans that were never completed. Considering the full context of the complaint that alleges (1) unfulfilled payments, (2) upstreamed money, (3) a wild lending spree that overhauled the nature of Crossroads's business model, and (4) improperly used government programming funds, actual fraud is met.

Again, Personal benefit requires a plaintiff to plead that "funds derived from the corporations' allegedly fraudulent conduct were pocketed by or diverted to the individual defendant." *Bates Energy Oil & Gas v. Complete Oilfield Svcs.*, 361 F. Supp. 3d 633, 665 (W.D. Tex. 2019). If funds are only used for a corporation's benefit or are diverted to other ventures, a plaintiff's claim fails. *Id.*

As discussed above, personal benefit is met for a hundred-million reasons present in Crossroads' income statements and its insiders' bank accounts.

*   *   *

Because actual fraud is present in the context of Plaintiffs' complaint and Crossroads personally benefited from its alleged conduct, the liability shield does not apply, and it must face the claims brought by Plaintiffs.

### 2. Statutory Standing - Negotiable Instruments & Breach of Contract

Defendants next argue that Plaintiffs lack statutory standing to sue for breach of contract because the contract is a negotiable instrument held by Defendants.

A negotiable instrument is created where there is "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order." TEX. BUS. & COM. CODE § 3.104(a). Only holders of negotiable instruments may enforce their terms. *Id.* § 3.301; *see also Maldonado v. CitiMortgage, Inc.*, 676 F. App'x 282, 284 (5th Cir. 2017). Because Capital Plus is the holder of the agreement, if it is negotiable, Plaintiffs will be unable to enforce it.

Plaintiffs assert that the note is not a negotiable instrument because it is forgivable, thus calling the fixed nature of the note into question. They are correct.

Notes are not negotiable where there is uncertainty as to the amount or where they incorporate methods that establish the value of the note and its forgivability from outside the agreement. *See Cobb Bank & Tr. Co. v. Am. Mfrs. Mut. Ins.,* 624 F.2d 722, 725 (5th Cir. 1980) (holding that the instrument was not negotiable where the amount to be paid was uncertain); *Fed. Deposit Ins. Corp. v. Eagle Props., Ltd.*, 664 F. Supp. 1027, 1035 (W.D. Tex. 1985) (note is not negotiable if a "provision leaves a possibility of reduction in the amount collectible on the note"); *FFP Mktg. Co. v. Long Lane Master Tr. IV*, 169 S.W.3d 402, 408 (Tex. App.

2005—Fort Worth 2005, no pet.) (note is not negotiable where "one cannot determine from the face of [the] note the extent of the maker's liability"); *Hinckley v. Eggers*, 587 S.W.2d 448, 451 (Tex. Civ. App. 1979—Dallas 1979, no writ) (note is not for a fixed amount where the amount to be paid could only "be determined only from sources outside the instrument").

The centrality of forgiveness to the nature of the PPP loan process meets this uncertainty. And while Defendants assert that all notes are forgivable at the holder's discretion, they again fail to distinguish the unique posture of PPP loans. As other courts have noted, "forgiveness is the essential characteristic of the debtor's obligation under the PPP Note and the PPP requirements. But for forgiveness, there is no PPP." *In re Parking Mgmt.*, 620 B.R. 544, 558 (Bankr. D. Md. 2020). Indeed, "[t]he debtor's liability to repay the PPP relies on some future extrinsic event which may never occur." *Id.* (cleaned up). And the agreement is "subject to a triggering event or occurrence reasonably contemplated by the debtor and creditor at the time the debtor applied for and obtained the PPP funds." *Id.*

On top of the amount being uncertain, the note is not unconditional. A promise is not unconditional if a promissory note incorporates other provisions. *See Resol. Tr. Corp. v. 1601 Partners, Ltd.*, 796 F. Supp. 238, 239-40 (N.D. Tex. 1992) (Sanders, J.) ("[W]hen an instrument incorporates by reference the terms of another document the … promise contained within the instrument, therefore, is rendered conditional."). Here, the entire forgiveness or partial forgiveness mechanism associated with the PPP loans came from agency rulemaking that fell outside the promissory note and had the potential to change any minute the SBA issued a new guidance. So the terms that make the note uncertain as to the amount also make the note conditional.

Defendants' objections on statutory standing are meritless.

3. <u>Breach of Contract</u>

Crossroads and CFP assert that the documents signed by Plaintiffs do not give rise to a contractual obligation because they were unilateral and binding only on Plaintiffs. The Court disagrees.

Documents "executed at the same time, with the same purpose, and in the course of the same transaction, [are] construe[d] . . . together." *NC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 216 (5th Cir. 2009). And "[i]t is well settled that courts must enforce the unambiguous language in a contract as written, and the applicable standard is the objective intent evidenced by the language used, rather than by the subjective intent of the parties." *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 845 (5th Cir. 2004) (citations omitted).

Capital Plus executed a "Notice – No Oral Agreements" clause, which refers to the notes as a "Loan Agreement." It then defines "Loan Agreement" as "one or more promises, promissory notes, agreements . . . pursuant to which a financial institution *loans* . . . or *agrees to loan money*." ECF No. 4 at 10. Further, the SBA PPP lending rule was incorporated into the documents governing the contract. The lending rule states: "[t]he lender *must* make a one-time, full disbursement of the PPP loan within 10 calendar days of loan approval; for the purposes of this rule, a loan is considered approved when the loan is assigned a loan number by SBA." 86 FED. REG. 3692, 3710. Taken together, the documents contain unambiguous language that provides CFP a duty to disburse funding upon issuing an SBA number—regardless of CFPs subjective intent surrounding the agreement.

Plaintiffs have a proper breach-of-contract claim.

### 4. Release

Defendants next contend that Plaintiffs' contractual claims are barred by a validly signed release covering all claims brought under the "loan agreement." The parties collectively whiffed on briefing this issue. Plaintiffs claim that the release didn't include future acts, and Defendants claim that the release was a complete forfeiture of all claims stemming from the agreement. And yet, neither party recognizes the unique relationship embedded in this specific contract.

Texas law holds that "parties have the right to contract as they see fit as long as their agreement does not violate the law *or* public policy." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004). And "it is by now axiomatic that legislative enactments generally

establish public policy." *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 504 (Tex. 2015). So when lawmakers impose a statutory restriction, "the issue for the courts is whether the contract violates the statute, not whether it violates public policy." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 771 (Tex. 2011) (discussing whether the contract meets statutory "requirement for enforceability under the Act"); *see also Woolsey v. Panhandle Ref. Co.*, 131 Tex. 449, 116 S.W.2d 675, 678 (Tex. 1938) ("[A]n agreement which violates a valid statute is illegal and void.").

The Court thus identifies the issue here as "whether public policy embedded in [the PPP program and SBA Lending Rules] precludes enforcement of [the exculpatory clause]." *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016).

While private parties can contract around many laws, Texas looks to their relationship to determine whether the provisions violate public policy. *Crowell v. Hous. Auth. of Dall.*, 495 S.W.2d 887, 889 (Tex. 1973). Courts regularly enforce exculpatory agreements between private persons of equal bargaining strength. *Id.* But when one party has substantially less bargaining power in the relationship, the exculpatory agreement will be declared void. *Id.*

In *Crowell*, the Texas Supreme Court held that an exculpatory clause exempting the Dallas Housing Authority ("DHA") from premises liability was against public policy. *Crowell*, 495 S.W.2d at 889. The court reasoned that because the DHA's legislative purpose rested on providing safe dwelling accommodations to low-income families, the provision directly violated the nature of the statutory relationship between the contracting parties. *Id.*; *see also Lone Star Gas Co. v. Veal*, 378 S.W.2d 89, 93 (Tex. Civ. App.—Eastland 1964, writ ref'd n.r.e.) (holding that exculpatory clause invalid where a public utility contracted out of liability for negligence in the performance of public service).

Like the DHA—a creature of specific legislative enactment—Capital Plus was a component of a government assistance program and not a freewheeling lender. For PPP loan agreements, there is no customization or negotiation of the core terms of the agreement because

it is prescribed by statute. Plaintiffs could not take to the marketplace to hunt down a better rate or deal. Indeed, Capital Plus's only job was mechanical—to approve or deny the loan and then release the funds. And while the exculpatory clause may cover conduct outside the regulation, its primary function reserves the right to directly violate statutorily enacted public policy—the only basis for the relationship between Capital Plus and Plaintiffs.

Thus, the exculpatory clause is void.

5. <u>Damages</u>

Defendants next argue that Plaintiffs' claims should be dismissed because they inconsistently or improperly pleaded the damages they are allegedly entitled to. The Court disagrees.

A 12(b)(6) motion concerns causes of action, not remedies. So "[w]hether a claim for relief should be dismissed under Rule 12(b)(6) turns not on whether all of the relief asked for can be granted, but whether the plaintiff is entitled to any relief." *Mott's, LLP v. Comercializadora Eloro, S.A.*, 507 F. Supp. 3d 780, 791 (W.D. Tex. 2020). And courts "have consistently interpreted [Rule 8] to allow a plaintiff any relief that the pleaded claim supports; requesting an improper remedy is not fatal." *Laird v. Integrated Res., Inc.*, 897 F.2d 826, 841 (5th Cir. 1990). Indeed, "[I]t need not appear that the plaintiff can obtain the particular relief prayed for in the complaint, as long as the district judge can ascertain from what has been alleged that some relief may be granted by the court." *Mott's*, 507 F. Supp. 3d at 791 (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)).

At this stage, Plaintiffs can plead alternative causes of action with different damage theories. And while some are debatably wrong, (1) this is not the time to address them, and (2) they are not fatal to Plaintiffs claims.

### D. All Defendants

#### 1. <u>Unjust Enrichment</u>

Plaintiffs state a claim for unjust enrichment against all Defendants due to the millions of SBA fees the Corporate Defendants received and the dividend payments the Individual Defendants received. They argue that because Defendants received the fees associated with processing their loans from the SBA and never disbursed the money, this entitles them to restitution. This argument misses the whole point of unjust enrichment.

Unjust enrichment requires a party to make restitution to another if they have been enriched *at the other party's expense. See Penick v. Penick*, 783 S.W.2d 194, 197 (Tex. 1988) ("one receiving benefits which are unjust for him to retain ought to make restitution or pay the value of the benefit to the party contributing the benefit.") This means that the benefit received by a defendant must come directly from a plaintiff. *Id.* Unjust enrichment does not operate on a but-for-causation benefit scheme, the benefit must be directly conferred. *Id.*

Here, Defendants were enriched from the fees they obtained from processing loan applications. These fees came directly from the government, not from Plaintiffs. And this rule is the same in every state from which Plaintiffs bring a claim.[13] Therefore, Plaintiffs conferred no benefit or enrichment. Therefore, Plaintiffs' unjust enrichment claims fail.

Plaintiffs' unjust enrichment claims are thus **DISMISSED**.

---

[13] *See First Union Nat. Bank*, 168 S.W.3d 917, 931 (Tex. App.—Dallas 2005, no pet.); *Hartness v. Nuckles*, 2015 Ark. 444, 475 (2015); *D.W.H Painting* Co., Inc. *v. D.W. Ward Constr. Co., Inc.*, 174 N.C.App. 327, 334 (2005*); State v. Ariz. Pension Planning*, 154 Ariz. 56, 58 (1987) (en banc); *Small v. Badenhop*, 67 Haw. 626, 636 (1985).

In addition to other states not recognizing claims where a benefit is not conferred by the plaintiff, California does not recognize unjust enrichment claims at all. Therefore, the California subclass claim fails under this theory were California law to apply. *See Hooked Media Grp., Inc. v. Apple, Inc.*, 55 Cal.App.5th 323, 336 (2020)

2.  North Carolina Unfair and Deceptive Trade Practices Act

Defendants next argue that Plaintiff failed to bring a proper claim under the NCUDTPA. The Court disagrees.

The NCUDTPA states that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. GEN. STAT. ANN. § 75–1.1(a). In applying North Carolina law, federal district courts in the Fifth Circuit are bound by the North Carolina Supreme Court's decisions. *Camacho v. Ford Motor Co.*, 993 F.3d 308, 311 (5th Cir. 2021). And when interpreting a North Carolina statute, we use the same methods of statutory interpretation used by the North Carolina Supreme Court. *Id.*

To establish a claim for unfair trade practices under the NCUDTPA, a plaintiff must meet three elements: (1) that the defendant committed an unfair or deceptive act or practice; (2) that the action was in or affecting commerce; and (3) that the act proximately caused injury to the plaintiff. *Dalton v. Camp*, 353 N.C. 647, 656–57 (2001) (citation omitted).

As to the first element, "[a] practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Id.* (citing *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987)). Determining whether an act is unfair or deceptive is a question of law for the court. *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68 (2000).

Whether the Court uses the words unfair, deceptive, unethical, or unscrupulous, the facts before it meet this standard. Plaintiffs allege that in a national crisis—where Congress entrusted private actors with approving PPP loans—Alpert and Donnelly controlled and directed Capital Plus and Crossroads to process an unattainable number of applications designed to skim fees off the top. They allegedly did this while owning a majority of the company's outstanding shares. And the second the PPP window closed, Alpert and Donnelly paid themselves millions in dividends while thousands of loans remained unprocessed—

leaving businesses hung out to dry in their time of need. These facts on the face of the complaint mean that the first element is met.

As to the second element, "in or affecting commerce," the statute defines "commerce" inclusively as "business activity, however denominated." § 75-1.1(b). But from this expansive definition, the North Carolina Supreme Court has somehow gathered that "[the Act] is not intended to apply to all wrongs in a business setting." *Dalton*, 353 N.C. at 658. Business activities that fall beyond the statute's scope include professional services, most employer-employee disputes, and securities transactions. *Id.* This is because the Act concerns only two types of business transactions: "(1) interactions between businesses, and (2) interactions between businesses and consumers." *Nobel v. Foxmoor Grp.*, 380 N.C. 116, 121 (2022).

This case fits neatly into the second category as it involves an interaction between a private company and a large class of individual consumers. And because the conduct here falls within the statute's scope, the second element is met.

Turning to the third element, the Act requires more than just proving simple causation. It also requires that "some type of egregious or aggravating circumstances must be alleged" for the Act's provisions to take effect. *Dalton*, 353 N.C. 647, 656–57 (2001).

Plaintiffs properly allege that the act was partly caused by Alpert and Donnelly because they controlled and directed the Crossroads and Capital Plus. And the facts and allegations contained in the complaint are egregious and aggravating. At risk of sounding repetitive, hundreds of thousands of loans remained unprocessed while the Corporate Defendants and insiders were enriched by a large dividend earned by approving an absurd amount of loans. Holding the facts alleged by Plaintiffs as true, this was an egregious abuse of private and public trust.

Plaintiffs have a valid NCUDTPA claim.

### 3. California Unfair Competition Law

Defendants next argue that Plaintiffs failed to bring a proper claim under California's Unfair Competition Law ("UCL"). The Court disagrees.

Once again, in diversity cases, courts must apply state substantive law and federal procedural rules. *Camacho*, 993 F.3d at 311. State statutes promulgated by the California legislature—like the UCL—are substantive. *Id.* In applying California law, federal district courts in the Fifth Circuit are bound by the Supreme Court of California's decisions. *Id.* And when interpreting a California statute, we use the same methods of statutory interpretation used by the Supreme Court of California. *Id.*

The UCL prohibits "unlawful, unfair or fraudulent" business practices. CAL. BUS. & PROF. CODE § 17200. Each of these three categories come with their own requirements. Here, Plaintiffs only allege (1) "unlawful" and (2) "unfair" conduct. The Court thus addresses both.

### i.    *"Unlawful" Business Practices*

Defendants argue that Plaintiff fails to state a claim for unlawful business practices under the UCL. The Court disagrees.

To be "unlawful," the UCL requires a plaintiff to allege a business practice that resulted in the independent violation of "any law." See *Hamilton v. Bank of Blue Valley*, 746 F. Supp. 2d 1160, 1180 (E.D. Cal. 2010) ("The UCL 'borrows' violations of other laws and treats them as unlawful practices independently actionable."). Under this broadly drawn statute, "[a] business act or practice is unlawful under the [UCL] if it violates a rule contained in some other state or federal statute." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1673 (2017) (citing *Rose v. Bank of Am., N. A.*, 57 Cal. 4th 390, 396 (2013)). And the predicate laws in question can be "civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made." *See Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (cleaned up).   In short, an alleged

violation of almost any law—save the law of the jungle—is enough to state a claim.

Defendants assert that Plaintiffs failed to allege a predicate violation of another law because a breach-of-contract claim does not provide an independent violation of a law unless there is an independent basis to make the breach unlawful. *See Sybersound Recs.,* 517 F.3d at 1152. But Plaintiffs correctly argue that they properly pleaded a regulatory violation—existing independent of their contractual relationship.

Plaintiffs' complaint points to a violation of the SBA "lending rule." The rule states: "[t]he lender *must* make a one-time, full disbursement of the PPP loan within 10 calendar days of loan approval; for the purposes of this rule, a loan is considered approved when the loan is assigned a loan number by SBA." 86 FED. REG. 3692, 3710 (emphasis added).

Because a predicate law can be regulatory[14] in nature, Plaintiffs maintain a valid UCL claim for unlawful business practices.[15] *See Sybersound Recs.,* 517 F.3d at 1151.

### ii.   *"Unfair" Business Practices*

Defendants next argue that Plaintiffs fail to state a claim for an unfair business practice under the UCL. They are wrong.

There is a current three-way split in California appellate courts as to what constitutes an "unfair" business practice in the consumer context. *See Nationwide Biweekly Admin., Inc. v. Superior Court,* 9 Cal. 5th 279, 284 (2020) (acknowledging the split among the appellate courts but declining to resolve it). So this Court must make an *Erie* guess as to which test the Supreme Court of California would adopt.

---

[14] Defendants' contention that this interim final rule issued by the SBA does not qualify as a law under the UCL is incorrect. Administrative rule making is a valid predicate law under the UCL. *See Sybersound Recs.,* 517 F.3d at 1151.

[15] The Complaint also alleges a violation of the NCUDTPA—which is a state enacted law. *See Sandoz Inc.,* 137 S. Ct. 1664, 1673 (2017). Though not raised by either party, this is arguably enough to state a valid and independently actionable UCL claim. So, in a strange way, one poorly drawn statute—plagued with vagueness—could give rise to another.

*Erie* guesses "treat state intermediate courts' decisions as the strongest indicator of what a state supreme court would do, absent a compelling reason to believe that the state supreme court would reject the lower courts' reasoning." *Kelly v. Nichamoff*, 868 F.3d 371, 375 (5th Cir. 2017). But an *Erie* guess may also consider the following factors:

> (1) decisions of the state supreme court in analogous cases, (2) the rationales and analyses underlying state supreme court decisions on related issues, (3) dicta by the state supreme court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which state courts look when formulating substantive law[,] and (7) other available sources, such as treatises and legal commentaries.

*Weatherly v. Pershing, L.L.C.*, 945 F.3d 915, 920 (5th Cir. 2019), *cert. denied*, 141 S. Ct. 236 (2020).

Many of these factors offer little help—California appellate and lower courts are split more than three ways on the issue, the Supreme Court of California has so far ducked resolving the issue, and treatises acknowledge the split with no resolution. But the "rationales and analyses underlying state supreme court decisions on related issues" highlight how broadly the California Supreme Court is willing to interpret this statute. As a result, this Court will turn to the statute's text and utilize "the same methods of statutory interpretation used by the California Supreme Court" to interpret the text of the UCL. *Id.* After this, the Court will determine which test has the most fidelity to the text of the UCL.

It does not appear that the Supreme Court of California has any consistent principles of statutory interpretation beyond pondering the orb of legislative history. *See Almond All. of Cal. v. Fish & Game Com.*, No. S275412, 2022 Cal. LEXIS 5573, at *2 (Sep. 21, 2022) (denying review of appellate court opinion finding that bumble bees were fish); *Ferra v. Loews Hollywood Hotel, LLC*, 11 Cal. 5th 858, 879 (2021) ("[C]anons of construction . . . will not be applied so as to defeat the underlying legislative intent otherwise determined."). Indeed, the court has embraced the chaotic results of "divining" legislative intent from

whatever sources are available—even where it leads to an absurd result contrary to the text:

> Careful analysis of a statute to divine legislative intent can sometimes yield results that might seem surprising at first blush. Courts engaged in this task have interpreted "less" as "more" and "unlawful" as "lawful." Long ago, the United States Supreme Court concluded that the "seas" referenced in one statute required no water at all; quite recently, it determined that a fish is not a "'tangible object.'"

> These kinds of seemingly illogical outcomes can in fact best capture the enacting Legislature's intent in a variety of circumstances. A statute may be construed in a manner that goes beyond the literal meaning of its text to avoid an absurd result the Legislature could not possibly have contemplated.

*Almond All. of Cal.*, 2022 Cal. LEXIS 5573, at *2 (cleaned up). And while this Court strongly disagrees with this judicial philosophy, it will do its best to implement and impersonate it here.[16]

The UCL is all about equity. In the Supreme Court of California's decisions applying the UCL, it consistently emphasizes that "the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable . . . new schemes which the fertility of man's invention would contrive." *Barquis v. Merchants Collection Ass'n*, 7 Cal. 3d 94, 112 (1972) (cleaned up). This means that "[w]hen a scheme is evolved which on its face violates the

---

[16] Rather than looking to the one thing that the legislature adopted—the text—Courts who adopt this philosophy find themselves reviewing everything besides that which was agreed and voted on. While this method requires judges to pretend that the legislature contains some Borg-like consciousness, it usually results in picking and choosing whatever fits a judge's sensibilities. Justice Scalia noted that:

> [L]egislative history has facilitated rather than deterred decisions that are based upon the courts' policy preferences, rather than neutral principles of law . . . . In any major piece of legislation, the legislative history is extensive, and there is something for everybody. As Judge Harold Leventhal used to say, the trick is to look over the heads of the crowd and pick out your friends. The variety and specificity of result that legislative history can achieve is unparalleled.

Antonin Scalia, A MATTER OF INTERPRETATION 21 (1997).

fundamental rules of honesty and fair dealing, *a court of equity* is not impotent to frustrate its consummation because the scheme is an original one." *Id.* at 112. And "there is a maxim as old as law that there can be no right without a remedy, and in searching for a precise precedent, *an equity court* must not lose sight, not only of its power, but of its duty to arrive at a just solution of the problem." *Id.* The California Supreme Court states a court's role in equity as follows:

> [Equity is] much more elastic and capable of expansion and extension to new cases than the common law. Its very central principles, its foundation upon the eternal verities of right and justice, its resting upon the truths of morality rather than upon arbitrary customs and rigid dogmas, necessarily gave it this character of flexibility, and permitted its doctrines to be enlarged so as to embrace new cases as they constantly arose. It has, therefore, as an essential part of its nature, a capacity of orderly and regular growth—a growth not arbitrary, according to the will of individual judges—but in the direction of its already settled principles. It is ever reaching out and expanding its doctrines so as to cover new facts and relations, but still without any break or change in the principles or doctrines themselves.[17]

*Nationwide Biweekly*, 9 Cal. 5th at 300. Indeed, "the flexible equitable powers of the modern trial judge derive from the role of the trained and experienced chancellor and depend upon skills and wisdom acquired through years of study, training and experience which are not susceptible of adequate transmission through instructions to a lay jury." *Id.*

---

[17] "Men should use common words to say uncommon things, but they do the reverse. We find them trying to envelop trivial ideas in grand words and to dress their very ordinary thoughts in the most extraordinary expressions and the most outlandish, artificial, and rarest phrases. Their sentences perpetually stalk about on stilts. [They] delight in bombast, and to their writing generally in a grand, puffed-up, unreal, hyperbolical, and acrobatic style." Arthur Schopenhauer, *Essays of Schopenhauer – "On Authorship and Style"* 150 (1890).

To put this passage on equity commonly, judges can do whatever they want when sitting in equity so long as the subjective taste of the judges who review their work agree with them as well.

After engaging with this flexible understanding of the law, the Court now turns to the three tests before it—analyzing which one best fits this judicial philosophy.

The *first* test—adopted by the Supreme Court of California in cases between direct competitors—boxes the definition of "unfair" into a small corner. This is because it requires the business conduct to violate antitrust or "the spirit" of antitrust law. *See Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 939 (2003). But the UCL was "intentionally framed in its broad, sweeping language, precisely to enable *judicial tribunals* to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Barquis*, 7 Cal. 3d at 112. Applying this narrow definition in all consumer cases would extinguish numerous actions based on unfair business practices. This would allow companies to fly above the great penumbras of the UCL—enacted to give little clarity and to allow judges maximum leeway to channel the spirit of the great muses of justice outside of "arbitrary customs and rigid dogmas." *Nationwide Biweekly*, 9 Cal. 5th at 300. The first test does not apply as it intrudes on the divinely appointed territory of the "great chancellor" to determine right and wrong.[18] *Id.*

Under the *second test*, courts apply the definition of "unfair" from Section 5 of the Federal Trade Commission Act ("FTCA"). *See Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006). This requires the plaintiff to prove three elements: (1) that the consumer injury is substantial; (2) that the injury is not outweighed by any countervailing benefits or consumers or competition; and (3) that it must be an injury that consumers themselves could not reasonably have avoided. *Id.* Such a constricting definition would chain down the "eternal verities of right and justice" and allow the "fertility of man's invention" to scheme of ways to escape the divine fate of justice. *Barquis*, 7 Cal.3d at 112. Thus, a rigid application of elements made with mere words

---

[18] The Court notes that some circuits that apply this test also allow a violation of statutory or administrative laws. However, the Court still finds this standard too restrictive given the California Supreme Court's comments on the purpose and meaning of the statute.

would despoil the lofty cause of the legislature—bringing it earthbound. The second test does not apply.[19]

Under the *third* test, an act or practice is "unfair" when it "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Smith v. State Farm Mutual Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001); *see also Ticconi v. Blue Shield of California Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 539 (2008); *Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138, 1156 (2018). This test simply restates the words of the UCL. And it remains flexible enough for judges to continue "reaching out and expanding its doctrines so as to cover new facts and relations." *Nationwide Biweekly*, 9 Cal. 5th at 300. After all, what is unfair? What is injurious? What is unethical? What is public policy? These decisions are not for ordinary men to make. Nay, they are for "the trained and experienced chancellor . . . [with] skills and wisdom acquired through years of study, training and experience which are not susceptible of adequate transmission through instructions to a lay jury." *Id.* And this test keeps skyward the ethereal wings of the legislature's intent, laying waste to any "arbitrary customs and rigid dogmas" such as elements, factors, or a predictable application of the law over time. *Id.*

Having adopted the third test in line with the Supreme Court of California's reasoning, the Court now analyzes Defendants' alleged conduct to see if it was substantially injurious, unethical, or against public policy.

Defendants alleged conduct was against public policy as it violates the federally enacted PPP program's intended benefit. Defendants' alleged conduct was also injurious. By ignoring loan obligations and refusing to disburse the funds the individuals were entitled to, Plaintiffs

---

[19] The Court further notes that even if the California Supreme Court adopted the FTCA test, its elements are still met. Plaintiffs' injuries are substantial because they are deprived of funds they are entitled to and must pay them back. There are no countervailing benefits to consumers or competition as this was a government program and other lenders were not able to process loans as a result of Capital Plus's aggressive lending practices. And lastly, consumers could not have reasonably avoided the mistake as Capital Plus was a credible lender under the PPP program.

businesses were harmed, and they remain on the hook for the needed payments they never received. *See Gibson v. World Sav. & Loan Assn.*, 103 Cal. App. 4th 1291, 1306–1307 (2002) (holding that a lender's failure to comply with trust-deed provisions was an unfair business practice). Lastly, Defendants' alleged conduct was also unethical. Scheming to keep government fees and shirking statutorily enacted responsibilities to disburse loans to individuals is unethical and violative of the public and private trust even under a narrow textualist reading of the UCL.

Plaintiffs thus state a valid UCL claim for unfair business practices against all Defendants.

## CONCLUSION

Defendants make many arguments in their defense that may be true but cannot be considered at this stage in the case. These issues are appropriately resolved at the summary judgment stage.

Bound by precedent, Defendants' Motions to Dismiss (ECF Nos. 31, 34, 36) are **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' unjust enrichment claims against all Defendants are **DISMISSED**. And to the extent Defendants seek to dismiss any other claims, their motions are **DENIED**.

**SO ORDERED** on this **6th day of September 2023.**

**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE